**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| The Narragansett Electric Company,<br>Plaintiff,<br>v.<br>Constellation Energy Commodities Group, Inc.,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>) | C.A. No. 06-404S |

**MOTION OF CONSTELLATION ENERGY COMMODITIES GROUP, INC. TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

Constellation Energy Commodities Group, Inc. ("Constellation") moves this Court pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss all counts of the complaint filed by The Narragansett Electric Company ("NEC") over the parties' four wholesale power purchase agreements. As set forth in the attached memorandum, the Court should dismiss NEC's complaint for lack of subject matter jurisdiction or failure to plead a claim on which relief can be granted. Alternatively, should the Court determine dismissal is not warranted, the Court should compel arbitration and stay these proceedings in the meantime.

Dated: October 23, 2006

Respectfully Submitted,

/s/ Stacey P. Nakasian

Stacey P. Nakasian, Esq. (Bar No. 5069)
Duffy Sweeney & Scott, LTD.
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700-Phone
(401) 455-0701-Fax

Kenneth W. Irvin (Pro Hac Vice pending)
Teresa M. Goody (Pro Hac Vice pending)
McDermott Will & Emery, LLP
600 13th Street, N.W.
Washington, DC 20005-3096
Tel: 202.756.8116
Fax: 202.756.8087

*Attorneys for Defendant*
*Constellation Energy Commodities Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 23rd, 2006, I electronically filed the foregoing *Motion to Dismiss* with the Clerk of the Court for the District of Rhode Island using the ECF System which will send notification to the following registered participants of the ECF System as listed on the Court's Notice of Electronic Filing:

Gerald J. Petros
Robin L. Main
Hinckley Allen & Snyder, LLP
50 Kennedy Plaza
Providence, RI 02903

/s/ Stacey P. Nakasian

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| The Narragansett Electric Company, Plaintiff, | ) | |
| v. | ) | C.A. No. 06-404S |
| Constellation Energy Commodities Group, Inc., Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

Constellation Energy Commodities Group, Inc. ("Constellation") moves this Court pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss all counts in the complaint filed by The Narragansett Electric Company ("NEC") over the parties' four wholesale power purchase agreements (the "PPAs").[1] Alternatively, if the Court determines dismissal inappropriate, the Court should compel arbitration and stay these proceedings.

## INTRODUCTION

NEC brought suit against Constellation, styling its complaint as one for a "declaratory judgment" that Constellation cannot shift to NEC certain increased costs for performing the PPAs. As set forth below, this Court lacks subject matter jurisdiction because the gravamen of NEC's complaint requires the Court to abrogate the parties'

[1] NEC is the successor by merger to Blackstone Valley Electric Company and Newport Electric Corporation—the original Rhode Island parties to the two PPAs executed in 1998. Constellation is the successor by name change to Constellation Power Source, Inc. Eastern Edison Company merged into an affiliate of NEC and the portion of 1998 Contracts concerning Eastern Edison ended in 2005.

express "Change in Law or Market Rules" covenant in each of the PPAs. That covenant embodies a clear, binding promise by the parties to negotiate in good faith an equitable adjustment to the PPAs following regulatory change (like the one at hand), and only the Federal Energy Regulatory Commission ("FERC") has jurisdiction to grant relief abrogating that contractual right. Accordingly, this Court lacks subject matter jurisdiction because FERC enjoys exclusive jurisdiction to grant the relief NEC truly seeks—contract reformation.

Even accepting NEC's claim as one for an interpretation of the PPAs and the Settlement Agreement,[2] the complaint still fails to state a claim on which relief can be granted. Contrary to NEC's allegation, the Settlement Agreement, on its face, does not divest Constellation of its contractual right to an equitable adjustment. Moreover, only FERC could grant that relief upon a finding in accordance with the *Mobile-Sierra* doctrine—which FERC has not made. NEC's complaint makes the conclusory allegation that Constellation "waived" its rights, but fails to plead legally sufficient grounds for establishing Constellation's assent (orally or in writing) to abrogate its contractual right to an equitable adjustment. All the PPAs stipulate that the failure of any party to enforce any right shall not constitute a waiver, and the 2001 and 2002 PPAs explicitly require a writing signed by the parties to modify those contracts. Consequently, the complaint does not allege any cognizable basis for declaring that Constellation has no right to an equitable adjustment.

---

[2] *See Devon Power LLC*, 115 FERC ¶ 61,340 at P 71 (2006) ("FERC Order," attached as Ex. F). Copies of the FERC Settlement and "Explanatory Statement," and FERC's June 16, 2006 Order accepting that settlement are available via the FERC's website www.ferc.gov under Docket Nos. ER03-563. For the Court's convenience copies are attached as Exhibits E and F.

Finally, if the Court determines dismissal is inappropriate, pursuant to the mandatory alternative dispute resolution provisions specified in the PPAs and the Federal Arbitration Act ("FAA"), the Court should compel NEC to negotiate in good faith and arbitrate (should negotiations fail), and stay these proceedings. As NEC's complaint admits, the Settlement Agreement effected material changes to the law and market rules governing the supply of "capacity," which triggered the parties' covenant to negotiate an equitable adjustment to the PPAs "to maintain, as closely as possible, the intent and substance of the allocation of rights and obligations."[3] That covenant directs the parties to negotiate in good faith and, failing that, "to submit the matter to arbitration."[4] On August 1, 2006, Constellation duly invoked the right to negotiate an equitable adjustment, but rather than fulfilling its promise to negotiate in good faith (and arbitrate, if needed), as required by the PPAs, NEC filed this suit.

Accordingly, this Court should dismiss NEC's complaint for lack of subject matter jurisdiction or failure to plead a claim on which relief can be granted. Alternatively, the Court should compel arbitration and stay these proceedings.

---

[3] Constellation is not a "Settling Party" as that term is used in the Settlement Agreement and FERC Order approving it. NEC's parent, National Grid USA—acting on behalf of itself and its subsidiaries—was a Settling Party. Compl. at ¶26. FPL Energy's participation as a Settling Party is irrelevant and betrays the infirmity in NEC's contention about Constellation's waiver because NEC does not allege that FPL Energy has authority to bind Constellation. *See id* at ¶ 26.

[4] The 2002 Contract prescribes mandatory arbitration for change of law or market rules disputes regardless of the amount in controversy. The 2001 Contract also appears to require arbitration for such disputes without regard to any dollar threshold (albeit the 2002 Contract includes a clause clarifying that, which the 2001 Contract omits). The 20% Contract and 36% Contract mandate senior representative mediation, and then arbitration upon joint agreement. *See infra* p. 7-9. The issue raised by NEC's complaint applies equally to all the PPAs, so as explained below even if the Court finds that only one of the PPAs clearly requires arbitration, the Court should stay the proceedings relating to the other three to allow the arbitrators to render their decision on the merits before them. *See infra* p. 25.

## STATEMENT OF THE CASE

### I. NEC AND CONSTELLATION

NEC is a retail electric distribution company that delivers electricity to retail end-user customers in Rhode Island. Compl. at ¶ 5-6. Constellation sells at wholesale in interstate commerce power ("energy" and "capacity") to NEC that partially meets NEC's overall requirements. *Id.* at ¶ 6. NEC and Constellation have enjoyed a customer-supplier relationship for many years, and the four PPAs at issue (attached as Exhibits A-D) to the accompanying Motion for Lease to File Under Seal are:

- Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company, Eastern Edison Company, Newport Electric Corporation and Constellation Power Source, Inc. (dated December 21, 1998, and amended on January 27, 2003 and June 3, 2003) **(the "20% Contract")**. Ex. A.

- Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company, Eastern Edison Company, Newport Electric Corporation and Constellation Power Source, Inc. (dated December 21, 1998, and amended on January 27, 2003 and June 3, 2003) **(the "36% Contract")**. Ex. B.

- Power Supply Agreement between The Narragansett Electric Company and Constellation Power Source, Inc. (dated October 5, 2001) **(the "2001 Contract")**. Ex. C.

- Power Supply Agreement between Narragansett Electric Company and Constellation Power Source, Inc. (dated August 23, 2002, and amended August 23, 2002) **(the "2002 Contract")**. Ex. D.

The 20% Contract, the 36% Contract, and the 2001 Contract are governed by Massachusetts law; the 2002 Contract is governed by Rhode Island law.

#### A. The PPAs

The issue in NEC's complaint is whether Constellation has the right to an equitable adjustment going forward now that FERC has changed the regulatory landscape. Compl. at ¶ 8. Under the PPAs, Constellation supplies (at wholesale)

portions of NEC's total Standard Offer Service requirements. *Id.* at ¶¶ 6-7. Delivering "Wholesale Standard Offer Service" entails Constellation supplying NEC with the necessary electric "energy" and "capacity" required to satisfy those requirements.

"Capacity" (also known as "installed capacity" or "unforced capacity" or "UCAP") as used in the PPAs serves as the functional equivalent of an option held by NEC to call forth more energy to meet increasing demand from its retail customers. Requirements mandated by the New England Independent System Operator ("ISO New England") and the New England Power Pool ("NEPOOL")[5] obligate NEC to procure "capacity" to supply "energy" (*i.e.*, availability to turn your lights on when you flip the light switch). Energy is what causes the lights to shine, but capacity is what ensures that flipping the switch does not cause a blackout. NEC satisfies these requirements by procuring supplies from Constellation, among others.

FERC regulates the wholesale market for electric energy and capacity, including NEC's contracts with Constellation and the markets administered by ISO New England. *Id.* at ¶ 8.[6] At the time the parties contracted, the cost for supplying capacity was negligible. Now, as a direct consequence of the Settlement Agreement, the market rules governing capacity have changed fundamentally and the costs of capacity for the

---

[5] NEPOOL is defined in the PPAs as the "New England Power Pool or its successor." *See, e.g.,* Ex. A at 3. NEPOOL is a voluntary association of more than 200 participants in the New England bulk power system, created in 1971 to establish a central dispatch system for New England interstate power and to enhance system reliability. *See* *http://www.iso-ne.com/aboutiso/co_profile/history/index.html*. NEPOOL created a regional power grid that now includes more than 350 generating plants and more than 8,000 miles of transmission lines. *Id.* NEPOOL has contracted with ISO New England, Inc. to operate and administer the New England transmission system and wholesale markets in Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont. *See* www.nepoolgis.com.

[6] *See also Mississippi Indus. v. FERC*, 808 F.2d 1525 (D.C. Cir. 1987) (holding that the Commission could exercise jurisdiction over the allocation of the costs of capacity among four utility operating companies of a holding company under "its undisputed authority over the wholesale rates of electric generating facilities in interstate commerce") and *Municipalities of Groton v. FERC,* 587 F.2d 1296 (D.C. Cir. 1978) (holding that the Commission had jurisdiction over the installed capability charge in New England, a precursor to ICAP).

remaining term of the PPAs will be materially higher.[7] Compl. at ¶¶ 32, 52 (alleging costs increased by $150 million).

**B. Standard Offer Service**

Standard Offer Service under the PPAs is firm all requirements electric power service, including installed capacity and reserves necessary to fulfill the requirements of those retail customers who contract with NEC for electric service. *Id.* at ¶ 7.[8] Constellation's duties under the PPAs include delivering "energy" and "capacity" to NEC, which Constellation procures from upstream sources of generation. *Id.*

The PPAs specify a stipulated base price plus a fuel adjustment factor covering all that Constellation delivers under the contracts. Under Article 3 of the 20% Contract and 36% Contract, for example, Constellation promised to deliver the allocated portion of NEC's total aggregated load of customers taking Standard Offer Service and to satisfy all requirements and costs of performance. Ex. A at 3-5; Ex. B at 5-6.

The 2001 Contract likewise provides that Constellation shall deliver 100% of NEC's Standard Offer 2 Service requirements, and satisfy all requirements and costs of performing. Ex. C at 1, 4.

The 2002 Contract also follows this pattern. This contract requires Constellation to deliver the allocated portion of NEC's Wholesale Standard Offer 1 Service, and to satisfy all present and future requirements and costs for "Installed Capacity" required for

---

[7] NEC alleges that the regulation mandated cost increase does not entitle Constellation to any equitable adjustment and shall be born solely by Constellation. *See generally* Compl.

[8] The PPAs define Standard Offer Service as "firm all-requirements electric service . . . including . . . installed capability . . . necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking Standard Offer Service." Ex. A at 3; Ex. B at 3.

the provision of Wholesale Standard Offer 1 Service and any related requirements, expenses or charges. Ex. D at 1.

### C. Constellation's Right to an Equitable Adjustment

The parties expressly conditioned their duties on the regulatory landscape remaining unchanged from the date of contract execution. Rather than allocate all risks of regulatory change to one party, each PPA has a provision that binds NEC and Constellation to negotiate an equitable adjustment in the aftermath of any regulatory change that upends the economic benefits and burdens contemplated by the parties at the time of contracting.

Although the PPAs obligated Constellation to secure and pay for the "capacity" needed to satisfy the allocated share of NEC's Standard Offer Service load, the PPAs each contain the parties' promise to negotiate any equitable adjustments needed to address intervening changes in law or market rules that materially affect the costs and obligations to provide Standard Offer Service. The Settlement Agreement triggered that covenant because it caused the amendment or termination of NEPOOL Rules, which changed the capacity market and materially increases the cost of providing capacity.

Specifically, the 20% and 36% Contracts provide that:

> 18(2) This Agreement is intended to comply with all NEPOOL Criteria, Rules and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or altered by NEPOOL or the ISO, in a manner which materially affects the costs and obligations to provide Standard Offer Service, the Companies and Supplier shall meet to determine appropriate compensation to the affected Party.

> 18(3) In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases Suppliers' costs or obligations to provide Standard Offer Service or the Companies are prevented from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier, the Companies and Supplier shall meet to determine appropriate compensation to the negatively impacted Party. In the event that the Parties are not able to agree on the materiality of the increased cost or obligation or the amount to be reimbursed, Parties shall attempt to resolve the matter in accordance with Article 13.

Ex. A at 17; Ex. B at 17. Article 13 in turn provides, in relevant part, that:

> Subject to Article 8(3), all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith.... In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration.

Ex. A at 14; Ex. B at 14.

The 2001 Contract likewise incorporates the parties' covenant to negotiate (and if necessary, arbitrate) any equitable adjustments needed to address changes that amend or terminate a Rule and which materially affect the costs and obligations to provide Standard Offer Service. Specifically, Article 14.2 reads:

> This Agreement must comply with all NEPOOL market rules and/or operating procedures ("Rules"). If, during the

> term of this Agreement, the NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate a replacement Rule ("Replacement Rule"). The intent of the Parties is that any such Replacement Rule reflect, as closely as possible, the intent and substance of the Rule being replaced as such Rule was in effect prior to such termination or amendment of the NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Appendix B [sic] . . . and to seek a resolution of the matter consistent with the above stated intent.

