# EXHIBIT E – Part 1

March 6, 2006

**Sherry A. Quirk**
**Direct Dial: 202 775 6814**

**VIA HAND DELIVERY**

Ms. Magalie R. Salas, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

Re: Explanatory Statement In Support of Settlement Agreement of the Settling Parties and Request for Expedited Consideration and Settlement Agreement Resolving All Issues, Devon Power LLC, et al., Docket Nos. ER03-563-000, -030, and -055.

Dear Secretary Salas:

In accordance with Rule 602 of the Federal Energy Regulatory Commission's ("FERC" or "Commission") Rules of Practice and Procedure, 18 C.F.R. § 385.602 (2005), the Settling Parties submit an Explanatory Statement of the Settling Parties and Request for Expedited Consideration ("Explanatory Statement") and Settlement Agreement Resolving All Issues ("Settlement Agreement") for approval by the Commission in the above captioned proceedings. Enclosed for filing are an original and fourteen (14) copies of the following documents:

- Explanatory Statement of the Settling Parties and Request for Expedited Consideration and supporting documents;
- Settlement Agreement Resolving All Issues and attachment;
- Draft letter order and a diskette containing such draft order in Microsoft Word format; and
- Draft form of notice of filing, suitable for publication in the *Federal Register,* and a diskette containing this form of notice.

This filing is made pursuant to Rule 602 of the Commission's Rules of Practice and Procedure and pursuant to the Commission's October 21, 2005 order in the captioned proceeding. Pursuant to Rule 602 of the Commission's Rules, initial comments must be filed within twenty (20) days of the filing. Reply comments may be filed not later than thirty (30) days after the filing of the offer. Accordingly, initial comments regarding this settlement must be filed on or before March 27, 2006, and reply comments must be filed on or before April 6, 2006. The Settling Parties request Commission action approving the Settlement Agreement in its entirety, without modification or condition, on or by June 30, 2006. To the extent necessary, waiver of the Commission's notice requirements is requested.

* The parties to the Settlement Agreement as of the date of the Settlement Agreement are identified in Section V of the Explanatory Statement.

For convenience, the following is a list of the documents being filed herewith.

| Attachment Number | Document |
|---|---|
| | Explanatory Statement of the Settling Parties in Support of Settlement Agreement and Request for Expedited Consideration (with Attachments 1- 7, as listed below) |
| Attachment 1 | Settlement Agreement Resolving All Issues (with Attachment 1A) |
| Attachment 1A | Definitions |
| Attachment 2 | Affidavit of Robert Stoddard |
| Attachment 3 | Affidavit of Miles Bidwell |
| Attachment 4 | Affidavit of Peter Cramton |
| Attachment 5 | NEPOOL Vote Tally |
| Attachment 6 | Affidavit of David LaPlante |
| Attachment 7 | Draft form of Notice of Filing and diskette containing such draft notice |
| Attachment 8 | Draft Letter Order Approving Settlement and diskette containing such draft order |

Also enclosed are two extra copies of the filing to be date-stamped and returned with our messenger.

The signatories to the Settlement Agreement support the Agreement. Due to the time pressures associated with completing this filing, the Settling Parties have not had sufficient opportunity to thoroughly review the final version of the Explanatory Statement, or to clear the final version of the Explanatory Statement within their respective organizations. As such, the Settling Parties at this time reserve their rights to file comments addressing specific aspects of the Explanatory Statement that may conflict with the Settlement Agreement, and commit to raise whatever such issues they may have (if any) in their Initial Comments.

As explained above, certain affidavits have been filed as part of and are referenced in the Explanatory Statement. Execution of the Settlement Agreement does not imply support, endorsement, or subscription to all or any of the Affidavits, which are being submitted only on behalf of the specific parties listed therein.

This submission includes affidavits on behalf of Robert Stoddard and David LaPlante (Attachments 2 and 6, respectively) that presently contain faxed copies of the affiants' notarized signatures. We will substitute original copies by further submission tomorrow, March 7, 2006. We will also forward additional Settlement Agreement signature pages as they are provided to us. Should you have any questions or need further information concerning this filing, please call me at the number above.

Sincerely,

Sherry A. Quirk

Attorney for ISO New England, Inc.

Encl.

cc: Service List
Individuals and Entities identified in Explanatory Statement.

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| Devon Power LLC, et al. | ) | Docket Nos. ER03-563-000, |
| | ) | ER03-563-030, and ER03-563-055 |

**EXPLANATORY STATEMENT OF THE SETTLING PARTIES IN SUPPORT OF SETTLEMENT AGREEMENT AND REQUEST FOR EXPEDITED CONSIDERATION**

(March 6, 2006)

Pursuant to Rule 602 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.602 (2005), the Settling Parties (as identified in the Settlement Agreement and Section V of this Explanatory Statement)[1] submit this "Explanatory Statement of the Settling Parties in Support of Settlement Agreement and Request for Expedited Consideration" ("Explanatory Statement" or "Statement") with accompanying settlement agreement ("Settlement Agreement" or "Agreement") (Attachment 1) for approval by the Federal Energy Regulatory Commission ("Commission"). As set forth more fully in Section 1 and 2 of the Settlement Agreement, the Settling Parties request, pursuant to Rule 212 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.212, that the Commission approve this Settlement Agreement in its entirety without conditions or modifications on or before June 30, 2006.[2] As explained *infra,* expedition is appropriate because implementation of the Settlement Agreement requires

[1] Capitalized terms used but not defined in this Explanatory Statement are intended to have the meanings given to such terms in the Settlement Agreement, the ISO New England Inc. Transmission, Markets and Services Tariff ("ISO Tariff"), the Participants Agreement, or the Second Restated New England Power Pool Agreement (the "Second Restated NEPOOL Agreement") (as such terms may be consolidated on Attachment A to the Settlement Agreement).

[2] Settlement Agreement at §§ 1-2.

substantial effort to finalize detailed market rules and manuals, and an approval on or before that date permits the necessary detail work to be completed in time to support the December 1, 2006 implementation.

This Settlement Agreement is the result of more than 30 days of noticed, formal settlement conferences among more than 175 parties pursuant to notice by and involvement of Administrative Law Judge Lawrence Brenner (the "Settlement Judge"). Those settlement talks were preceded by 24 days of hearings involving 64 parties, thousands of pages of exhibits, roughly 5000 pages of transcript, and a 283-page initial decision issued on June 15, 2005 (the "Initial Decision").[3] Consistent with Commission direction,[4] the Settling Parties have developed an alternative to the Initial Decision's locational installed capacity ("LICAP") mechanism that would replace the LICAP mechanism to achieve the Commission's goals, as stated in the June 2004 Order.[5] In the long term, the capacity market proposed in the Settlement Agreement establishes a "market-type mechanism"[6] to attract new Resources to meet the growing electric energy needs of the New England region, generally using the Forward Capacity Market ("FCM") design recommended by state regulators and consumer representatives. For a transition period before the FCM, the Settlement Agreement provides a level of compensation to suppliers that is lower than the compensation that would have been paid had the LICAP mechanism approved in the Initial Decision been adopted by the Commission. These transition payments will serve as a bridge to the FCM. The market design, in both the short and long term, also provides a price

[3] *Devon Power LLC, et al.*, 111 FERC ¶ 63,063 (2005) ("Initial Decision").

[4] *Devon Power LLC, et al.,* Docket ER03-563-030, oral argument, September 20, 2005. Tr. 252:20-253:10.

[5] *Devon Power LLC, et al.*, 107 FERC ¶ 61, 240 at P 1 (2004) ("June 2004 Order").

[6] 107 FERC ¶ 61, 240 at P 7.

signal for capacity to perform when needed and facilitates participation in the capacity market by intermittent and demand response resources. As shown in Attachments 2, 3, and 4, Witnesses Robert Stoddard, on behalf of Capacity Suppliers and Dominion, Miles Bidwell, on behalf of the Connecticut Department of Public Utility Control ("CT DPUC"), and Peter Cramton, on behalf of the ISO, support the FCM as a workable market design for the New England region.[7]

Based on polling by the Settlement Judge, this Settlement Agreement has the support of public utility regulators from four of the six New England states, and is either supported or not opposed by a broad cross-section of generation owners, transmission owners, load serving entities and ISO New England Inc. (the "ISO"). NEPOOL supports this settlement by a 78.46% vote of its Markets Participants.

## I. INTRODUCTION

As demonstrated in this Explanatory Statement, the Settlement Agreement strikes a just, reasonable, and fair balance among suppliers, state public utility regulators, consumer advocates, and load, and should be approved. The Settlement Agreement achieves two fundamental objectives shared by all parties to this case. First, the FCM provides a market structure that will encourage needed new generation to be built. Second, the FCM is designed to allow new capacity to set the clearing price, thus providing a market-based measure of the cost of new entry.

Section II of this Explanatory Statement provides a summary of the case, and Section III contains an overview of the Settlement Agreement. In Section IV, the Settling Parties explain their request for expedited consideration of the Settlement Agreement. Section V identifies the

[7] Execution of the Settlement Agreement does not imply support, endorsement, or subscription to all or any of the Affidavits, which are being submitted only on behalf of the specific parties listed therein.

Settling Parties. A more detailed explanation of the Settlement Agreement, along with the information required by the Commission to be included with an explanatory statement, is contained in Section VI. Section VII provides additional details concerning the service of this Settlement Agreement and Explanatory Statement on interested parties, and Section VIII provides a concluding statement.

