# EXHIBIT E – Part 4

# ATTACHMENT 1-A

# ATTACHMENT A
# SETTLEMENT AGREEMENT RESOLVING ALL ISSUES

**Definitions.** This Attachment A consolidates, references and summarizes capitalized terms that are used in the Settlement Agreement. This Attachment is for convenience only and should not be considered a part the Settlement Agreement itself. Except as specifically defined within the Settlement Agreement, the capitalized terms are from the ISO Transmission, Markets and Services Tariff or other operative documents, and the definitions below are to definitions as they now appear in those documents, and are subject to change from time to time pursuant to those documents.

**"Alternative Price Rule"** is defined in Section 11, Part III.I of the Settlement Agreement.

**"Billing Policy"** is Exhibit ID to Section I of the Tariff.

**"Capacity Clearing Price"** is the clearing price in the FCA for each Capacity Zone determined in accordance with Section 11, Part III.G of the Settlement Agreement and as more fully described in Section 11, Part III of the Settlement Agreement.

**"Capacity Zone"** is the geographic sub-region in the New England Control Area that is determined by the ISO in accordance with Section 11, Part III.A of the Settlement Agreement based on an identification of transmission limits that may bind in the FCA.

**"Cold Weather Condition"** is the existence of Effective Temperatures ≤ 0 degrees Fahrenheit (on peak hours) and Effective Heating Degree Days ≥ 65.

**"Cold Weather Event"** is a day when Cold Weather Conditions are forecast to exist and the ISO forecasts a system wide capacity deficiency requiring the implementation of OP-4 actions (i.e., the 7-day capacity margin forecast ≤ 0 MW for an Operating day).

**"Cold Weather Warning"** is a day when Cold Weather Conditions is forecast to exist and the ISO forecasts tight capacity conditions (i.e., the 7-day capacity margin forecast > 0 MW and < 1,000 MW).

**"Commitment Period"** is as a period of either one year in duration (corresponding to the Power Year for which the FCA is held) or, for New Capacity, up to five years in duration (beginning with the Power Year for which the FCA is held), as described in more detail in Section 11, Part II of the Settlement Agreement.

**"Conditional Approval Order"** is a FERC order accepting or approving the Settlement Agreement conditioned on the modification of any of the terms of the Settlement Agreement.

**"Cost of New Entry"** or **"CONE"** is determined in accordance with Section 11, Part III.F of the Settlement Agreement.

**"Day-Ahead"** is the calendar day immediately preceding the Operating Day.

**"Day-Ahead Energy Market"** is the schedule of commitments for the purchase or sale of energy, payment of Congestion Costs, and payment for losses developed by the ISO as a result of the offers and specifications submitted in accordance with Section III.1.10 of Market Rule 1.

**"De-list Bid"** is a bid from Existing Capacity submitted in an FCA to be removed from the Forward Capacity Market, as described in more detail in Section 11, Part III.D.5 of the Settlement Agreement.

**"De-listed Capacity"** is all or a portion of a Capacity Resources that does not clear in a FCA, and any portion of such Resource for which a Permanent De-list Bid or De-list Bid has been accepted or has transferred its obligation pursuant to Section 11, Part IV.A.6 of the Settlement Agreement is not otherwise committed to provide capacity pursuant to a bilateral contract or reconfiguration auction.

**"Deposit"** is the financial assurance provided by New Capacity in order to submit a bid in a FCA for which it has been qualified pursuant to Section 11, Part II.B.3 of the Settlement Agreement.

**"Economic Minimum Limit"** or **"EcoMin"** is the maximum of the following values: (i) the minimum generation amount, in MWs, that a generating unit can deliver for a limited period of time without exceeding specified limits of equipment stability and operating permits; (ii) a level supported by environmental and/or operating permit restrictions; or (iii) a level that addresses any significant economic penalties associated with operating at lower levels that can not be adequately represented by three-part bidding. In no event shall the Economic Minimum Limit submitted as part of a generating unit's Offer Data be higher than the generation level at which a generating unit's incremental heat rate is minimized (i.e., transitioning from decreasing as output increases to increasing as output increases) except that a Self-Scheduled Resource may modify its Economic Minimum Limit on an hourly basis, as part of its Supply Offer, in order to indicate the desired level of Self-Scheduled MWs.

**"Effective Date"** is the date that the FERC approves the Settlement Agreement in its entirety without modifications or conditions or with such modifications or changes as are agreed to by the Settling Parties in accordance with Section 2 of the Settlement Agreement.

**"Effective Heating Degree Days"** is equal to: 68 - (average of max and min Effective Temperature of the day).

**"Effective Temperature"** is equal to: dry bulb temperature - [windspeed X (65 – dry bulb temp) / 100].

**"Existing Capacity"** is any Resource that does not meet any of the eligibility criteria for New Capacity as provided in Section 11, Part II.B.3 of the Settlement Agreement or Import Capacity as provided in Section 11, Part II.C.2.a or b of the Settlement Agreement or any Resource that, subject to ISO evaluation, for the purposes of the first FCA, is under construction and within twelve months of its expected commercial operations date as described in Section 11, Part II.D.1 of the Settlement Agreement.

**"Existing Import Capacity"** is capacity that a party wishes to import in the FCA pursuant to a multi-year contract entered into before the qualification deadline to provide Capacity Resources during the Commitment Period from outside the New England Control Area as described more fully in Section 11, Part II.C.1.a of the Settlement Agreement.

**"Export Bid"** is a bid submitted in the FCA to export capacity from a Resource.

**"Export Capacity"** is any Resource within the New England Control Area seeking to submit a bid to export all or part of its capacity in the FCA or selling its De-listed Capacity to a buyer outside the Control Area following the FCA as described in Section 11, Part II.C.1.c of the Settlement Agreement.

**"External Resource"** is a generation resource located outside the metered boundaries of the New England Control Area.

**"FCA Payment"** is the payment for which each capacity Resource clearing in the FCA, or otherwise covered by a multi-year commitment, but not a Self-Supplied FCA Resource, shall be entitled to monthly based on the product of its MWs of capacity cleared in the relevant FCA and the Capacity Clearing Price in the appropriate location in the New England Control Area, as described in more detail in Section 11, Part V.A of the Settlement Agreement.

**"Financial Assurance Policy"** or **"FAP"** is Exhibit 1A, Exhibit IB, or Exhibit IC to Section I of the Tariff, as applicable.

**"FERC"** or **"Commission"** is the Federal Energy Regulatory Commission.

**"Forward Capacity Auction"** or **"FCA"** is the descending clock auction that is to be held annually each year in accordance with the Forward Capacity Market as described more fully in Section 11, Part III of the Settlement Agreement.

**"Governance Participants"** are the parties to the Participants Agreement and the NEPOOL Participants.

**"HQI Excess"** is the amount by which accepted Import Bids exceed the difference between the approved Phase I/II transfer limit and the approved MW of HQICCs.

