# EXHIBIT F

Part 1

115 FERC ¶61,340
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Joseph T. Kelliher, Chairman;
Nora Mead Brownell, and Suedeen G. Kelly.

Devon Power LLC Docket Nos. ER03-563-030
ER03-563-055

ORDER ACCEPTING PROPOSED SETTLEMENT AGREEMENT

(Issued June 16, 2006)

1. In these proceedings, the Commission has been addressing a proposal by ISO New England, Inc. (ISO-NE) to establish a locational installed capacity (LICAP) mechanism. That proposal was made in response to Commission orders identifying flaws in New England's current capacity market, and was further developed through subsequent hearing procedures. As this proceeding has developed, additional evidence has been produced regarding the flaws in the current capacity market and the resulting impacts those flaws have had on New England's electric system infrastructure. As discussed in more detail below, the Commission established additional procedures to consider how the LICAP mechanism would address the deficiencies in the current capacity market and meet New England's projected need for new infrastructure in coming years. Those additional procedures also gave the parties an opportunity to discuss and develop potential alternatives to the LICAP mechanism.

2. On March 6, 2006, a broad group of the parties to this proceeding (collectively Settling Parties[1]) filed a proposed settlement (Settlement Agreement) that would resolve all issues in this matter. As described in more detail in this order, the Settlement Agreement contains an alternative to LICAP, called the Forward Capacity Market (FCM). The settlement is contested. In this order, we accept the proposed Settlement Agreement, finding that as a package, it presents a just and reasonable outcome for this proceeding consistent with the public interest.

---

[1] Settling Parties are identified in Appendix A to this order.

## I. **<u>Background and Procedural History</u>**

3. The Initial Decision contains a detailed history of this proceeding up to the point of its issuance.[2] Rather than repeat that detailed history here, we will briefly recount certain key points of prior proceedings and the present case.

4. As a means of ensuring reliability, for many years ISO-NE (and previously NEPOOL) has imposed an installed capacity (ICAP) requirement on load-serving entities, requiring them to procure specified amounts of ICAP based on their peak loads plus a reserve margin. Prior to the widespread unbundling of the generation, transmission and distribution functions of most New England load-serving entities (which in many cases included state-mandated divestiture of generating assets), if a utility did not have sufficient resources to meet its ICAP requirement, it could either obtain ICAP from an entity in the pool with a surplus or pay the deficiency charge.

5. Beginning in 1998, ISO-NE began operating a bid-based market for ICAP.[3] In 2000, as part of the region's development of wholesale power markets and market-based rates, the Commission first began to identify flaws in the ICAP market. In an order addressing competing proposals to implement a congestion management system and multi-settlement system in New England, the Commission rejected a proposal by ISO-NE to eliminate the ICAP requirement, reasoning that ISO-NE should first propose an alternative mechanism to meet the reliability function served by the ICAP requirement.[4] The Commission did allow ISO-NE to replace the ICAP auction mechanism with an administratively-determined ICAP deficiency charge, agreeing with ISO-NE that the auction "can produce inflated prices unrelated to the actual harm caused by ICAP deficiencies."[5]

6. In 2002, the Commission further addressed deficiencies in New England's ICAP market, this time noting the lack of a locational element. In its order addressing the implementation of energy markets and locational marginal pricing in New England, the

---

[2] *See Devon Power LLC*, 111 FERC ¶ 63,063 at P 2-36 (2005) (Initial Decision).

[3] *See New England Power Pool*, 83 FERC ¶ 61,045 at 61,263 (1998).

[4] *See ISO New England, Inc.*, 91 FERC ¶ 61,311 (2000).

[5] *Id.* at 62,081.

Commission identified the lack of a locational element as a significant flaw in the ICAP market, stating that it "believes that location is an important aspect of ensuring optimal investment in resources."[6]

7. These specific proceedings began in response to the February 26, 2003 filing by Devon Power LLC, Middletown Power LLC, Montville Power LLC, Norwalk Power LLC and NRG Power Marketing Inc. (collectively NRG) of four cost-of-service reliability-must-run (RMR) agreements covering 1,728 megawatts of generating capacity located within Connecticut and the constrained Southwest Connecticut area. In a series of orders addressing NRG's filing[7] as well as RMR agreements filed by other entities,[8] the Commission rejected the majority of the RMR agreements, out of concern about the effect widespread use of such contracts could have on the competitive market. The Commission stated that ISO-NE, "rather than focusing on and using stand-alone RMR agreements, should incorporate the effect of those agreements into a market-type mechanism."[9] Accordingly, the Commission directed, pursuant to section 206 of the Federal Power Act (FPA),[10] that revised bidding rules (called Peaking Unit Safe Harbor, or PUSH, bidding) be instituted on an interim basis to give low-capacity factor generating units operating in designated congestion areas the opportunity to recover their costs through the market.[11] To replace the interim PUSH mechanism, the Commission directed ISO-NE to file by March 1, 2004, for implementation by June 1, 2004, "a mechanism that implements location or deliverability requirements in the ICAP or resource adequacy market . . . so that capacity within [designated congestion areas] may be appropriately compensated for reliability."[12]

---

[6] *New England Power Pool and ISO New England, Inc.*, 100 FERC ¶ 61,287 at 62,278 (2002).

[7] *Devon Power LLC*, 102 FERC ¶ 61,314 (2003) (March 25 Order); *Devon Power LLC*, 103 FERC ¶ 61,082 (2003) (April 25 Order); *Devon Power Company*, 104 FERC ¶ 61,123 (July 24 Order).

[8] *PPL Wallingford Energy LLC*, 103 FERC ¶ 61,185 (2003); *PPL Wallingford Energy LLC*, 105 FERC ¶ 61,324 (2003).

[9] *See* April 25 Order at P 29.

[10] 16 U.S.C. 824e (2000).

[11] *See* April 25 Order at P 33; July 24 Order at P 25-31.

[12] April 25 Order at P 37.

8. On March 1, 2004, ISO-NE made its filing in compliance with the April 25 Order. In the compliance filing, ISO-NE proposed a locational installed capacity (LICAP) mechanism that would add a locational element to the current ICAP market, establishing four ICAP regions with separate ICAP requirements: Maine, Connecticut, Northeast Massachusetts/Boston (NEMA/Boston), and the remainder of New England (Rest of Pool). Under the proposal, capacity transfer limits would be established to limit the amount of ICAP that load serving entities in one region could purchase from another region. Additionally, ISO-NE proposed to use a downward sloping demand curve to establish the amount of ICAP which must be procured and the price for that capacity. Additionally, under the proposed LICAP mechanism, capacity transfer rights would be allocated to load or generators, depending on their location, to allow market participants to hedge against congestion costs. Under the proposal, holders of capacity transfer rights between two ICAP regions would receive the difference in ICAP prices between those regions.

9. In a June 2, 2004 Order,[13] the Commission established hearing procedures regarding ISO-NE's compliance filing, and delayed the implementation of the LICAP mechanism from the proposed June 1, 2004 date until January 1, 2006. The Commission stated that it agreed with two broad concepts in ISO-NE's proposal. First, the Commission found it appropriate to establish separate ICAP regions, but questioned whether the regions proposed by ISO-NE adequately reflected where infrastructure investment is needed most, specifically noting the constrained area of Southwest Connecticut. Second, the Commission agreed with the overarching concept of a demand curve, but found that more information was necessary to develop appropriate parameters for the curve. As a result of these findings, the Commission directed ISO-NE to submit a further filing addressing whether the Commission should revise the LICAP proposal to create a separate ICAP region for Southwest Connecticut. Additionally, the Commission established a separate investigation and paper hearing in Docket No. EL04-102-000 to determine whether a separate energy load zone should be created for Southwest Connecticut, and whether it should be implemented in advance of LICAP. Finally, the Commission established hearing procedures to determine the appropriate demand curve parameters, the proper method for calculating capacity transfer limits, the appropriate method for determining the amount of capacity transfer rights to be allocated, and the proper allocation of capacity transfer rights. In subsequent orders, the Commission

---

[13] *Devon Power LLC*, 107 FERC ¶ 61,240 (2004) (June 2 Order).

addressed ISO-NE's filing regarding the creation of a separate ICAP region for Southwest Connecticut, and denied rehearing and granted clarification in part of the June 2 Order.[14]

10. On June 15, 2005, the Presiding Judge issued an Initial Decision on the issues set for hearing in the June 2 Order.[15] The Initial Decision largely (with some variation) adopted the demand curve proposed by ISO-NE in its August 31, 2004 initial testimony, and also ruled on the appropriate allocation of capacity transfer rights and the appropriate methodology for calculating capacity transfer limits. Briefs on Exceptions to the Initial Decision were filed on July 15, 2005, and Briefs Opposing Exceptions were filed on August 4, 2005.

11. In section 1236 of the Energy Policy Act of 2005, signed into law on August 8, 2005, Congress noted the New England Governors' concerns that the LICAP proposal would not provide adequate capacity or reliability while imposing high costs on consumers.[16] Congress declared that the Commission should carefully consider the states' objections.

12. Several entities (mostly state entities and load representatives) requested oral argument before the Commission on the exceptions to the Initial Decision, pursuant to Rule 711(c) of the Commission's Rules of Practice and Procedure.[17] In an August 10, 2005 Order, the Commission granted these requests and scheduled oral argument for September 20, 2005.[18] Additionally, the Commission stated that, in light of its decision to hear oral arguments, "we have determined that the implementation of the LICAP mechanism, if it proceeds, will not be earlier than October 1, 2006."[19]

13. The oral argument focused on whether the LICAP mechanism, as adopted in the Initial Decision, or any alternative approach would provide for just and reasonable

---

[14] *See* June 2 Order, *order on reh'g and clarification, Devon Power LLC,* 109 FERC ¶ 61,154 (2004), *reh'g denied,* 110 FERC ¶ 61,315 (2005); *see also Devon Power LLC,* 109 FERC ¶ 61,156 (order on compliance filing directing establishment of Southwest Connecticut region), *order on reh'g and clarification,* 110 FERC ¶ 61,313.

[15] *See supra* note 2.

[16] Pub. L. No. 109-58, § 1236, 119 Stat. 961 (2005).

[17] 18 C.F.R. § 385.711(c) (2005).

[18] *Devon Power LLC,* 113 FERC ¶ 61,075 (2005).

[19] *Id.* at P 5.

wholesale power prices in New England, at levels that encourage needed generation additions and whether LICAP or any alternative approach would provide adequate assurance that necessary electric generation capacity or reliability will be provided. The Commission also asked the parties to address at oral argument what are the costs, benefits, and economic impacts of the proposal (or any alternative approach), compared to continued reliance on the status quo, such as the cost of RMR agreements. Both at the oral argument and in briefs filed prior to the oral argument, parties to the proceeding were given the opportunity to present alternatives to LICAP directly to the Commission.[20] Parties presented two alternatives to LICAP in their briefs and at oral argument: the New England Resource Adequacy Market and the New England Locational Resource Adequacy Market.