Ex. C at 20-21.[9]

Finally, the 2002 Contract also includes the parties' covenant to negotiate an equitable adjustment. Section 15.2 of the 2002 Contract reads:

> If, during the term of this Agreement, any NEPOOL Rule [defined at page 3 of the 2002 Contract as all rules, operating procedures, agreements, manuals, protocols and tariffs adopted by NEPOOL/ISO, and accepted by FERC], Rhode Island statute or other applicable law is terminated or amended in a manner that would eliminate or materially (including economically) alter any rights or obligations of a Party hereunder, the Parties agree to negotiate in good faith to amend this Agreement so as to maintain, as closely as possible, the intent and substance of the allocation of rights and obligations contemplated hereunder. If after a period of thirty (30) days from the date on which a Party provides written notice to the other Party of the need to amend this Agreement, the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Section 16.2 (*regardless of the amount, if any, in controversy*) and to seek a resolution of the matter consistent with the above stated intent.

[9] The reference in the 2001 Contract to Appendix B appears to be an error. Presumably, the correct reference should be to Section 15.2. The direction of Section 14.2 to "submit the matter to arbitration under ***the terms*** . . ." evidences the parties' intent to submit equitable adjustment disputes to arbitration regardless of the amount in controversy. *See* Ex. C at 21 (emphasis added).

Ex. D at 23-24 (emphasis added). Section 16.2 provides, in relevant part, that:

> Any dispute between the Company and Seller arising under or in connection with or relating in any way to this Agreement shall be referred to a senior representative of the Seller designated by the Seller and a senior representative of the Company designated by the Company for resolution on an informal basis as promptly as practicable. In the event the designated senior representatives are unable to resolve the dispute within ten (10) days, or such other period as the Parties may jointly agree upon . . . such dispute shall be submitted to arbitration and resolved in accordance with the arbitration procedure set forth in this Section 16.2. . . [T]he arbitrators shall be knowledgeable in electric utility matters, including wholesale power transactions and power market issues[.]

*Id.* at 24.[10]

### D. Constellation Duly Invoked the Right to an Equitable Adjustment

In light of these provisions of the PPAs, Constellation duly invoked the right to an equitable adjustment by a letter to NEC, dated August 1, 2006.[11] Contrary to NEC's allegations, Constellation's letter did not assert any demand to specific remuneration, but rather properly exercised Constellation's right under each of the PPAs to discuss with NEC the appropriate adjustments needed. Consistent with the dispute resolution provisions in the PPAs, NEC and Constellation met on August 22, 2006, but NEC's appearance was perfunctory. Notably, NEC has not alleged that it satisfied its duty to negotiate. Rather than engaging Constellation and fulfilling its covenant, NEC filed the instant suit.

---

[10] While Section 16.2 also states that the matter shall be submitted to arbitration "to the extent a reasonable estimate of the amount in dispute does not exceed two hundred fifty thousand dollars ($250,000.00)," Section 15.2 nullifies this cap when there is a law or regulatory change equitable adjustment dispute.

[11] A true and correct copy of that August 1, 2006 letter is attached as Exhibit G. NEC incorporated the letter in the complaint by reference. Compl. ¶¶ 30-32.

## II. THE SETTLEMENT AGREEMENT

The Settlement Agreement and FERC's order accepting it caused major changes in the regulatory landscape governing the PPAs. FERC mandated a new wholesale market for "capacity," during the Settlement Agreement "Transition Period" (December 1, 2006 to May 31, 2010), which coincides with the remaining term of the PPAs. Leading up to the Settlement Agreement, FERC found that companies supplying capacity were not receiving enough revenue to justify continued operation in a market-based rate regime or to foster development of the new generation needed for future demand. *Devon Power LLC*, 115 FERC ¶ 61,340 at PP 62-67 (attached as Ex. F, "FERC Order"). To address that problem, the Settlement Agreement imposes a regulatory regime intended to spur development of new electric generation to ensure reliable service in the future.

The change caused by the Settlement Agreement for the Transition Period alters profoundly the balance of economic benefits and burdens struck in the PPAs. That change mandates fixed prices for capacity suppliers in lieu of the negotiated terms allowed under the regulatory regime when the PPAs were executed. *Id.* at P 30. Costs of capacity billed by ISO New England to Standard Offer Service providers increase dramatically because the Settlement Agreement ordains a New England-wide fixed price negotiated by the capacity suppliers and other parties to the Settlement Agreement; not a price set by supply and demand. *Id.* at P 30-33. FERC approved the Settlement Agreement under the "just and reasonable" standard of review. *Id.* at P 68-73.

Neither the FERC Order nor the explanatory statement filed in conjunction with applying for approval provide any support for NEC's contention that Section VIII(A) of the Settlement Agreement abrogated Constellation's rights under the PPAs to an equitable adjustment. *See generally* Ex. E, Ex. F. The FERC Order and the explanatory

statement contain no discussion of that provision and no indication of the consequence of the Settlement Agreement that NEC alleges. *See id.*

Contrary to NEC's contention, the Settlement Agreement expressly provides that load-serving entities (like NEC) will make the transition payments for UCAP. *See* FERC Order at P 31 ("Transition payments will be made by unforced capacity (UCAP) obligation holders (load-serving entities)."). Equally important, the Settlement Agreement explicitly purports to ***not*** prejudice contractual rights of parties:

> Neither support for this Settlement Agreement, nor the Term Sheet relating hereto, nor the submission of this Settlement Agreement and the concurrence in, ***or failure to comment on***, the described settlement shall constitute an admission by any Settling Party that any allegation or contentions in Docket Nos. ER03-563-030 and ER03-563-055 were true or valid or that any Settling Party had acted consistent with, or contrary to, contract provisions, the FPA, or any other federal or state law or regulation.
>
> * * *
>
> FERC's approval of this Settlement Agreement shall not constitute approval of or precedent regarding any principle or issue in Docket Nos. ER03-563-030 and ER03-563-055 before the FERC.

Settlement Agreement at 5-6 (emphasis added).

The very language on which NEC relies does not, under any reasonable reading, provide that Constellation contractual waives its right to an equitable adjustment for the materially higher costs of performing the PPAs:

> The current UCAP products shall be retained for the period commencing on December 1, 2006 and ending on May 30, 2010 (the "Transition Period") as provided for in Part VIII.I. Payments will be made to UCAP entitlement holders, and made by UCAP obligation holders including wholesale standard offer suppliers in Rhode Island as under the current Market Rules and tariffs; it being understood that the agreement of wholesale standard offer suppliers in Rhode Island to make UCAP payments is contingent upon

> the agreement of the state of Rhode Island utility regulatory authorities to support the settlement.

*Id.* at 46. The FERC Order explained that "obligation holders" means "load-serving entities," like NEC. FERC Order at P 31. In that regard, the clause cited by NEC merely provides that, in Rhode Island, the obligation of load-serving entities to pay UCAP entitlement holders will be satisfied by having wholesale standard offer service suppliers make the payment. The clause addresses the party from whom UCAP entitlement holders may expect payment as it concerns Rhode Island utilities. It does not address in any way specific contractually negotiated equitable adjustment rights that exist between a Rhode Island load-serving entity and a particular wholesale supplier. Moreover, as explained in more detail below, only FERC could grant abrogation of specifically negotiated contract rights upon a finding in accordance with the *Mobile-Sierra* doctrine—which FERC has not made.