Notwithstanding the very broad support for this Settlement Agreement, the Settling Parties do expect that aspects of the Settlement Agreement will be opposed. The Maine Public Utilities Commission, the Massachusetts Department of Telecommunications and Energy, and the Massachusetts Attorney General have expressed opposition to the proposed settlement. Although the Connecticut Department of Public Utility Control and the Connecticut Office of Consumer Counsel support the settlement, the Connecticut Attorney General has stated its opposition. In addition, some transmission-owning utilities and load serving entities do not support the settlement. As will be shown below, however, the Commission should approve the Settlement Agreement, notwithstanding these objections.

It is well settled that the Commission "can approve contested settlements as long as it determines that the proposal will establish just and reasonable rates."[8] The Commission's decision to approve a contested portion of a settlement must be supported by substantial evidence or a finding that, as to the contested matter, there is no genuine issue of material fact.[9] This standard is embedded in section 385.602(h) of the Commission's regulations.[10]

---

[8] *New Orleans Public Service, Inc. v. FERC*, 659 F.2d 509, 512 (5th Cir. 1981) (citing *Placid Oil Co. v. FPC*, 483 F.2d 880, 893 (5th Cir. 1973), *aff'd. sub nom. Mobil Oil Corp. v. FPC*, 417 U.S. 283, 312-13, 94 S. Ct. 2328, 2347-48, 41 L. Ed. 2d 72 (1974)).

[9] *Exxon Co., U.S.A. v. FERC,* 182 F.3d 30, 37 (D.C. Cir. 1999). On appeal, a reviewing court "will set aside FERC's approval if it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* However, the test is narrow and the court "is not to

In addressing a contested settlement, at least four approaches are available to the Commission. The Commission may: (1) make a merits decision on each contested issue; (2) approve the settlement as a package if it determines that the overall result of the settlement is just and reasonable; (3) approve the settlement if its benefits to directly affected parties outweigh objections by contesting parties whose interests are too attenuated; or (4) sever contesting parties.[11] In this instance, the settlement may be approved as a complete package because it represents a just and reasonable result.

The Settling Parties urge the Commission to evaluate and approve the Settlement Agreement as a package. This Settlement Agreement reflects a complex compromise among all affected parties. Each Settling Party might well oppose at least some individual components within the Agreement if taken in isolation, but the Settling Parties together have agreed to the package as a whole.[12] Changing any aspect of the Agreement would upset the balance achieved in the Agreement and will undoubtedly provoke calls to change other aspects of the Agreement. Getting the parties to this point has been an extraordinary challenge and there can be no

---

substitute its judgment for that of the agency." *Id.* (citing *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 77 L. Ed. 2d 443, 103 S. Ct. 2856 (1983)). Where, the analysis to be performed "requires a high level of technical expertise, [the court] must defer to the informed discretion of the responsible federal agencies." *Id.* Nonetheless, the FERC must engage in rational decision making. *Id.* (citing *Motor Vehicle Mfrs. Ass'n of the United States, Inc.*, 463 U.S. 29 at 43 (1983)).

[10] Section 385.602(h)(i) of the regulations provides that

> If the Commission determines that any offer of settlement is contested in whole or in part, by any party, the Commission may decide the merits of the contested settlement issues, if the record contains substantial evidence upon which to base a reasoned decision or the Commission determines there is no genuine issue of material fact.

[11] *Trailblazer Pipeline Company*, 85 FERC ¶ 61,345 (1998), *order on reh'g*, 87 FERC ¶ 61,110 (1999).

[12] No Settling Party's support for this Settlement Agreement should be construed as support for any individual component of the Settlement Agreement or for anything more than support for the Settlement Agreement as a whole solely in the context of resolving this proceeding.

assurance that conditions or changes, no matter how slight they may appear on the surface, could alter that balance. This Settlement Agreement is a complete package that must be considered in its entirety and should be approved in its entirety as just, reasonable, and in the public interest.

While in certain circumstances the Commission is able to sever parties or issues from a contested settlement and approve the settlement among the settling parties as uncontested, the Settling Parties believe that severance is inappropriate in this instance. Ultimately this settlement will create a structure applicable to all generation and load in the region. Contesting parties cannot be severed and permitted to litigate the applicable transition charges or market design elements in specific situations without affecting the rate charged to and received by Settling Parties. Further, many (if not all) Settling Parties agreed to compromise specifically to avoid the uncertainty of prolonged litigation. Issues cannot be severed without upsetting the balance of the Agreement.

## II. SUMMARY OF THE CASE

This proceeding began on February 26, 2003, when Devon Power LLC, Middletown Power LLC, Montville Power LLC, Norwalk Power LLC and NRG Power Marketing Inc. (collectively, "NRG") filed, pursuant to Section 205 of the Federal Power Act ("FPA"),[13] four cost-of-service reliability-must-run ("RMR") agreements covering 1,728 MW of generating capacity located within Connecticut and the Southwest Connecticut ("SWCT") Designated Congestion Areas ("DCAs").

In an order issued April 25, 2003[14] (the "April 2003 Order"), the Commission rejected NRG's RMR agreements, and allowed collection of only going-forward maintenance costs

[13] 16 U.S.C. § 824d (2000).

[14] *Devon Power LLC, et al.*, 103 FERC ¶ 61,082 (2003).

through the tracking mechanism approved in a prior order issued March 25, 2003.[15] The Commission directed the ISO to file a " mechanism that implements location or deliverability requirements in the ICAP or resource adequacy market . . . so that capacity within DCAs may be appropriately compensated for reliability."[16]

Pursuant to the Commission's directive in the April 2003 Order, on March 1, 2004, the ISO submitted a LICAP filing (the "March 1 Filing").[17] The ISO's March 1 Filing was protested and commented on by various parties. Two months later, on June 2, 2004, the Commission issued an order (the "June 2004 Order")[18] conditionally accepting the March 1 Filing, established hearing procedures regarding that filing, and identified issues to be addressed at hearing. The Commission directed the Presiding Administrative Law Judge to issue an initial decision on or before June 1, 2005, and deferred implementation of the LICAP proposal until January 1, 2006.

Following the June 2004 Order, the LICAP proposal was addressed in hearings before Administrative Law Judge Bobbie J. McCartney (the "Presiding Judge"). Twenty-four days of hearings were held, beginning on February 23, 2005, and concluding on March 31, 2005. Following voluminous briefs by all interested parties, the Presiding Judge issued the Initial Decision on June 15, 2005.[19]

In the Initial Decision, the Presiding Judge concluded that the ISO's LICAP proposal, as modified throughout the hearings, was just and reasonable and should be accepted by the

---

[15] *Devon Power LLC, et al.,* 102 FERC ¶ 61,314 (2003).

[16] April 2003 Order at P 37. The Commission further clarified its findings in an order on rehearing in *Devon Power LLC, et al.,* 104 FERC ¶ 61,123 (2003).

[17] Compliance Filing of ISO New England Inc., Docket No. ER03-563-030 (March 1, 2004).

[18] *Devon Power LLC, et al.,* 107 FERC ¶ 61,240 (2004).

[19] *Devon Power LLC, et al.,* 111 FERC ¶ 63,063 (2005).

Commission with certain modifications. That Initial Decision has been the subject of numerous briefs on and briefs opposing exceptions and is still pending before the Commission.

Following the issuance of the Initial Decision, the Commission granted a request by numerous parties for oral argument on alternatives to LICAP.[20] In that same order, the Commission again delayed implementation of LICAP, this time holding that it would not be implemented any earlier than October 1, 2006.

Pursuant to direction of the Commission, on September 13, 2005, parties representing load, including the public utility regulatory commissions for all six states, filed the New England Resource Adequacy Model ("NERAM")[21] and the New England Locational Resource Adequacy Model ("NELRAM")[22] structures as proposed alternatives to LICAP. Those alternatives proposed a forward resource auction to procure capacity, a descending clock auction held several years in advance of an installed capacity commitment period, penalties for non-performance, and a phase-in or transition period.[23] All of these features of the proposed alternatives have been incorporated into the Settlement Agreement.[24]

---

[20] *Devon Power LLC, et al.*, 112 FERC ¶ 61,179 (2005).

[21] Statement in Support of the New England Resource Adequacy Market, *Devon Power LLC*, Docket ER03-563-030 (Sept. 13, 2005).

[22] Four State Commissions' Proposed Alternative to LICAP *Devon Power LLC*, Docket ER03-563-030 (Sept. 13, 2005).

[23] The filing, joined by the Maine Public Utilities Commission, stated at p. 13:

> Because the performance and payment under [a forward procurement approach] will not occur until 2010, the [state commissions for Maine, New Hampshire, Vermont, and Rhode Island] agree that some payments to existing generation resources are appropriate between the first auction and the initial performance period in 2010. . . . The Commission should direct that the issue of transition payments be resolved through a stakeholder settlement process.

[24] Settlement Agreement at § 11, Parts I.A-C and III (Forward Capacity Auction), Part III.F (descending clock auction), Part V.C.2 (availability penalties) and Part VIII (Transition Period).

On October 21, 2005, the Commission granted the request of multiple parties for appointment of the Settlement Judge.[25] This Settlement Agreement is the product of that settlement process.