"**Hydro Quebec Interconnection Capability Credits**" or "HQICCs" are credits that are granted to a Market Participant or group of Market Participants in accordance with the ISO System Rules, which may be used to satisfy the Market Participant's UCAP requirement as determined in accordance with Section III.8.2 of Market Rule 1, where the value of such credits is determined in accordance with the ISO New England Manuals.

**"Import Bid"** is a bid in the FCA to import capacity from outside the New England Control Area, as described in more detail in Section 11, Parts II.C and III.D.4 of the Settlement Agreement.

**"Inadequate Supply"** is defined in Section 11, Part III.L.2 of the Settlement Agreement.

**"Information Policy"** is the policy on file with the Commission as part of the Tariff establishing guidelines regarding the information received, created and distributed by Participants and the ISO in connection with the New England Markets and the New England Transmission System.

**"Intermittent Resources"** are wind, solar and run-of-river hydro Resources, or such other Resources as determined from time to time pursuant to the Participant Processes that provides for consultation with state utility regulatory agencies as described in Section 11, Part II.E.1 of the Settlement Agreement.

**"Installed Capacity Requirement"** or **"ICR"** is the level of capacity required to meet the reliability requirements defined for the New England Control Area and calculated in accordance with Section III.8 of Market Rule 1. The Installed Capacity Requirement is used to determine an Unforced Capacity Requirement for the New England Control Area and individual Market Participants.

**"Insufficient Competition"** is defined in Section 11, Part III.L.2 of the Settlement Agreement.

**"Internal Market Monitoring Unit"** is the staff of the ISO designated to implement the mitigation measures set forth in Appendix A to Market Rule 1 for mitigation of market power.

**"Local Sourcing Requirement"** is the portion of the total capacity requirement of the load in a Capacity Zone that must be purchased from Resources located within that Capacity Zone after taking into account all of the capacity that can be reliably imported into the Capacity Zone.

**"Load Serving Entity"** or **"LSE"** is an entity that serves load in the New England Control Area.

**"Locational Forward Reserves Market"** or **"LFRM"** is the Locational Forward Reserves Market jointly filed by the ISO and NEPOOL in FERC Docket No. ER06-613-000.

**"Locational Marginal Price"** or **"LMP"** is as calculated in accordance with Section III.2 of Market Rule 1. The LMP for a Node (as defined in Market Rule 1) is the nodal price at that Node; the LMP for an External Node (as defined in Market Rule 1) is the nodal price at that External Node; the LMP for a Load Zone or Reliability Region (each as defined in Market Rule 1) is the Zonal Price for that Load Zone or Reliability Region, respectively; and the LMP for a Hub (as defined in Market Rule 1) is the Hub Price for that Hub.

**"Market Monitor"** is ISO's Internal Market Monitoring Unit.

**"Market Participant"** is a participant in the New England Markets that has executed a Market Participant Service Agreement, or on whose behalf an unexecuted Market Participant Service Agreement has been filed with and accepted or approved by the Commission.

**"Market Rule 1"** is ISO New England Market Rule 1 and the appendices and attachments thereto set out in Section III of the Tariff, as modified and amended from time to time.

**"Market Rules"** are the rules for the administration of the New England Markets filed with the Commission in accordance with the Participants Agreement and accepted by the Commission.

**"Municipal Market Participant"** is a Market Participant that is either a municipality or an agency thereof, or a body politic and public corporation created under the authority of one of the New England states, authorized to own, lease and operate electric generation, transmission or distribution facilities, or an electric cooperative, or an organization of any such entities.

**"NCPC Charge"** is the charge to a Market Participant as provided in Section III.3.2.3, Section III.6.4, and Appendix F of Market Rule 1.

**"NCPC Credit"** is the payment made to a Resource as provided in Section III.3.2.3, Section III.6.4 and Appendix F of Market Rule 1.

**"New Capacity"** is a Resource which has never been listed as a Capacity Resource (i.e., counted as capacity) in the New England capacity markets or a Resource that meets one of the four criteria listed in Section 11, Part II.B.2 of the Settlement Agreement.

**"New Capacity FA Amount"** is the financial assurance obligation of New Capacity whose bid has been accepted in the FCA equal to CONE (on a $/kw-month basis) for that FCA multiplied by the number of kw of capacity awarded, as described in Section 11, Part II.G.2.b of the Settlement Agreement.

**"New England Control Area"** is the Control Area (as defined in Section II.1.11 of the Tariff) for New England, which includes PTF, Non-PTF, MTF and OTF. The New England Control Area covers Connecticut, Rhode Island, Massachusetts, New Hampshire, Vermont, and part of Maine (i.e., excluding the portions of Northern Maine and the northern portion of Eastern Maine which are in the Maritimes Control Area).

**"New England Markets"** are the markets for the purchase of energy, capacity, ancillary services, demand response services, or other related products or services (including financial transmission rights) within the New England Control Area, as set forth in the Market Rule 1.

**"New Import Capacity"** is capacity that a party wishes to import in the FCA but without a multi-year contract before the qualification deadline to provide Capacity Resources during the Commitment Period from outside the New England Control Area as described in Section 11, Part II.C.1.b of the Settlement Agreement.

**"Offer"** is the amount a Supply Offer would have been but for the Offer Cap as set forth in Section 11, Part IV.A.5 of the Settlement Agreement.

**"Offer Cap"** is the amount defined in Section 1.10.1A(d)(viii) of Market Rule 1 above which an energy offer price may not be specified.

**"Operating Day"** is a calendar day period beginning at midnight for which transactions in the New England Markets are scheduled.

**"Out of Market Bid"** is a New Capacity Bid or a New Import Bid that, pursuant to Section 11, Part III.H.2 of the Settlement Agreement, is not allowed by the Market Monitor to set the Capacity Clearing Price.

**"Participant Processes"** shall mean those processes for Governance Participants outlined in Section 7.1.1 of the Participants Agreement.

**"Peak Energy Rent"** or **"PER"** is the amount determined in accordance with Section 11, Part V.B of the Settlement Agreement.

**"Permanent De-list Bid"** is a bid from Existing Capacity submitted in the FCA to be permanently removed from the Forward Capacity Market, as described in more detail in Section 11, Part III.D.3 of the Settlement Agreement.

**"Pool-Planned Unit"** is one of the following units: New Haven Harbor Unit 1 (Coke Works), Mystic Unit 7, Canal Unit 2, Potter Unit 2, Wyman Unit 4, Stony Brook Units 1, 1A, 1B, 1C, 2A and 2B, Millstone Unit 3, Seabrook Unit 1 and Waters River Unit 2 (to the extent of 7 MWs of its Summer Capability and 12 MWs of its Winter Capability).