14. Following the oral argument, the Commission issued an order giving the parties an additional opportunity to pursue a settlement on an alternative to the LICAP mechanism.[21] In that order, the Commission stated that it remained concerned about the resource adequacy situation in New England (particularly in the congested areas of Southwest Connecticut and Northeastern Massachusetts), noting that "[t]he parties at the oral argument generally agreed that the status quo is failing and that generation resources are not being added at a rate necessary to maintain reliability and assure just and reasonable wholesale power prices."[22] The Commission directed the Chief Administrative Law Judge to appoint a settlement judge to guide the process of developing a proposed alternative to LICAP. Additionally, the Commission stated that it would continue to evaluate the Initial Decision, and directed ISO-NE to make a compliance filing to aid in its consideration of the Initial Decision.[23]

## II. Description of Proposed Settlement Agreement

### A. Forward Capacity Market

15. The Settlement Agreement provides for the implementation of an FCM as an alternative to the ISO-NE-designed LICAP mechanism. The Settlement Agreement is the end product of a series of over 30 formal settlement conferences that occurred over a four-month period with the active participation and involvement of Administrative Law

---

[20] *See* Notice Scheduling Oral Argument, Docket No. ER03-563-030 (August 25, 2005).

[21] *Devon Power LLC*, 113 FERC ¶ 61,075 (2005) (October 21 Order).

[22] *Id.* at P 5.

[23] *Id.* at P 10-14.

Judge Lawrence Brenner. Of 115 parties to the settlement proceedings, eight parties have formally opposed the Settlement Agreement. The NEPOOL Participants Committee voted, with 78.46 percent, to support the Settlement Agreement, with support from all six voting sectors.

16. The FCM establishes annual auctions for capacity. The capacity product will be sold on a per-megawatt of deliverable capacity basis. Capacity resources, regardless of type, will receive the same auction clearing price. The Forward Capacity Auctions (FCA) will procure capacity three-plus years ahead of the commitment period, which is intended to provide for a planning period for new entry and allow potential new capacity to compete in the auctions. The commitment period is a year-long period that corresponds to the ISO-NE power year.[24] Thus, sellers will commit to provide capacity for one year—for example, June 1, 2011 to May 31, 2012—three-plus years in advance of the commitment period. However, the Settlement Agreement grants new capacity the option to lock-in capacity prices for up to five years. New capacity may, during the process to qualify as an eligible resource, select a commitment period of up to five years, in one-year increments, provided that the resource meets certain auction criteria. This design element is intended to provide predictable revenues and facilitate financing for new capacity.

17. The FCAs are designed as descending clock auctions. In such an auction, the administrator announces a starting price. Bidding in the FCA will begin at a specified price—two times the agreed Cost of New Entry (CONE).[25]

18. Following the first auction, subsequent CONEs will be mathematically established, based on preceding CONEs and the clearing price of the preceding auction. The proposed FCM provides annual reconfiguration auctions to be held two and a half years prior to each commitment period, as well as twice-yearly seasonal auctions and monthly auctions just prior to, and during each commitment period. These reconfiguration auctions provide for the buying, selling and exchange of capacity obligations and maintenance of liquidity. There are three types of reconfiguration auctions: (i) three annual auctions (for trading year-long commitments) before the relevant commitment period, (ii) monthly auctions held prior to each commitment month,

[24] The ISO-NE power year is a period of twelve months beginning June 1 of each year and ending on May 31 of the next calendar year.

[25] CONE, which represents the initial price of each auction, is set for the initial auction at $7.50/kW-month, which was negotiated as part of the settlement.

and (iii) seasonal auctions held prior to June and October of each year to accommodate transactions to sell a seasonal strip product. The reconfiguration auctions will preserve the locational element of the initial auction.[26]

19. Until there have been three successful auctions, the price for existing capacity will be set within a ceiling of 1.4 times CONE and a floor of 0.6 times CONE, which is referred to as the "collar mechanism." In the auctions to which the collar mechanism applies, if the auction clearing price is greater than 1.4 times CONE, existing capacity will be paid 1.4 times CONE and new capacity will be paid the auction clearing price. The auction clearing price will not fall below 0.6 times CONE. In the first year, this means that auction prices for existing capacity can range from $4.50 to $10.50/kW-month.

20. The amount of capacity procured will be that amount required to maintain the installed capacity requirement. Thus, if the system has surplus capacity, not all capacity resources offered will be purchased.[27] Each load-serving entity, as the ultimate purchaser of capacity, is required to pay for a share of the installed capacity requirement proportionate to its share of peak load. FCM allows load-serving entities to self-supply: load-serving entities may use owned and contracted resources (in whole or in part) to supply their capacity obligations. Thus a load-serving entity can meet its capacity obligations without paying the auction clearing price. Resources designated as self-supply are subject to the same performance obligations and qualification requirements as other resources participating in the FCM and the FCAs.

21. Resources participating in the auctions will be designated as existing or new resources. Existing capacity will be defined as a resource previously listed as a resource in New England's capacity market; new capacity will never have been listed as a capacity resource. Existing capacity may also qualify as new capacity if it undertakes specified types of major investments to upgrade its facilities. The incremental amount of an increase in output from an existing capacity resource will be considered new capacity, provided the output increase is greater than or equal to two percent of the Resource's Summer Seasonal Claimed Capability. The Settlement Agreement indicates that additional thresholds for new capacity may be addressed in the stakeholder process, which will enable consultation from state utility regulatory agencies. The Settlement Agreement sets rules under which imported capacity is included in the FCAs.

---

[26] The locational element of the FCM is described below.

[27] This component of the FCM differs from the LICAP proposal, which set a target level of capacity in excess of the installed capacity requirement.

22. Capacity resources, existing and new, are required to submit qualification documentation to be eligible to participate in the auctions. New capacity that is selected to provide capacity in the future must demonstrate control over the proposed project site, a critical path schedule with milestones supporting the feasibility of the project, and an interconnection analysis showing the impact of connecting to the transmission grid. The FCM proposal also enables bidding by demand-side and intermittent resources.

23. The FCM proposal contains a locational component. Before each auction, ISO-NE will determine capacity zones based on an identification of transmission limits that may bind. In instances where transmission limits are expected to bind (accounting for predicted upgrades that will be on-line by the commitment period), ISO-NE will designate separate capacity zones and hold separate but simultaneous auctions.

24. Capacity suppliers will have their monthly capacity payments reduced to account for two phenomena. First a "peak energy rent" sum will be deducted from monthly capacity payments. The peak energy rent sum, originally developed in the LICAP proposal, is based on revenues that would be earned in the energy market by a hypothetical, proxy peaking unit. There are a number of agreed characteristics that apply to the hypothetical unit, including indexing to the marginal fuel. The peak energy rent deduction is designed as a hedge for load against price spikes in the energy market.

25. Suppliers will also have payments reduced to account for availability during designated periods of system stress (*i.e.*, Shortage Events). This provision is intended to create an economic incentive for capacity resources to be available when capacity is most valuable to load. Penalties will be assessed to suppliers for failing to be available during a Shortage Event and will be assessed on a resource-specific basis. On any critical day, a resource can have compensation reduced by up to 10 percent of annual auction payments if it is not available; in any month, a resource can lose up to two and one-half months of its annual FCA Payment.

26. The availability component of the FCM proposal also has a provision that expels capacity resources that perform poorly for an extended period, until availability improves. Prior to clearing a unit to participate in the FCA, ISO-NE will determine whether the resource meets two criteria: 1) in any four-year period, was the resource available during less than 40 percent of the Shortage Events; and 2) did the resource fail to be available for ten or more Shortage Events during the four-year period? If both of these criteria are met, the resource will not be eligible to participate in the FCA. Until the resource achieves an availability score of 60 percent or higher in three consecutive years or has demonstrated to the satisfaction of ISO-NE that the source of the inadequate availability score has been remedied, it will remain ineligible.

27. The FCM contains several rules to address high concentrations of market power, whether held by buyers or sellers. First, the FCM proposes a set of auction rules that curb incentives to manipulate the market and distort capacity prices. Only specified types of bids are eligible to set the capacity clearing price. To ensure that the FCA clearing prices are determined competitively, the FCM is designed to allow new capacity to set the clearing price, thus providing a market-based measure of the cost of new entry. In addition, the FCM has specific market rules that declare the auction to possess insufficient competition, as well as provisions for setting the clearing price under such conditions. If the insufficient competition rule is triggered, new capacity resources are paid the capacity clearing price; existing capacity resources are paid the lower of the capacity clearing price or 1.1 times CONE.

28. Second, the Market Monitor will review bids priced above or below specified price thresholds, which are tied to percentages of CONE. For example, the Market Monitor will review and decide whether to accept into the auction a capacity resource that submits any type of de-list bid (*i.e.*, enabling it to exit the market temporarily or shut down permanently) that is higher than 0.8 times CONE. In such instances, should the Market Monitor determine that the bid is consistent with the resource's net risk-adjusted going-forward and opportunity costs, the bid is incorporated into the auction. In addition, the Market Monitor will review any new capacity or imported capacity bid below 0.75 times CONE, to determine whether the bids are consistent with the long run average costs of that new capacity resource or the opportunity cost (or another reasonable economic measure) for the import.

29. Third, the peak energy rent deduction is intended to help mitigate incentives to create price spikes in the energy market. Settling Parties assert that, while it may be profitable to raise prices in the energy market, the peak energy rent mechanism will remove any profits gained from the rise in prices because the extra revenues earned in the energy market are deducted from capacity payments.

### B. <u>Transition Period</u>

30. June 1, 2010 is identified as the first period for which suppliers would receive payments pursuant to the FCA auction mechanism. The Settlement Agreement provides for a transition period—beginning December 1, 2006, ending June 1, 2010—during which, fixed payments will be made to all installed capacity. Below is a table that details the level of the payment as it increases over time during the transition period:

Transition Payments

| Period | Payment ($/kW-month) |
|---|---|
| December 1, 2006 - May 31, 2007 | $3.05 |
| June 1, 2007 – May 31, 2008 | $3.05 |
| June 1, 2008 – May 31, 2009 | $3.75 |
| June 1, 2009 – May 31, 2010 | $4.10 |

Transition payments will be netted against RMR payments and will be considered capacity payments for the purposes of netting in the locational forward reserves market. Settling parties state that no new compensation mechanism has been implemented and, to date, little new generation has been constructed in New England. Settling parties assert that such transition payments serve as a bridge to the implementation of the FCM and as a means to help ensure that existing generators remain available until new resources can be built. There is no locational component to the transition payments, meaning that suppliers in historically constrained regions of New England will receive the same per kW-month payments as suppliers in historically unconstrained regions.