## III. THE INSTANT DISPUTE

NEC initiated suit seeking a declaratory judgment that Constellation could not invoke contract provisions for an equitable adjustment in light of a regulatory reconstruction. NEC's complaint was filed without any true or substantive effort by NEC to abide by its obligations under the PPAs. Although Constellation duly notified NEC of its request to negotiate in good faith an equitable adjustment, NEC failed to abide by the PPAs by meeting once perfunctorily and refusing to engage in good faith negotiations. NEC's complaint was filed September 11, 2006, and by stipulation Constellation was allowed until October 23, 2006, to respond to the complaint.

## ARGUMENT

While NEC's complaint masquerades as one for a declaratory judgment, in substance it seeks to reform the PPAs and abrogate material rights thereunder. Absent from NEC's complaint are the documents on which it relies: the PPAs, the Settlement Agreement, the FERC Order, and Constellation's letter to NEC invoking the right to an equitable adjustment. Review of those documents shows NEC alleges no cognizable basis for concluding that Constellation waived its rights to an equitable adjustment following the regulatory changes at hand. The Settlement Agreement cannot and does not purport to abrogate that right either. NEC's complaint, at its core, seeks contract reformation, not interpretation—*i.e.*, an order from this Court deleting the parties' covenant in each PPA to negotiate any equitable adjustment needed to preserve their respective economic benefits following major regulatory change.

This Court lacks authority to grant such relief because FERC enjoys exclusive jurisdiction over contract abrogation claims. Furthermore, NEC's complaint fails to state a claim on which relief can be granted. In any event, if the Court does not dismiss, it should compel alternative dispute resolution and stay the proceedings because NEC failed to abide by the mandatory dispute resolution provisions of the PPAs.

### I. NEC'S COMPLAINT SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(1) FOR LACK OF SUBJECT MATTER JURISDICTION

#### A. Legal Standard for Rule 12(b)(1) Motion to Dismiss

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Subject matter jurisdiction is both an Article III and a statutory requirement; therefore, "no action of the parties can confer subject-matter

jurisdiction upon a federal court." *Ins. Corp. of Ir., Ltd. V. Compagnie des Bauxite de Guinee*, 456 U.S. 694, 702 (1982).

On a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The court may dismiss a complaint for lack of subject matter jurisdiction only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Subject matter jurisdiction focuses on the court's power to hear the claim, and thus motions attacking the subject matter jurisdiction of the court may rely on materials outside the pleadings. *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363-64 (1st Cir. 2001).

**B. FERC has Exclusive Jurisdiction Over the Relief NEC Seeks**

The Federal Power Act, 16 U.S.C. §§ 824-824m ("FPA"), grants FERC "exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce." *Pub. Util. Dist. No. 1 v. IDACORP Inc.* (*Grays Harbor*), 379 F.3d 641, 646 (9th Cir. 2004) (citations omitted) (emphasis omitted). Through the FPA, Congress granted FERC plenary authority over all sales of electric energy at wholesale in interstate commerce. *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986). FERC's power includes the exclusive authority to determine the reasonableness of wholesale rates. *Miss. Power & Light Co., v. Miss.*, 487 U.S. 354, 371 (1988); 16 U.S.C. § 824e(e)(2).

Although FERC and courts enjoy concurrent jurisdiction over matters of contract interpretation and enforcement, FERC has exclusive jurisdiction to determine rates for the sale of wholesale power. *Arkansan Louisiana Gas Co. v. Hall (Arkla)*, 453 U.S. 571,

583 (1981); *Pub. Util. Dist. No. 1 v. Dynegy Power Mktg., Inc.* (*Snohomish PUD*), 384 F. 3d 756, 761-62 (9th Cir. 2004); *Utilimax.com, Inc. v. PPL Energy Plus, LLC*, 378 F. 3d 303 (3d. Cir. 2004). FERC's exclusive authority is not limited to rates *per se*, but extends to, among other things, matters that directly affect wholesale rates. *Nantahala*, 476 U.S. at 966-67.

In recognition of Congress' determination to repose exclusive authority over rates in an agency, the Supreme Court long ago recognized the filed rate doctrine. *See Montana–Dakota Util. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251 (1951). Under this doctrine, courts may not substitute their own judgment for that of FERC. *Arkla*, 453 U.S. at 577.[12] The filed rate doctrine prohibits a court from "entering [any] judgment that would serve to alter the rate paid by a plaintiff." *Bryan v. Bellsouth Commc'ns, Inc.*, 377 F.3d 424, 429 (4th Cir. 2004) (citation omitted). In addition to barring court-imposed ***changes*** to filed rates, the filed rate doctrine also bars suits challenging the services, billing or other practices that ***affect*** the filed rate. *Brown v. MCI Worldcom Network Servs., Inc.*, 277 F.3d 1166, 1170 (9th Cir. 2002); *see also Stand Energy Corp. v. Columbia Gas Transmission Corp.*, 373 F. Supp. 2d 631, 635 (S.D.W.Va. 2005) (citing 15 U.S.C. § 717c(c)) (ruling that the filed rate doctrine "extends to the services, classifications, charges and practices included in the rate filing").[13]

---

[12] This doctrine applies equally to rates that are higher and lower than the filed rate, and prohibits both the supplier and customer from seeking a different rate. *See MCI Telecomm, Inc. v. T.A. Commc'n, Inc.*, 40 F. Supp. 2d 728, 735 (D. Md. 1999) (citing *Louisville & Nashville R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915)) ("Deviation from [the filed rate] is not permitted upon any pretext. Shippers . . . are charged with notice of it, and they as well as the carrier must abide by it. . . . This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.").

[13] The same principles concerning the filed rate doctrine under the FPA apply under the FPA's sister statute, the Natural Gas Act. The rate provisions of the FPA and NGA are "substantially identical," *FPC v.*

Courts have no authority to grant relief that alters the rate filed with and accepted by FERC. While courts have authority to hear breach of filed rate cases, courts may not award damages using a rate other than the one on file with FERC. *Arkla*, 453 U.S. at 579 ("It would undermine the congressional scheme of uniform rate regulation to allow a state court to award as damages a rate never filed with [FERC]"). Regardless of whether the court believes a different rate would be more reasonable, the filed rate doctrine bars it from assuming any right to a rate different from the rate approved by FERC. *Montana-Dakota*, 341 U.S. at 251-52. No matter how reasonable alteration of the rates at issue may seem, the filed rate doctrine bars a court from granting any such relief:

> While the filed rate doctrine may seem harsh in some circumstances, see, *e.g., Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116 (1990), its strict application is necessary "to prevent carriers from intentionally 'misquoting' rates to shippers as a means of offering them rebates or discounts," the very evil the filing requirement seeks to prevent. *Id.* at 127. Regardless of the carrier's motive—whether it seeks to benefit or harm a particular customer—the policy of nondiscriminatory rates is violated when similarly situated customers pay different rates for the same services.

*AT&T v. Cent. Office Tel., Inc.*, 524 U.S. 214, 223 (1998).