## III. OVERVIEW OF SETTLEMENT AGREEMENT

### A. THE FORWARD CAPACITY MARKET

The Settlement Agreement provides for the implementation of an alternative to LICAP – a forward capacity market (the "FCM") establishing competitive auctions for capacity resources to be held three years ahead of their anticipated need. Consistent with proposals advanced before the Commission by state regulators and load, the forward capacity auction ("FCA"), which will be held annually, will be a descending clock auction. A key element of the auction design is the competitive bidding process that will price all capacity from bids made by new capacity. The bidding will start at two times the agreed starting value of CONE of $7.50/kW-month, so the starting value will be $15 per kW-month in the first auction. Recognizing the need for market liquidity and that circumstances will change as suppliers' capacity commitments come due, the FCM provides for an annual reconfiguration auction two years, one year, and just prior to the Commitment Period and twice-yearly seasonal auctions and monthly auctions just prior to, and during each Commitment Period. Due to software and implementation considerations, however, the first initial auction is expected to be held early in 2008 for a Commitment Period beginning June 1, 2010.[26] The initial auction for the commitment period beginning June 1, 2011 would be held shortly thereafter.

---

[25] *Devon Power LLC, et al.*, 113 FERC ¶ 61,075 (2005) at P 9.

[26] Settlement Agreement at § 11, Part I.C.

The parties focused on minimizing the risk of auction failure, either because new proposals for capacity resources do not materialize or because bids to meet future needs are adversely impacted by risk analyses for the new market structure or market power. Acknowledging that uncertainties exist with the initial auctions, the FCM contains a mechanism (specified in Section III.G.4.) that is designed to imitate the principles of a price collar often used on trading floors of large financial markets, which establishes a ceiling on the price for existing capacity resources at 1.4 times the cost of new entry ("CONE"), and a floor of 0.6 times CONE until there have been three successful auctions. In the first year, this means that auction prices for existing capacity can range from $4.50 to $10.50. The FCM also contains provisions to ensure that if there is inadequate supply offered or the structure of competition of offers of new supply is insufficient to ensure a competitive result, necessary new resources are brought into the market while limiting the payment to existing suppliers.

With respect to market power concerns, the FCM provides limited opportunities for existing capacity to impact Capacity Clearing Prices. Except within a specified range, all existing capacity that remains listed is effectively a price taker in each FCA and cannot set the clearing prices to be received by other existing capacity resources. Such existing capacity can seek, however, to forego receiving any capacity revenues for a Commitment Period by submitting bids to de-list from the capacity market (a "De-List Bid").[27] If the Capacity Clearing Price falls below the level of a De-List bid, the existing capacity submitting that bid will be allowed to de-list all or a portion of a Resource unless the absence of that Resource would produce reliability problems, in which case the Resource will be entitled to just and reasonable compensation but will not set the Capacity Clearing Price. Existing capacity also will be

[27] Settlement Agreement at § 11, Part III.D.5.

permitted to bid to retire/permanently de-list their capacity. Again, if the Capacity Clearing Price falls below the level of a retirement/permanent de-list bid, the Resource submitting that bid will be permitted to retire/permanently de-list, subject to reliability limitations. The Market Monitoring Unit will have specifically delineated authority to review and reject bids that are concluded to be improper, subject to appropriate Commission involvement. This review is intended to ensure that neither monopoly nor monopsony market power are inappropriately exercised.

The level of capacity payments paid to capacity resources will be directly and immediately tied to the availability of those resources. Availability metrics were a highly contested issue in hearings. The Settlement Agreement reflects a compromise that adopts a definition of "Shortage Event" that is intended to capture hours when capacity resources are determined to be most needed due to conditions on the system. The Settlement Agreement provides for loss of capacity compensation for capacity resources that fail to perform (subject to certain well-defined excuses) during these Shortage Events. On any critical day, a resource can have their compensation reduced up to 10% of annual FCA Payment if it is not available and, in any month, a resource can lose up to two and one-half months of its annual FCA Payment. The availability provisions in the FCM also have a variety of other mechanisms designed to balance, in the specific context of the settlement, the desire for strong economic incentives for capacity resources to be available when needed without creating unnecessary payment risk to resources.

Additional understandings have been worked out with respect to gas-fired resources, intermittent resources, and demand resources. Because of the expected critical need for gas-fired resources during winter shortage hour events, the Settlement Agreement provides for future changes to the market rules that will accelerate when bids must be received for the Day-Ahead

Energy Markets during the winter months and when the ISO will issue financially binding dispatch schedules for the next day. Because of the continued mismatch between the time when gas can be nominated for delivery day ahead and when the ISO is certain of the need for particular gas-fired generation, the Settlement Agreement provides assurance that gas-fired generation procuring transportation and gas to meet its binding Day-Ahead schedule will be entitled to certain reimbursements for gas purchased in reliance on the schedule but not burned as a result of the actual dispatch of the unit.

In addition, due to the continuing desire to accommodate wind and other intermittent resources, rather than subject them to additional reductions in compensation for failure to operate at rated capacity during Shortage Events, the FCM provides for reduced capacity ratings for these units that will reflect their intermittent nature of performance. Over the next 12 months, FCM market rules that are comparable to supply side resources will be developed for demand-side capacity resources.

Similar to the litigated LICAP proposal, the FCM includes a reduction in payments for capacity (except for self-supplied capacity) equal to the "Peak Energy Rents" ("PER") that would be expected to be received from a hypothetical proxy unit during the Commitment Period. This PER deduction will act as both as disincentive for suppliers to raise prices in the energy market and a hedge for load against energy price spikes.

**B. TRANSITION TO FCM**

A transition period is a necessary part of this settlement because the FCM proposed in the settlement will not result in the purchase of capacity until the 2010/11-Power Year. This leaves a gap between now and 2010/11 that must be filled by an interim compensation arrangement. To address this period, the Settlement Agreement provides for a negotiated level of capacity

payments for this interim or transition period. Indeed, the proponents of alternatives to LICAP recognized the need for a transition period. Beginning for the month of December 2006, and extending until the Commitment Period for the first FCA, which is expected to occur on June 1, 2010, these payments start at $3.05/kW-month, and increase to $4.10kW-month, paid to all installed capacity. The capacity product is UCAP on a seasonal basis, with a weighted EFORd availability metric.

While there could be disagreement among the Settling Parties as to the actual level of savings to consumers from this Settlement Agreement when compared to LICAP, there is no question that consumers benefit from the settlement. The detailed comparison of the currently projected prices of LICAP and of the settlement transition payment rates are set forth in the Tables 3 and 4 of the attached affidavit of ISO Vice President of Wholesale Markets Strategy David LaPlante (Attachment 6). Along with the other data and record evidence described below, Mr. LaPlante demonstrates that the settlement transition payment rates would be consistently below the projected prices that likely would have been in effect over the same 4-year period had LICAP, which was found to be just and reasonable in the Initial Decision, been implemented. Accordingly, these settlement provisions should be approved as just and reasonable as part of the overall settlement package. This is particularly true in light of the comprehensive nature of the settlement and the multifaceted balance among a variety of competing interests that included the transition payments.

## IV. REQUEST FOR EXPEDITED CONSIDERATION

The Settling Parties respectfully request that the Commission approve the Settlement Agreement without modification or condition no later than June 30, 2006. This schedule is extremely important to achieving the agreement to implement transition payments beginning

December 1, 2006, and a first FCA in early 2008. Once the Commission has approved the Settlement Agreement, there will remain many details to be worked out in the stakeholder process, which will provide for consultation with state utility regulatory agencies. For that process to be successful, there must be time for a full review and consideration of the details. The Settlement Agreement proposes that such details for transition can be completed by October 1, 2006, with details for FCM finalized and filed by February 15, 2007. Delay in Commission approval of the Settlement Agreement beyond June 30, 2006, materially increases the risk that the necessary details will not be completed in time for implementation on the schedule required by the Settlement Agreement.

For that reason, Section 2 of the Settlement Agreement provides that it terminates on June 30, 2006, in the absence of a Commission order accepting it. That Section further provides that, if the Commission approves the settlement with modifications or conditions, the Settling Parties have only 30 days to attempt to negotiate modified arrangements that are acceptable to all the Settling Parties.

## V. THE SETTLING PARTIES

The parties to the Settlement Agreement (each individually a "Settling Party" and collectively the "Settling Parties") as of the date of this Explanatory Statement are as follows:[28]

American National Power, Inc.
Associated Industries of Massachusetts
Boston Generating, LLC
Calpine Eastern Corporation
Calpine Energy Services, L.P.
Cape Wind Associates, LLC
Central Vermont Public Service Corporation
Connecticut Department of Public Utility Control
The Connecticut Light and Power Company
Connecticut Municipal Electric Energy Cooperative
Connecticut Office of Consumer Counsel
Conservation Services Group
Consolidated Edison Energy, Inc.
Dominion Energy Marketing, Inc.
Dominion Nuclear Connecticut, Inc.
Dominion Resources, Inc.,
Duke Energy North America, LLC
Energy Management, Inc.
EnerNOC, Inc.
Entergy Nuclear Generation Company
Entergy Nuclear Vermont Yankee, LLC
Exelon Generation Company, LLC
Exelon New England Holdings, LLC
FPL Energy, LLC
Granite Ridge Energy, LLC
HQ Energy Services (U.S.) Inc.
ISO New England Inc.
Lake Road Generating Company, LP

[28] Mirant New England no longer exists post-bankruptcy. The Mirant companies are: Mirant Americas Energy Marketing, LP; Mirant Canal, LLC; and Mirant Kendall, LLC.