**"Poorly Performing Unit"** is a Resource which, for purposes of qualifying to participate in the FCA, in any four-year period (a) receives three availability scores of less than or equal to forty percent (40 percent), and (b) fails to be available during at least ten (10) Shortage Events, as described in more detail in Section 11, Part V.C.7 of the Settlement Agreement.

**"Power Year"** is a period of twelve (12) months commencing on June 1 of each year and ending on May 31 of the next calendar year.

**"Qualified Capacity"** for the FCA and annual reconfiguration actions: (a) for New Capacity, is an amount in MWs equal to such New Capacity's bid MWs, subject to demonstrations of at least that capacity in the qualification process; (b) for Existing Capacity, except as provided in Section 11, Part II.D.5 of the Settlement Agreement, is an amount in MWs equal to its Summer Seasonal Claimed Capability as adjusted pursuant to Section II.D.4 of the Settlement Agreement; (c) for Intermittent Resources and Demand Resources is the amount in MWs to be determined pursuant to the distinct method to be developed by the end of the fourth quarter of 2006 pursuant to the Participant Processes that includes consultation with state utility regulatory agencies.

**"Real-Time"** is a period in the current Operating Day for which the ISO dispatches Resources for energy and Regulation (as defined in Market Rule 1), designates Resources for Regulation and, if necessary, commits additional Resources.

**"Real-Time Energy Market"** is the purchase or sale of energy, payment of congestion costs, and payment for losses for quantity deviations from the Day-Ahead Energy Market in the Operating Day.

**"Reserve Constraint Penalty Factors"** or **"RCPFs"** are rates, in $/MWh, that are used within the Real-Time dispatch and pricing algorithm to reflect the value of operating reserve shortages and are defined in Section III.2.8 of Market Rule 1.

**"Resource"** is a generating unit, a Dispatchable Load, an External Resource, or an External Transaction as defined in Market Rule 1.

**"Resource Adequacy Assessment"** or **"RAA"** is the assessment performed periodically by the ISO for each hour of each day in connection with system operations, as referred to in Section 11, Part VII.A of the Settlement Agreement.

**"Seasonal Claimed Capability"** is the maximum dependable load-carrying ability in kilowatts of a generating unit (or ISO-approved combination of units, as per OP 14) being rated, excluding capacity required for station use, for the Summer Period or Winter Period, as applicable.

**"Self-Schedule"** is the action of a Market Participant in committing and/or scheduling its Resource, in accordance with applicable ISO New England Manuals, to provide service in an hour, whether or not in the absence of that action the Resource would have been scheduled or dispatched by the ISO to provide the service.

**"Self-Supplied FCA Resource"** is defined in Section 11, Part II.F.1 of the Settlement Agreement.

**"Self-Supply Option"** is defined in Section 11, Part II.F of the Settlement Agreement.

**"Settlement Agreement"** is the Settlement Agreement Resolving all Issues dated March 6, 2006 in Docket No ER03-563-____.

**"Settling Party"** a party to the Settlement Agreement.

**"Shortage Event"** is defined in Section 11, Part V.C.1.d of the Settlement Agreement.

**"Successful FCA"** is a FCA that has not been found to have Insufficient Competition or Inadequate Supply.

**"Summer Period"** is for each Power Year the four-month period from June through September.

**"Supplemental Reserves"** are the additional 1,000 MW of NCPC scheduled in accordance with Section 11, Part VII.D of the Settlement Agreement by the ISO if and as needed.

**"Tariff"** is the ISO New England Transmission, Markets and Services Tariff, FERC Electric Tariff No. 3.

**"Term Sheet"** is the confidential document voted upon by the settling parties dated January 31, 2006 that was referenced in the Report filed by the Settlement Judge with the FERC on January 31, 2006 in Docket No. ER03-563-055.

**"Transition Period"** is the period of time commencing on December 1, 2006 and ending May 30, 2010, or as provided in Section 11, Part VIII.I.

**"Unforced Capacity"** or **"UCAP"** is the measure by which: (1) Installed Capacity suppliers will be rated, in accordance with the formulae set forth in the ISO New England Manuals, to quantify the extent of their contribution to satisfy the ISO Installed Capacity Requirement, and (2) the measure to determine if a Market Participant has met its procurement obligations relating to the Installed Capacity Requirement.

**"Waiver Period"** is the period of time from March 6, 2006 through the earlier of September 5, 2006, or the date on which the second FCA is successfully completed.

**"Winter Period"** is for each Power Year the eight-month period from October through May.

## TABLE OF ABBREVIATIONS AND ACRONYMS

This Table provides definitions for abbreviations and acronyms used throughout the Settlement Agreement and related materials.

| | |
|---|---|
| 2d RNA | Second Restated NEPOOL Agreement |
| AGC | Automatic Generation Control |
| ARRs | Auction Revenue Rights |
| CONE | Cost of New Entry |
| CTRs | Capacity Transfer Rights |
| DCAs | Designated Congestion Areas |
| EcoMin | Economic Minimum Limit |
| EFORd | Demand Estimated Forced Outage Rate |
| FAP | Financial Assurance Policy |
| FCA | Forward Capacity Auction |
| FCM | Forward Capacity Market |
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act |
| HQICCs | Hydro Quebec Interconnection Capability Credits |
| ICR | Installed Capacity Requirement |
| IRH | Interconnection Rights Holders |
| ISO | ISO New England Inc. |
| kW | Kilowatt |
| LFRM | Locational Forward Reserves Market |
| LICAP | Locational Installed Capacity |
| LMP | Locational Marginal Price |
| LSE | Load Serving Entity |
| MMWEC | Massachusetts Municipal Wholesale Electric Company |
| Mobile-Sierra | "public interest" standard of review (set forth in *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332 (1956) and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956)) |
| MTF | Merchant Transmission Facilities |
| MW | Megawatt |
| NCPC | Net Commitment Period Compensation |
| NEMA | Northeast Massachusetts |
| NEPOOL | New England Power Pool |
| NYPA | New York Power Authority |
| OMOI | FERC Office of Market Oversight and Investigations |
| OP | Operating Procedure |
| OP-4 | Operating Procedure 4, entitled "Action During a Capacity Deficiency" |
| OP-7 | Operating Procedure 7, entitled "Action in an Emergency" |

| | |
|---|---|
| OTF | Other Transmission Facility |
| PER | Peak Energy Rent |
| PTF | Pool Transmission Facilities |
| RAA | Resource Adequacy Assessment |
| RCPFs | Reserve Constraint Penalty Factors |
| RFP | Request for Proposal |
| RMR | Reliability Must Run |
| RNA | Restated NEPOOL Agreement |
| ROCT | Rest of Connecticut |
| ROP | Rest of Pool |
| RSP | Regional System Plan |
| SWCT | Southwest Connecticut |
| UCAP | Unforced Capacity |
| WRC | Wellesley, Reading and Concord |

# ATTACHMENT 2

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| **Devon Power LLC, *et al.*** | | Docket No. EL03-563-055 |

AFFIDAVIT OF ROBERT B. STODDARD IN SUPPORT OF SETTLEMENT AGREEMENT

| | |
|---|---|
| **Commonwealth of Massachusetts** | ss. |
| **County of Suffolk** | |

I, Robert B. Stoddard, being duly sworn, depose and say:

1. My name is Robert B. Stoddard. I am a Vice President of CRA International ("CRA") in its offices at 200 Clarendon Street, T-33, Boston, Massachusetts 02116. I have previously offered testimony in this docket on behalf of FPL Energy, LLC, Entergy Nuclear Generation Company, LLC, Entergy Nuclear Vermont Yankee, LLC, Mirant Americas Energy Marketing, LP, Mirant New England, LLC, Mirant Kendall, LLC, Mirant Canal, LLC, Mystic I, LLC, Mystic Development, LLC and Fore River Development, LLC (collectively, the "Capacity Suppliers"). That testimony presented my professional and educational credentials.