31. Transition payments will be made by unforced capacity (UCAP) obligation holders (load-serving entities). UCAP obligations are determined by ISO-NE and are calculated as the load-serving entity's customers' proportionate share of peak load. Transition payments will be adjusted to account for unit availability. During the 3 1/2 year transition period, transition payments will be adjusted downward according to a modified equivalent demand forced outage rate (EFORd) measurement, which most heavily weights availability during times of greatest need.[28]

32. The currently applicable RMR agreements in New England are scheduled to terminate upon the implementation or effectiveness of a locational ICAP mechanism. The Settlement Agreement explicitly states that the beginning of the first commitment period (June 1, 2010) will be considered to be the implementation or effectiveness of a locational ICAP mechanism rather than the transition period. The Settlement Agreement states that nothing prejudices the rights of any party to challenge, seek to terminate or support an RMR agreement on any other grounds or restrict any party's rights to seek, agree to or oppose any RMR modifications.

[28] EFORd measures the portion of time a unit is in demand, but is unavailable due to forced outages.

33. The Settlement Agreement outlines processes to implement the transition period and FCM following approval by the Commission. Market rules governing the FCM will be developed in detail and filed with the Commission in at least two packages. The first filing, tentatively planned by October 1, 2006, will include rules for implementing the transition provisions on December 1, 2006. The second filing, which must be made by February 15, 2007, will contain the rules for the FCM. The Settlement Agreement provides that market rules will be developed in accordance with NEPOOL's traditional rule review process and will include the opportunity for input from state utility regulators. Parties to the settlement may challenge the market rules only on the grounds that they are inconsistent with, or not necessitated by, the Settlement Agreement.

### C. **<u>Other Features</u>**

34. A critical input into the FCM will be the determination of the installed capacity requirement, which will determine how much capacity will be purchased through the auctions. The Settlement Agreement establishes a general timeline for determining the installed capacity requirement. ISO-NE is currently conducting a stakeholder process to review the process for deriving the installed capacity requirement. ISO-NE hopes to conclude that stakeholder process during the third quarter of 2006 and file a revised process with the Commission, in the latter part of 2006. Based upon the outcome of that filing, the installed capacity requirement for the first auction will be filed during the third quarter of 2007, with a requested effective date of October 1, 2007, enabling the first auction to be conducted no later than early 2008.

35. Settling Parties waive their rights under section 206 of the FPA to seek a change in the Settlement Agreement or the market rules implementing the agreement for the period beginning March 6, 2006 through the earlier of September 5, 2008 or the date on which the prices from the second FCA become final (roughly 2 1/2 years). During this period, ISO-NE will retain its authority under section 205 of the FPA (subject to appropriate stakeholder processes) to file modifications of the market rules that address the terms of the Settlement Agreement. ISO-NE may exercise that authority only where it can demonstrate that failure to implement the proposed change would have a negative effect on 1) system reliability or security, or 2) the competitiveness or efficiency of the forward capacity or forward reserve markets. Were ISO-NE to make such a filing, Settling Parties will retain all of their rights to challenge the proposed modifications before the Commission.

36. The Settlement Agreement states that final prices derived from all auctions and the transition provisions cannot be changed unless required by the public interest under the

*Mobile-Sierra* standard.[29] Settling parties assert that one reason for adopting this standard for final auction prices is to reduce regulatory uncertainty, thus reducing the risk premium new entrants may require. The Settlement Agreement allows parties to challenge key inputs into the auction prior to the running of the auction. Not later than 90 calendar days prior to each FCA, ISO-NE will make an informational filing with the Commission in which it will identify: 1) the capacity zones applicable to that auction; 2) the resources qualified to participate in the FCA or reconfiguration auction specifically; and 3) conclusions of the Market Monitor regarding the acceptability of bids. Interested parties will have 15 days to file comments on or challenges to the determinations in that informational filing. Unless the Commission issues an order to the contrary within 75 calendar days following the informational filing, ISO-NE will use the determinations in the informational filing in the next FCA.

37. Results from FCAs will be filed with the Commission by ISO-NE pursuant to section 205 of the FPA. Parties will have 45 days to file objections to the auction results, and this will be the only means of challenging such results. Once this process is complete, the prices will be subject to the *Mobile-Sierra* public interest standard under section 4.C of the Settlement Agreement. Section 5 of the Settlement Agreement provides that ISO-NE's internal market monitoring unit will issue a full report analyzing the operations and effectiveness of the FCM 180 days after the second FCA and annually in its markets report thereafter.

## III. Procedural Matters

38. Comments on the Settlement Agreement were filed by the following parties: Berkshire Power Company, LLC (Berkshire), Consolidated Edison Energy, Inc. (ConEd), EnerNOC, Inc. (EnerNOC), Exelon Generation Company, LLC and Exelon New England Holdings (Exelon), Industrial Energy Consumer Group (IECG), Load Supporters,[30] Long

---

[29] *See* Settlement Agreement at section 4.C and *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 344-45 (1956) (*Mobile*) and *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 355 (1956) (*Sierra*).

[30] Load Supporters are: Connecticut Department of Public Utility Control, Connecticut Office of Consumer Counsel, New Hampshire Public Utilities Commission, Rhode Island Public Utilities Commission, Rhode Island Division of Public Utilities and Carriers, Vermont Public Service Board, Vermont Department of Public Service, and The Connecticut Power and Light Company, by its agent Northeast Utilities Service Company.

Island Power Authority and LIPA (LIPA), Maine Parties,[31] Objecting Parties,[32] PPL EnergyPlus, LLC and PPL Wallingford Energy LLC (PPL), PSEG Energy Resources & Trade LLC (PSEG), Reading Municipal Light Department (Reading), and Select Energy, Inc. (Select). NSTAR Electric and Gas Corporation (NSTAR) filed supplemental comments in opposition to the Settlement Agreement.

39. Reply comments were filed by the following parties: American National Power, Inc., Granite Ridge Energy, LLC and TransCanada Power Marketing Ltd. (American National Power), Calpine Energy Services, L.P. and Calpine Eastern Corporation (Calpine), Capacity Suppliers,[33] Connecticut Municipal Electric Energy Cooperative (CMEEC), ISO-NE, Lake Road Generating Company, L.P. (Lake Road), Load Supporters, Maine Parties, Massachusetts Municipal Wholesale Electric Company and Reading (MMWEC), Milford Power Company, LLC (Milford), National Grid USA (National Grid), New England Power Pool Participants Committee (NEPOOL), New York Independent System Operator, Inc. (NYISO), NRG Companies (NRG),[34] Objecting Parties, and PPL. On April 11, 2006, Exelon filed a motion for leave to file reply comments out of time and reply comments. On June 6, 2006, Black Oak Energy, LLC (Black Oak) and EPIC Merchant Energy, LP (EPIC) filed a motion to intervene out of time and a motion to file limited comments out of time.

---

[31] Maine Parties are Maine Public Utilities Commission and Maine Public Advocate.

[32] Objecting Parties are: Attorney General of the Commonwealth of Massachusetts, Richard Blumenthal, Attorney General for the State of Connecticut, NSTAR Electric and Gas Corporation, NEPOOL Industrial Customer Coalition, and The Energy Consortium (which includes President and Fellows of Harvard College, Brandeis University, Polaroid Corporation, USG Corporation, and Massachusetts Institute of Technology).

[33] Capacity Suppliers are: Boston Generating, LLC, Mystic Development, LLC, Mystic I, LLC, Fore River Development, LLC (collectively, "Boston Gen"), FPL Energy, LLC, Mirant Americas Energy Marketing, LP, Mirant Kendall, LLC, Mirant Canal, LLC, Entergy Nuclear Generation Company, LLC, Entergy Nuclear Vermont Yankee, LLC, Dominion Resources, Inc., Dominion Nuclear Connecticut, Inc. and Dominion Energy Marketing, Inc.

[34] NRG includes Devon Power LLC, Montville Power, Connecticut Jet Power and Middletown Power.

40. We will accept Exelon's motion to file reply comments out of time. We deny, however, the motion of Black Oak and EPIC to intervene and file initial comments at this late stage of the proceeding. We find that granting Black Oak and EPIC's motion would be disruptive given that its motion was filed less than a month before the June 30, 2006 date by which the Commission must act on the Settlement Agreement. Moreover, since the comments amount to a protest to the Settlement Agreement, granting the motion would prejudice those supporting the settlement by effectively denying them the opportunity to reply under the Commission's rules. Black Oak's and EPIC's arguments that they were not aware of the Settlement Agreement's impact on their interests are unpersuasive; the Settlement Agreement was filed three months before Black Oak and Epic sought to intervene, and was considered in the New England Power Pool stakeholder process, which should have alerted active participants in the New England markets like Black Oak and EPIC that their interests might be impacted.

## IV. Discussion

### A. General Comments in Support of the Settlement

41. The following parties filed comments in support of the Settlement Agreement: Load Supporters, Reading, EnerNOC, ConEd, Berkshire, Exelon, Select, and Lake Road. In general, these parties support acceptance of the Settlement Agreement without modification. For the most part, those submitting general comments supporting the settlement emphasize that it is the product of a complex and difficult negotiation and represents a careful and interconnected balancing of interests. Accordingly, most state that modifying any portion of the Settlement Agreement could upset this balance and risk unraveling the settlement entirely.

42. ConEd states that the settlement corrects deficiencies in the current market and is the most likely construct to attract and retain the resources needed for reliability. Exelon supports the request that the settlement be approved in its entirety as just and reasonable and in the public interest. Exelon further states that the forward commitment provision will allow existing generators to make informed decisions and will benefit load by facilitating a robust and cost effective regional planning process. Select asserts that the FCM accommodates various load parties by basing the compensation mechanism on a market outcome.

43. Load Supporters state that the FCM is designed to produce just and reasonable results and is a substantial benefit to New England electricity customers compared with LICAP. Load Supporters state that the FCM contains many of the elements derived from

prior alternatives, including the New England Resource Adequacy Market[35] and the New England Locational Resource Adequacy Market,[36] as well as the Central Resource Adequacy Market,[37] and rests on facts developed in the evidentiary record. Load Supporters state that the settlement resolves several of the material flaws that the parties had with the LICAP proposal by requiring load to purchase only the amount of capacity needed, by facilitating new entrant participation (including demand-side resources) through a three-year forward commitment period, and by using an auction to produce the lowest reasonable cost of new entry. Load Supporters also state that that another important feature of the settlement is that it allows load the opportunity to self-supply or contract bilaterally; thereby providing a hedge against volatility—an important feature for Connecticut, New Hampshire, and Vermont. Load Supporters also state that the Settlement Agreement provides a stakeholder process that includes participation by the New England state regulatory agencies, to determine the installed capacity requirement.

44. More specifically, Load Supporters state that the FCM increases the elasticity of supply, *i.e.*, an upward sloping supply curve, by procuring capacity three years in advance with a minimum one-year commitment period, by enabling potential new entrants to compete with existing suppliers, and by clearly defining the obligations of capacity suppliers. According to Load Supporters, this planning period enables existing capacity to provide quantities responsive to price, provides relief from reliability-based barriers to exit and enables demand-side resources to respond to price as well. They compare this feature to LICAP, which would commit resources only one month in advance of their obligation to perform and commit them for only one month at a time.