As applied here, this Court lacks jurisdiction because the gravamen of NEC's claim seeks contract reformation—*i.e.*, a ruling that the Settlement Agreement and FERC Order abrogated Constellation's right to an equitable adjustment following the regulatory change at hand:

> Constellation is not entitled to recover any additional compensation from NEC because (1) the Settlement Agreement confirms that the Transition Period UCAP Costs remain an obligation of Constellation, and that

*Sierra Pac. Power Co.*, 350 U.S. 348, 353 (1956), and are cited "interchangeably." *Arkla*, 453 U.S. at 578 n.7.

> Constellation cannot pass those costs onto NEC and the Rhode Island ratepayers; (2) the PPAs provide that Constellation is responsible for the UCAP obligation and payments, and Constellation is not entitled to pass on those costs, whether determined under LICAP, the Settlement Agreement, or some other method, to NEC and the Rhode Island ratepayers; and (3) Constellation has waived any right to recover Transition Period UCAP Costs from NEC and the ratepayers.

Compl. at ¶31.

NEC's claim seeks a direct, material alteration of the parties contract—not enforcement of the rate on file with FERC. Admitting the absence of any explicit agreement by Constellation to waive its right to an equitable adjustment, NEC pleads a claim sounding in equity to justify barring Constellation from exercising that right. Compl. at ¶¶ 40-41. NEC points to no contractual provision for which it seeks an interpretation or enforcement. Rather, NEC petitions the Court to reform the parties' contracts because, as NEC alleges, that is the reasonable consequence of the action before FERC. *Id.*

NEC's complaint seeks exactly the relief that the filed rate doctrine bars the Court from granting. The filed rate doctrine protects FERC's exclusive authority by barring courts from determining filed rates or ordering reparations, damages, or equitable relief based on any assumed rate different from that filed with FERC. *Arkla*, 453 U.S. at 579-580; *Montana-Dakota*, 341 U.S. at 251-521; *Snohomish PUD*, 384 F.3d at 761-62; *California v. Dynegy, Inc.*, 375 F.3d 831, 836-39 (9th Cir. 2004); *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 416 (1st Cir. 2000). NEC's claim to reform the PPAs because of the Settlement Agreement can only be brought before FERC, pursuant to section 206 of the FPA, 16 U.S.C. § 824e. Therefore, this Court lacks subject matter

jurisdiction to entertain NEC's claim that the Settlement Agreement strips Constellation of its contractual rights to an equitable adjustment.

## II. NEC'S COMPLAINT FAILS TO PLEAD A CLAIM ON WHICH RELIEF CAN BE GRANTED

### A. Legal Standard for Rule 12(b)(6) Motion to Dismiss

In response to an initial pleading, a defendant may test the legal sufficiency of a complaint under Federal Rule of Civil Procedure 12(b)(6). *Conley*, 355 U.S. at 45-46. The complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds on which it rests. Fed. R. Civ. P. 8(a)(2); *Conely*, 355 U.S. at 47. The plaintiff's complaint must, however, state factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable legal theory. *Platten v. HG Berm. Exempted Ltd.*, 437 F.3d 118, 127 (1st Cir. 2006) (citation omitted).

A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45-46; *Greene v. Rhode Island*, 398 F.3d 45, 48 (1st Cir. 2005). Thus, in resolving a Rule 12(b)(6) motion, the court accepts as true all well-pleaded facts alleged by the plaintiff in its complaint and draws in its favor all reasonable inferences fitting their stated theories of liability. *Platten*, 437 F.3d at 127. The court, however, need not accept as true "bald assertions," inferences unsupported by facts set out in the complaint, or legal conclusions cast as factual allegations. *Abbott v. United States*, 144 F.3d 1, 2 (1st Cir. 1998) (citation omitted). Courts may also consider matters fairly incorporated within the complaint and matters susceptible to judicial notice (*e.g.*, public records) without converting the motion into one

for summary judgment. *Greene*, 398 F.3d at 48 (quoting *In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003)).

### B. NEC's Complaint Alleges No Cognizable Claim to Abrogate Constellation's Right to an Equitable Adjustment

Even accepting NEC's claim as one for an interpretation of the PPAs and the Settlement Agreement, the complaint still fails to plead a claim upon which relief can be granted. NEC's complaint does not allege any explicit consent by Constellation to waive its right to an equitable adjustment. NEC, instead, pleads the alleged assent to abrogating that contractual right came from statements allegedly made by the State of Rhode Island—not NEC—and Constellation's failure to object to a settlement to which it is not a party. Compl. at ¶¶ 20-25. NEC does not plead a cognizable claim because neither the Settlement Agreement, nor Constellation's conduct provides any basis for the relief NEC seeks. Moreover, under the *Mobile-Sierra* doctrine, NEC has alleged no actionable basis for imposing any unilateral change to the PPAs on Constellation.

#### 1. NEC alleges no mutual consent to abrogating the right to an equitable adjustment

To the extent NEC's complaint asserts that Constellation agreed to modify the PPAs to abrogate the right to an equitable adjustment, the complaint fails to plead a claim upon which relief can be granted. Massachusetts and Rhode Island law both provide that to establish a modification of a contract, the plaintiff must prove: there was offer and acceptance of the contract change; mutual assent to the change; consideration for the change; and that the parties intend to be bound by the change. *See Bourg v. Bristol Boat Co., Inc.*, 705 A.2d 969, 971 (R.I. 1998); *see also Costonis v. Medford Housing Auth.*, 176 N.E.2d 25, 28 (Mass. 1961); *but see Tri-City Concrete Co. v. A.L.A. Constr. Co.*, 179 N.E.2d 319, 320 (Mass. 1962) (additional consideration is required for unilateral

modification of contract by one of the parties). To overcome an express contract provision (as both the 2001 Contract and 2002 Contract require) that all modifications be in writing, NEC must show that the parties waived their contractual right to that condition. *Costonis*, 176 N.E. 2d at 28; *cf. A.T. Cross Co. v. Royal Selangor(s) PTE, Ltd.*, 217 F. Supp. 2d 229, 232-33 (D.R.I. 2002) (reciting Rhode Island requirements for finding existence of arbitration agreement).

NEC's complaint is completely devoid of any allegation that Constellation knowingly assented, for due consideration, to the modification of the PPAs involved with abrogating the right to an equitable adjustment and any arbitration attendant to that right. By NEC's admission, the costs associated with procuring capacity to perform the PPAs during the Transition Period will exceed $150 million. Compl. at ¶ 52. In light of the gravity of that amount, NEC's complaint glaringly omits any allegation that NEC wanted Constellation to abrogate the equitable adjustment right; that NEC communicated its intention to Constellation for that unilateral change; or that Constellation assented for valid consideration to NEC's request. *See, e.g., Compl. of Ballard Shipping Co.*, 752 F. Supp. 546, 548 (D.R.I. 1990) (waiver of right to arbitration "not to be lightly inferred"), *rev'd in part on other grounds*, 32 F.3d 623 (1st Cir. 1994).

Moreover, NEC's allegations regarding Constellation's conduct do not plead a legally sufficient case for finding that Constellation waived, by its conduct, its right to an equitable adjustment. One party to a contract cannot change the obligation of the other party to the contract by unilateral action, *New England Mut. Life Ins. Co. v. Harvey*, 82 F. Supp. 702, 706 (D. Mass. 1949), and claims for a unilateral modification by one of the parties to a contract lies only where due consideration for the modification is exchanged.