MASSPOWER
Milford Power Company, LLC
Mirant Americas Energy Marketing, LP
Mirant Canal, LLC
Mirant Kendall, LLC
Mystic Development, LLC, Mystic I, LLC, and Fore River Development, LLC
National Grid USA (on behalf of itself and its subsidiaries that are intervenors in this proceeding)
NEPOOL Participants Committee
New Hampshire Public Utilities Commission
NRG (Devon Power, LLC, Middletown Power LLC, Montville Power LLC, Norwalk Harbor, LLC, and NRG Power Marketing, Inc.)
Pinpoint Power, LLC
Public Service Company of New Hampshire
Rhode Island Division of Public Utilities and Carriers
Rhode Island Public Utilities Commission
Select Energy, Inc.
Sempra Energy Trading Corp.
TransCanada Power Marketing Limited
The United Illuminating Company
Vermont Department of Public Service
Vermont Public Power Supply Authority
Vermont Public Service Board

A number of other parties in the proceeding also have been very engaged and involved in the settlement discussions, but have not submitted executed signature pages by the date of this Statement. For some of those parties, additional processes may be required for approval. Other parties may be continuing to work on resolution of related but independent matters before they are able to support the Settlement Agreement. In addition, while there are others who have indicated opposition to the Settlement Agreement, their representatives have been involved in helping to define key aspects of this agreement.

## VI. THE SETTLEMENT AGREEMENT

The Settlement Agreement is included as Attachment 1 to this Explanatory Statement. A more detailed summary of the Settlement Agreement is included below. This section also includes additional information in compliance with the Commission's directives regarding settlement agreements.

### A. Compliance with Commission Directives Regarding Information to Be Provided with Settlement Agreements

This Statement, including its attachments and the transmittal letter filed herewith, provides the information required by Rule 602 of the Commission's Rules of Practice and Procedure.[29] Pursuant to the October 23, 2003 Notice to the Public entitled "Information to be Provided with Settlement Agreements,"[30] the Settling Parties state as follows:

This Settlement Agreement resolves significant potential issues regarding the LICAP market recommended by the Initial Decision. The Settling Parties have developed an alternative capacity market, the new FCM, that renders moot significant opposition to the recommended LICAP market and, assuming the Settlement is approved, eliminates the need for potential future litigation on the recommended LICAP market. The FCM will be implemented as quickly as possible and, as noted previously, the transition prices are significantly lower than projected prices if the LICAP mechanism adopted in the Initial Decision had been affirmed by the Commission.

The issues being settled have major policy implications: This case presents the fundamental policy issue of how to design a capacity market in order to resolve reliability

---

[29] 18 C.F.R. § 385.602 (2006).

[30] See "Notice to the Public - Information to be Provided with Settlement Agreements," (issued Oct. 15, 2003); "Errata," (issued Oct. 23, 2003).

compensation issues. However, the resolution reflected in this settlement is, by its nature and specific terms, non-precedential. Other than the instant dockets, the Settling Parties are not aware of the results of any other pending cases that will be dictated by Commission action on this Settlement Agreement.[31] The settlement does not involve an issue of first impression and there are no previous reversals on the issues involved. The Settlement Agreement and the implementing market rules remain subject to the just and reasonable standard established by Sections 205 and 206 of the Federal Power Act, except as specifically provided for in Section 4. of the Settlement Agreement.

In accordance with the December 8, 1999 Notice to the Public entitled "Proposed Settlement Agreements," the Settling Parties are including as Attachment 8 hereto a draft Commission letter order approving the settlement and a diskette containing that letter order in Microsoft Word format.

### B. Summary of the Terms of the Settlement Agreement

#### 1. Effectiveness, Termination and Scope of the Agreement

Section 1 of the Settlement Agreement provides that it will become effective either by the Commission approving the agreement in its entirety or, subject to the process described in Section 2, with changes or modifications as agreed by the Settling Parties.

Section 2 sets out provisions for renegotiation if the Commission approves the Settlement Agreement conditionally and termination of the Settlement Agreement if the Commission

[31] The Settlement Agreement does clarify in Part VIII.E. that unless otherwise agreed in a FERC-approved settlement, transition payments will be netted against any RMR payments. Moreover, in Part VIII.F., the Settlement Agreement clarifies that the beginning of transition payments will not trigger automatic termination of RMR agreements that, by their terms, terminate upon the implementation or effectiveness of a locational ICAP mechanism but that the start of the first Commitment Period will be considered such implementation or effectiveness for purposes of terminating RMR agreements.

disapproves the Settlement Agreement or the parties do not accept a Conditional Approval Order. Unless Settling Parties agree to an extension, the Settlement Agreement shall terminate if the Commission does not approve it by June 30, 2006. If the Commission gives only conditional approval (*i.e.*, it modifies any of the Settlement's terms), settlement discussions will be reinstituted for 30 days to permit the Settling Parties to renegotiate and restore the balance of risks and benefits. If the Settling Parties reach agreement, the renegotiated Settlement Agreement will be filed with the Commission. Without a further agreement, the Settlement Agreement will terminate.

The Settlement Agreement resolves all of the issues raised in Docket Nos. ER03-563-030 and ER03-563-055 before the FERC.

### 2. Market Rules

Section 3 of the Settlement Agreement sets out processes for implementation of the settlement once it is approved by the Commission. First, Section 3.A. details the process for developing the provisions of the ISO Tariff (the "Market Rules") that will be necessary to implement the settlement. The Market Rules will be developed and filed in at least two packages. The first filing will contain rules for implementation of the transition provisions on December 1, 2006, and will be filed by October 1, 2006. The second filing, which must be made by February 15, 2007, will contain the rules for the FCM itself. To the extent addressed in the Settlement Agreement, the parties to the settlement may only challenge the Market Rules on the grounds that they are inconsistent with, or not necessitated by, the Settlement Agreement. Section 3.D. states that the Market Rules will be developed in accordance with NEPOOL's traditional rule review process and will include the opportunity for input from state utility regulators.

Under Section 3.C., a general timeline is laid out for determining a critical input into the FCM – the Installed Capacity Requirement ("ICR"). This process will determine how much capacity will be bought through the auctions. As the Commission is aware, the ISO is currently conducting a stakeholder process in New England (including market participants and state regulators) to review the process for deriving ICR. The goal is to conclude that process during the third quarter of 2006 and, as appropriate, file with the Commission in the fourth quarter of 2006. Based upon the outcome of that filing, the ICR for the first auction will be filed during the third quarter of 2007, with a requested effective date of October 1, 2007, which will enable the first auction to be conducted no later than early 2008. As noted in Section I.C. the first auction will have a truncated Planning Period of slightly over two years, enabling the first Commitment Period to coincide with the June, 2010 through May, 2011 Power Year. Thereafter, auctions will be conducted approximately three and a half years prior to the Commitment Period.

Under Section 4.A., the settling parties waive their Section 206 rights to seek a change in the Settlement Agreement or the Market Rules implementing the agreement for a period of roughly two and one half years (the "Waiver Period"). During this Waiver Period, subject to Section 4.C., the ISO retains its FPA Section 205 rights (subject to appropriate stakeholder processes) but may exercise those rights only upon a showing that the change is needed to prevent a negative effect on system operations or the forward capacity or forward reserves markets. After the Waiver Period, all Settling Parties have their rights provided by law to seek changes.

The Settling Parties agree that two aspects of the settlement require additional special protections against changes. Thus, under Section 4.C., the final prices derived from all auctions and the transition provisions in Section 11, Part VIII cannot be changed unless required by the

public interest under the Mobile Sierra standard. At least one purpose for adopting the Mobile-Sierra standard for final auction prices is to reduce regulatory uncertainty and thus the risk premium that new entrants may require.

Section 11, Part IX, however, allows parties to challenge key inputs to the auction before the auction is run. Once the auction is run, Section 11, Part II.G.3.b. provides that results from the primary auctions will be filed by the ISO pursuant to Section 205 of the FPA. Parties will have 45 days to file objections to the auction results, and this will be the only means of challenging such results. Section 5 provides that the ISO's internal market monitoring unit will issue a full report analyzing the operations and effectiveness of the FCM 180 days after the second FCA and annually in its Markets Report thereafter.

### 3. Auction Mechanics

The FCM is a new locational capacity market design that integrates major elements of several proposed forward procurement models – *e.g.*, NERAM and NELRAM (collectively, "RAM Proposals"), and Reliability Options[32] – and the Initial Decision's LICAP. The FCM also shares certain characteristics with the Central Resource Adequacy Market ("CRAM") that was developed as part of the joint discussions of New England, New York and PJM market participants.[33]

Despite the FCM's new name, however, the Commission is acquainted with many elements of the FCM's design. Aspects of FCM were presented in filings and at oral argument

---

[32] Testimony describing Reliability Options is an offer of proof in Docket ER03-563-030. *See* Order Confirming Rulings, Devon Power LLC, ER03-563-030 (Dec. 3, 2004); Hearing Tr. at 1606:16-19.

[33] "Central Resource Adequacy Markets for PJM, NY-ISO and NE-ISO, Final Report" FERC Docket No. ER03-647-004, filed February 26, 2004.