2. I have represented the Capacity Suppliers, Dominion Resources, Inc., Dominion Nuclear Connecticut, Inc., and Dominion Energy Marketing, Inc. (collectively, "Dominion") throughout the settlement process. In this capacity, I participated fully in nearly all the settlement meetings, and I had extensive personal involvement in the development of the proposed market design and in the negotiations of the detailed auction mechanics and other economic aspects of the proposed settlement. I have carefully reviewed the Settlement Agreement and the explanatory statement as they pertain to the economics of the long-run market design and the transition period.

3. I render this affidavit in the context of supporting the filed settlement. As with all settlements, the proposed Forward Capacity Market (the "FCM") market design reflects a number of compromises necessary to resolve this case without litigation. With this background in mind, it is my professional opinion that it is sound and should work as intended to create

correct economic incentives for new resources to serve the New England market and to retain existing units when economic. It is not necessarily the only market design that could work to accomplish these goals, but it is a workable design that reflects a widely-supported compromise of supply, load and regulators. Given the settlement posture of this case, however, my opinion should not be construed out of context as my support or the support of my clients for specific individual components, or for any aspect of the market design as it might be implicated in other proceedings.

4. Although the market design does not include a demand curve, the price volatility and uncertainty that plagues the current market is mitigated by other factors. The FCM is a forward procurement, which allows flexibility of supply both to enter and exit the market. In addition, other measures were included to provide appropriate stability to prices. Capacity prices, therefore, should stay within a fairly narrow band around the actual Cost of New Entry (the "CONE"), as determined by bids from new resources entering the market. Prices above CONE should attract new, competitively priced entry in subsequent years; prices below CONE will deter new entry and may lead to retirement of uneconomic units.

5. The comprehensive FCM market design described in the Settlement Agreement collectively defines a capacity market for New England that should result in total compensation, through the capacity and energy markets, sufficient for new and existing resources to earn a competitive rate of return on their investments and to provide for the reliability needs of the region.

6. The Settlement Agreement includes nearly four years of interim Transition Payments beginning in December, 2006. Interim payments are necessary to retain those existing resources that are needed for system resource adequacy and to attract imports from other markets, such as New York and Canada, that have historically been important in maintaining the region's reliability. These interim Transition Payments serve as a bridge from the current market, which fails entirely to compensate adequately generators providing such benefits to the system, to the FCM, which is designed to provide such compensation. In the specific context of settling this proceeding, adopting these interim Transition Payments is in the public interest.

7. This concludes my affidavit.

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

**Devon Power LLC, *et al.*** | Docket No. EL03-563-030

AFFIDAVIT OF ROBERT B. STODDARD

**Commonwealth of Massachusetts**

**County of Suffolk**

ss.

I, Robert B. Stoddard, being duly sworn, depose and state that the contents of the foregoing Affidavit In Support Of Settlement Agreement on behalf of the Capacity Suppliers and Dominion is true, correct, accurate and complete to the best of my knowledge, information, and belief.

Robert B. Stoddard

SUBSCRIBED AND SWORN to
before me this 6th day of March, 2006

Notary Public
My commission expires: April 3, 2009

CATHERINE M. JOYCE
Notary Public
Commonwealth of Massachusetts
My Commission Expires
April 3, 2009

# ATTACHMENT 3

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| ***Devon Power LLC*, et al.** | ) | **Docket Nos. ER03-563-000<br>ER03-563-030<br>ER03-563-055** |

**AFFIDAVIT OF**

**MILES O. BIDWELL, JR., Ph.D.,**

**ON BEHALF OF**

**THE CONNECTICUT DEPARTMENT OF PUBLIC UTILITY CONTROL**

**MARCH 2, 2006**

**AFFIDAVIT**

1. My name is Miles O. Bidwell. My business address is 24 Raintree Lane, Hilton Head Island, South Carolina 29926. I am a Principal of Power Economics, Inc. and President of Bidwell Associates, Inc. I hold B.A., M.A., and Ph.D. degrees in Economics from Columbia University, where I specialized in applied microeconomic theory and econometrics. I previously offered testimony in this proceeding on behalf of the Connecticut Department of Public Utility Control ("CT DPUC"), Exhibits CT-1 and CT-22. My curriculum vitae, summarizing my experience in electricity and regulated markets, is attached.

2. On behalf of the CT DPUC, I participated fully in the development and negotiation of the capacity market design, the Forward Capacity Market ("FCM"), that is included in the proposed settlement agreement filed in *Devon Power, LLC* (FERC Docket No. ER03-563-030) on March 6, 2006. I am offering this affidavit in support of this filed settlement. Should any part of this market design be implicated in other Commission proceedings, my opinion should not be construed out of the context of this filed settlement.

3. I have also reviewed the document entitled, "Settlement Agreement Resolving All Issues" and Section VI.B.3 of the Explanatory Statement of the Settling Parties in Support of Settlement Agreement and Request for Expedited Consideration, which describes the FCM and the Forward Capacity Auction ("FCA") mechanism.

4. Based on my personal involvement in developing the FCA during the settlement and these documents, it is my opinion that the FCA is a competitive market design based on sound economic principles. The FCA is intended to procure appropriate levels of

capacity resources for resource adequacy and reliability in New England at a reasonable cost to New England's electricity ratepayers by using competitive market economics. The FCA's design endeavors to promote vigorous competition between all types of new and existing capacity resources, including traditional generation, import, intermittent, and load response capacity resources. It is my opinion that competition in such a properly designed capacity market will achieve appropriate investment in the least-cost mix of resource technologies, correctly price the cost of efficient new entry and the locational value of capacity resources, and provide appropriate levels of compensation to capacity resource suppliers.

5. This correctly-designed competitive market will also provide the proper incentives for capacity resources to flexibly respond to system needs and to be available when the system is stressed. The FCA includes an availability metric that financially penalizes nonperforming capacity resources and financially rewards resources that provide capacity when capacity is most valuable to load – *i.e.*, when the system is stressed. If the availability metric works as intended, I believe that capacity resources will respond to system needs efficiently and quickly.