45. Load Supporters also state that the FCM procures only the amount of capacity necessary to maintain reliability, compared to LICAP which set a target of 5.4 percent above the installed capacity requirement and would pay suppliers for surpluses up to 15

---

[35] *See* "Statement in Support of the New England Resource Adequacy Market," filed by Massachusetts Department of Telecommunications and Energy *et al.* in Docket No. ER03-563-030 (Sept. 13, 2005).

[36] *See* "Four State Commissions' Proposed Alternative to LICAP", filed by Rhode Island Public Utilities Commission, New Hampshire Public Utilities Commission, Vermont Public Service Board, Vermont Department of Public Service and Maine Public Utilities Commission in Docket No. ER03-563-030 (Sept. 13, 2005) (describing the proposed New England Locational Resource Adequacy Market).

[37] *See* ISO-NE March 1, 2004 compliance filing in Docket ER03-563-030 at 52.

percent above the installed capacity requirement. Load Supporters stated that this permits capacity in excess of the amount needed to retire, mothball, or sell into other markets. Load Supporters state that, unlike the LICAP's proposed administratively determined demand curve, the FCM sets price through a competitive auction. Load Supporters state that the FCM includes multiple constraints on market power. Load Supporters also state that the ISO-NE Market Monitoring Unit will evaluate the performance of the FCM and will prepare annual reports on the operation of the market.

46. In addition, Load Supporters state that, unlike LICAP, the FCM expressly defines the commitments that supply must make in return for load's substantial capacity payments. Load Supporters also state that the minimum year-long commitment period for capacity resources locks in price and firm obligations giving load certainty over price and reliability while giving suppliers certainty over revenue. They also note that the FCM further reduces risks for new capacity investment by providing 1) an option for new suppliers to lock in a five-year commitment period, 2) annual reconfiguration auctions to cover the risk of non-performance, and 3) a flexible financial assurance policy.

47. Load Supporters argue that the proposal to adjust the monthly capacity payments determined by the FCA not only reduces incentives for suppliers to withhold in the energy market but also provides a hedge for load against energy market price spikes. Load Supporters state that the Shortage Event mechanism will reward resources that perform during periods of system stress and penalize those resources that fail to perform. Load Supporters also state that availability will be improved with the settlement provisions regarding gas delivery.

48. Lake Road states that the settlement should be approved as in the public interest. Lake Road asserts that in the long-term, the FCM will provide a more sophisticated method to encourage the right amount of capacity in the right locations. NEPOOL supports the settlement and, without taking positions on the issues, opposes any change or condition that would upset the negotiated balance of the Settlement Agreement.

### B. General Comments in Opposition to the Settlement

49. Comments in opposition to the Settlement Agreement are addressed in detail below.

### C. Standard of Review and Commission Conclusions Regarding Overall Justness and Reasonableness of the Settlement

50. In the explanatory statement, Settling Parties note that the Commission "'can approve contested settlements as long as it determines that the proposal will establish just and reasonable rates.'"[38] They state that the Commission must support its decision to accept a contested settlement with substantial evidence or a finding that there is no genuine issue of material fact as to the contested matter. Noting the four approaches in *Trailblazer*[39] that the Commission may utilize to address a contested settlement, Settling Parties urge the Commission to approve the Settlement Agreement as a package under the second *Trailblazer* approach, which (as discussed below) allows the Commission to approve a settlement as a package if it determines that the overall result of the settlement is just and reasonable.[40] Settling Parties argue that the Settlement Agreement is a complete package that reflects a complex compromise among the affected parties, and that while those parties may oppose some individual components within the agreement, they have agreed to the settlement as a package. Settling Parties contend that changing any aspect of the Settlement Agreement would upset the balance achieved among the parties and result in calls to change other aspects of the agreement. Settling Parties also assert that severing contesting parties (under the fourth *Trailblazer* approach) is inappropriate here because the settlement creates a structure applicable to all generation and load in New England, meaning that objecting parties cannot continue to litigate the transition charges or market design without affecting the rates charged to and received by other parties and upsetting the balance achieved in the Settlement Agreement.

---

[38] Explanatory Statement at 4, *citing New Orleans Public Service, Inc. v. FERC*, 659 F.2d 509, 512 (5th Cir. 1981) (*citing Placid Oil Co. v. FPC*, 483 F.2d 880, 893 (5th Cir. 1973), *aff'd sub nom. Mobil Oil Corp. v. FPC*, 417 U.S. 283, 312-13 (1973)).

[39] *Trailblazer Pipeline Company,* 85 FERC ¶ 61,345 (1998), *order on reh'g*, 87 FERC ¶ 61,110 (1999) (*Trailblazer*). The four approaches laid out in *Trailblazer* are: (1) Commission renders a binding merits decision on each contested issue, (2) Commission approves the settlement based on a finding that the overall settlement as a package is just and reasonable, (3) Commission determines that the benefits of the settlement outweigh the nature of the objections, and the interests of the contesting party are too attenuated, and (4) Commission approves the settlement as uncontested for the consenting parties, and severs the contesting parties to allow them to litigate the issues raised.

[40] In their comments, Exelon and Select, among other commenters, support this request.

51. Parties submitting comments on the Settlement Agreement also discussed the applicable standard of review. IECG, Objecting Parties, Load Supporters and American National Power all state that to approve a contested settlement, the Commission "must make 'an independent finding supported by substantial evidence on the record as a whole' that the Settlement is just and reasonable[,] . . . produce[s] a reasonable resolution of the proceedings" or that "'there is no genuine issue of material fact.'"[41] Additionally, IECG states that the fact that a settlement agreement was agreed to by many parties does not guarantee that the result is just and reasonable.[42] Similarly, Objecting Parties argue that the number of parties supporting a proposed settlement, while a factor to consider, is not dispositive in determining whether to approve the settlement.[43] American National Power adds that the Commission has broad discretion when considering contested settlements.[44]

52. Maine Parties, Load Supporters and American National Power all discuss the *Trailblazer* approaches to addressing contested settlements, particularly the second approach. Load Supporters note that the Commission explained the second *Trailblazer* approach in the context of the approval of contested settlements in *Indicated Shippers*[45] and *Pacific Gas Transmission Co.*[46] In those cases, the Commission emphasized that to be approved as a package, the settlement rates must be shown to be less than or equal to the just and reasonable rates that would likely result from litigation.[47] Load Supporters also note that in *Trailblazer*, the Commission stated that when parties ask that a

---

[41] *See, e.g.*, Comments in Opposition to the Proposed Settlement Agreement of IECG at 2, *citing Mobil Oil Corp. v. FPC*, 417 U.S. 283, 314 (1974) and *San Diego Gas & Electric Company*, 108 FERC ¶ 61,002 at 61,010-011 (2004).

[42] Comments in Opposition to the Proposed Settlement Agreement of IECG at 3-4, *citing NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158 (D.C. Cir. 1998).

[43] *See* Comments in Opposition to Settlement of Objecting Parties at 12-13, *citing NorAm Gas Transmission Co. v. FERC*, 148 F. 3d 1158 (D.C. Cir. 1998) and *Laclede Gas Co. v. FERC*, 997 F.2d 936 (D.C. Cir. 1993).

[44] Reply Comments of American National Power at 7, *citing Arctic Slope Regional Corp. v. FERC*, 832 F.2d 158, 164 (D.C. Cir. 1987).

[45] *Indicated Shippers v. Sea Robin Pipeline Co.,* 81 FERC ¶ 61,146 (1997) (*Indicated Shippers*).

[46] 82 FERC ¶ 61,289 (1998).

[47] Initial Comments of Load Supporters in Support of Offer of Settlement at 9-10, *citing Trailblazer*, 85 FERC ¶ 61,345 at 62,342-343.

settlement be considered as a package, it would "'try to honor the parties' intent' and consider the justness and reasonableness of the package in its entirety."[48] ISO-NE, in reply to comments opposing the Settlement Agreement, adds that the Commission has previously held that it may approve a contested settlement as a package if the overall result is just and reasonable even if some aspects of the settlement are problematic.[49] Further, ISO-NE notes that a contested settlement may be approved if, as a whole (considering both contested and uncontested issues), it provides a just and reasonable result.[50] Finally, it states that "[t]he Commission need only find that the overall package, resulting from the give and take of the bargaining which led to the settlement, falls within" the just and reasonable range.[51]

53. IECG asserts that the Settlement Agreement does not provide a just, reasonable or otherwise lawful resolution of the proceeding, and that the Settling Parties have not offered substantial record evidence that the agreement will result in just and reasonable rates or that the settlement will provide contesting parties with a result that is at least as good as the result they could achieve through litigation on the merits. According to IECG, the Settling Parties have only provided a comparison between the rates the Commission might have approved when ruling on the Initial Decision and the transition payments, which it argues is insufficient to support the increased costs contemplated by the transition period or to allow the Commission to conclude that parties opposing the agreement would not be better off through continued litigation.[52]

54. Maine Parties, focusing on the procedural avenues in *Trailblazer*, argue that the Commission's only options are to conditionally accept the settlement, sever the contested issues and initiate further proceedings to resolve those issues, or reject the entire settlement and initiate hearing procedures. Like IECG, they contend that the record lacks the substantial evidence necessary to resolve the contested material issues of fact on the

---

[48] Initial Comments of Load Supporters in Support of Offer of Settlement at 10.

[49] Reply Comments of ISO-NE at 16, *citing San Diego Gas & Electric Co. v. Sellers of Energy Ancillary Services*, 108 FERC ¶ 61,002 at 61,011 (2004).

[50] Reply Comments of ISO-NE at 16, *citing Trailblazer*, 85 FERC ¶ 61,345 at 62,342.

[51] *Id.*, *citing Trailblazer*, 85 FERC ¶ 61,345 at 62,343.

[52] As discussed further below, IECG notes that the LICAP mechanism recommended in the Initial Decision would have included elimination of RMR agreements, improved availability metrics, and included other features that make a comparison to the transition payments insufficient.

merits, approve the overall settlement as a package, or find that the benefits of the settlement outweigh the objections. Maine Parties also argue that the transition payments cannot be found just and on reasonable based on a comparison to the rates that might have resulted from the Initial Decision, contrary to the arguments of Load Supporters. According to Maine Parties, neither *Trailblazer* nor the precedents it cites suggest that the Initial Decision, which was never reviewed by the Commission and later set aside, should be considered the likely outcome of litigation. Additionally, Maine Parties note that in *Indicated Shippers* (cited by Load Supporters), the Commission, after finding that the parties had raised genuine issues of material fact, went on to determine the issues on the merits after the parties agreed that the record contained substantial evidence upon which the Commission could make a merits determination. Maine Parties also note that in *Indicated Shippers* the Commission engaged in a thorough analysis to determine the likely outcome of litigation, which Load Supporters do not suggest the Commission undertake here.