*Tri-City Concrete Co.*, 179 N.E.2d at 320; *Doujotos v. Leventhal*, 171 N.E. 445, 445-46 (Mass. 1930) (citation omitted) (defining waiver "as the intentional relinquishment of a known right"); *Violet v. Travelers Express Co., Inc.*, 502 A.2d 347 (R.I. 1985) (defining waiver as a party voluntarily and intentionally relinquishing its right); *see also* Restatement (Second) Contracts, § 19(2) (stating that the conduct of a person is not effective as a manifestation of assent unless that person intends to engage in the conduct and knows or has reason to know that the other party may infer from the conduct that he assents).

Here, NEC has not alleged facts sufficient to establish that Constellation voluntarily and intentionally gave up its right to an equitable adjustment for due consideration. Accordingly, the complaint fails to state a claim, for a consensual modification of the PPAs, on which relief could be granted.

**2. NEC fails to plead a cognizable claim for imposing any unilateral change to the PPAs on Constellation**

Ignoring that Constellation is not a signatory to it, NEC's complaint pleads that Section VIII(A) of the Settlement Agreement effectuated a unilateral change to the PPAs that bars Constellation from its right to an equitable adjustment. Compl. at ¶ 21. NEC's mental gymnastics flies in the face of the provision's indisputable language. The actual language of Section VIII(A) does not, on its face, provide that Constellation cannot or will not seek an equitable adjustment as the PPAs permit. Section VIII(A) merely states an "understanding" among the signatories to the Settlement Agreement that wholesale standard offer suppliers would "make" UCAP payments if "the state of Rhode Island utility regulatory authorities" supported the settlement.

The provision does not say that Constellation agrees to bear solely the increased costs under the new regulatory regime and to forego its right to an equitable adjustment. Indeed, the provision states that suppliers' commitment to make the payments is contingent on the Rhode Island regulatory authorities supporting the settlement, not vice versa as NEC avers. Moreover, the FERC Order recites nothing about the "understanding" alleged by NEC.

FERC's silence on the question of whether the Settlement Agreement abrogated Constellation's right to an equitable adjustment is fatal to NEC's claim because the PPAs are protected by the filed rate doctrine. Neither the Settlement Agreement nor the FERC Order approving it can unilaterally modify or abrogate the PPAs without an explicit FERC finding under the "public interest" test specified by the *Mobile-Sierra* doctrine. *See, e.g., Boston Edison Co. v. FERC* (*BECo*), 233 F.3d 60, 67-68 (1st Cir. 2000) (holding that a specification of the rate in and of itself implicates the *Mobile-Sierra* doctrine). The *Mobile-Sierra* doctrine holds that where a fixed-rate contract for the sale of electricity does not expressly grant the right to change prices unilaterally, FERC may abrogate or modify the contract only if the public interest so requires. *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.* (*Mobile*), 350 U.S. 332 (1956); *FPC v. Sierra Pac. Power* (*Sierra*), 350 U.S. 348 (1956).[14] *Mobile-Sierra* "denies either party the right to change such prices or charges unilaterally" unless the public interest test is met. *Texaco*, 148 F.3d at 1095 (citing *Pennzoil Co. v. FERC*, 645 F.2d 360, 373 (5th Cir. 1981));

[14] The U.S. Supreme Court devised the *Mobile-Sierra* standard because the Federal Power Act depends on settled contractual expectations of contracting Parties being disrupted "only if the public interest so requires." *Texaco, Inc. v. FERC*, 148 F.3d 1091, 1095 (D.C. Cir. 1998). *See also BECo*, 233 F.3d at 64-65, *Town of Norwood*, 202 F.3d at 408 (1st Cir. 2000).

*Oglesby v. FERC*, 610 F.2d 897, 899-900 (D.C. Cir. 1979); *Appalachian Power Co. v. FPC*, 529 F.2d 342, 348 (D.C. Cir. 1976).

Under *Mobile-Sierra*, where parties have entered into a fixed-rate contract that denies either the buyer or seller the right to change terms unilaterally, FERC may not undo the parties' contract absent substantial, credible evidence that contract abrogation or modification is needed to protect the public from harm. *Sierra*, 350 U.S. at 355. This public interest test meshes the respect for contracts prescribed by the FPA "with the traditional scheme of regulation," *BECo*, 233 F.3d at 65, by allowing "contracting parties [to] determine for themselves when and how existing rates may be altered, subject to FERC's power to adjust rates in the public interest." *Bethany*, 727 F.2d at 1142; *see also Borough of Lansdale v. FPC*, 494 F.2d 1104, 1112-13 (D.C. Cir. 1974) (stating that the purpose of *Mobile-Sierra* is to "subordinate the statutory filing mechanism to the broad and familiar dictates of contract law").

NEC's complaint fails to allege that FERC has made the requisite "public interest" finding under *Mobile-Sierra*—because no such finding exists. The FERC Order does not address whether the PPAs should be modified under the *Mobile-Sierra* test, and FERC's approval of the Settlement Agreement does not suffice to meet the "public interest" test prescribed by *Mobile-Sierra* for effectuating the unilateral change NEC seeks. *See Ne. Utils. Serv. Co. v FERC*, 55 F3d 686, 689-91 (1st Cir. 1995) (describing the "public interest" test). Accordingly, because neither the Settlement Agreement, nor the FERC Order abrogates the right to an equitable adjustment afforded by the PPAs, NEC's complaint fails to state a claim on which relief can be granted.

## III. ALTERNATIVELY, THE COURT SHOULD COMPEL NEC TO FULFILL ITS ADR DUTY AND STAY THIS CASE

### A. The Federal Arbitration Act

Congress enacted the FAA in 1925 with the intention of putting arbitration agreements on equal footing with other contracts so that courts would enforce promises to arbitrate. *Bercovitch v. Baldwin Sch.*, 133 F.3d 141, 147-48 (1st Cir. 1998) (quoting *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265 (1995)) (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219-21, & n.6 (1985)). The FAA provides that "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (1999). Commerce is broadly defined in this context, and is coextensive with the reach of Congress' Commerce Clause power. *Bercovitch*, 133 F.3d at 147-48 (citing *Allied-Bruce Terminix Cos.*, 513 U.S. at 268). The FAA directs that judicial proceedings shall be stayed[15] pending the resolution of mandatory arbitration. 9 U.S.C. § 3 (1999).

[15] The First Circuit, however, permits a court to dismiss, as opposed to stay, a case when all of the issues before the court are arbitrable. *Bercovitch,* 133 F.3d at 156 n.21; *Spencer Furniture, Inc. v. Media Arts Group, Inc.*, 349 F. Supp. 2d 49, 51 (D. Mass. 2003); *Bangor Hydro-Electric Co.*, 62 F. Supp. 2d at 161; *Sea-Land Serv., Inc. v. Sea-Land of P.R., Inc.*, 636 F. Supp. 750, 757-58 (D.P.R. 1986). As the Fifth Circuit explained, 9 U.S.C. § 3 "was not intended to limit dismissal of a case in the proper circumstances." *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) (citations omitted) (stating that "[t]he weight of authority clearly supports dismissal of the case when *all* of the issues raised in the district court must be submitted to arbitration")(emphasis in original). There are advantages to dismissal, such as:

> Any post-arbitration remedies sought by the parties will not entail renewed consideration and adjudication of the merits of the controversy but would be circumscribed to a judicial review of the arbitrator's award in the limited manner prescribed by law. This course of action will also make the arbitrability issue immediately appealable and will avoid the litigation expenses and delay if the arbitration conducted were vacated by a later appeal.

*Sea-Land Services*, 636 F. Supp. at 757-58.