{W0137188; 3}

before the Commission in September 2005. The FCM integrates elements of these market designs and is intended to help assure resource adequacy and reliability for New England at just and reasonable rates, in the context of this settlement package as a whole, as supported by the affidavits of Witnesses Stoddard, Bidwell, and Cramton included as Attachments 2, 3 and 4.

a. Capacity Product Definition and Market Structure

The FCM establishes an auction-based market for locational capacity resources in New England. The product is a megawatt of deliverable capacity with a future supply commitment in a Power Year three years in advance.[34] The three-year period between the auction and the supply commitment period is the Planning Period. The duration of the supply commitment – the Commitment Period – coincides with the June-to-May Power Year and is one year for all existing capacity, but new capacity may choose a Commitment Period of up to five years.[35] The capacity product may be supplied by many types of Capacity Resources, including traditional generating plants, intermittent resources (e.g., wind and hydro),[36] and demand response resources[37] located in New England, as well as imports of capacity resources from outside New England. Partial delisting provisions incorporated into the design permit Capacity Resources to offer a portion of their capacity in the FCA.[38] As set forth further below, the Settlement Agreement also provides an improved definition of the capacity product by distinguishing the

[34] This is true for all auctions but the first, which has a projected two-year planning period. The first auction is expected to be held by the end of first quarter of 2008 for a commitment period in Power Year 2010/11. All other auctions will have a three-year planning period. For example, capacity for Power Year 2012/13 will be procured in the first quarter of calendar year 2009.

[35] *See* Settlement Agreement, § 11, Part I.B.

[36] *Id.* at Part § 11, II.E.

[37] *Id.*

[38] *Id.* at § 11, Part II.D.4.

service obligations assumed by the portion of a Resource sold as a capacity ("listed") and the rights retained by the de-listed portion of a resource.[39] Capacity Resources may be designated by a load serving entity to be a self-supplied resource.[40] As discussed below, the FCM includes a locational component that allows for prices to differ in import- or export-constrained zones.

The capacity product is procured in an annual auction administered by the ISO. The amount of capacity that the ISO will procure in the auction is 100 percent of the forecast Installed Capacity Requirement for the appropriate commitment period.[41] A descending clock auction will be used to set the Capacity Clearing Price.[42]

Supplementing the FCA are reconfiguration auctions held prior to and during the Commitment Period.[43] These reconfiguration auctions provide a mechanism for the ISO, suppliers and traders to buy, sell, and exchange capacity obligations and will maintain market liquidity. The FCM includes three types of reconfiguration auctions: (i) three annual auctions (for trading year-long commitments) before the relevant Commitment Period, (ii) monthly auctions held prior to each commitment month, and (iii) seasonal auctions held prior to June and October of each year to sell a "seasonal strip" product. These reconfiguration auctions preserve any locational element of the initial auction.

---

[39] *See generally* Settlement Agreement §11, Part IV.

[40] *Id.* at § 11, Part II.F.

[41] Settlement Agreement, § 11, Part III.C. The ICR is "a measure of the total installed generating capability that the ISO projects is necessary to satisfy its total forecasted load requirements and to maintain sufficient reserve capacity to meet reliability standards." 2006/2007 Power Year Installed Capacity Requirements, *ISO New England Inc.*, Docket No. ER06-656-000 (Feb. 21, 2006) at 6.

[42] *Id.* at § 11, Part III.G.

[43] *Id.* at § 11, § 11, Part III.M.

b. Participation and Qualification of Capacity Resources

Capacity Resources that participate in the auction will be designated as Existing or New resources.[44] Existing Capacity is a Capacity Resource previously listed as a resource in New England's capacity market. New Capacity has never been listed as a capacity resource. Existing Capacity may also qualify as New Capacity if it undertakes specified types of major investments to upgrade its facilities.[45]

Capacity Resources are required to submit qualification documentation to participate in the auction. Existing Capacity is required to submit documentation, as required by the market rules. In addition, an Existing Capacity Resource that intends to submit a bid to exit the market, permanently or temporarily, may be required to submit information supporting its request to the ISO's Internal Market Monitoring Unit ("Market Monitor").[46] New Capacity must submit documentation demonstrating its control over the proposed project site, a critical path schedule with milestones supporting the feasibility of the project being built, and an interconnection analysis showing the impact of connecting to the transmission grid.[47] New capacity may also be required to submit documentation supporting their bids to the Market Monitor.

Capacity Resources are also required to provide financial assurances to the ISO. Existing Capacity is generally subject to the requirements of the existing Financial Assurance Policy,

---

[44] *Id.* at § 11, Part II.B, § 11, Part II.D.2.

[45] *Id.* at § 11, Part II.B.2.

[46] The three bid types that enable the Existing Capacity Resource to leave the capacity market are Export Bids, De-list Bids, and Permanent De-list Bids. If any of these bids are greater than a specified price threshold, the bidder is required to submit additional information to the Market Monitor for review.

[47] *Id.* at §§ 11, Part II.B.3, II.B.4.

Exhibit IA to Section I of the Tariff.[48] New Capacity is required to provide financial assurances as well.[49] When deciding a reasonable level of financial assurances for New Capacity, the Settling Parties weighed the concern that higher credit requirements could raise costs, and a lesser requirement would not sufficiently deter a capacity commitment default. The parties agreed that the Settlement Agreement's financial assurance requirement – an annually increasing provision of credit totaling three months of capacity payments priced at the cost of new entry – is reasonable.[50]

In addition, as described below, the FCM allows resources to self-supply. Load-serving entities ("LSEs") may use owned and contracted resources to self-supply, in whole or in part, the capacity obligations of the loads they serve. Self-supplied resources are required to undertake the same obligations as to qualification and performance as any other Capacity Resources. If designated as self-supplied, the resource will clear the FCA and offset an equal number of megawatts of the projected share of ICR in the Commitment Period for the LSE designating that resource.

c. Mechanics of the Descending Clock Auction

In the simplest form of a descending clock auction, the auction administrator announces a starting price – twice the Cost of New Entry ("CONE") under the FCM. Bidders are given specified time to decide how many MW to offer at the current auction price. Following the end of each bidding round, the auctioneer adds up the quantity of resources offered at the stated price. If the number of MW offered is more than the number of MW required, the auctioneer

---

[48] *Id.* at § 11, Parts II.D.2.c., 11, § 11, Part II.G.2.a.

[49] *Id.* at § 11, Part II.G.2.b.

[50] *Id.* at II.G.2.



{W0137188; 3}

lowers the price for the following round– *i.e.,* the "clock ticks down". Bidders then again decide how much to offer at the lower price. When the total amount of MWs submitted equals the total amount of MWs demanded, the auction closes, and the remaining bidders are winners. Bidders in the clock auction must submit bids in every round, and the number of MW they submit may never be larger than the number of MWs they submitted in a previous round.

The last round of the auction sets the Capacity Clearing Price, which is the price received by all Capacity Resources that are winners and is, in most instances, the price incorporated into the next auction's CONE (which sets the starting price for the next FCA). Consistent with the Commission's objectives, the FCM is designed to price capacity resources accurately to reflect the cost of new entry. In designing the market, a significant challenge essential to market performance is to establish rules assuring that the clearing price is determined competitively. To achieve this outcome, settling parties agreed that price formation by the market will rely primarily on the bids of New Capacity. Existing Capacity's De-list Bids, Export Bids and Permanent De-list Bids, and Imports are eligible to set the Capacity Clearing Price only within specified limits.

CONE is set at $7.50 for the first auction. For all other auctions, CONE is mathematically calculated using the clearing prices of previous auctions.

d. Features of the FCM

Key design elements of the FCM include (1) an auction format to derive competitive prices approximating the cost of new entry, (2) forward procurement of capacity resources, (3) annual commitment periods, (4) opportunities for new entry to participate in the market, (5) procurement of ICR, (6) a locational mechanism to value capacity locationally, when necessary, (7) deductions of PER, (8) market power mitigation rules, and (9) availability-adjusted payments

reducing payments for nonperformance and rewarding Resources available during periods of system stress. Each of these elements is discussed below.

***First***, the FCA is a competitive market for pricing capacity resources. The market-wide FCA price is derived in a central auction administered by the ISO. The FCA price is derived from competing bids of all types of capacity resources: conventional generation, intermittent resources (wind and hydro), and demand response resources.[51]

Several benefits accrue from this market design. First, competing capacity resource suppliers determine the prices. Over time, the compensation received by capacity resources is expected to approximate the cost of new entry, which will appropriately compensate existing generators needed for reliability and attract and retain new entry. Second, capacity resources, without regard to type or technology, receive the same price that clears in the auction. Third, prices that are competitive and paid uniformly across all resources will help New England achieve the right mix of plant technologies – baseload, intermediate, and peakers. In sum, the competitive pricing will benefit all New England stakeholders by producing efficient prices for capacity resources.

***Second***, the FCA is forward-looking. The time between the auction and when the capacity resource supplier is obligated to produce is over three years.[52] This three-year Planning Period is intended to provide a planning period for new entry, so that potential new capacity resources can participate in the auction and compete with incumbent resources. If a potential capacity resource wins in the auction, it has more than three years to build the necessary infrastructure needed to fulfill its capacity obligation. If the potential capacity resource is not

[51] *Id.* at § 11, Part III.G.