6. Importantly, the FCA contains safeguards necessary to protect ratepayers from paying unjust and unreasonable prices. These safeguards include (i) a mechanism to stabilize the market in the early years of its operation that is designed to imitate the principles of a price collar often used on trading floors of large financial markets; (ii) obligatory review by New England's market monitor of specified types of bids priced above or below clearly articulated price thresholds; (iii) default rules setting the clearing price for capacity if the auction has insufficient competition or supply; and (iv) a mechanism to

deduct Peak Energy Rents that coordinates energy market revenues and capacity revenues for the purpose of mitigating incentives to manipulate the energy market and raise energy prices.

7. This concludes my affidavit.

**AFFIDAVIT**

Miles Bidwell, being duly sworn, deposes and says: that he is the witness in the foregoing Affidavit and is familiar with its contents. He states further that the facts contained in said Affidavit are true to the best of his knowledge and belief.

Miles Bidwell

Subscribed and sworn to before me,
This 2nd day of March, 2006

Notary Public Angela D. Grant

My Commission Expires 8/19/07

**POWER**
**ECONOMICS**

**MILES O. BIDWELL, Ph.D.**

**BUSINESS ADDRESS**

24 Raintree Lane
Hilton Head, SC 29926
843 342-6070
fax 843 342-9016

Dr. Bidwell is a Principal of Power Economics, Inc. and President of Bidwell Associates, Inc. Both firms provide advice and expert testimony on matters pertaining to the electricity industry, its regulation, and its movement toward a more competitive and efficient industry structure. Dr. Bidwell holds B.A., M.A. and Ph.D. degrees in Economics from Columbia University, where he specialized in applied microeconomic theory and econometrics.

Until 1996, Dr. Bidwell was a Vice President of National Economic Research Associates, Inc. (NERA). At NERA, Dr. Bidwell directed projects, conducted studies and presented testimony on behalf of Independent Power Producers of electricity, of electric, gas and telephone utilities and on behalf of the customers of regulated utilities. He also performed market and cost studies in antitrust and merger cases and frequently advised clients on topics such as analyzing the implications of different industrial structures and alternative forms of regulation. For the last twenty years, Dr. Bidwell has been conducting research and advising clients on issues related to the electricity industry's transformation from regulation to competition. He was an early proponent of the market type structure that became the basis for the electricity industry in England and Wales, worked extensively on a new industry structure in California (not the one adopted), and has participated in each of the industry restructuring proceedings in New York State. As part of his work in California, he developed a method for including demand side bidding in a day ahead and spot electricity market. Since 1999, he has been working with economists at Power Economics, Inc. on cases and reports in New York and California. In 2002, as part of a project for the California ISO, Dr. Bidwell developed a new approach for ensuring market stability and resource adequacy along with optimal reliability by using a new instrument, Reliability Options. He is currently working on electricity market structures using Reliability Options in several European countries and has just completed a major study for a consortium of European Union Electricity Regulators.

Before joining NERA, Dr. Bidwell served as Chief of Regulatory Research for the New York Public Service Commission. During this period he was responsible for the further application of economic theory to regulation and to ratemaking involving the areas of electric utilities, telecommunications, water and gas, including developing a method for using NYPP data to estimate the time varying marginal cost of electricity. At the same time, Dr. Bidwell designed and directed the Graduate Program in Regulatory Economics at the State University of New York at Albany, where he was an adjunct professor. Earlier in his career, he served on the economics faculty at Wake Forest University.

As an expert witness, Dr. Bidwell has appeared before Federal and State courts and in hearings before numerous State regulatory Commissions, the U.S. Nuclear Regulatory Commission, the Federal Energy Regulatory Commission, the Federal Communications Commission, and the House of Lords.

POWER
ECONOMICS

## EDUCATION

**COLUMBIA UNIVERSITY**

Ph.D. Economics, 1973

**COLUMBIA UNIVERSITY**

M.A. Economics, 1969

**COLUMBIA UNIVERSITY**

B.A. Economics, 1966 (with honors)

## EMPLOYMENT

1999 POWER ECONOMICS, INC.

Principal. Dr. Bidwell has worked with various members of Power Economics for more than 25 years. Since 1999, Dr. Bidwell has focused on projects that he could do in collaboration with the economists at Power Economics. These include: assistance to the California State Legislature, litigation on prices during the California Energy Crisis, various projects involving cost allocation and rate strategy, and the structure of the Capacity Market in New England.

1996- BIDWELL ASSOCIATES, INC.

President. At Bidwell Associates, Inc., Dr. Bidwell provides advice and expert testimony on matters pertaining to the electricity industry, its regulation, and its movement toward a more competitive industry structure.

1985-1996 NATIONAL ECONOMIC RESEARCH ASSOCIATES, INC.

Vice President. At NERA, Dr. Bidwell directed projects, conducted studies and presented testimony on behalf of Independent Power Producers, electric and telephone utilities and on behalf of customers of regulated utilities. He performed market and cost studies in merger and antitrust cases and advised clients on issues pertaining to the privatization and alternative industrial structures in the US and in the UK.

1978-1985 NEW YORK STATE PUBLIC SERVICE COMMISSION.

Chief of Regulatory Research. During his more than seven years on the staff of the New York State Public Service Commission, Dr. Bidwell developed methods for measuring and analyzing economic costs and marginal costs, which are now used in rate setting. He has been responsible for the further application of economic theory to regulation and to ratemaking involving the areas of electric utilities, telecommunications, water and gas.

1981-1985 STATE UNIVERSITY OF NEW YORK AT ALBANY

Adjunct Professor. Dr. Bidwell designed and directed the Graduate Program in Regulatory Economics at the State University of New York at Albany where he was an Adjunct Professor of Economics.

1973-1978 WAKE FOREST UNIVERSITY

Assistant Professor. Dr. Bidwell taught courses in microeconomic theory, economic growth and development, international trade, and industrial organization.

1970-1973 COLUMBIA UNIVERSITY

Preceptor in Economics

**PROFESSIONAL ACTIVITIES**

The American Economic Association

The Royal Economic Society

The International Association for Energy Economics

The American Bar Association

**POWER**
ECONOMICS

---

**RECENT ACTIVITIES (Publications)**

"Will NETA Ensure Generation Adequacy?" with Alex Henney. Platts Power UK, Issue 122, April 2004, McGraw Hill, London. This article is the first part of the study listed next.

"Will NETA Ensure Generation Adequacy?" with Alex Henny. This study was supported by various organisations including Energywatch. April 29, 2004. The first third of this study has been published in *Power UK*.

"Reliability Options: A Market-Oriented Approach to Long-Term Adequacy." *The Electricity Journal,* Vol. 18, Issue 5, June 2005.