55. Responding to arguments that the record lacks the substantial evidence necessary to approve the Settlement Agreement, ISO-NE argues that the Affidavits submitted with the Agreement, the written proposals for alternatives to LICAP submitted prior to the oral argument, and the oral argument itself all represent substantial evidence upon which to base approval of the settlement. Moreover, ISO-NE states that the extensive record developed in the LICAP proceeding and the Commission's orders in other proceedings concerning the development of capacity markets provide substantial evidence.[53] ISO-NE also states that the Commission has previously held that it is not limited to opinion testimony and may rely on a wide range of materials as substantial evidence, including its own orders, tariffs and certificates on file, and its general policies.[54]

56. Load Supporters, as well as ISO-NE and Capacity Suppliers, also contend that the parties objecting to the settlement have raised no genuine issues of material fact.[55] ISO-NE argues that factual contentions made by opponents of the Settlement Agreement are

[53] ISO-NE notes that the FCM incorporates features of many other models that the Commission has received evidence on in this and other proceedings. *See* Reply Comments of ISO-NE at 18-19.

[54] *Id.* at 18, *citing Williston Basin Interstate Pipeline Co.*, 68 FERC ¶ 61,357 at 62,432-33 (1994).

[55] According to ISO-NE, "it is well settled that 'a genuine issue of material fact sufficient to preclude approval of a settlement agreement must be a dispute of the basic facts underlying the settlement.'" Reply Comments of ISO-NE at 12 (citation omitted).

either not valid and thus do not rise to the level of material facts, or are questions of law and policy and not facts themselves.

57. In reply comments, ISO-NE argues that the Commission has broad discretion to make policy determinations on technical matters of market and rate design, and that it has the authority to decide, based on its expertise, that the Settlement Agreement is just and reasonable as a package.[56] Additionally, in response to arguments from opponents of the Settlement Agreement regarding the weight to be given to the amount of support for the agreement, ISO-NE argues that the Commission's precedent strongly favors settlements, particularly those that have broad support, and that the Commission may approve a settlement even when a particular aspect of it deviates from Commission policy.[57]

**Commission Conclusion**

58. The Commission has broad authority and discretion under Rule 602(h) of its regulations to address contested settlements.[58] Courts have confirmed the Commission's authority to approve contested settlements, so long as the proposal will establish just and reasonable rates.[59] Under Rule 602(h), the Commission may decide the merits of the contested issues if the record contains substantial evidence on which to base a reasoned decision or if the Commission determines that there is no genuine issue of material fact. If the Commission finds that the record lacks substantial evidence or that the contesting parties or issues cannot be severed, the Commission may establish hearing procedures to supplement the record, or it may take other appropriate action.[60]

59. In *Trailblazer*, the Commission explained at length the standards and procedures it employs in ruling on contested settlements. The Commission stated that, in reviewing a

---

[56] Reply Comments of ISO-NE at 10-11, *citing in part Elec. Consumers Res. Council v. FERC*, 407 F.3d 1232 (D.C. Cir. 2005); *Fuels Research Council, Inc. v. FPC*, 374 F.2d 842 (7th Cir. 1967); *Entergy Servs. v. FERC*, 319 F.3d 536 (D.C. Cir. 2003).

[57] Reply Comments of ISO-NE at 20 (citations omitted). ISO-NE also says that this agreement does not deviate from any applicable Commission policy.

[58] 18 C.F.R. § 385.602(h) (2005).

[59] *See New Orleans Public Service, Inc. v. FERC*, 659 F.2d 509, 511-12 (5th Cir. 1981), *citing Placid Oil Co. v. FPC*, 483 F.2d 880, 893 (5th Cir. 1973), *aff'd sub nom. Mobil Oil Corp. v. FPC*, 417 U.S. 283, 312-13 (1974).

[60] *See* 18 C.F.R. § 385.602(h)(1)(ii)(B) (2005). In *Arctic Slope Regional Corp. v. FERC*, 832 F.2d 158, 164 (D.C. Cir. 1987), the court observed that "the breadth of discretion trumpeted by Rule 602(h)(1)(ii)(B) is manifest."

settlement, it must first determine whether the settlement presents an acceptable outcome for the case that is consistent with the public interest. The Commission acknowledged the value of settlements, but stated that some cases may involve an overriding public interest that outweighs the interest in achieving a settlement. In such instances, the Commission has modified those settlements to be consistent with Commission policy.[61]

60. If the Commission concludes that a contested settlement provides an acceptable outcome for a case, it must next determine the approach it will employ to address the contested issues. In *Trailblazer*, the Commission explained four approaches it has taken for approving a contested settlement despite the objections of the contesting party. Under the first approach, if there is an adequate record, the Commission can address each of the contested issues on the merits, approving the settlement if the Commission finds that each of the contesting party's contentions lacks merit. This approach is appropriate where the issues are primarily policy issues or the parties have agreed that the record is sufficient to decide the issues on the merits. However, the Commission explained that, even where the settlement cannot be approved under the first approach, it may be approved under other approaches. Thus, under the second approach, even if some individual aspects of a settlement may not be just and reasonable standing alone, the Commission may approve a contested settlement as a package if the overall result of the settlement is just and reasonable. Under this approach, the Commission will not make a merits decision on whether each element of the settlement package is just and reasonable but will determine whether the overall package falls within a zone of reasonableness.[62] When the Commission takes this approach, it need not find that the settlement rate is exactly the rate the Commission would find just and reasonable on the merits after litigation and need only find that the settlement rate falls within a zone of reasonableness. The Commission must also find under this approach that the contesting party would be in no worse position under the settlement than if the case were litigated.

61. Under the third approach, if the settlement is not found to satisfy the just and reasonable standard, the Commission may approve the settlement where the benefits of the settlement outweigh the nature of the objections, and the contesting parties' interest is too attenuated so that the settlement may be approved under the fair and equitable standard applicable to uncontested settlements. The third alternative usually has included a finding that the contesting party would have another forum in which to raise its contentions. The fourth approach is severance of the contesting party, permitting that party to obtain a litigated result, and approving the settlement as to the consenting parties.

---

[61] *Trailblazer,* 85 FERC at 62,341.

[62] *Id.* at 62,342; *order on reh'g,* 87 FERC at 61,440.

**The Outcome Under the Settlement Agreement Meets the *Trailblazer* Standards for Approval**

62. Pursuant to our *Trailblazer* standards, the Commission first finds that the Settlement Agreement is consistent with the public interest.[63] The results, including the long-term FCM and short-term transition mechanisms, resolve the deficiencies in New England's existing capacity market identified by the Commission and the parties to this case. As noted above, the Commission instituted these section 206 proceedings in the April 25 Order in response to the compensation problems faced by generating resources that are needed for reliability but could not obtain sufficient revenues in the markets to continue operation. The Commission stated that its long-term goal was to approve a locational or deliverability mechanism to ensure that capacity resources in New England are appropriately compensated, particularly in highly constrained areas.[64] In the June 2 Order establishing hearing procedures on ISO-NE's proposed LICAP mechanism, the Commission again found that New England faced significant Reliability Compensation Issues in both the short and long terms, particularly in constrained areas.[65] In analyzing the proposed LICAP mechanism, the Commission noted that a capacity market mechanism should both provide adequate revenues to appropriately compensate (and keep in service where needed for reliability) existing capacity resources and provide incentive for the development of new infrastructure in areas where it is most needed.[66]

63. Moreover, as the record in this proceeding has developed, both the parties to this case and the Commission have recognized the necessity of a workable capacity market to meet the need for additional infrastructure in New England. While the region has sufficient capacity to meet reliability requirements today, reserve margins are barely adequate, and deficits are predicted in the very near future.[67] At the oral argument, the

---

[63] *See NAACP v. FPC*, 425 U.S. 662, 670 (1976) (noting that the use of the words "public interest" in the FPA is a "charge to promote the orderly production of plentiful supplies of electric energy and natural gas at just and reasonable rates.")

[64] April 25 Order at P 37.

[65] June 2 Order at P 35 *et seq.*, *citing PJM Interconnection, L.L.C.*, 107 FERC ¶ 61,112 (2004).

[66] *See* June 2 Order at P 40-43, 49-52; *see also* November 8 Order on Rehearing at P 65-67.

[67] *See, e.g.,* Executive Summary of the ISO-NE Regional System Plan 2005, attached to Notice of Proposed Speakers and Time Allocation for Oral Argument filed by ISO-NE in Docket No. ER03-563-030 (Sept. 14, 2005).

parties almost unanimously agreed that the status quo presents significant problems that the Commission must address.[68] The record from the oral argument is replete with virtually unchallenged statements that existing generators needed for reliability are not earning sufficient revenues (and are in fact losing money), and that additional infrastructure is needed soon to avoid violations of reliability criteria.[69]

64. The Settlement Agreement provides necessary solutions to resolve these deficiencies in New England's current ICAP market and the resulting impacts those deficiencies have had on New England's infrastructure, and is well supported both by the record and by Commission policy.[70] The Settlement Agreement incorporates the primary components of the two alternatives proposed by state entities and discussed at oral argument: a forward resource auction, a descending clock auction, penalties for non-performance, and a phase-in or transition period.[71]

65. First, both the FCM and the interim transition mechanism will provide the revenues needed by generators to keep them in operation to preserve reliability.[72] Below, we discuss in more detail the justness and reasonableness of the transition payments as a short-term measure to ensure that existing generating units remain available. The FCM

---

[68] Tr. of Oral Argument at 252:8-12 (Chairman Kelliher noting that "every presenter, other than one, agreed that the Commission has to take some kind of action").

[69] *See, e.g.,* Tr. Of Oral Argument at 36:21-24; 44:7-11; 76:6-22; 150:9-151:6; 167:1-4; 237:9-12.

[70] *See, e.g., PJM Interconnection, L.L.C.*, 107 FERC ¶ 61,112 at 15 (noting that the Commission, in addressing Reliability Compensation Issues, will take account of both present circumstances and expected needs).

[71] *See, e.g.*, Tr. of Oral Argument at 148 *et seq.* and 165 *et seq.*; *see also* "Statement in Support of the New England Resource Adequacy Market," filed by Massachusetts Department of Telecommunications and Energy, Connecticut Department of Public Utility Control *et al.* in Docket No. ER03-563-030 (Sept. 13, 2005); "Four State Commissions' Proposed Alternative to LICAP", filed by Rhode Island Public Utilities Commission, New Hampshire Public Utilities Commission, Vermont Public Service Board, Vermont Department of Public Service and Maine Public Utilities Commission in Docket No. ER03-563-030 (Sept. 13, 2005) (describing the proposed New England Locational Resource Adequacy Market).