Federal courts enforce agreements not only for arbitration, but also for nonbinding mediation. *See, e.g., HIM Portland, LLC v. DeVito Builders, Inc.*, 317 F.3d 41, 44 (1st Cir. 2003) (affirming the district court's denial of a motion to compel arbitration because the parties failed to engage in mediation, which was a condition precedent to binding arbitration); *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 335 (7th Cir. 1987) (granting summary judgment against party who failed to mediate because mediation was a condition precedent to pursuing another remedy); *AMF, Inc. v. Brunswick Corp.*, 621 F. Supp. 456, 463 (E.D.N.Y. 1985) (compelling participation in a non-binding advisory process because participation was a condition precedent to filing suit).

The defendant seeking to compel arbitration must make a four-pronged showing: (1) valid agreements to arbitrate exist, (2) the defendant is entitled to invoke the arbitration clauses, (3) the plaintiff is bound by the clauses, and (4) the claim falls within the scope of arbitration. *Intergen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003). The defendant's burden is not onerous, and after the defendant makes the requisite showing the burden shifts to the plaintiff to demonstrate that the dispute is not arbitrable. *Am. Heritage Life Ins. Co. v. Lang*, 321 F.3d 533, 539 (5th Cir. 2003).

In this case, the Court's task is to determine whether NEC and Constellation intended to use non-judicial means to settle any dispute about an equitable adjustment following a regulatory change like that at hand. *See HIM Portland*, 317 F.3d at 43. Doubts as to whether the dispute is subject to arbitration shall be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22-26 (1983). Courts should deny arbitration only if "it may be said with positive assurance

that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute." *AT&T Tech. Inc. v. Comm. Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960). "[S]o long as the parties are bound to arbitrate and the district court has personal jurisdiction over them, the court is under an unflagging, nondiscretionary duty to grant a timely motion to compel arbitration . . . even though the agreement in question requires arbitration in a distant forum." *Intergen N.V.*, 344 F.3d at 142.

### B. NEC Bound Itself to Mandatory ADR for all Equitable Adjustment Disputes

NEC's complaint essentially asks the Court to allow NEC to breach its obligation to negotiate in good faith (and then arbitrate) with Constellation when there has been a change like the one at hand. Under the authority conferred by the FAA and its inherent power, if it does not dismiss, the Court should stay this proceeding immediately in respect of the ADR provisions mandated by the PPAs.

Because this action concerns contracts evidencing transactions involving interstate commerce, this case fits squarely within the FAA, so the first question for the Court is whether an arbitration agreement exists. Constellation must only demonstrate "at a bare minimum, that the protagonists have agreed to arbitrate some claims." *McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir. 1994). "When presented with a question of contract interpretation, [the court's] task is to ascertain the intentions of the parties, consistent with state law principles and with due regard for the federal policy favoring arbitration." *HIM Portland*, 317 F.3d at 43 (internal quotation omitted); *see Bangor Hydro-Electric Co. v. New England Tel. & Tel. Co.*, 62 F. Supp. 2d 152, 156 (D. Me.

1999) (citing *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith , Inc.*, 170 F.3d 1, 19 (1st Cir. 1999)).

Cursory review of the PPAs demonstrates that the parties have agreed to negotiate, *in good faith*, (and arbitrate at least with respect to the 2002 Contract) their dispute as it concerns the matter at hand. Following common practice, the PPAs each include provisions by which the parties promised to negotiate any equitable adjustments needed to address changes in law or market rules that materially affect the costs and obligations to provide Standard Offer Service. In all cases, the PPAs provide a right to an adjustment after a change like the one at hand, and direct negotiation (and arbitration at least with respect to the 2002 Contract) for any dispute about the amount of that adjustment. The PPAs state that there will be an adjustment; the issue for the parties is only as to the amount of the adjustment.

Sections 18(2) and 18(3) of the 20% and 36% Contracts direct that, following a regulatory change "affecting a right or obligation of a Party . . . in a manner which materially affects the costs and obligations to provide Standard Offer Service, [NEC] and [Constellation] shall meet to determine appropriate compensation to the affected Party." Ex. A at 17; Ex. B at 17. If those efforts fail, then both the 20% Contract and 36% Contracts refer the parties to mandatory negotiation among senior company representatives, conducted face-to-face in good faith. Ex. A at 14; Ex. B at 14. If the senior representatives do not resolve the dispute after thirty days, the dispute may be submitted to binding arbitration by joint agreement. *Id.*

The 2001 Contract and 2002 Contract likewise require the parties to negotiate an equitable adjustment in the aftermath of regulatory change, but make mandatory (at least

under the 2002 Contract) the submission to arbitration of any unresolved dispute over the adjustment. Specifically, sections 14.2 and 15.2, respectively, direct that the parties shall negotiate in good faith to amend the PPAs with the intent of reflecting, as closely as possible, the parties' intent at the time of contract formation. Ex C. at 20-21; Ex. D at 23-24. If the Parties are unable to reach agreement on such an amendment, the 2002 Contract unambiguously mandates arbitration for equitable adjustment disputes (while there is some potential ambiguity with respect to whether arbitration is required under the 2001 Contract). *Id.*[16]

For each of the PPAs, the parties manifested their intent to attempt to resolve their disputes by way of alternative dispute resolution and to maintain their respective economic benefits of the contract. The contracts unambiguously state that good faith negotiations and arbitration, at least with respect to the 2002 Contract, are conditions precedent to litigation. Consequently, NEC misfired when it commenced this lawsuit without first satisfying its promise to negotiate an equitable adjustment.[17]

---

[16] The Court must apply state contract law principles to evaluate the validity of an arbitration agreement. *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003), *cert. denied* 540 U.S. 1160 (2004). "[I]n applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of [the Federal Arbitration] Act, due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Volt Information Sciences, Inc. v. Board of Trustees*, 489 U.S. 468, 475-76 (1989) (internal citations omitted); *see also Moses H. Cone Mem'l. Hosp.*, 460 U.S. at 24 (stating that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration"). NEC has not alleged any reason why Massachusetts and Rhode Island law would not enforce the arbitration agreements at hand.

[17] Constellation recognizes that one of the four contracts unequivocally requires arbitration, while the remaining contracts all prescribe negotiation as a condition precedent to litigation. Nonetheless, because the same dispute exists under each of the PPAs, the contracts are inextricably intertwined. The Court must at a minimum give effect to the arbitration clause of the 2002 Contract, and not usurp the arbitrators' ability to resolve that dispute. Constellation also has the right, per all the contracts, to pursue private negotiations with NEC prior to the commencement of any judicial action. Accordingly, the Court should stay the suit in its entirety, compelling NEC to comply with its covenants to pursue alternative dispute resolutions with regard to all four PPAs.

### C. The Instant Dispute Falls Within the ADR Clauses

The Court's next question is whether the instant dispute indeed falls within the scope of the arbitration and mediation clauses. *Bangor Hydro-Electric Co.*, 62 F. Supp. 2d at 158; *see also Brennan v. King*, 139 F.3d 258, 264 (1st Cir. 1998) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25). The Court must remain mindful of the federal presumption favoring arbitrability, whereby "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Brennan v. King*, 139 F.3d 258, 264 (1st Cir. 1988) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25). While the question of arbitration is properly made by the court, the issue of arbitrability is of limited scope. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967) (holding that the court determines only "issues relating to the making and performance of the agreement to arbitrate," and an attack on the contract as a whole must be made before the arbitrator). The burden here is on NEC to demonstrate that the dispute is not arbitrable. *Lang*, 321 F.3d at 539.