[52] Settlement Agreement, § 11, Part I.B.

selected, it can abandon the project or put the project on hold to bid again in the next annual auction. Likewise, if an existing resource is not selected in the FCM, there is a three-year period to allow the orderly transition to alternative, more economic resources. In economic terms, the planning period increases the elasticity of the short-term supply curve (Figure 1) into an elastic long-term supply curve (Figure 2) because suppliers of capacity resources can respond to price movements by changing the amount of capacity they offer in the auction.[53]

Figure 1




Figure 2




Potential new suppliers of capacity resources benefit from a three-year planning period, as do existing suppliers, in two significant ways. First, decisions whether to build, retire, or repower can be made well in advance of their obligation. Second, the Planning Period provides relief from reliability-based barriers to exit for generating units seeking to retire. If a unit intends to retire from the market, but is unable because the unit is needed for reliability reasons, the three-year period gives developers time to propose and the ISO time to procure the capacity to

---

[53] *See e.g.*, Motion to Intervene of the New England Conference of Public Utilities Commissioners, Devon Power LLC, Docket No. ER03-563-030 (Mar. 22, 2004), Austin Aff. at P 9 (advocating approach to "design a market where the natural supply curve is more elastic, not fixed [such as] lengthening the supply period to several years so that new and existing generation can compete against one another").

replace the retiring unit.[54] In addition, a forward-looking capacity market will assist the ISO to prioritize system planning work and to address transmission and resource capacity needs along the horizon.

***Third***, the capacity product procured in the FCA is committed for a longer period than the current ICAP and proposed LICAP markets, which trade a monthly capacity product. In the FCA, existing suppliers of capacity resources must offer a capacity product with a year-long commitment. The year-long commitment period locking in the capacity price makes near-term revenue streams more predictable.

New capacity suppliers that win the auction are entitled, however, to a one-time option to lock-in capacity prices for up to five years.[55] New suppliers are given this option because it gives investors predictable revenues streams during the project's early years and should facilitate project financing. Predictable revenue streams are expected to make the project more appealing to financiers and to lower risk premiums charged on the cost of capital. Ultimately, lower risk premiums for new investment will benefit New England ratepayers because new capacity resources may be supplied at lower cost (which means ratepayers will pay less).

***Fourth***, the FCA facilitates opportunities for new entry in New England's capacity market. Any potential capacity resource is eligible to participate in the auction. New projects proposed must be feasible, so the market rules will require that they fulfill specified criteria to participate in the auction.[56]

---

[54] Settlement Agreement, § 11, Part III.K.

[55] *Id.* at § 11, Part I.B.

[56] *Id.* at § 11, Part II.B.3.

***Fifth***, the ISO will buy the amount of capacity required to maintain the ICR. Each load serving entity (the ultimate purchaser) is required to pay for a share of ICR proportionate to its share of peak load.[57] Because the ISO will only buy ICR, if the system has surplus capacity, not all capacity resources offered will be purchased. Excess capacity resources that are not selected in the auction may retire, mothball, export, or only participate in New England's energy and other markets. The competitive market will send clear signals to any units that cannot provide lowest-cost capacity to repower or retire, thus opening the grid for New Capacity.

***Sixth***, the FCM includes a locational component representing New England's import- and export-constrained transmission topologies.[58] Before the auction, capacity zones will be determined by the ISO based on an identification of transmission limits that may bind. If transmission limits (including predicted transmission upgrades that will be on-line by the Commitment Period) are expected to bind, capacity zones are designated, and separate but simultaneous auctions are held for each zone.

This locational component accomplishes the Commission's objectives in three ways. First, the Settlement Agreement's locational component will provide – as the Commission emphasized the need for – "'an incentive . . . in the constrained areas to develop resources or transmission alternatives' to help mitigate potential rate impacts."[59] Second, the locational component will assist to value capacity appropriately in constrained areas. Third, the locational component will configure import-constrained capacity zones to map New England's electrical topology accurately. The need for a locational component will be evaluated by the ISO before

[57] *Id.* at § 11, Part III.C.

[58] *Id.* at § 11, Part III.A.

[59] March Order at P 11 (internal citations omitted).

each auction, so separate auctions will not be held if the capacity zone is determined to be unnecessary. The dynamic character of zonal designations enables state regulators and load to identify and take actions to eliminate transmission constraints creating capacity zones.

***Seventh***, except for self-supplied capacity,[60] the FCM includes a deduction from the monthly capacity payment for PER, as in the LICAP model.[61] Under the settlement agreement, however, the PER deduction serves a slightly different purpose because FCA has no demand curve and the PER is not needed to calculate a net CONE value. Under the settlement agreement, the PER deduction primarily acts as a hedge for load against price spikes in the energy market. Because suppliers will be giving back to load energy rents earned by a hypothetical unit in the actual energy market, it also acts as a disincentive for suppliers to exercise market power in the energy market.[62] In the FCM, the PER deduction is determined by calculating the difference between the real time energy price and a strike price derived from the incremental hypothetical cost of a proxy unit. Settlement Agreement, § 11, Part V.B.1. In addition, the PER is converted to a 12-month rolling average and is subtracted from Capacity Resources' monthly capacity payments. *Id.* at § 11, Part V.B.2. The rolling average smoothes month-to-month PER variations to stabilize Capacity Resources' revenue streams from the FCM over a year.

---

[60] The PER adjustment does not apply to Self-Supplied FCA Resources, because the entitlement holders of those Resources are able to credit inframarginal revenues directly against the capacity costs of their Self-Supplied FCA Resources.

[61] Settlement Agreement, § 11, Part V.B.

[62] In this respect it has a similar effect as the PER deduction under the demand curve. *See* ISO-17 (Stoft) at 95:7-17 ("What the energy market gives to an exercise of market power...[PER] takes it away").

***Eighth,*** the FCM builds in four types of rules to prevent market failures associated with high concentrations of market power, whether held by buyers or sellers. These rules are integrated into the market and are transparent and predictable. Integration, transparency, and predictability allow participants to make their investment and pricing decisions in consideration of these rules.

The first is a set of auction rules that curb incentives to manipulate the market and distort capacity prices. Only specified types of bids can set the auction's clearing price paid to auction winners and incorporated into the successive auctions' CONE.[63] Permanent De-list bids, import bids, export bids, and De-list bids may set the Capacity Clearing Price, but only subject to identified limitations.[64] In addition, specific market rules, such as the Insufficient Competition rule,[65] have been designed to address problems of market failure. The Insufficient Competition rule sets prices for capacity resources if the system (or zone) is short of capacity, the total amount of new capacity bid is small, and any of the new capacity bid is needed to meet ICR (or the local sourcing requirement, if applicable). If the Insufficient Competition rule is triggered, then new capacity resources are paid the Capacity Clearing Price and existing capacity resources are paid the lower of the Capacity Clearing Price or 1.1 CONE.[66]

The second default rule provides for Market Monitor review of bids priced above or below specified price thresholds. *Id.* at § 11, Part III.E. The price thresholds are tied to percentages of CONE. For example, the Market Monitor will review and decide whether to

---

[63] *Id.* at § 11, Part III.F.

[64] *Id.* at § 11, Part IIIG.H.2.

[65] *Id.* at § 11, Part III.L.2.

[66] *Id.*

accept into the auction a capacity resource that submits any type of de-list bid (*i.e.*, enabling it to exit the market temporarily or shut down permanently) that is higher than 0.8 CONE. If the Market Monitor determines that the value of the bid is consistent with the resource's net risk-adjusted going-forward and opportunity costs, then the bid is incorporated into the auction.[67] Similarly, a bid from new capacity or imported capacity that is below 0.75 CONE will be reviewed by the Market Monitor, who will determine whether the bid is consistent with the long run average costs of that new capacity resource or the opportunity cost (or another reasonable economic measure) for the import.[68]

The third type of rule, discussed previously, is the three-year planning period that permits new entry to compete with existing capacity resources in the auction and that increases the elasticity of supply by allowing resources to respond to price signals. The fourth rule, also discussed above, assists to mitigate incentives to create price spikes in the energy market. The PER deduction applies similar concepts as the PER deduction proposed in the LICAP model.[69] As in the LICAP market, these revenues are subtracted from capacity payments. The result is that while it may be profitable to raise prices in the energy market, the PER mechanism will remove any profits so gained because the extra revenues earned in the energy market are deducted from capacity payments.

***Finally***, the FCM contains a mechanism that adjusts capacity payments made to Capacity Resources depending on whether they are available during designated periods of system stress (a

---

[67] *Id.* at § 11, Part III.D.2.

[68] *Id.* at § 11, Part H.1.

[69] *Id.* at § 11, Part V.B.

"Shortage Event").[70] The purpose of the availability mechanism is, in the specific context of settling this case, to create a strong economic incentive for Capacity Resources to be available when their capacity is most valuable to load – during times of system stress.[71] The FCM rewards responsive and highly available Capacity Resources and reduces capacity compensation to resources that are not available when called by the ISO. Capacity resources that perform poorly for an extended period are expelled from the market until their availability improves.[72]

#### 4. Finality

Several inputs into the auctions will require determinations by the ISO or its Market monitoring unit. These include: (1) determinations of zones (Part III.A.); (2) propriety of specified bids (Part III.D.); and (3) qualification of resources to participate in the auctions (Part II). In order to ensure that the auctions can be conducted with certainty, these inputs must be filed by the ISO as an informational filing no later than 90 days prior to the auction. Parties will have 15 days to file objections. Unless the Commission orders otherwise within 75 days, such determinations will be used in the auction and the results therefrom will be final and subject to the Mobile Sierra standard under Section 4.C.

#### 5. Transition Provisions

Because the FCM construct cannot commence until development of market rules and related software, the initial FCA auction is not expected to be held until early in 2008 for a commitment period beginning June 1, 2010. Although the Commission previously anticipated

[70] *Id.* at § 11, Part V.C.

[71] *Id.* at § 11, Part V.C.4 (defining availability).