**RECENT ACTIVITIES (Reports and presentations)**

"Assuring Resource Adequacy." Report and presentation to the Amsterdam Power Exchange. Amsterdam, September, 2003.

"Assuring Resource Adequacy." Report and presentation to the Ministry of Energy, the Hague, October, 2003.

"Assuring Resource Adequacy and Market Stability." Presentation to NordPool, Helsinki, November, 2003.

"Report on Power Sector Reform Alternatives in Thailand," with Carl Pechman, prepared for Probe International, December 7, 2003.

"Generation Adequacy Study for European Regulators," with Alex Henney. This confidential study consists of three reports, Report 1: A Review of Practices and Proposals in Various Jurisdictions; Report 2: The Behaviour of Energy-Only Markets: Will They Ensure Generation Adequacy? Report 3: The RO Method of Assuring Adequacy. August 2005

**RECENT ACTIVITIES (Testimony)**

| | |
|---|---|
| FERC | FERC 95 Rebuttal Testimony (with Carl Pechman) on behalf of The California Parties before the Federal Energy Regulatory Commission in San Diego Gas & Electric Company, Complainant v. Sellers of Energy and Ancillary Services into Markets Operated by the California Independent System |

| | |
|---|---|
| | Operator Corporation and the California Power Exchange (Dockets EL00-95-045, EL00-98-042) February 2002 |
| FERC | Rebuttal Testimony on behalf of Public Utility District No. 1 of Snohomish County, WA, and Southern California Water Company. FERC Docket Nos. EL02-26-000, et al. September 2002. |
| FERC | Prepared Direct Testimony on behalf of PacifiCorp. Docket Nos. EL02-80-000, et al. October 2002. |
| FERC | Prepared Rebuttal Testimony on behalf of PacifiCorp. Docket Nos. EL02-80-000, et al. November 2002. |
| FERC | Prepared Direct Testimony of Miles O. Bidwell, Ph.D. on behalf of the City of Tacoma and the Port of Seattle, Washington. Docket No. EL01-10-005. March 2003 |
| FERC | Prepared Direct and Answering Testimony of Carl Pechman and Miles Bidwell on behalf of the Connecticut Department of Public Utility Control, *et al.* Docket No. ER03-563-030. November 4, 2004 |
| FERC | Prepared Cross Answering Testimony of Miles Bidwell and Carl Pechman on behalf of the Connecticut Department of Public Utility Control, *et al.* Docket No. ER03-563-030. January 10, 2005 |

POWER
ECONOMICS

**SELECTED SPEECHES**

"Using Marginal Costs in Electric Rate Design." Presented at the Second NARUC Biennial Regulatory Information Conference, Ohio State University, Columbus, Ohio, September 1980.

"Optimal Rate Structure: An Empirical Examination." Presented at the Workshop on Regulatory Economics, Rutgers University, Newark, New Jersey, March 1981.

"Efficiency and Equity of Kilowatt and Kilowatt Hour Charges: An Empirical Examination." Presented at the Annual Conference of the Advanced Workshop in Regulation and Public Utility Economics, Mohonk Mountain House, New Paltz, New York, June 3-4, 1982.

"Deriving an Appropriate Capital Carrying Charge in a Time of Inflation." Presented at the Third NARUC Biennial Regulatory Information Conference, Ohio State University, Columbus, Ohio, September 1982.

"Efficient Pricing for Cogenerators: Marginal Energy Cost and Power Pool Contracts." *Proceedings of the Third NARUC Biennial Regulatory Information Conference*, with Mark Reeder, Ohio State University, Ohio, September 1982.

"Marginal Cost Analysis and Rate Base Allocation Under Suboptimal Inflationary Conditions." Presented at the 1983 Rate Symposium on Problems of Regulated Industries, Kansas City, Missouri, February 6-9, 1983.

"Optimal Prices, Economic Depreciation, and Regulated Utilities." Presented at the 23rd Annual Iowa State Regulatory Conference, Ames, Iowa, May 1984.

"Avoiding Rate Shock: The Search for Optimal Intertemporal Cost Allocation." Presented at the Institute of Public Utilities Fifteenth Annual Conference, 1984.

"Regulatory Guidelines for Pricing Electricity in Times of Excess Capacity." Presented at the Michigan State University Public Utility Papers, 1985.

"The Significance of Economic Depreciation for the Future Viability of the Bell Operating Companies." Talk given at the Touche Ross Conference on Capital Recovery in Telecommunications, Washington, D.C. October 24-25, 1985.

"Indexing Electric Utility Rates." Presented at the February 18-19, 1987, Energy Research Group Meeting.

"Depreciation Policy in a Competitive Environment." Presented at a conference sponsored by NERA at Camelback Inn, Scottsdale, Arizona, March 4-7, 1987.

"U.S. Economic Regulation of Electricity." Presented in London, England, June 26, 1987.

"Equity Versus Efficiency." Presented at Innovative Pricing Conference, Syracuse, New York, September, 1988.

"Marginal Cost and Bad Fish." Presented at the conference of Industrial Energy Bulletin, New York, New York, 1989.

"From Revenue Requirements To Rates: An Economist's Perspective." Continuing Education Lecture sponsored by the Ohio Bar Association, May 15, 1989.

"Regulatory Scrutiny of Marketing Expenses: Competitive Necessity vs. Regulatory Hang Ups." Presented at NERA Telecommunications Seminar, Scottsdale, Arizona, April 12-14, 1989.

"Are New York's Demand Side Management Programs Economic?" Presented at the Multiple Intervenors' Annual Meeting, Syracuse, November 1-2, 1989.

"Measuring The Value Of Unserved Energy." Presented at the March 13-14, 1990, Energy Research Group Meeting in Washington, D.C.

"Price Discrimination Is Not Hazardous To Your Health." Presented at the Conference on "Problems of Mixed Competitive and Regulated Markets: The Issue Of Undue Price Discrimination" in Windsor, England, May 19, 1990.

"Estimating Customer Preferences." Presented at NERA, U.K., May 21, 1990.

"The Value of Unserved Energy—Revealed." Presented at the June 26-27, 1990 Energy Research Group Meeting in Washington, D.C.

"An Analysis of New Rate Design Techniques." Presented at the Multiple Intervenors' 1990 Annual Meeting, Syracuse, New York.

"The Value of Reliability and Least Cost Planning." Presented at the 1991 Electric Utility Business Environment Conference & Exhibition, Denver, CO, March 20-22, 1991.

"Measuring the Value of Reliability." Presented at the 1991 Marginal Cost Working Group Seminar, Seattle, WA, April 25, 1991.

"Less is More." Presented at the 1991 Annual Multiple Intervenors' Meeting in Syracuse, New York, October 30, 1991.