[72] *See, e.g.,* Brief Opposing Exceptions of ISO-NE at 2-3; *ISO-NE 2004 Annual Markets Report at* 111-12, *available at* http://www.iso-ne.com/markets/mkt_anlys_rpts/annl_mkt_rpts/2004/2004_annual_markets_report_.pdf.

construct, when fully implemented, will provide a market-based mechanism to appropriately value capacity resources based on their location, satisfying cost-causation principles.[73] Many of the load representatives were particularly concerned that the LICAP proposal did not "impose any reciprocal obligation on these generators to continue operating over the long-term."[74] The FCM addresses these concerns by requiring new capacity that bids in the FCAs to meet milestones regarding project feasibility and an interconnection analysis showing the impact of connecting to the transmission grid. In addition, the forward-looking nature of the FCM will provide appropriate signals to investors when new infrastructure resources are necessary with sufficient lead time to allow that infrastructure to be put into place before reliability is sacrificed.[75] The locational component of the FCM will ensure that the addition of new infrastructure is targeted to where reliability problems are most imminent.[76]

66. The fact that this Settlement Agreement resolves all of the outstanding issues in a difficult, contentious and lengthy matter also weighs in our decision that the settlement is consistent with the public interest. The Settlement Agreement represents difficult compromises among the diverse parties to this proceeding that, if found just and reasonable, should be honored. From October 2005 until March 2006, over 175 representatives, including representatives from all of the state public utility regulatory agencies, as well as representatives of transmission owners, generators, power traders and marketers, demand response and intermittent resource owners, consumer-owned utility systems and end users, engaged in informal and formal settlement negotiations.[77] Moreover, the Settlement Agreement, by ending this protracted litigation, will bring a needed measure of stability and allow New England to move forward on other market enhancements. Additionally, the Commission strongly favors settlements, particularly in difficult cases like the instant proceeding.[78]

---

[73] *See, e.g., PJM Interconnection, L.L.C.*, 107 FERC ¶ 61,112 at 19-20; *PJM Interconnection, L.L.C.*, 115 FERC ¶ 61,079 at P 49-51 (2006).

[74] Brief on Exceptions of the New England Conference of Public Utility Commissioners at 2.

[75] *See PJM Interconnection, L.L.C.*, 115 FERC ¶ 61,079 at P 67-72.

[76] *Id.* at P 49-51.

[77] Reply Comments of NEPOOL Participants Committee at 2.

[78] *See, e.g., Idaho Power Co.*, 109 FERC ¶ 61,308 at P 5 (2004) (stating that the Commission is "strongly in favor of settlements, particularly in cases [that are] hotly contested and complex.").

67. The Settlement Agreement is also consistent with the public interest because it comports with the recently expressed intent of Congress regarding this case. In section 1236 of the Energy Policy Act of 2005, Congress noted the concerns voiced by the governors of the New England states regarding the LICAP mechanism, and declared that the Commission should carefully consider their objections.[79] The oral argument held in this proceeding considered the states' objections to the LICAP mechanism and their proposals for alternative capacity market designs. Settlement discussions followed regarding alternatives. This settlement is a product of those discussions, and includes measures to address many of the objections voiced by the states, responding to the sense of Congress in section 1236.

**The Overall Result of the Settlement Agreement is Just and Reasonable**

68. To address the contested issues raised by those opposing the Settlement Agreement, we will use the second approach articulated in *Trailblazer*, as requested by the Settling Parties.[80] Using this approach here is appropriate for several reasons. First, we find that the record in this proceeding is sufficient to allow us to make a determination that as a package, the settlement is just and reasonable. The record includes, among other items, both written submissions and oral argument testimony concerning various approaches to designing New England's capacity market, data regarding current and projected capacity prices in New England, price projections under both the settlement and various LICAP demand curve proposals, and information regarding the current and projected need to develop new infrastructure in New England. Moreover, with regard to the transition payments (the most heavily protested aspect of the Settlement Agreement), we agree with the presiding Settlement Judge that this record provides a thorough basis for the Commission's decision to approve the Settlement Agreement as a package.[81]

69. In addition to honoring the intent of the Settling Parties, the second of the four *Trailblazer* approaches is the most appropriate here. It would be inappropriate to strictly apply the first approach here because the Settlement Agreement contains several complex and interrelated features intended to be considered as an overall package, and altering any of those features will have consequences for other portions of the settlement. We will consider the contested issues below, however, to ensure the overall justness and

---

[79] Energy Policy Act of 2005, Pub. L. No. 109-58, § 1236, 119 Stat. 961 (2005).

[80] *See Trailblazer*, 87 FERC at 61,440 (stating that the Commission will try to honor the parties' intent that a settlement be considered as a package).

[81] *Report on Contested Settlement by Settlement Judge*, *Devon Power LLC,* 115 FERC ¶ 63,013 (2006).

reasonableness of the settlement as a package. The third approach is unavailable here because while we believe that the settlement, as a package, provides significant benefits that outweigh the nature of the objections raised, the parties raising such objections (which include load representatives of certain states) have more than an attenuated interest. Finally, the fourth approach is not appropriate here because the Settlement Agreement provides a capacity market structure that will apply throughout New England, making it impossible to effectively sever any of the contesting parties to allow them to further pursue the issues they raise, since the resolution of those issues will affect all the parties.

70. Applying the second *Trailblazer* approach here, we find that the parties objecting to the Settlement Agreement would "be in no worse position under the terms of the settlement than if the case were litigated," and that the Settlement Agreement, as a package, achieves an overall just and reasonable result within a zone of reasonableness.[82]

71. We find that the Settlement Agreement achieves an overall just and reasonable result for many of the same reasons we articulated above in finding that it provided an acceptable outcome for this case consistent with the public interest. The settlement package, including both the FCM and the interim transition mechanism, resolves the issues raised in this proceeding concerning the under-compensation of capacity resources in New England, and provides the appropriate market structure to ensure that generating resources are appropriately compensated based on their location and contribution to system reliability and provides incentives to attract new infrastructure where needed. As discussed below, the key price-determining parameters of the FCM descending clock auction (such as CONE) are appropriate and adequately supported in the record. "A just and reasonable rate is not a product of any single formula, but is instead a rate within a broad ambit of various rates which may be just and reasonable," and as we discuss below, none of the parties opposing the Settlement Agreement has shown that the settlement (or any specific aspect of it) is outside of this "range of reasonableness."[83]

72. We find that the parties opposing the Settlement Agreement would be no worse off under the settlement than through continued litigation. The affidavits and other evidence provided by the Settling Parties and others in support of the Settlement Agreement show that the settlement, and particularly the transition period, results in rates

---

[82] *Trailblazer*, 87 FERC ¶ 61,110 at 61,339.

[83] *See Belco Petroleum Corp. v. FERC*, 589 F.2d 680, 689 (D.C. Cir. 1979), *citing Permian Basin Area Rate Cases*, 390 U.S. 747, 767 (1968); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944); *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585-86, (1942).

for capacity that are lower than the projected payments under ISO-NE's proposed demand curve (which we note was adopted in the Initial Decision) and that are comparable to the rates under alternative demand curves proposed at the hearing, bringing those rates within a range that we find is just and reasonable.[84] We address this issue more specifically below with regard to the opposing parties' specific arguments that the transition payments cannot be approved on the basis of a comparison with the rates that would have resulted under LICAP.[85]

73. Further, we note that, while Objecting Parties' are correct that the level of support for the Settlement Agreement is not dispositive, the Commission can give weight to the broad-based support the Settlement Agreement received.[86] In this difficult, contentious proceeding, the Settlement Agreement was either supported or not opposed by 107 of the 115 parties in the proceeding.[87] We agree with the Settlement Judge's characterization of this level of support as "quite extraordinary and . . . noteworthy."[88]

### D. Specific Issues Raised in Comments on Proposed Settlement Agreement and Reply Comments, and Commission Conclusions

74. As noted above, while we are approving the Settlement Agreement as just and reasonable as a package under the second approach of *Trailblazer*, we analyze below the specific issues raised by parties opposing the settlement to ensure that each, when considered as part of the overall package, meets the standards articulated in *Trailblazer*.

#### 1. Transition Mechanism

75. As noted above, during the transition period, fixed payments will be paid to all installed capacity. These payments are intended to serve as a bridge to the FCM, and are

---

[84] *See, e.g.,* Explanatory Statement in Support of Settlement Agreement at 34-40; Attachment 6 to Settlement Agreement (Affidavit of David LaPlante); Comments of Load Supporters and Affidavit of Miles O. Bidwell, Jr., Ph.D.

[85] For example, we address below Maine Parties' contentions that the Commission should consider a lower LICAP demand curve for Maine when comparing the transition payments to the LICAP mechanism, among other issues.

[86] *See Laclede Gas Co. v. FERC*, 997 F.2d 936, 946 (D.C. Cir. 1993); *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1164-65 (D.C. Cir. 1998).

[87] *See Report on Contested Settlement by Settlement Judge, Devon Power LLC,* 115 FERC ¶ 63,013 at P 15 (2006).

[88] *Id.*

not locational. All suppliers will receive transition payments, though these payments will be netted against RMR payments as well as adjusted to account for outages.

76. Several parties—IECG, Maine Parties and Objecting Parties—oppose the transition payments for a variety of reasons. First, they argue that there is no evidence to support the level of the transition payments. Objecting Parties assert that there is no record evidence that examined the amount of revenue required to keep existing resources available and nothing to indicate that the transition payments were compared against such a study. Maine Parties assert that there is insufficient evidence in the record on which the Commission may base a just and reasonable finding and that "a hearing would reveal that the transition payments are unjust and unreasonable" as they exceed "what is needed by generators" to supplement revenues from other markets.[89] IECG asserts that Settling Parties do not make a case that the costs of the transition payments are equivalent to the costs of the transition period. Maine Parties submit that the rationale that lower rates are necessarily just and reasonable is inconsistent with Commission precedent.[90] Maine Parties also state that ISO-NE has failed to justify that transition payments are necessary to retain existing generation in Maine. Maine Parties submit further that most Maine suppliers would continue to operate without transition payments as they have been setting energy prices.

77. IECG, Maine Parties and Objecting Parties further argue that the transition payments are not connected to an added service or benefit. The parties note that during the transition period, some suppliers will be paid in the locational forward reserves market and some will continue to be paid under RMR contracts. Objecting Parties assert that, rather than target financially distressed generation needed for reliability, the transition payments simply extend capacity payments to all capacity suppliers. Objecting Parties state that the transition payments are "money for nothing"[91] and argue that existing RMR contracts should be eliminated at the beginning of the transition period. IECG similarly notes that there is no restraint upon RMR agreements. IECG states that the transition payments will not result in new entry and will not provide a reliability benefit to consumers as nothing is required of suppliers other than their continued existence. IECG further objects to the notion that many generators that currently receive adequate compensation (whether through ICAP or RMR or locational forward reserves market payments) will also receive transition payments. Objecting Parties assert that transition payments will not prevent entities that earn insufficient revenue during the

---

[89] Comments of Maine Parties at 12.