As fully discussed above, the mandatory dispute resolution provisions are triggered by an intervening change in law or market rule that materially affects the parties' costs and obligations under the PPAs. The Settlement Agreement effects a sea change: the entire regime for pricing capacity has been materially changed, as have the economic benefits and burdens, rights, and obligations of the parties. This change squarely fits within the change in law or market rules provisions that trigger mandatory ADR because it is precisely the type of situation for which the parties included the

provision in the PPAs. NEC and Constellation plainly stated this intent for mandatory ADR in all the PPAs.[18]

**D. The Court Should Stay or Dismiss This Case**

Where, as here, the plaintiff's claims must be arbitrated, "the [Federal Arbitration] Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed. 9 U.S.C. §§ 3, 4." *Dean Witter Reynolds*, 470 U.S. at 218. The PPAs provide for alternative dispute resolution prior to litigation. Accordingly, at a minimum, the Court should compel NEC to abide by its promise to negotiate in good faith (using senior representatives), to honor Constellation's right to an equitable adjustment, and to arbitrate any equitable adjustment dispute arising out of the fundamental regulatory change of the capacity market.

The four PPAs are inextricably intertwined. The requirement for good faith negotiations exists in each of the PPAs, and it is undisputed that at least the 2002 Contract requires mandatory arbitration for equitable adjustment disputes. Under section 3 of the FAA, courts must compel arbitration and stay proceedings involving an "issue referable to arbitration." 9 U.S.C. § 3. *See also A.T. Cross Co.*, 217 F. Supp. 2d at 232-33 ("doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"). Given that the equitable adjustment dispute must be referred to arbitration at least under the 2002 Contract, it makes little sense to litigate in court precisely the

[18] Count IV of the Complaint addresses Constellation's right to an equitable adjustment for the implementation of Ancillary Services Market Phases I and II ("ASM"). Those changes fall squarely within the equitable adjustment clauses of the PPAs because they entail a change in a NEPOOL market rules that increases costs incurred by Constellation under the PPAs. Disputes about equitable adjustments are subject to mandatory good faith negotiations and mandatory arbitration under the 2002 Contract (at least). NEC does not allege that Constellation's request to negotiate an adjustment based on the implementation of ASM is not arbitrable. Accordingly, the Court should give effect to the mandatory ADR for the parties' dispute about an equitable adjustment for ASM implementation costs and dismiss Count IV.

same issue between the same parties. Numerous courts have approved of stays pursuant to Section 3 of the FAA when the issue in question was referable to arbitration and the stayed proceeding involves common questions of fact that are within the scope of the arbitration agreement. *Contracting Northwest, Inc. v. Fredericksburg,* 713 F.2d 382, 387 (8th Cir. 1983) (holding Section 3 of the FAA even permits a stay of a suit involving nonarbitrating parties so long as the suit is based on issues referable to arbitration); *accord Am. Home Assurance Co. v. Vecco Concrete Constr. Co.*, 629 F.2d 961, 964 (4th Cir. 1980); *Bowlby v. Carter Mfg. Corp.*, 138 F. Supp. 2d 182, 188 (D. Mass. 2001) (granting stay of claims under employment agreement not subject to arbitration pending outcome of arbitration under purchase and sale agreement). Given that the equitable adjustment issue is referable to arbitration at least under the 2002 Contract, the Court may properly exercise the authority of Section 3 of the FAA to stay the virtually identical equitable adjustment disputes under the other PPAs.

In addition to the stay authority provided under the FAA, this Court has the inherent power to exercise broad discretion to stay all proceedings in an action pending the resolution of independent proceedings elsewhere. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Baggesen v. Am. Skandia Life Assurance Co.*, 235 F. Supp. 2d 30, 33 (D. Mass. 2002) ("Where a case involves both arbitrable and non-arbitrable claims, whether the non-arbitrable claims should be stayed pending resolution of the arbitrable claims is generally discretionary with the court."). "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for the litigants." *Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 879 n.6 (1998) (quoting *Landis*, 299 U.S. at

254-255); *see* Fed. R. Civ. P. 1 (permitting federal judges to manage their dockets in a way as to promote just and efficient resolutions). Without a doubt, "[a] trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." *Leyva v. Ceritified Grocers of California, Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979). Accordingly, the Court should compel NEC to abide by its promise to participate in mandatory alternative dispute resolution and stay these proceedings. Alternatively, the Court should compel ADR and dismiss this case without prejudice.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss NEC's complaint for lack of subject matter jurisdiction or failure to plead a claim upon which relief can be granted. Alternatively, if the Court determines dismissal inappropriate, the Court should compel arbitration and stay these proceedings or dismiss the case without prejudice.

Dated: October 23, 2006

Respectfully Submitted,

/s/ Stacey P. Nakasian

Stacey P. Nakasian, Esq. (Bar No. 5069)
Duffy Sweeney & Scott, LTD.
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700-Phone
(401) 455-0701-Fax

Kenneth W. Irvin (Pro Hac Vice pending)
Teresa M. Goody (Pro Hac Vice pending)
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC 20005-3096
Tel: 202.756.8116
Fax: 202.756.8087
E-mail: kirvin@mwe.com
E-mail: tgoody@mwe.com

*Attorneys for Defendant*
*Constellation Energy Commodities Group, Inc.*

# APPENDIX

**Exhibit A** Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company, Eastern Edison Company, Newport Electric Corporation and Constellation Power Source, Inc. (dated December 21, 1998, and amended on January 27, 2003 and June 3, 2003) **(the "20% Contract")** (filed under seal pursuant to accompanying motion)

**Exhibit B** Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company, Eastern Edison Company, Newport Electric Corporation and Constellation Power Source, Inc. (dated December 21, 1998, and amended on January 27, 2003 and June 3, 2003) **(the "36% Contract")** (filed under seal pursuant to accompanying motion)

**Exhibit C** Power Supply Agreement between The Narragansett Electric Company and Constellation Power Source, Inc. (dated October 5, 2001) **(the "2001 Contract")** (filed under seal pursuant to accompanying motion)

**Exhibit D** Power Supply Agreement between Narragansett Electric Company and Constellation Power Source, Inc. (dated August 23, 2002 and amended August 23, 2002) **(the "2002 Contract")** (filed under seal pursuant to accompanying motion)

**Exhibit E** Settlement Agreement, filed March 6, 2006, *Devon Power LLC*, FERC docket ER03-563-000 and ER03-563-055; and Explanatory Statement in Support of Settlement Agreement of the Settling Parties and Request for Expedited Consideration, filed March 6, 2006, *Devon Power LLC*, FERC docket ER03-563-000 and ER03-563-055

**Exhibit F** *Devon Power LLC*, 115 FERC ¶ 61,340 (June 16, 2006).

**Exhibit G** Letter, dated August 1, 2006, from Constellation to NEC

**CERTIFICATE OF SERVICE**

I hereby certify that on October 23rd, 2006, I electronically filed the foregoing *Memorandum of Points and Authorities in Support of Motion to Dismiss* with the Clerk of the Court for the District of Rhode Island using the ECF System which will send notification to the following registered participants of the ECF System as listed on the Court's Notice of Electronic Filing:

Gerald J. Petros
Robin L. Main
Hinckley Allen & Snyder, LLP
50 Kennedy Plaza
Providence, RI 02903

/s/ Stacey P. Nakasian