[72] *Id.* at § 11, Part V.C.7.

implementation of this new mechanism by "no later than June 1, 2004,"[73] in the absence of transition payment provisions, June 1, 2010, would be the first period for which suppliers would receive payments pursuant to the FCA auction mechanism. Due to the LICAP litigation, no new compensation mechanism has been implemented and, to date, little new generation has been constructed in New England.

Evidence in the record in this proceeding, supplemented by the attached affidavit of ISO Vice President of Markets Development David LaPlante, clearly shows that the transition payments are just and reasonable from the perspective of ratepayers as they are less than the prices that likely would have resulted from LICAP, which was found just and reasonable by Judge McCartney. The transition payments form a bridge to the implementation of the FCM and should help ensure reliable system operation during that time.

In his January 28, 2005 testimony in this proceeding, James Daly, on behalf of the Attorney General of Massachusetts, NSTAR and other parties, projected the following LICAP clearing prices for the 2007-2010 period:[74]

Table 1
Daly's Clearing Price in $/kW-month

| SWCT | ROCT | NEMA | ROP | Maine |
|---|---|---|---|---|

[73] *Devon Power LLC, et al.*, 103 FERC ¶ 61,082 (2003) at P 33, *quoted in Devon Power LLC, et al.*, 107 FERC ¶ 61,240 (2004) at P 37.

[74] *See* Supplemental Answering Testimony of James G. Daly (Exh. No. Mass AG-17) Table 4 at p. 15. Suppliers do not agree with Mr. Daly's price estimates, which the Initial Decision rejects (111 FERC ¶ 63,063 at P 282), but the estimates nevertheless may be used to illustrate the very large savings that the settlement offers as compared to at least some parties' projected LICAP prices. For example, in spreadsheets provided with that testimony, it appears that Mr. Daly's prices are gross prices and do not reflect a PER deduction. However, even if the $.48 per KW-month PER deduction (which he escalates at 20% per year) that he describes (Exh. No. Mass AG -17, 13:8-11) is subtracted from the prices set forth on Table 1, the proposed settlement transition payment rates are still below his LICAP price projections.

| | | | | | |
|---|---|---|---|---|---|
| 2007 | $5.31 | $5.32 | $5.32 | $5.32 | $5.30 |
| 2008 | $6.96 | $6.96 | $6.96 | $6.96 | $6.96 |
| 2009 | $8.34 | $8.35 | $8.33 | $8.34 | $8.34 |
| 2010 | $12.29 | $12.29 | $ 12.29 | $12.29 | $12.29 |

In Mr. LaPlante's Prepared Rebuttal Testimony in this proceeding,[75] he provided the following projected base case and no investment case LICAP clearing prices on a kW/month basis:

Table 2

2006/07-2010-2011 5-Year Average Zonal Prices

| | Base Case | No Investment Case |
|---|---|---|
| Southwest Connecticut | $6.15 | $8.61 |
| Rest of Connecticut | $5.71 | $6.54 |
| NEMA/Boston | $4.25 | $5.80 |
| Rest of Pool | $3.96 | $5.13 |
| Maine | $3.96 | $5.13 |

For these projections, Mr. LaPlante assumed the then current levels of Installed Capacity Requirements, Local Sourcing Requirements, and existing Installed Capacity.[76] For the base case, Mr. LaPlante assumed the level of investment in new generation described in Mr. Karl's

[75] Prepared Rebuttal Testimony of David LaPlante, Exhibit No. ISO-23, Tables 3 and 4 at 60-61.

[76] These prices do not reflect a PER deduction.

testimony.[77] These low estimates of LICAP clearing prices are now out of date because of significant changes, especially increases in the projections of Installed Capacity Requirements to meet the reliability standard.

Along with his March 16, 2005 supplemental testimony, Mr. Daly provided the following revised clearing prices for the 2007-2010 period.[78] Mr. Daly based the revised projections, in part, on increased Installed Capacity Requirements levels for the 2005/2006 power year that at the time of his March 16 testimony, had recently been approved by the NEPOOL Participants Committee.[79]

Table 3

Daly' Clearing Price in $/kW-month

| | SWCT | ROCT | NEMA | ROP | Maine |
|---|---|---|---|---|---|
| 2007 | $7.63 | $7.63 | $7.63 | $7.63 | $7.63 |
| 2008 | $10.21 | $10.21 | $10.21 | $10.21 | $10.21 |
| 2009 | $14.28 | $14.25 | $14.26 | $14.26 | $14.26 |
| 2010 | $16.14 | $16.16 | $16.16 | $16.15 | $16.16 |

In the attached affidavit, Mr. LaPlante,[80] provides the following current projection of LICAP prices based upon the LICAP demand curve adopted in the Initial Decision, and updated

[77] *See* Prepared Rebuttal Testimony of Mark Karl, Exh. ISO-39, 67:8-68:2.

[78] *See* workpaper for Exh. Mass AG-23.

[79] *See* Supplemental Answering Testimony of James G. Daly (Exh. No. Mass AG-23) at 2:8-9:2. Again, Suppliers do not agree with Mr. Daly's price estimates and the Initial Decision rejected them. 111 FERC at P 282.

[80] LaPlante Affidavit at P 11, included as Attachment 5 to this Statement.

data concerning, among other things, Installed Capacity Requirements, Local Sourcing Requirements, and existing installed capacity.[81]

Table 4

LICAP Clearing Price Less PER

($Kw-Month)

| Zone | 2006/07 | 2007/08 | 2008/09 | 2009/10 |
|---|---|---|---|---|
| Connecticut | $4.13 | $5.14 | $6.39 | $11.15 |
| NEMA/Boston | $4.13 | $5.14 | $6.39 | $7.84 |
| Rest of Pool | $4.13 | $5.14 | $6.39 | $7.84 |
| Maine | $4.13 | $5.14 | $6.39 | $7.84 |

Under the settlement, all listed ICAP Resources shall receive fixed payments, based on the following payment rates and the resources' seasonal UCAP ratings:

Table 5 – Settlement Interim Payment Rates

| | |
|---|---|
| December 1, 2006 to May 31, 2007 | $3.05/kW-month |
| June 1, 2007 to May 31, 2008 | $3.05/kW-month |
| June 1, 2008 to May 31, 2009 | $3.75/kW-month |
| June 1, 2009 to May 31, 2010 | $4.10/kW-month |

These numbers show that as the projections have become more recent and reflect more current data, the LICAP price estimates have increased such that the prices calculated pursuant to

[81] *Id.* at PP 7-10. These are the ISO's numbers and not consensus numbers for the Settling Parties.

the LICAP demand curve adopted in the Initial Decision are higher than the proposed settlement transition payments for every zone for every year of the transition period. Although there is no consensus among the Settling Parties as to the precise level of savings to consumers from this Settlement Agreement when compared to LICAP, there is no question that the transition prices are lower than the prices under LICAP as approved by Judge McCartney.

In the context of the complex and interrelated provisions of the Settlement Agreement, it is appropriate for the transition payments to be the same for all zones in New England. Some have argued that ratepayers in import constrained zones should pay more for capacity than those in capacity surplus zones and that customers in export constrained zones should pay less than those in zones with surplus. This is of course true if the facts demonstrate that zones are actually constrained. However, the price projections described by Mr. LaPlante show nearly flat prices across zones and therefore support interim payments that do not vary on a $/kW-month basis by zone. Nonetheless, as RSP 2005 makes clear, the region's import constrained zones, particularly Connecticut and Boston, have a stronger need for additional capacity than is the case in other regions. However, ratepayers in the constrained zones of Connecticut and NEMA/Boston are already paying substantially more than ratepayers in unconstrained zones such as Maine because of the RMR contracts that are currently required in those constrained regions. The transition period payments agreed to by the parties were negotiated at arms length.

The settlement transition mechanism also includes an availability metric. The Initial Decision recommended that EFORd continue to be used as the availability metric in New England, as requested by Suppliers. That recommendation was vigorously challenged by both the ISO and Load, who sought to measure availability only at times when the region was short of operating reserves or energy. *See, e.g.,* Initial Decision at PP 439-460. The Settlement

Agreement reflects a compromise between these two proposals, adopting for the transition period a modified EFORd that most heavily weights availability during times of greatest need.

As noted above, the Commission's obligation is to determine based on the record whether the Settlement Agreement as a package should be approved. There may be many different calculations of the level of savings to consumers from this settlement when compared to LICAP. The transition payments under the Settlement are clearly lower, however, than the cost of LICAP, as shown here and in Mr. LaPlante's affidavit.

### 6. Agreement Regarding Rights and Obligations

Part IV of the Settlement Agreement sets forth the rights and obligations of Listed, De-listed and Self-Supplied capacity under the FCM.

#### a. Listed Capacity

Listed Capacity is any resource participating, or "listed," in the capacity market. Not all of a resource must be listed, and only the listed portion of a resource has the rights and obligations of Listed Capacity.

The key obligation imposed on Listed Capacity is that it must offer into both the Day-Ahead and Real-Time Energy Markets whenever available.[82] In addition, Day-Ahead offers must have a start time plus minimum run time plus minimum down time less than or equal to 72 hours, or, failing that because of "physical design limits," must bid in Day-Ahead at zero, or self-schedule.[83]

Another key obligation imposed on Listed Capacity is that, consistent with good utility practice, the resource's Day Ahead and Real Time offers must reflect the then-known unit-

[82] Settlement Agreement, § 11, Part IV.A.1.