"Accurate Depreciation Rates And Rapid Amortization Benefit Customers (Or Everything You Always Wanted To Know About Depreciation But Were Afraid To Ask)." Presented at the Minnesota Public Utilities Commission, March 9, 1992.

"Is Environmentalism Good for Business?" A talk at the Economic Recovery & Environmental Responsibility Conference. Presented by Sound Waters & SACIA, The Southwestern Area Commerce & Industry Association, May 13, 1992.

"Green Economics." A speech presented at the Green & Clean 6th Annual Corporate Breakfast Forum, Greenwich, Connecticut, October 28, 1992.

"Opportunities and Challenges in Privatization." A talk presented at the 2nd Annual European Business Conference, Chicago, IL, May 1, 1993.

"Rockets & Feathers: The Asymmetry of Response to Telephone Price Change." Presented at the Advanced Workshop in Regulation and Public Utility Economics Twelfth Annual Conference, Cape Cod, Massachusetts, May 26-28, 1993.

"Opening the Flood Gates of Competition—Industrial Customers and Independent Power Producers' Stake in Competitive Electricity Supply." Presented at the IPPNY Annual Membership Meeting and Conference, Albany, October 6, 1993.

"Issues In Incentive Regulation: Theory Versus Practice." Presented at the Rutgers Research Seminar, "Incentive Regulation for Public Utilities," in Newark, New Jersey, October 22, 1993.

"Retail Wheeling and the Future US Electricity Industry." Presented at the National Independent Energy Producers Winter Quarterly Meeting, in Washington, DC, January 25, 1994.

"Measuring the Value of Unserved Energy." Presented at the Advanced Workshop in Regulation and Public Utility Economics at Rutgers University in Newark, New Jersey, April 15, 1994.

"Restructuring the Electricity Industry." Presented at "Markets in Motion." Independent Power Producers of New York's Annual Spring Legislative Conference in Albany, May 18, 1994.

"Rockets & Feathers II: Empirical Estimation of Asymmetric Response and Reconciliation of Asymmetric Behavior with Classical Utility Theory." Presented at the Advanced Workshop in Regulation and Public Utility Economics Thirteenth Annual Conference, Newport, Rhode Island, May 25-27, 1994.

"International Lessons for Electricity Restructuring." Presented to the Economic Planning Institute, Government of Japan, Tokyo, Japan, March 1995.

"Reduce Stranded Cost – Restructure Rates." Presented before Parties to the New York Public Service Commission Competitive Opportunities Docket, Albany, New York, May 3, 1995.

"Rules For A Speedy And (Less) Painful Transformation To Competition," presented at the Advanced Workshop in Regulation and Public Utility Economics 14th Annual Conference, Newport, Rhode Island, May 26, 1995.

"Accommodation of the System to IPPs with Open Access." Presented at the III Workshop on Independent Power Production in Brazil, Belo Horizonte, Brazil, June 30, 1995.

"Promoting Electricity Consumption to Ease the Transition into Competition." Presented at the 107th Annual Convention, Regulatory, Symposium, National Association of Regulatory Utility Commissioners, New Orleans, Louisiana, November 13, 1995.

"Stranded Costs: There is a Solution." Presented at the Rutgers University Advanced Workshop in Regulation and Public Utility Economics, Newark, New Jersey, November 17, 1995.

"Update on Electricity Restructuring Across the Northeast." Presented at the New Jersey Business & Industry Association, Business to Business Seminar, Shrinking Your Electric Bill: How Your Business Can Save Money on Electric Bills, Jamesburg, New Jersey, December 12, 1995.

"How to Minimize Stranded Costs Through Rate Restructuring." Presented before a conference of the Parties to the New York Public Service Commission, Competitive Opportunities Docket, Albany, New York, February 14, 1996.

"Structuring Markets--Finding the Optimal Amount of Regulation." Presented at the Rutgers Research Seminar, Pricing and Regulatory Innovations Under Increasing Competition, in Newark, New Jersey, May 3, 1996.

**POWER**
**ECONOMICS**

"Market Clearing Prices on Peak Days," with Mark Reeder, presented at the Advanced Workshop in Regulation and Public Utility Economics, 15th Annual Conference, Lake George, New York, May 30, 1996.

"Market Power Issues." Presented at the Independent Power Producers of New York's 11th Annual Fall Conference, Albany, New York, September 25, 1996.

"Norway and England Have Very Different Electricity Market Structures: We Can Learn From Both." Presented at the 1996 Multiple Intervenors Annual Membership Meeting, Syracuse, New York, October 1996.

"Creating New Markets: The Role of ISO's, Power Exchanges, and Reliability." Presented at the Rutgers University Advanced Workshop in Regulation and Competition, Newark, New Jersey, April 1997.

"Transmission System Planning and Investment: Can a Private Market Determine and Provide the Investments That Minimize System Costs?" Presented at the IBC Group's Reliability for Competitive Power Conference, San Francisco, California, September 29-30, 1997.

"Driving on the Same Side of the Road—Avoiding Collisions on the Road to Competition." Presented at the Independent Power Producers of New York's 12th Annual Fall Conference, Albany, New York, October 8, 1997.

"Marginal Cost Methods for Electric Utilities." Co-taught NERA Course with Dr. Hethie Parmesano, Redondo Beach, California, October 20-22, 1997.

**PUBLICATIONS AND CONSULTING REPORTS**

"The Family Labor Supply Decision: A Trade Model." Ph.D. dissertation, Columbia University, 1973.

"The Price of Children and Factor Reversals." *Atlantic Economic Journal*, Vol. II, Number 2, November 1974.

"Family Structure, The Marriage Market, and Time Allocation." *Atlantic Economic Journal*, Vol. III, Number 2, November 1975.

"Comments on the Economic Impact of Damming the New River." United States Department of the Interior, Bureau of Outdoor Recreation, Washington, D.C. *Final*

*Environmental Statement Proposed South Fork New River National Wild and Scenic River*, pages 500-503, 1976.

"Comment on Interactions Between Population and Environment." *Atlantic Economic Journal*, Vol. IV, 1976.

"A Peak Load Pricing Policy for North Carolina Utilities." *Carolina Planning*, Vol. III, Number 1, pages 16-22, Winter 1977.

"Some Thoughts on Social Responsibility and Scientists." *Spring*, Vol. I, Winston-Salem, North Carolina, November 1977.

"Efficient Pricing for Cogenerators: Marginal Energy Cost and Power Pool Contracts." *Proceedings of the Third NARUC Biennial Regulatory Information Conference*, with Mark Reeder, Ohio State University, Ohio, September 1982.

"Avoiding Rate Shock: The Search for Optimal Intertemporal Cost Allocation." *Changing Patterns in Regulation, Markets, and Technology: The Effect on Public Utility Pricing*. Proceedings of the Institute of Public Utilities Fifteenth Annual Conference, Michigan State University Public Utilities Papers, 1984, P.C. Mann and H.M. Trebing, eds., pages 481-507.