[90] *Id.* at note 30.

[91] Comments of Objecting Parties at 19.

transition period from filing for RMR agreements and that the new availability provisions will not affect generators behavior. Objecting Parties state that were it not for the preservation of RMR agreements, parties "may decide to advance the proposition that transition payments are needed to maintain existing capacity until FCM payments begin."[92]

78. All of the above parties argue that it is inappropriate to compare the transition payments to hypothetical LICAP payments as the Commission never ruled on the LICAP proposal. Objecting Parties contend that the "less than LICAP" arguments many settling parties offer is a "wholly insufficient basis" for supporting the Settlement Agreement.[93] Maine Parties and IECG argue that a comparison to the level of LICAP payments as the likely litigated outcome is irrelevant to whether the transition payments are just and reasonable. Objecting Parties and IECG submit that LICAP payments were designed to achieve different objectives. Objecting Parties state that while LICAP rates were designed to elicit new construction, supporters make no such claim in reference to the transition payments. Moreover, Objecting Parties argue that while LICAP payments, however flawed, were based on estimated costs of new construction, there is no cost justification for the transition payments. IECG notes that the LICAP proposal would have eliminated RMR contracts, would have adjusted LICAP payments for peak energy rents and held the potential for a substantial availability adjustment. Maine Parties state that transition payments are not adjusted for PER. Maine Parties and IECG argue that an analysis of comparative savings cannot provide a foundation for finding transition payments just and reasonable. IECG argues that the Commission must determine that the transition payments are just and reasonable. Maine Parties state that the appropriate comparison is to the current vertical demand curve in a locational ICAP market.

79. Objecting Parties argue that the first FCA (held in early 2008) will set a price all existing resources can expect to receive during the commitment period and thus there is no need for a bridge to FCM.

80. Maine Parties state that the transition mechanism disregards location and fails to account for Maine's capacity surplus. Maine Parties argue that this capacity surplus is unlikely to disappear during the transition period and therefore the price of capacity in Maine would likely not rise to the level of the transition payments. Maine Parties state that capacity payments should reflect the limited value of capacity during the transition period and reflect the unique circumstances of Maine.

---

[92] Reply Comments of Objecting Parties at 3.

[93] *Id.* at 7-8.

81. Maine Parties also assert that if the Commission accepts the Settlement Agreement, it should modify the transition payments for the Maine zone to $2.00/kW-month. In the alternative, Maine Parties submit that the issue could be severed from the proceeding and set for hearing. Maine Parties state that this level would be modestly higher than prices in New York, which serve as a reasonable comparison. IECG states that it may be appropriate for some level of transition payments if there is a relationship to the value received; however, parties do not make this case. IECG states that if the Commission accepts the Settlement Agreement, it should reduce the transition payments by 50 percent. Objecting Parties assert that for the transition mechanism to be just and reasonable, transition payments should be paid only to units needed for reliability that are not recovering going forward costs.

82. PSEG, while not opposing the Settlement Agreement, states that the capacity market will not account for the locational value of generation for five years and that the transition payments will not be sufficient to attract new market entry. Therefore, they argue, the transition mechanism will not permit generation, transmission, and demand side to compete.

83. Load Supporters, Select, Berkshire, NRG, Calpine and Lake Road all submitted comments or reply comments supporting the transition payments. Load Supporters state that the transition mechanism is an interim step to improve resource adequacy and reliability for existing suppliers until the FCM can be fully implemented. They argue that the transition mechanism provides predictable capacity payments that are not subject to the existing "all or nothing" capacity market and are not subject to the actions of other generators. Load Supporters also state that the transition mechanism removes uncertainty, provides a six month commitment period, and includes an availability adjustment if a resource fails to perform. Load Supporters state that the transition mechanism will not be subject to the potential for market power and, through the use of transition payments that are lower than the projected LICAP payments together with RMR contracts, will meet its purpose of compensating existing generation sufficiently to remain available until new generation can be constructed. They also state that the record (in particular, ISO-NE's LICAP price projections during the transition period) shows no difference in prices between Maine and the Rest-of-Pool, and thus there is no basis to differentiate the amount of capacity payments by region, noting that RMR agreements are still paid locally during this period. Under these circumstances a locational aspect to the transition would not serve to promote increased reliability, Load Supporters contend.

84. Load Supporters also contend that the settlement balances short-term and long-term objectives during the transition period and that deconstructing the settlement to alter the transition would create implications for other aspects of the agreement. Load Supporters state that, while it is true that the full benefits of the market will be realized once FCM is fully implemented, the transition period provides superior benefits to load

than either the current regime or the likely litigated outcome. Load Supporters argues the transition mechanism is superior to the Initial Decision which would have adopted a permanent solution. Under the Settlement Agreement, the transition mechanism would apply for the interim until the FCM provides a competitive market. Load Supporters describe the following benefits: the availability metric that will be in place beginning December 1, 2006; capacity resources will be committed seasonally instead of monthly; the fixed capacity payments and the resulting removal of the determination of ICR from the equation during the transition period results in certainty over the amount of capacity load will purchase; and capacity payments are not targeted to financially distressed suppliers.

85. Load Supporters further state that the transition payments have been shown to be less than the capacity payments under the Initial Decision, and that Maine is not making appropriate comparisons. They note that under the status quo, load will be exposed to capacity payments that may approach the $6.66/kW-month deficiency rate due to forecasted load growth. Load Supporters also state that the transition payments are well below the estimate for the cost of new entry and are premised on the assumption that over the long term, capacity payments should be the cost of new entry.

86. Load Supporters state that Maine Parties have not made arguments that justify different treatment during the transition and states that all of New England has a current capacity surplus, not just Maine. They state that Maine Parties have incorrectly relied on congestion charges in the energy market as a basis for stating that capacity payments should be reduced to $2.00 per kilowatt-month for Maine, and for assuming that the rest of New England, which is not capacity deficient, will require that an amount of capacity be imported from Maine, sufficient to create a binding transmission constraint.

87. Lake Road states that failure to implement the Settlement Agreement in total, including the transition payments, would have a number of negative effects, including: exacerbating the need for RMR agreements; increasing the likelihood of generator bankruptcies; failing to provide the incentive for the development of infrastructure; and disrupting the functioning deregulated market in New England. Further, Lake Road states that the transition payments are critically important and will provide a badly-needed solution in the short-term. Similarly, Capacity Suppliers state that it is not an option to spend nothing on capacity during the period covered by the transition mechanism.

88. American National Power argues that Objecting Parties' claims that generators should not be paid for capacity conflicts with the Commission's reasoning directing the development of LICAP; *i.e.,* that generators in designated congestion areas be appropriately compensated for reliability. It further states that Objecting Parties' complaint that the transition payments are "money for nothing" does not acknowledge

that capacity is a legitimate product for which existing generators should be paid. American National Power also states that the Commission has distinguished the locational forward reserves market from the capacity market and recognizes that the capacity market ensures there is adequate generating capacity installed on the system. It also takes issue with the conclusions made by Maine Parties that there is a relationship between the energy market and binding transmission constraints in the capacity market. American National Power, as well as Calpine, state that without a technical demonstration of a binding capacity constraint, for which no evidence was presented, a capacity price reduction for Maine is not justified.

**Commission Conclusion**

89. While the Commission may not consider the transition payments ideal as a single market design element, when considered as part of the larger Settlement Agreement, we find (consistent with the second approach of *Trailblazer*) that they serve as a reasonable transitory mechanism that enables the New England region to shift to the FCM. We note that the FCM incorporates many of the proposed features of alternatives presented at oral argument. We find that the transition payments are a just and reasonable component of the overall package embodied in the Settlement Agreement because: (1) based on record evidence from the hearing, the payments fall within the reasonable range of capacity prices, and contesting parties are in no worse position under the Settlement Agreement than they would be through continued litigation; (2) in the first years, the payments are less than the cost of new entry, accurately reflecting market conditions; and (3) the payments result in just and reasonable rates for existing generators.

90. Over the course of the 10-month hearing in this proceeding, numerous parties filed alternative demand curves to the curve proposed by ISO-NE. The Commission never ruled on the justness and reasonableness of that demand curve or any of the other demand curves proposed in the hearing (although the Initial Decision did adopt ISO-NE's proposal). Nonetheless, for the purposes of addressing the Settlement Agreement as a just and reasonable package, and establishing the justness and reasonableness of the transition payments as part of that package, we can analyze the price projections under the proposed demand curves that were entered into evidence in the hearing and compare them to the transition payments. As we noted above, "[a] just and reasonable rate is not a product of any single formula, but is instead a rate within a broad ambit of various rates which may be just and reasonable."[94] We disagree with arguments that the Commission

[94] *See Belco Petroleum Corp. v. FERC*, 589 F.2d 680, 689 (D.C. Cir. 1979), *citing Permian Basin Area Rate Cases*, 390 U.S. 747, 767 (1968); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944); *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585-86, (1942).

cannot compare the transition payments to the potential rates that would have resulted from continued litigation over the LICAP mechanism. As we discuss above with regard to our standard of review, under the second *Trailblazer* approach, the Commission must find that contesting parties would be in no worse position under the settlement than if the case were litigated. Comparing the transition payments to the likely outcome of litigation is the most reasonable approach for evaluating this aspect of the Settlement Agreement.

91. The record evidence shows a range of rates that could have resulted from continued litigation. In particular, it is useful to look at the projected prices for Maine and Northeastern Massachusetts/Boston under the demand curve proposed by Maine and Vermont load representatives (one of the lower demand curves) and ISO-NE's proposed demand curve. While other demand curves were proposed at the hearing, the parameters of those curves would have produced prices that were either much higher or much lower. The Maine/Vermont and ISO-NE curves provide a narrow range of rates that provide a reasonable basis for comparison to the transition payments.

92. In direct testimony filed February 10, 2005, ISO-NE witness David LaPlante provided a series of price estimates, for a variety of scenarios, using the ISO-NE-proposed demand curve.[95] ISO-NE projected prices for each of five LICAP regions previously approved by the Commission: Southwest Connecticut (SWCT), Rest of Connecticut, Northeast Massachusetts/Boston (NEMA/Boston), Maine and the Rest of Pool. ISO-NE developed price estimates for Maine that ranged from $2.29/kW-month in 2007 to $4.04/kW-month in 2010; prices for NEMA/Boston were the same.[96]

93. In the same exhibit, ISO-NE also projected capacity prices under a demand curve advocated by Maine and Vermont load representatives.[97] ISO-NE projected prices for Maine under that curve that ranged from $1.91/kW-month in 2007 to $2.53/kW-month in 2010; prices for NEMA/Boston were the same.

94. James Daly, witness for a coalition of parties, including the Attorney General of Massachusetts (AG Mass), NSTAR and The Energy Consortium, also developed a series of price projections using ISO-NE's demand curve. He first provided projections in supplemental answering testimony, filed January 28, 2005. On March 16, 2005, Mr. Daly updated his price projections to reflect an increase in the installed capacity

[95] Exhibit No. ISO-24.