[83] *Id.* at § 11, Part IV.A.2.

specific operating characteristics of the resource.[84] Intentionally failing to do so exposes Listed Capacity to significant penalties under the Settlement Agreement. For a first violation, the ISO issues a warning. A second violation incurs a fine of up to the daily FCA payment, capped at $150,000; a third violation incurs a fine of up to two times the daily FCA payment, capped at $300,000; a fourth violation incurs a fine of up to four times the daily FCA payment, capped at $600,000; any further violation permits all remedies under the Federal Power Act, without limitation.[85] Violations may be cumulative (*i.e.,* warning, second, third, and fourth violations) if they occur within a 90-day window, are similar to the original violation and are by the same or a similar unit.[86] If multiple similar units that have their bids submitted by the same entity and all commit the same violation, it will be treated as a single violation.[87] Listed Capacity has specific due process rights with respect to all such warnings and penalties, including timely notice from the ISO within 10 days of the observed behavior, an opportunity to confer, and petition rights at the FERC Office of Market Oversight and Investigations.[88]

Another obligation of Listed Capacity is that it may not go on economic outages.[89] Special bid rules apply, however, in circumstances when "extraordinary fuel prices" prevent a resource from recovering its full operational cost in its bid.[90]

---

[84] *Id.* at § 11, Part IV.A.3.

[85] *Id.* at § 11, Part IV.A.4.

[86] *Id.* at § 11, Part IV.A.4.b.

[87] *Id.* at § 11, Part IV.A.4.c.

[88] *Id.* at § 11, Part IV.A.4.d.

[89] *Id.* at § 11, Part IV.A.5.

[90] *Id.*

Finally, Listed Capacity has the right under specified circumstances to transfer its capacity market obligations to another resource.[91] After the transfer, such capacity is treated as De-listed Capacity.

b. De-listed Capacity

The key distinction between Listed Capacity and De-listed Capacity is the latter has no obligation to bid into the Day-Ahead and Real-Time Energy Markets and does not have to honor the ISO's requests to reschedule maintenance.[92] This applies to the portion of a Capacity Resource that (1) does not clear in a FCA, (2) has an accepted Permanent De-list Bid, (3) has an accepted De-list Bid, (4) has an accepted Export Capacity bid and has been de-listed, or (5) has transferred its capacity obligation and is not otherwise committed to provide capacity pursuant to a bilateral contract or reconfiguration auction.[93]

De-listed Capacity may, however, offer into the Day-Ahead Energy Market and, if accepted, would have the same obligations as other resources in the Day-Ahead Market.[94] Further, if bid into the Day-Ahead Market, De-listed Capacity is not subject to the restrictions placed on bidding of unit characteristics for Listed Capacity. De-listed Capacity not offered or accepted in the Day-Ahead Market may only participate in the Real-Time Energy Market by self-scheduling. The ISO may request to commit such resources, but they are not obligated to

[91] *Id.* at § 11, Part IV.A.6.

[92] *Id.* at § 11, Part IV.B.2.

[93] *Id.*

[94] *Id.*, § 11, Part IV.B.3.

come on line, and are not subject to any performance or availability penalties if they do come on line.[95]

Further, since their capacity has not been relied upon to meet the ICR, De-listed Resources are not required to reschedule their maintenance at the ISO's request and De-Listed Capacity may export its capacity. Capacity exports can be transacted either through an accepted Export Bid in the FCM or – subsequent to the FCM – through a bilateral export transaction from De-Listed Capacity.

c. Self-Supplied FCA Resource

Finally, Part IV of the Settlement Agreement establishes that self-supplied resources will have the same rights and obligations as other Capacity Resources accepted in the FCA.[96] The FCM will allow LSEs to use owned or contracted resources to self-supply all or part of their capacity obligations. Resources so designated (a "Self-Supplied Resource") are subject to the same performance obligations and qualification requirements as other Resources participating the FCM and the FCA. The total quantity of designated Self-Supplied Resources may not exceed the projected share of the ICR for the LSE designating that Resource pursuant to Market Rules. To be considered a Self-Supplied Resource, that Resource must be offered into the FCA. In order to qualify as a Self-Supplied Resource for purposes of fulfilling a Local Sourcing Requirement applicable to a load in an import-constrained region, the Self-Supplied Resource must be located in the same Capacity Zone as the associated load, unless the self-supplied

[95] *Id.* at § 11, Part IV.B.4.

[96] *Id.* at § 11, Part IV.C.

resource is a Pool-Planned Unit with a special allocation of CTRs up to the number of allocated Capacity Transfer Rights ("CTRs").[97]

Together, these provisions in Part IV establish rights and obligations of resources in or out of the FCM so that resources will know how to act. They should be accepted as part of the settlement package.

### 7. Agreements Regarding Gas Availability

Part VII of the Settlement Agreement addresses a specific problem in coordinating the schedules of the gas and electricity markets in winter months. Under current electric scheduling time frames, gas-fired resources may not have timely information to purchase gas in cold weather periods. They may be unsure of whether and to what extent they will be dispatched the following day. The choice is either to (1) purchase gas and speculatively bear the risk of lost opportunity costs in the event the associated generation is not dispatched and the gas resale market price is significantly lower, or (2) reduce the quantity of gas purchased in advance of the generation schedule. This introduces significant uncertainty for both the gas-fired generator and for the ISO in predicting the availability of gas resources.

Part VII thus provides that – starting in the first FCM and each December, January and February thereafter – the posting of Day-Ahead Market results and the initial Resource Adequacy Assessment will be rolled back to earlier time periods, by a "target completion time" of 10:30 a.m. of the day prior to the electric Operating Day.[98] Other specific scheduling clarifications and adjustments further accommodate gas pipeline nomination deadlines.

---

[97] Although the ISO will continue to model any such Pool-Planned Units in their actual location, the combination of the physical asset and the CTRs will offset the financial obligation of the self-supplier.

[98] Settlement Agreement, § 11, Part VII.A.

On days when the ISO forecasts a Cold Weather Warning or Cold Weather Event for the next Operating Day, Part VII also provides that the ISO shall procure an additional 1000 MW of Supplemental Reserves for peak load periods of the day exclusively for gas-fired resources.[99] Gas resources will be compensated for the gas reserved, purchased, and nominated for all such Supplemental Reserves, as set forth by formula.[100]

Finally, on all such days when the ISO forecasts a Cold Weather Warning or Cold Weather Event sufficiently in advance of pipeline gas nominating deadlines, all gas-fired resources are required to confirm to the ISO that they will nominate sufficient fuel to be able to deliver energy and Supplemental Reserves scheduled for the Operating Day.[101]

## VII. SERVICE OF THIS PLEADING

This Explanatory Statement, the Settlement Agreement and all attachments have been served on all persons required to be served under Commission rule or order or under law. Pursuant to the agreement of all Settling Parties, this Explanatory Statement, the Settlement Agreement and all attachments have been served on all participants to this proceeding by electronic mail pursuant to the listserv established in this proceeding. The foregoing has also been served on the NEPOOL Participants Committee members by electronic mail, pursuant to section 17.11(e) of the NEPOOL Participants Agreement.

## VIII. CONCLUSION

---

[99] *Id.* at § 11, Part VII.B.

[100] *Id.*

[101] *Id.* at § 11, Part VII.C.

The Commission should approve the Settlement Agreement in its entirety without condition or change. The Settlement Agreement resolves issues that have caused intense controversy in the region for years. The long term market design accepts a forward procurement model for capacity that has been advocated by state regulators in all six New England states, and has now been accepted in settlement by virtually all of the generating resources in the region. It is designed to provide economic incentives for Resources to be available when most needed, and it supports participation by all types of Resources, including demand response and intermittent resources. During the transition, FCM is demonstrably less expensive to consumers than LICAP, which the Presiding Judge adopted in the Initial Decision.

At this juncture, it is clear that no settlement is possible that will satisfy all interests. The settlement presented here is widely supported or not opposed by a supermajority of interests in the region. It achieves that support by carefully balancing many conflicting and competing interests. The voluminous record in this proceeding, as well as the supporting affidavits provided on behalf of certain parties by experts that were fully involved in this proceeding, demonstrate that, as a package, the Settlement Agreement is just and reasonable.

For the foregoing reasons, the Settling Parties urge the Commission to approve the Settlement Agreement by order issued on or before June 30. 2006, without any change, deletion or condition.

Respectfully Submitted
ON BEHALF OF THE SETTLING PARTIES,

By:______________________

Sherry A. Quirk, Esq.
Stanley P. Wolf, Esq.
Monica Berry, Esq.
Sullivan & Worcester
1666 K Street, NW
Washington, DC 20006
(202) 775-6814
Attorneys for ISO New England Inc.

By:______________________

Raymond Hepper, Esq.
Kerim May, Esq.
ISO New England Inc.
1 Sullivan Road
Holyoke, MA 01040-2841
(413) 540-4592
Attorneys for ISO New England Inc.

By:______________________

**David T. Doot**
Day, Berry & Howard LLP
CityPlace I
Hartford, CT 06103-3499
(860) 275-0102
Attorney for New England Power Pool

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served in accordance with the applicable Rules of Practice and Procedure, the foregoing document upon each person designated on the official service list compiled by the Secretary in the captioned proceedings.

Dated at Washington, D.C., this 6th day of March, 2006.

Sherry A. Quirk, Esq.
Sullivan & Worcester
1666 K Street, NW
Washington, DC 20006
T: 202.775.6814
F: 202.293.2275
squirk@sandw.com