"Regulatory Guidelines for Pricing Electricity in Times of Excess Capacity." *The Impact of Deregulation and Market Forces on Public Utilities: The Future Role of Regulation*. Michigan State University Public Utility Papers, 1985, P.C. Mann and H.M. Trebing, eds., pages 455-470.

"The Shortage Cost of Electricity Supply." Report for the Long Island Lighting Company, August 1986.

"Is Shoreham's Operation Economic?" Report for the Long Island Lighting Company, 1986.

"Indexing Electric Utility Rates." Proceeding of the February 18-19, 1987, Energy Research Group Meeting.

"Depreciation Policy in a Competitive Environment." *Proceedings of NERA Seminar Telecommunications in a Competitive Environment* (March 1987).

"U.S. Economic Regulation of Electricity." Proceeding of Seminar in London, England, June 26, 1987.

"Report to Oglethorpe Power Corporation on the Optimal Generation Expansion Plan." Report to Oglethorpe Power Corporation, 1987.

**POWER**
**ECONOMICS**

---

"Will a Government Takeover of LILCO Save Money for Consumers: An Update." Report for the Long Island Lighting Company, 1987.

"Methods for Measuring the Costs of Service Interruptions and the Demand for Interruptible Rates." Study Proposal for Long Island Lighting Company, 1987.

"Economic Impact of a Premature Shutdown of the Vermont Yankee Nuclear Plant." Report for the Vermont Yankee Nuclear Power Corporation, May, 1988.

Report to Dayton Power & Light Company on DP&L's avoided costs and the optimal amount and pricing of cogeneration, June, 1988.

"Need For The Halfmoon Cogeneration Project." Report for Inter-Power of New York, Inc., on the economic value of and "need" for the Halfmoon Cogeneration Project, September, 1988.

"Equity Versus Efficiency," Proceeding of Innovative Pricing Conference, Syracuse, New York, September, 1988.

"Marginal Cost and Bad Fish," Proceedings of Conference, Industrial Utilities: Redefining The Relationship. *Industrial Energy Bulletin*, New York, New York 1989.

"New Directions In Telecommunications Planning" (Confidential Report) April, 1989.

"Regulatory Scrutiny of Marketing Expenses Competitive Necessity vs. Regulatory Hang Ups," proceeding of NERA Seminar *Telecommunications In A Competitive Environment*, April 1989.

"Comments on the Energy Efficiency Options Study Prepared for the Iowa State Utilities Board by Morgan Systems Corporation." Report for Iowa Electric Light & Power Company, November 16, 1989.

"Evaluating a Public Utility's Investments," *Public Utilities Fortnightly*, May 10, 1990.

"The Value of Reliability and Least Cost Planning," proceedings of *1991 Electric Utility Business Environment Conference & Exhibition*, Denver, CO, March 20-22, 1991.

"Optimal Pricing of Water," report for Long Island Water Company, March 4, 1991.

"Illuminating Externalities," Letter to the Editor, *Public Utilities Fortnightly*, April 1, 1991.

"Measuring the Value of Reliability," proceedings of *1991 Marginal Cost Working Group Seminar*, Seattle, WA, April 25, 1991.

"Public Disclosure of Bids and Bidders," report prepared for New York Telephone, June, 1991. (Confidential)

"An Overview of Public Utility Regulation in the United States," prepared for NERA London as part of a paper for the Sydney, Australia Water Board, July 1991.

"The Price Elasticity of Demand for Touchtone," a report for New York Telephone Company, July, 1991. (Confidential)

"The Privatization of Pakistan's Telephone Services: Outline of Economic Issues," prepared for the Government of Pakistan, August 13, 1991.

"The Time-Differentiated Marginal Costs of New York State Electric and Gas Corporation," prepared for New York State Electric and Gas Corporation, August 27, 1991.

"A Study of Demand for Optional New York Telephone Residence Services," prepared for New York Telephone Company and Telesector Resources Group, Inc., August, 1993

"Efficient Imputation and Transfer Pricing: Past, Present, and Future." Prepared for NYNEX Corporation, October 21, 1993.

"The Value of Unserved Energy." Prepared for the Los Angeles Department of Water and Power, April 8, 1994.

"The Indexation of Shipping Costs." Prepared for Burmah Gas Transport LTD, November 17, 1994.

"Issues In Incentive Regulation: TFP in State Regulatory Reform—Theory Versus Practice," *Incentive Regulation for Public Utilities*, pages 185-213, Michael A. Crew, Ed., Kluwer Academic Publishers, Boston, 1994.

"An Analysis of Asymmetric Demand Response to Price Changes: The Case of Local Telephone Calls," with Bruce X. Wang and J. Douglas Zona, *Journal of Regulatory Economics*, pages 285-298, Michael A. Crew, Ed., Kluwer Academic Publishers, Boston, 1995.

"How to Reduce Stranded Costs?" Prepared for Southern California Edison, April, 1995.

"Survey Of Studies On The Elasticity Of Demand For Electricity," with P. Della Valle. Prepared for Southern California Edison, August 1, 1995.

POWER
ECONOMICS

---

"Transmission Congestion and Pricing." Appendix to the New York Public Service Commission's Final Report on Electricity Competition, September 1995.

"Report on Preliminary Evaluation of Purchased Electricity Pass Through Cost Issue in Connection with GDRRA/MWE Litigation and Proposed Study Plan," with L. Guth, December 14, 1995

"Restructure Rates to Cut Stranded Costs," with P. Della Valle, The Electricity Journal, December 1995.

"Structuring Markets--Finding the Optimal Amount of Regulation," in, *Pricing and Regulatory Innovations Under Increasing Competition,* Michael A. Crew, Ed., Kluwer Academic Publishers, Boston, 1996

Report on the Electricity Industry Structure in the United States and the UK, prepared for the Queensland Electricity Reform Unit, Brisbane, Australia, August 1997.

"Reforming the Pool of England & Wales," with Alex Henney. Report for the Minister for Energy, Science & Industry and Pool Members, November 1997.

"A Demand Response Will Lower Peak Prices," with Carl Pechman, Duane Chapman, Tim Mount, prepared for Multiple Interveners for presentation to the New York Independent System Operator, January 18, 2001.

"The California Electricity Crisis: A Report To the Building Owners And Managers Association (BOMA) of California," with Carl Pechman, prepared for BOMA California, March 19, 2001.

"Assuring Resource Adequacy." Report and presentation to the Amsterdam Power Exchange. Amsterdam, September, 2003.

"Assuring Resource Adequacy." Report and presentation to the Ministry of Energy, the Hague, October, 2003.

"Assuring Resource Adequacy and Market Stability." Presentation to NordPool, Helsinki, November, 2003.

"Report on Power Sector Reform Alternatives in Thailand," with Carl Pechman, prepared for Probe International, December 7, 2003.