[96] *Id.*

[97] The Maine Public Utilities Commission, Maine Public Advocate, Vermont Department of Public Service and the Vermont Public Service Board.

requirement as approved by the NEPOOL Participants Committee.[98] Mr. Daly's price projections for Maine ranged from $7.63/kW-month in 2007 to $16.16/kW-month in 2010; prices for NEMA/Boston were the same.[99] Mr. Daly argued that the net cost of ISO-NE's LICAP proposal was $14.5 billion.[100] Maine Parties and Vermont argued that, using the updated installed capacity requirement, "cost[s] will rise to $1.2 billion and $7.3 billion for Maine and Rest of Pool, respectively, for a five-year period."[101] In their Reply Brief, Maine Parties and Vermont argued that New England consumers could pay "as much as $6 billion in LICAP charges" during the first three years of ISO-NE's proposal.[102]

95. In Attachment 6 to the Settlement Agreement, ISO-NE witness David LaPlante provided updated capacity price projections using the demand curve approved in the Initial Decision, which is identical to the ISO-NE-proposed demand curve for which Mr. LaPlante provided projections in February 2005. Mr. LaPlante relied on updated assumptions, including the level of installed capacity requirement approved by the Commission for the 2005/2006 power year, as well as installed capacity requirement projections contained in the most recent ISO-NE Regional System Plan. Mr. LaPlante's price estimates for Maine ranged from $4.13/kW-month in 2007 to $7.84/kW-month in 2010; prices for NEMA/Boston were the same.[103]

96. These most recent price projections, using the ISO-NE demand curve, exceed those made by Mr. LaPlante in February 2005. Therefore, it is reasonable to assume that had Mr. LaPlante also updated the price projections for the demand curve proposed by

---

[98] The installed capacity requirement is established annually via the NEPOOL stakeholder process, approved by a vote of the NEPOOL Participants Committee and filed with the Commission under section 205 of the FPA.

[99] Workpaper for Exhibit No. AG Mass-23

[100] Exhibit No. AG Mass-23 at 3.

[101] Initial Brief of the Maine Public Utilities Commission, the Maine Public Advocate, the Vermont Department of Public Service and the Vermont Public Service Board at 32.

[102] Reply Brief of the Maine Public Utilities Commission, the Maine Public Advocate, the Vermont Department of Public Service and the Vermont Public Service Board at 5.

[103] Settlement Agreement, Attachment 6.

Maine and Vermont load representatives, those projected prices would have increased in similar magnitude from the February 2005 projections.

97. This record evidence indicates that the cost of the transition payments to Maine and Massachusetts customers under the Settlement Agreement would be less than the costs of ISO-NE's proposed demand curve. In its Initial and Reply Briefs, Maine Parties[104] made various assertions with regard to the total costs of LICAP to Maine customers, projecting the costs at anywhere from $734 million to $1.2 billion through 2010. In his affidavit, Maine Parties' witness Thomas Austin submits that the transition payments as proposed by the Settlement Agreement "will cost Maine consumers about $300 million over the transition period," which ends in 2010.[105] By the Maine Parties' own admission, the transition payments will impose far fewer costs on Maine customers than the price projections Maine Parties referenced in its Initial and Reply Briefs.

98. An examination of the various price projections illustrated above, using ISO-NE's proposed demand curve as well as Maine Parties' and Vermont's demand curve, shows a range of prices that could have resulted from continued litigation. The chart below shows projections for Maine and for NEMA/Boson, with the transition payments included for comparison:

**Range of Projected Prices – Maine $/kW-month**

| | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| LaPlante - ME & VT Curve (Feb. 2005)* | 1.91 | 1.96 | 1.64 | 2.53 |
| LaPlante - ISO-NE Curve (Feb. 2005) | 2.29 | 2.36 | 4.44 | 4.04 |
| Transition Payments | 3.05 | 3.05 | 3.75 | 4.05 |
| LaPlante - ISO-NE Curve (March 2006) | 4.13 | 5.14 | 6.39 | 7.84 |
| Daly - ISO-NE Curve (March 2005) | 7.63 | 10.21 | 14.26 | 16.16 |

* Not updated to reflect current assumptions.

**Range of Projected Prices - NEMA/Boston $/kW-month**

| | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|

[104] In briefs on the Initial Decision, Maine Parties were joined by the Vermont Department of Public Service and the Vermont Public Service Board. Both the Vermont Department of Public Service and the Vermont Public Service Board are parties to the Settlement Agreement. They filed in support of the Settlement Agreement as members of Load Supporters.

[105] Affidavit of Thomas D. Austin at 9, filed with Comments of the Maine Parties Contesting the Proposed Settlement, March 27, 2006.

| | | | | |
|---|---|---|---|---|
| LaPlante - ME & VT Curve (Feb. 2005)* | 1.91 | 1.96 | 1.64 | 2.53 |
| LaPlante – ISO-NE Curve (Feb. 2005) | 2.29 | 2.36 | 4.44 | 4.04 |
| Transition Payments | 3.05 | 3.05 | 3.75 | 4.05 |
| LaPlante – ISO-NE Curve (March 2006) | 4.13 | 5.14 | 6.39 | 7.84 |
| Daly – ISO-NE Curve (March 2005) | 7.63 | 10.21 | 14.26 | 16.16 |

*Not updated to reflect current assumptions.

99. As the above data indicate, the record evidence shows that the transition payments fall well within the range of capacity prices projected using the demand curve proposed by ISO-NE, as well as the demand curve proposed by Maine Parties and Vermont during the hearing. The Commission notes that projected prices using the Maine and Vermont-proposed demand curve do not reflect the most recent installed capacity requirement and other updated assumptions. Since those updated assumptions produced a sharp increase in prices under the ISO-NE-proposed demand curve, it is reasonable to assume that the initial projections for the Maine and Vermont-proposed demand curve are too low and would increase in a similar manner. Thus, the transition payments fall at the very low end of this price range.

100. Taken as a whole, we conclude that this evidence establishes the justness and reasonableness of the transition payments as a component of the overall package represented by the Settlement Agreement. Not only does the evidence show that the transition payments fall within the "range of reasonableness," as discussed above, but the evidence also leads us to conclude (consistent with the second *Trailblazer* approach) that those objecting to the settlement would not reach a more favorable result through continued litigation. The record evidence shows that even had the Commission, in continued litigation, adopted elements from other, lower demand curves proposed at hearing, the transition payments would still be comparable if not significantly lower. Taking into account the expense of continued litigation and its attendant uncertainty, we conclude that contesting parties "would be in no worse position under the terms of the settlement than if the case were litigated."[106]

101. Moreover, the proposed transition payments are significantly less than the estimated cost of new entry of a new peaker, a type of plant whose capital costs are lower than most, if not all, other plants. Thus, the payments are likely to be significantly lower than a cost-of-service payment for most, if not all, new generators. As noted above, the Settlement's proposed transition payments would be set initially at $3.05/kW-month and rise to $4.05/kW-month for 2010. These payments are significantly lower than the

[106] *Trailblazer*, 87 FERC ¶ 61,110 at 61,339.

$7.50/kW-month CONE used to begin the FCM auction, which, as discussed below, we find reasonable. Thus, the payments are well within the "range of reasonableness."

102. Additionally, the transition payments are reasonable rates for existing generators until the FCM begins. Comments that the transition payments are unreasonable and inappropriate because they will not provide the incentive for new entry ignore that one of the Commission's stated goals in this proceeding is to ensure that existing generators are appropriately compensated.[107]

103. Finally, the transition payments will require a long-term commitment and will be more closely tied to the availability of a unit, both significant improvements over the existing capacity market (status quo) and the LICAP proposal as approved in the Initial Decision. First, the transition payments will be adjusted to account for unit performance during periods of high demand. Transition payments will also be adjusted by an EFORd score that is weighted according to on-peak hours, seasonal peak hours, and shortage hours (including certain periods of system-wide emergency operations or actions).[108] Second, the commitment period for capacity resources consists of two six-month seasonal periods (section VIII.H), as compared to the monthly period in the current capacity market. Third, during the transition period, suppliers may partially de-list or export their units (section VIII.F), an attribute the Commission previously stated would be desirable.[109]

104. The existing capacity market does not provide these features. The current market only adjusts capacity payments for average unit availability (unforced capacity (UCAP)), while the transition period will provide an adjustment to transition payments for suppliers that do not perform that is targeted more effectively to periods of system stress. We also find that the longer commitment period for capacity resources is superior to both the status quo and to ISO-NE's LICAP proposal. Under the current ICAP market, the commitment period is monthly; the commitment period under ISO-NE's LICAP proposal was also monthly. During the transition period, supply resources must commit to a six-month seasonal supply of capacity. Taken together, these provisions increase the stability of the market during the transition period and add certainty and price stability for load customers. We find that these features provide enhanced reliability and customer

---

[107] April 25 Order at P 37; June 2 Order at P 40-43, 49-52; *Devon Power LLC,* 109 FERC ¶ 61,154 at P 65-67 (2004).

[108] Settlement Agreement, section VIII.D

[109] *New England Power Pool,* 100 FERC ¶ 61,287 at P 110 (2002).

protection that is superior to the existing ICAP market, which we have found to be unjust and unreasonable.

105. Maine Parties argue that the transition payments fail to account for locational differences in capacity levels, and that Maine should pay a lower transition payment because it has a surplus of capacity. However, record evidence does not support altering the transition payment for Maine based on its capacity surplus. The most recent price projections provided by Mr. LaPlante exhibit little to no variability in capacity prices across New England regions for the period covered by the transition mechanism. Furthermore, in areas where import constraints do currently exist, RMR agreements have been approved, and the costs associated with those payments are paid locally.[110] Therefore, for this limited period, it is reasonable to not include a locational feature in the transition mechanism. The locational feature in the FCM, which we address below, appropriately addresses on a long-term basis issues regarding payments to capacity in constrained regions.

106. We also reject Maine Parties' request that we sever the issue of what level of transition payment Maine should pay. As we concluded above in our discussion of the standard of review, severance is not appropriate in this case because the Settlement Agreement provides a capacity market construct (including a transition period) that will apply throughout New England. Moreover, as Settling Parties note in their explanatory statement, the level of transition payments for the entire region were negotiated at arms length among all of the Settling Parties.[111] Severing the amount one state will pay would undoubtedly affect that negotiated amount for all parties.

107. The Commission will not reduce the level of the transition payments by 50 percent as suggested by IECG. IECG arrives at 50 percent without demonstrating why that is the appropriate level. Also, the transition payments are a fundamental component of the Settlement Agreement.

108. Finally, we address arguments with regard to the relationship between the Settlement Agreement and the currently-approved RMR agreements below.

---

[110] *See* Explanatory Statement in Support of the Settlement Agreement at 39.

[111] *Id.*