# EXHIBIT F

**Part 2**

## 2. FCM Design

### a. Alternative Price Rule

109. The settlement provides for an alternative price rule that will reset the clearing price under certain conditions. This rule allows load to self-supply their own capacity, but removes the incentive to do so for the purpose of depressing capacity prices. The rule applies when at least some of the offers from new capacity or imports are below .75 times CONE and the Market Monitor concludes that such low offers are not consistent with long run average costs, opportunity costs, or other reasonable economic measures. Capacity submitting such bids is deemed to be "out-of-market." When any submitted bids are deemed out-of-market, the capacity clearing price will be reset when the following conditions are met: 1) new capacity is needed, either system-wide or in an import-constrained zone; 2) there is adequate supply in the auction; and 3) at the auction clearing price, purchases from out-of-market capacity are greater than the required new entry. If these conditions are met, the clearing price for the applicable capacity zone will be set to the lower of 1) the price at which the last bid from new capacity was withdrawn, minus $0.01 or 2) CONE.

110. Objecting Parties and IECG argue that the alternative price rule should be rejected because it maintains an artificial price support for incumbents. IECG argues that the alternative price rule interferes with competition between existing suppliers and self-supply by load serving entities. IECG argues that this rule prevents long-term contracting opportunities from effectively competing in the auction process and thus discourages long-term contracting by load serving entities. Objecting Parties argue that the sole purpose of the alternative price rule is to maintain a LICAP level of quantity and price support in the market, which reflects the unbalanced negotiating positions among the parties rather than any rational market mechanism.

111. Capacity Suppliers respond that the alternative price rule does not restrict competition, but rather, curbs the exercise of load's monopsony power. Capacity Suppliers assert that without this rule, there is no way to restrict load from submitting artificially reduced bids for new capacity, thus driving clearing prices to zero. Capacity Suppliers' witness Stoddard states that the rule does not interfere with the ability of load to contract bilaterally, but that it prevents loads that may control a small amount of new capacity needed to meet load growth – perhaps one or two percent – from setting the clearing price for the remaining 98 to 99 percent of capacity. Mr. Stoddard argues that when new resources that are under contract to load or otherwise indifferent to the capacity clearing price submit bids below the average cost of new entry, they may be able to set the clearing price; in these instances, the auction price would inaccurately be signaling that there is no need for new generation, while contract market prices would be signaling that there is a need for new generation. ISO-NE contends that, in instances

where new supply is required to meet the Installed Capacity Requirement, the alternative price rule prevents the price from dropping to zero. ISO-NE contends that the alternative price rule sets a methodology that directly ties the clearing price to an actual bid by new capacity or CONE and prevents price volatility, thus providing consumers with price predictability and rate stability.

112. Load Supporters assert that the alternative price rule will exclude bids that do not represent actual costs and thus is designed to ensure that prices over the long run will approximate the true cost of new entry. Load Supporters assert further that as long as a self-supplied resource bids its true costs, it can set the auction clearing price. Load Supporters argue that the rule helps to ensure that the competitive cost of new entry sets the clearing price when entry is needed, and, therefore, provides incentives for investment in new capacity.

**Commission Conclusion**

113. We find that the alternative price rule is a reasonable provision of the settlement because it helps to ensure that capacity prices will reflect the price needed to elicit new entry when new capacity is needed. In the absence of the alternative price rule, the price in the FCA could be depressed below the price needed to elicit entry if enough new capacity is self-supplied (through contract or ownership) by load. That is because self-supplied new capacity may not have an incentive to submit bids that reflect their true cost of new entry. New resources that are under contract to load may have no interest in compensatory auction prices because their revenues have already been determined by contract. And when loads own new resources, they may have an interest in depressing the auction price, since doing so could reduce the prices they must pay for existing capacity procured in the auction. If the owners of these two categories of resources control more new capacity than the amount of new capacity needed in a capacity zone, their low bids could artificially depress the price in the FCA.

114. To address this potential problem, it is reasonable for the Market Monitor to review offers from new capacity that appear to be unreasonably low. And if the Market Monitor determines that a low offer is not economically justified, it is reasonable to reset the clearing price to a level that would be expected in a competitive market that requires new capacity. The reset price under the alternative price rule is such a price. The alternative price rule provides two options for establishing a reset price. One option is CONE; it is reasonable to expect that the market price would normally approximate the estimated cost of new entry when new entry is needed. Under the alternative price rule, the reset price would never exceed CONE. But under the second option, the price would be less than CONE in those instances when an in-market source of new capacity has indicated through its bid that it is willing to supply capacity at a price less than CONE. In these instances, it is reasonable to reset the price at a level slightly below the last bid

from in-market new capacity that has withdrawn from the auction. Furthermore, under section IX of the Settlement Agreement, ISO-NE will provide an informational filing 90 days prior to the conduct of each FCA; that informational filing will identify any Market Monitor conclusions concerning the acceptability of bids in the FCA, allowing the Commission to review the Market Monitor's actions.

115. We disagree with Objecting Parties and IECG that the alternative price rule would maintain an artificial price support for incumbents; rather, we agree with Capacity Suppliers that the rule would ensure that new capacity, when needed, will receive a reasonable price. We also disagree with IECG that the rule would discourage long-term contracting and interfere with competition between existing suppliers and self-supply by load serving entities. Rather, we agree with Load Supporters that the rule would not preclude self-supply or bilateral contracting. The rule would not eliminate the value of self-supplying or contracting to create a hedge against the uncertainty of auction clearing prices. The rule would merely help to ensure that loads do not use self-supply to artificially suppress the auction's clearing price below the price needed to elicit new entry when new entry is needed.

**b. <u>Locational Feature</u>**

116. In addition to its concerns regarding the lack of a locational element in the transition period, Maine Parties also express concerns regarding the locational feature of the FCM. As noted above, under the locational feature included in the Settlement Agreement, ISO-NE will determine any separate capacity zones prior to each auction based on its identification of transmission constraints that may bind. This compares to the LICAP proposal, under which the capacity zones would be permanently established in the tariff and would not change prior to each auction absent a tariff change.

117. Specifically, Maine Parties argue that the determination by ISO-NE of whether binding constraints exist (which will then result in separate import constrained zones) is inferior to allowing actual price separation to occur as part of the auction process. In particular, Maine Parties argue that the administrative determination will be made with incomplete information, and could be influenced by entities with greater resources. Maine Parties also argue that this process could result in the region purchasing capacity that is not deliverable to the import-constrained region, leading to higher prices (since more capacity is being paid than can be delivered). Furthermore, Maine Parties contend that a pre-determined conclusion that a constraint will or will not bind is unduly rigid and suppresses market forces that would ordinarily determine the locational value of capacity on their own. Maine Parties conclude that "[t]he failure to model import constraints in

the auction runs counter to the Commission's core interest of ensuring price separation to value capacity properly in import-constrained zones."[112]

118. In reply, Load Supporters argue that the Settlement Agreement properly determines the need for separate capacity zones before the auction, and that much of the agreement hinges on this feature. Load Supporters contend that five separate auctions would be inefficient where objective criteria apparent before the auction show no need for the separate zones. Additionally, Load Supporters assert that establishing ISO-NE's determination and criteria in advance allows load to take action to minimize the impact of separate, smaller capacity zones. Load Supporters state that changing this aspect of the settlement could disturb the delicate balance reached in the package as a whole. Furthermore, in response to Maine Parties' suggestion that the locational element could result in the purchase of capacity that is not deliverable, Load Supporters state that the Settlement Agreement includes explicit provisions to maintain local resource adequacy and reliability in a more precise manner than would Maine Parties' suggested modification.

119. ISO-NE, in its reply, explains that the locational mechanism in the Settlement Agreement was a compromise crafted to bring together parties who favored either a locational capacity market or a regional capacity market. ISO-NE states that the need for a locational capacity market is critical to provide an incentive for the right mix of generation in the right locations, and the approach in the settlement was negotiated to ensure that there would be a locational element in the market when and where required. Furthermore, ISO-NE notes that export constraints will be modeled through the auction, making Maine Parties' concern only directed at import constraints. According to ISO-NE, while always including a separate zone in the auction might be a better approach in theory, the approach in the Settlement Agreement will achieve the same result by identifying the need for new capacity or transmission inside an import-constrained zone and then properly pricing it. Additionally, ISO-NE and Load Supporters argue that the zonal determinations will not be subject to undue influence, since the ISO will be required under the settlement to make an informational filing with the Commission, which parties can then challenge.

120. Finally, ISO-NE contends that Maine Parties are incorrect that more capacity may be purchased than can be imported into the constrained zone because under the settlement's "before-the-fact" determination process, the amount of existing capacity and capacity that is committed to be constructed is compared to the capacity needed within the zone (given assumed transmission) and if there is sufficient capacity, no separate zone

[112] Comments of Maine Parties at 17.

is modeled. Since the calculation is done each year, changed circumstances are taken into account, and only the retirement of a unit during the auction (without a purchase of replacement capacity) could result in an incorrect calculation. ISO-NE states this scenario is unlikely and is addressed by the retirement rules and market mitigation thresholds under the ISO-NE tariff.

121. National Grid, also in reply, argues that the Settlement Agreement resolves locational concerns more effectively than the LICAP mechanism because it ties the creation of zones directly to the actual current location of load pockets, and is performed on an annual basis to reflect current system conditions, instead of creating rigid and inflexible zones that are changed only with difficulty. Furthermore, it contends that Maine Parties' assertion that ISO-NE will determine the zones by "administrative fiat" is without merit, because ISO-NE will use an objective technical test to identify the zones, and will use local sourcing requirements (*i.e.*, the amount of capacity that must be obtained within each zone) based on a well-defined reliability analysis and a methodology for determining transfer limits between regions that the parties have previously uniformly supported.[113] Additionally, National Grid contends that Maine Parties' proposal to alter the locational feature will present market power concerns, since pre-established zones (such as those in the LICAP proposal) present more of an opportunity to manipulate participation in the auction to force the pre-defined transmission constraints to bind and create price separation, while determining the zones before the auction based on objective factors analyzing the actual state of the system will minimize such opportunities. Finally, National Grid argues that altering this feature could cause a collapse of the settlement.

**Commission Conclusion**

122. We will accept the locational feature of the FCM, which (as we explain here) contributes to the overall justness and reasonableness of the Settlement Agreement as a package and satisfies the directive in prior Commission orders that the capacity market take into account location. Transmission constraints in New England can restrict the ability to deliver energy from some locations to others, and a market design for capacity should reflect transmission constraints to send correct price signals for investment. We believe that the settlement provides for a means to recognize transmission constraints that is, on balance, reasonable in light of competing considerations.

123. Under the settlement, separate capacity zones would be established for each yearly FCA in those instances when the ISO determines in advance that transmission constraints

[113] Reply Comments of National Grid at 4-5.

are likely to bind. The Maine Parties argue that determining zones in advance, as proposed in the settlement, is inferior to allowing price separation to occur as part of the auction process. In principle, there may be advantages to the Maine Parties' approach, but the settlement's approach will reduce the incentive to exercise market power in the capacity market. We agree with National Grid that if auction results were used to force local capacity zones/local auctions, as Maine Parties' propose, sellers of capacity would have the incentive to withhold capacity to create price separation and separate capacity zones where they are not necessary.[114] These constraints would bind only because of the exercise of market power, and not because of actual physical limitations arising from competitive market conditions. The locational feature of the Settlement Agreement, in contrast, will be based on an objective analysis of actual transmission system constraints.

124. Therefore, we accept the locational feature of the FCM. We note that the settlement provides for the ISO's Market Monitor to post a report analyzing the operations and effectiveness of the FCM no later than 180 days after the second FCA is conducted, as well as annually in its annual markets report. In these reports, the Market Monitor should include an evaluation of the locational element.

### c. <u>Level of CONE/"Collar"</u>

125. Under the Settlement Agreement, the beginning price for each FCA will be twice CONE (or $15.00/kW-month), with the value of CONE for the initial FCA set at $7.50/kW-month. In subsequent auctions, CONE will be based on preceding values of CONE and preceding auction clearing prices.

126. Objecting Parties argue that the initial CONE of $7.50/kW-month is excessive and should be set below $7.00/kW-month. Objecting Parties assert that the combination of an excessive CONE and the price floor established via the collar mechanism will result in load paying excessive capacity charges even in a surplus situation. Objecting Parties note that capacity payments will be netted against reserves payments from the locational forward reserves market. Reserves payments are capped at $14/kW-month. Objecting parties argue that, given that the beginning price for capacity will be $15.00/kW-month (two times CONE), there is the possibility that reserves will clear at a lower price than capacity, meaning qualified locational forward reserves markets resources could have to take a financial loss to provide locational reserves.

127. Maine Parties argue that setting the initial CONE at $7.50/kW-month is too high, particularly for Maine, which has a surplus of generation and limited export capability. Maine Parties assert that the CONE does not reflect the lower cost of new entry in Maine

---

[114] *See* Reply Comments of National Grid at 7.

relative to other locations in New England. Maine Parties cite LICAP testimony from ISO-NE witness Reed, who determined that several inputs into the totaled installed costs of generation were higher in Southwest Connecticut than in Maine.[115] Maine Parties argue that, in the LICAP proceeding, ISO-NE proposed an estimated benchmark cost of capacity for Maine that was $1.00/kW-month lower than Southwest Connecticut. Thus, Maine Parties assert that a just and reasonable initial CONE for Maine would be $6.50/kW-month. Maine Parties also argue that the collar mechanism will keep prices artificially high.

128. Capacity Suppliers and ISO-NE argue that neither Objecting Parties nor Maine Parties provide analyses or cite record evidence to support an alternative value for the initial CONE. Capacity Suppliers submit that the primary purpose of CONE is to indicate the auction's beginning price; actual clearing prices will reflect the market for capacity not CONE. Capacity Suppliers and ISO-NE contrast the proposed $7.50/kW-month level of initial CONE with the estimated cost of new capacity derived by ISO-NE witness Reed during the LICAP proceeding—$7.27 in Maine, $7.70 in Rest of Pool, and $8.16 in NEMA/Boston. Capacity Suppliers assert that this record evidence substantiates the $7.50 CONE estimate, which is for the 2010/11 power year.

129. Load Supporters submit that the settling parties made great efforts to balance the risks between resource suppliers and load so that the long-term CONE could assure a steady stream of new competitors willing to offer capacity at the lowest reasonable cost. Load Supporters assert that altering the initial value for CONE would disrupt the settlement's delicate equilibrium, and may precipitate its collapse.

**Commission Conclusion**

130. The Commission will not modify the initial value of CONE proposed in the Settlement Agreement. We find that the $7.50/kW-month CONE is a reasonable estimate of the cost of new entry and basis for the beginning price in the FCM auctions, and we

---

115 ISO-NE witness John J. Reed derived the following values for the estimated costs of capacity for a benchmark peaking unit (*see* Exhibit No. ISO-3 in Docket No. ER03-563-030):

| LICAP Region | NEMA/Boston | SWCT | Rest of Connecticut | Maine | Rest of Pool |
|---|---|---|---|---|---|
| $/Kw-year | $97.87 | $99.16 | $96.52 | $87.22 | $92.34 |
| $/kW-month | $8.16 | $8.26 | $8.04 | $7.27 | $7.70 |

believe it is supported by substantial evidence in the record. For example, the $7.50/kW-month CONE is at the lower part of the range of the estimated benchmark costs of capacity produced by ISO witness Reed at the hearing in this proceeding. Further, Capacity Suppliers' witness offers substantial evidence that, after adjusting Mr. Reed's estimates for inflation over four years to 2010, the $7.50/kW-month level of CONE would be lower than all of Mr. Reed's estimates.[116] Additionally, the $7.50/kW-month figure is not a substantial increase from the existing $6.66/kW-month deficiency charge currently in place in the ICAP market and approved by the Commission in 2002, given inflation and increases in the cost of capacity.[117] Neither Maine Parties nor the Objecting Parties offer any evidence as to why their suggested modifications provide a more reasonable estimate of the cost of new entry.

131. With regard to the issue raised by Objecting Parties' regarding the impact of the FCM on the locational forward reserve market, the Commission notes that, while $15.00/kW-month is the initial bid price (representing two times CONE), the prices in the descending clock auction will descend until the market clears. Subsequent values of CONE will be "mathematically calculated using the clearing prices of previous auctions"[118] and thus the beginning prices in subsequent FCAs will reflect the prices needed to elicit supplies to serve projected demand. Additionally, prices paid to capacity suppliers will be reduced via the peak energy rent deduction and availability metric. We expect that these provisions will appropriately address Objecting Parties' concerns. We note that in the locational forward reserves market proceeding,[119] ISO-NE indicated that the locational forward reserves markets settlement rules would accommodate the design of any successor capacity market in this docket. We expect ISO-NE to carefully observe prices in the locational forward reserves markets and FCM markets and to file to correct any problems of overlap.

132. We will not grant Maine Parties' request to reduce CONE for Maine alone. First, we note that CONE is only a starting point for the auction, and changing CONE for Maine alone will not change the actual cost of new entry in Maine. Since it is simply a beginning point for the auction, CONE will not necessarily establish the market clearing price in all FCAs. Moreover, we find that a single value for CONE is just and

---

[116] Supplemental Affidavit of Robert B. Stoddard at 3, Filed with Reply Comments of Capacity Suppliers.

[117] *See New England Power Pool and ISO New England, Inc.*, 100 FERC ¶ 61,287 at 62,277-78 (2002).

[118] Explanatory Statement to Settlement Agreement at 26.

[119] *ISO New England, Inc.*, 115 FERC 61,175 (2006).

reasonable, since the FCM is a region-wide construct with a locational element when transmission system conditions warrant. Additionally, the $7.50/kW-month CONE differs only slightly from the $7.27/kW-month estimated cost of capacity for a benchmark peaking unit entered into evidence by ISO-NE witness Reed in the hearing below, even without updating Mr. Reed's figure to reflect inflation and increased fuel costs.[120] Furthermore, Maine Parties do not address how different CONEs for Maine and for the rest of New England would operate in practice with respect to a single clearing auction.

#### d. Definition of "New Capacity"

133. Under the Settlement Agreement suppliers that undertake new investment in existing resources (*i.e.*, capacity that is considered to be existing capacity) to increase output may have capacity reclassified as new capacity. A previously existing resource shall be considered new capacity if the supplier undertakes new investment such that: (1) resource output is increased by the greater of 40 megawatts or 20 percent of Summer Seasonal Claimed Capability[121]; (2) the resource is repowered at a rate equal to or greater than $200 (plus appropriate cost escalation) per net kilowatt installed project cost; (3) the resource is upgraded to comply with environmental regulations or permits at a rate equal to or greater than $100 (plus appropriate cost escalation) per net kilowatt installed project cost. The Settlement Agreement also contains provisions to classify incremental capacity additions as new capacity.

134. Objecting Parties argue that because existing suppliers have both the incentive and ability to withhold capacity, it is important that only "new" resources be allowed to set the auction clearing price. While Objecting Parties acknowledge that there is probably some reasonable uprate threshold for declaring existing capacity "new," they argue that the greater of 20 percent or 40 megawatt threshold included in the settlement is too low. Objecting Parties argue that requiring 100 percent or more is more appropriate; with 100 percent a resource owner would need to add a megawatt of truly new capacity for every megawatt of existing capacity that would be withdrawn from the market and reclassified as "new."

---

[120] *See* Exhibit No. ISO-3

[121] The Seasonal Claimed Capability rating of a generating unit is the maximum dependable load carrying ability, in megawatts the unit and represent the MW value of the resource used in the capacity market. All resources within New England must perform capability audits. Capabilities are calculated for winter and summer.

135. Objecting Parties also argue that the ability of all imports to qualify as new capacity is an additional flaw. Objecting Parties contend that allowing imports to set capacity prices above the CONE creates an unnecessary opening for the exercise of market power, and increases the probability that existing resources will set the clearing price. Objecting Parties argue that enabling existing resources outside the pool to set high clearing prices creates a gaming opportunity for existing resource owners to export and then import a corresponding amount as new for the purpose of influencing prices. All imports, they argue, other than from new transmission or new generation construction, should be treated as "existing" resources in the FCA.

136. Load Supporters, in their reply comments, argue that the 20 percent/40 megawatt threshold promotes competition. Load Supporters and Capacity Suppliers assert that repowering brownfield sites may be completed more quickly and at a lower cost than new construction because the site is already permitted, licensed, and developed for generation use. Load Supporters argue that the FCM is reasonably designed to enable existing resources to improve their sites quickly, to provide substantial value at least-cost to load, and to improve capacity resource reliability and adequacy where needed. Capacity Suppliers state that settling parties agreed that sending market signals to existing units to incur upgrade costs, when economic and efficient, is appropriate. ISO-NE contends that the Settlement Agreement is premised on the notion that an uprate of the sizes identified would require "extremely significant" investment. Load Supporters add that upgrades of at least 20 percent are unlikely to be possible without some period of de-listing. ISO-NE submits that new investment in existing units is precisely the new entry the FCM hopes to attract. ISO-NE states that an uprate of that size would further require new environmental permits, new interconnection and major additions to or replacements of existing components. ISO-NE submits that market rules will assure that capacity from these re-powerings will be unable to exercise market power. NRG argues that investors will not fund output increases without finding that the capacity market will support that investment.

137. In reply, Capacity Suppliers also argues that the ability of imports to set the clearing price was designed to increase competition between proposed new generation and imports and should serve to reduce the FCM clearing price. ISO-NE argues that if external generation is ineligible to set the price, it will sell its output elsewhere.

**Commission Conclusion**

138. The Commission will not direct the settling parties to reconsider the threshold used to reclassify existing capacity as new capacity. The Commission finds that the threshold provision to which the Objecting Parties refer provides incentives to attract more supply to New England because it will encourage existing suppliers to expand their facilities. We further find that the level of the 20 percent/40 megawatt threshold is

sufficient to provide incentives for significant additions to capacity levels, while preventing existing capacity from being reclassified as new capacity by means of minor additions. We note that both Load Supporters and Capacity Suppliers argue that investment in existing capacity may be more cost efficient than new construction as well as quicker to come online. Results of recent ISO-NE analyses, presented in the 2005 Regional System Plan, show that "New England will likely face an increased risk of operating with less capacity than needed by 2008."[122] The 2005 Regional System Plan further states that results indicate that the region "will not have sufficient capacity to meet the IC Requirement in the 2008 to 2010 timeframe, depending on load growth, weather conditions, generator performance and attrition, and the conditions in specific load pockets, such as Connecticut." Given these projections and that new generation requires two to four years to be built, increased output from existing resources could provide important reliability protection. The Commission thus accepts the 20 percent/40 megawatt threshold agreed to by settling parties as an appropriate means for attracting additional capacity.

139. We note that the Objecting Parties do not oppose the provision generally; rather they propose an alternative level (100 percent) as they believe the 20 percent/40 megawatt level is too low. The Commission finds that a 100 percent threshold level is too high. One of the benefits of the proposed threshold is that it encourages suppliers to add new capacity quickly, far sooner than the time they would need to build new units. We do not believe that a 100 percent threshold provides the same benefit. Moreover, the Settling Parties negotiated and agreed on a threshold level as part of the overall Settlement Agreement, which was approved by a significant majority of the NEPOOL Participants Committee. Given that we find that this provision creates appropriate incentives to bring on potentially cheaper capacity more rapidly, we will accept the 20 percent/40 megawatt provision.

140. New import capacity is capacity that a party without a multi-year contract wishes to bid into the FCA; it will be required to meet the financial assurance as well as physical backing requirements described above. This provision is intended to increase the level of eligible capacity in instances where new capacity is required to meet reliability criteria. Allowing additional imports to bid into the FCM, provided eligibility requirements are met, is reasonable as this increases the supply of capacity available in the auction.

---

[122] ISO New England, Regional System Plan 2005 at ES-9.

**e. Capacity Transfer Rights**

141. NSTAR states that the settlement continues a discriminatory allocation of Capacity Transfer Rights (CTR) to municipal entities at the expense of investor-owned utilities. NSTAR states that Pool Planned Units (PPUs) should not be singled out in this manner because they do not support the transmission system at any greater level than other customers. NSTAR states that without this CTR allocation, owners of PPUs will continue to receive their entitlements in the PPUs. NSTAR states that if the Commission allocates CTRs to the municipals, then the investor-owned utilities should be allocated CTRs based on their interest in PPUs at the time they were divested.

142. Reading supports the settlement and states that the right to self-supply by load serving entities is a critical component for vertically integrated utilities such as itself. Reading states that its investment in PPUs and associated transmission upgrades was made prior to the creation of the ISO and were based on the PPUs being fully integrated with load throughout the region. Referencing prior Commission orders that recognize the nature of the pre-existing contracts, Reading states that these life-of-unit contracts are specific entitlements by which they meet their energy and capacity obligations. Reading also states that the Presiding Judge, in the Initial Decision, ruled that the PPU Entitlement holders be allocated CTRs.[123]

143. MMWEC and Reading submit that were the Commission to modify the Settlement as requested by NSTAR, they would oppose the Settlement. They state that the PPU/CTR provisions contained in the Settlement counterbalance other financial burdens placed on consumers.

**Commission Conclusion**

144. The Commission will not alter the contractual arrangements relating to the PPUs. Municipal utilities have invested in these assets under a prior standard providing that their output would be fully available to the utilities. The municipals continue to be the original holders of these life-of-units contracts that are an important part of their ability to meet energy needs and to self supply capacity to meet pool obligations from their own resources. The Presiding Judge found in the Initial Decision that this differentiated the municipal entities that remain vertically integrated from utilities such as NSTAR who have divested themselves of these entitlements; and, therefore, found that subsequent holders of these entitlements no longer have the same obligations as the original owners.[124] We agree with this finding and also find that the proposed Settlement

---

[123] *See* Initial Decision at P 703.

[124] Initial Decision at P 704.

Agreement continues to preserve these arrangements consistent with past Commission policy. In its June 28, 2000 Order addressing the proposals to implement a congestion management and multi-settlement system in New England, the Commission recognized these entitlements and awarded Auction Revenue Rights to the entitlement holders to allow them to import the output into the congested NEMA zone for the life of their contracts, noting the circumstances of these pre-existing contracts.[125] We find that NSTAR has provided no basis that CTRs should be awarded to entities that no longer own these contracts and our June 2000 Order does not contemplate continuation of these rights for contracts that are no longer held.

### f. Market Monitor Review of Exports

145. According to LIPA, under section III.D.4 of the Settlement Agreement, the Market Monitor will automatically review export bids by de-listed capacity. LIPA objects to this automatic review unless there is an indication of an exercise of market power. LIPA states that the "automatic review provision…assumes…an attempt to exercise market power" and that this provision is a discriminatory and unjustified disruption of market transactions.[126] LIPA states that the market rules in this regard should specify criteria that the Market Monitor will apply. LIPA also states that the settlement does not specify the types of actions that the Market Monitor may take regarding export transactions and urges the Commission to modify the settlement to require that conduct and impact criteria be used to trigger action by the Market Monitor and that these criteria be included in the market rules.

146. ISO-NE replies that LIPA has not set forth credible reasons why certain de-listed capacity is entitled to an exemption from independent Market Monitor review. Load Supporters reply that contrary to LIPA's assertion, the Market Monitor only reviews export bids greater than 0.8 CONE and that this provision provides a reasonable threshold for identifying bids that may warrant review while avoiding an undue burden on market participants.

#### Commission Conclusion

147. We will not modify the settlement's provisions regarding Market Monitor review of export bids. An export bid has a similar effect on the capacity market as a bid to de-list, since both bids remove capacity from New England loads. While a bid to export all

---

[125] *See ISO New England, Inc.*, 91 FERC ¶ 61,311 at 62,073 (2000).

[126] Comments of LIPA at 8.

of a suppliers' capacity may not be the exercise of market power (since the seller would not benefit from any increases in prices within New England), a bid to export capacity in tandem with a bid to sell capacity in New England could represent an exercise of market power. Therefore, we agree with ISO-NE that export bids should be reviewed by the Market Monitor in the same manner as de-list bids, to guard against the potential exercise of market power when an export bid is coupled with a bid in the capacity market. LIPA has not provided evidence as to why export transactions should be exempt from review by the Market Monitor and has not provided details as to how the settlement should be modified. Moreover, we will not require the alteration of the settlement in order to accommodate LIPA's concerns over market rules which have yet to be written, vetted through the stakeholder process, or filed with the Commission. The settlement does not represent the detailed market rules which will be filed later. As such, LIPA's concerns regarding the market rules are premature.

### g. Assessment of Tie Line Capability

148. LIPA raises concerns regarding the ability of ISO-NE under the Settlement Agreement to impose limitations on capacity import and export transactions by assessing the capabilities of ties to adjoining control areas. Specifically, LIPA is concerned about tie benefits on its two interconnections with New England (the Cross Sound Cable and the 1385 cable) and argues that the FCM market rules should clarify tie benefits since LIPA's ties connect through a constrained region. LIPA requests that the Commission clarify that nothing in this settlement will set a precedent for the appropriate means by which ISO-NE will determine the tie benefits.

#### Commission Conclusion

149. LIPA has not provided evidence that this issue needs to be addressed here, and has not specified any specific provisions of the Settlement Agreement that give rise to its concerns. To the extent that this issue deals with market rules that have not been submitted to the Commission, it is premature to address this issue at this time.

### h. Price Setting Mechanism

150. As discussed above, the FCM will not utilize a downward sloping demand curve like LICAP would have, instead employing a descending clock auction. PSEG states that, without a downward sloping demand curve, FCM will only procure that quantity of capacity sufficient to meet ISO-NE's projected installed capacity requirement. As a result, PSEG argues that the FCM will produce price volatility as well as volatility of reliability. PSEG asserts that only new units will be able to set prices significantly greater than zero and that such bids will be accepted only when shortage conditions are already present or imminent. PSEG contends that the FCM will produce capacity prices

at or near zero until shortages occur. When shortages occur, argues PSEG, prices will reach the CONE, perhaps for a single year, and then drop to zero again. PSEG appears to contend that, without a downward sloping demand curve as well as a mechanism to procure more than 100 percent of the installed capacity requirement, the FCM will not encourage the development and financing of new capacity resources. PSEG maintains that a demand curve mechanism like the LICAP model or PJM's Reliability Pricing Model (RPM) would provide the long-term price stability lacking in the Settlement Agreement.

**Commission Conclusion**

151. In this order we find that the Settlement Agreement is just and reasonable as a package and, therefore, we are not proposing modifications that would mandate the development of a demand curve in addition to the FCM. As the Commission recently stated in its order on PJM's proposed RPM mechanism, "there is not a single just and reasonable method for satisfying capacity obligations."[127] PSEG does not oppose the Settlement Agreement, and does not explain how the downward sloping demand curve should be integrated into the FCM.

**i. Availability Metric/Compatibility With Adjoining Markets**

152. As described above, the Settlement Agreement includes an availability metric that will reduce capacity payments to account for availability during designated periods of system stress (*i.e.*, Shortage Events). PSEG states that ISO-NE and capacity purchasers have argued that performance incentives assure that capacity resources are providing reliability benefits when the system needs them most. PSEG argues, however, that sufficient incentives already exist for generators to come online or to provide reserves during periods of peak demand. PSEG argues that generators will add a risk premium to capacity offers (to protect against outages) in response to the shortage events approach to measuring availability. PSEG argues that neither ISO-NE nor other proponents have demonstrated that the resulting higher costs to consumers justify enhanced system reliability.

153. PSEG and LIPA argue that the shortage events proposal redefines the nature of the capacity product. Both NYISO and PJM currently measure generator availability based on EFORd. PSEG and LIPA assert that adoption of the shortage events proposal would implement a capacity product that differs greatly from neighboring markets, and would

---

[127] *PJM Interconnection, L.L.C.*, 115 FERC ¶ 61,079 at P 103 (2006).

create an undesirable seam between New York and New England. LIPA notes that during the transition, the value of capacity will be adjusted by the weighted EFORd availability metric which is not done in NYISO and PJM. LIPA asserts that the Initial Decision found that availability of generation in New England should continue to be applied and measured using the EFORd approach, based on Commission precedent and conformity with the NYISO and PJM. LIPA argues that the Commission should require ISO-NE to demonstrate that the use of this new standard of availability will be consistent with the EFORd measure. LIPA adds that modifications to the current capacity product should be left for broader regional discussions. PSEG asserts that PJM's RPM approach to resource adequacy provides a superior alternative to the FCM design, and the Settlement Agreement should not serve as a model for markets outside of New England. LIPA urges the Commission to ensure that the market rules, when filed, are compatible with neighboring capacity markets and also urges the Commission to require that ISO-NE file an implementation report that details how external transactions will be integrated with FCM.

154. NYISO, in reply, requests that the Commission not take action that would require significant changes to the New York ICAP market but give full consideration to any unintended consequences of FCM on trade between the markets, and require an explanation and analysis of compatibility as the settlement is more fully developed.

155. In its answer, ISO-NE asserts that the interim EFORd proposal (for use during the transition period) and the FCM shortage events proposal are designed to ensure tradability across regions. ISO-NE states that during the interim period and thereafter, it will continue to calculate EFORd for all generating units in New England and thus trade between New York and New England will not be impeded. ISO-NE states that although capacity would be bought and sold in a way that is slightly different from the method used in New York, ISO-NE proposes to translate between these two different capacity products.

156. Load Supporters submit that the shortage event proposal provides more effective incentives for generators to supply resources to be responsive during stress periods than EFORd. Load Supporters also support the availability provisions that would expel underperforming units from the capacity markets, stating that the units will be replaced by better-performing resources. Load Supporters argue that the Settlement Agreement's availability metric does not create an insurmountable trade "seam." Load Supporters contend that the shortage event proposal satisfies the reliability and resource adequacy needs for New England load and that the EFORd metric that LIPA advocates does not. Capacity Suppliers indicate that it accepts the "shortage events" methodology as part of the settlement package.

**Commission Conclusion**

157. ISO-NE's LICAP proposal contained an approach to measuring a generator's availability that differs from the conventional EFORd method. EFORd calculates "average availability over all hours of the year."[128] A generator's EFORd score is reduced only for forced outages.[129] In the LICAP proceeding, ISO-NE's proposed method for measuring a generator's availability was based on "shortage hours," which were hours in which ISO-NE was short of operating reserves, rather than EFORd. There, ISO-NE argued, EFORd would treat a generator outage during a cool spring afternoon the same as an outage during the hottest day of the summer, and would send a price signal that power is worth the same whether the level of demand is very high or very low.

158. Many of the parties representing load supported ISO-NE's shortage hours proposal. This element of the LICAP proposal was contested vigorously in the LICAP hearing and subsequent briefs. The Initial Decision stated that while ISO-NE had successfully shown that EFORd was "not perfect and that the Shortage Hours approach may provide a better overall availability metric," ISO-NE had not successfully shown that the EFORd approach is so imperfect as to be unjust and unreasonable.[130] In the Initial Decision, the Presiding Judge concurred with the Capacity Suppliers and other suppliers that it was not an opportune time to replace EFORd with a new metric. However, the Presiding Judge stated that the revised availability metric held promise and emphasized that "availability should continue to be defined using the EFORd metric *at this time*."[131] The Commission also provided an opportunity for ISO-NE to further develop its shortage hours approach, directing ISO-NE to file that proposal in a compliance filing.[132]

159. The Commission will accept the shortage events method proposed in the Settlement Agreement. We find that it is a more appropriate measure of availability, and provides an appropriate incentive for generators to provide reliable service during the periods of system stress, which preserves reliable service. The evidence offered in the hearing and in post-hearing briefs suggests that the current EFORd measurement (as contrasted to the modified measurement proposed for the transition period) may not

---

[128] Brief on Exceptions of ISO-NE at 9.

[129] *Id.*

[130] Initial Decision at P 546.

[131] *Id.* at P 548 (emphasis in the original).

[132] *Devon Power LLC,* 113 FERC ¶ 61,075 (2005).

appropriately measure the availability of capacity resources during times when they are most needed, and therefore deserving of full compensation for the service they provide. The Commission believes that it is reasonable for market participants to elect to measure availability in a manner that emphasizes hours of high demand. Moreover, the Commission believes that achieving resolution in the settlement discussions would have been very difficult without a revised measurement tool for availability; modifying the shortage event mechanism at the request of PSEG and LIPA, neither of which formally oppose the Settlement Agreement, would be unreasonable.

160. With regard to transactions with neighboring markets, ISO-NE states that it will continue to calculate EFORd for all generating units in New England during the transition period and thereafter. We find that this will adequately address LIPA's and PSEG's concerns and will continue to allow exports and imports of capacity between ISO-NE and neighboring markets.

### j. <u>Relationship to RMR Agreements</u>

161. Objecting Parties argue that the Settlement Agreement is defective in that 1) it does not immediately terminate existing RMR agreements and 2) does not prohibit the filing of new RMR agreements for several years. Objecting Parties argue that the Settlement Agreement should provide for a re-determination of RMR eligibility in light of the transition payments. Objecting Parties assert that the transition payments are so large that many, if not all, entities now charging RMR rates would be ineligible for those rates.

162. Objecting Parties submit that the locational forward reserves market, which is to be implemented in fall 2006, is devoted to compensating seldom-run resources that are needed for contingency support, particularly in congested areas.[133] Objecting Parties believe that the locational forward reserves markets and other market revisions should render an installed capacity market superfluous. Thus, Objecting Parties argue, all RMR contracts that have been granted since the April 25 Order should terminate on the first day of the locational forward reserves market. Objecting Parties argue that the Commission should modify the transitional provisions of the Settlement Agreement to provide for the termination of all Commission-approved RMR contracts. Objecting Parties argue that, after termination of the RMR agreements, holders would be permitted

[133] The locational forward reserves market (LFRM), was proposed to the Commission in a filing on February 6, 2006 (Docket No. ER06-613-000) and approved in a Commission order issued May 12, 2006. *ISO New England, Inc.*, 115 FERC 61,175 (2006).

to reapply for new agreements only upon a showing that, even with interim payments, their receipts would be less than going-forward costs and make clear that any future RMRs would be limited to going-forward costs.

163. PSEG argues that the FCM design will not reduce the need for RMR contracts and may encourage the use of RMR contracts. PSEG argues that existing generation that is unable to set clearing prices may have to retire; where that generation is required for reliability, the only alternative would be to seek an RMR contract. PSEG also argues that the shortage event proposal will impose greater risks on older units that may be needed to maintain reliability. PSEG contends that, as such, the proposed FCM design encourages the retirement of these older units, and RMR agreements will be necessary to retain them. PSEG believes that PJM's RPM proposal provides a superior alternative and should serve as the model for future capacity markets.

164. Milford Power argues that Objecting Parties' arguments regarding RMRs contain several impermissible collateral attacks on prior Commission orders. Milford Power and ISO-NE argue that, with regard to termination, the Commission has ruled in several proceedings that RMR agreements should terminate only upon the implementation of a locational capacity mechanism. ISO-NE argues that a party may file a section 206 complaint to terminate any RMR agreement based on changed circumstances (*e.g.* demonstration that there is no longer a financial need). ISO-NE also notes that the Settlement Agreement states that nothing therein "prejudices the rights of any party to challenge, seek to terminate or support an RMR agreement on any other ground or restrict any party's rights to seek, agree to, or oppose any RMR modifications."[134] Concerning limiting RMRs to going forward costs, Milford Power argues that the Commission has repeatedly ruled that an eligible RMR unit is entitled to recover its full cost of service.

165. ISO-NE submits that locational forward reserves market revenues only go to approximately 2,000 to 3,000 megawatts of generation out of a total of 32,000 megawatts of generation. ISO-NE states that while the locational forward reserves markets is an important market enhancement, it is only a partial remedy for revenues that need to be restored through a capacity market. Berkshire Power states that the Settlement Agreement recognizes that the fixed transition payments will not be adequate to compensate ICAP resources operating under an RMR agreement. CMEEC and MMWEC disagree and argue that the Commission should reject any such interpretation. CMEEC and MMWEC argue that the Settlement Agreement does not recognize anything with respect to the adequacy of transition payment revenues to compensate any or all

[134] Settlement Agreement at VIII.F.

RMR resources, or that the termination of existing RMR agreements cannot be sought for any legitimate reason.

**Commission Conclusion**

166. The Commission will not require the termination of existing RMR agreements prior to the full implementation of the FCM and will not require RMR holders to reapply for new RMR agreements. The Commission has consistently accepted RMR agreements for a term that expires upon implementation of a locational capacity mechanism.[135] FCM will not result in the purchase of capacity until the beginning of the first commitment period in June 2010. Therefore, the June 2010 termination date of RMR agreements is consistent with the express terms of the RMR agreements and the Commission's intent that those contracts terminate when a capacity market mechanism is fully implemented.[136] The Commission notes that the transition payments will be netted against RMR revenues, which will protect against over-recovery. Furthermore, the Settlement Agreement explicitly states that participants do not waive their rights to challenge the need for RMR contracts, given changes in a generator's compensation or changes to system infrastructure.[137]

167. Objecting Parties' arguments regarding the forward reserves market are misplaced in this proceeding, and accordingly, we reject them. This proceeding focuses solely on the capacity market, and the Commission has already ruled on issues related to

---

[135] *See, e.g., Devon Power LLC*, 106 FERC ¶ 61,264 (2004) (*Devon Power*); *Mirant Kendall, LLC and Mirant Americas Energy Marketing, L.P.*, 109 FERC ¶ 61,227 (2004), *order on reh'g*, 110 FERC ¶ 61,272 (2005) ; *PSEG Power Connecticut, LLC*, 110 FERC ¶ 61,020, *order on reh'g*, 111 FERC ¶ 61,441, *order on reh'g*, 111 FERC ¶ 63,023 (2005); *Milford Power Company*, 110 FERC ¶ 61,299, *order on reh'g*, 112 FERC ¶ 61,154 (2005); *Bridgeport Energy, LLC*, 112 FERC ¶ 61,077, *order on reh'g*, 113 FERC ¶ 61,311 (2005), *reh'g rejected*, 114 FERC ¶ 61,265 (2006); *Berkshire Power Company, LLC*, 112 FERC ¶ 61,253 (2005), *reh'g denied*, 114 FERC ¶ 61,099 (2006), *reh'g rejected*, 115 FERC ¶ 61,253 (2006); *Consolidated Edison Energy Massachusetts, Inc.*, 112 FERC ¶ 61,263 (2005); *reh'g pending*; *Pittsfield Generating Company, L.P.*, 115 FERC ¶ 61,059 (2006), *reh'g pending.*

[136] *See Id.*

[137] *See* Settlement Agreement at section XIII.F.

the implementation of the forward reserves market.[138] As the Commission noted in its order approving the implementation of that market, "markets for capacity and operating reserves are separate, distinct and non-duplicative."[139]

168. The Commission disagrees with the comments made by PSEG regarding the potential for the FCM to induce additional RMR agreements. While existing units may not be able to set the clearing price in all auctions, they will receive revenues from the capacity market that, combined with other revenues, will provide them more of an opportunity to recover their costs than the current "all or nothing" capacity market. Moreover, PSEG voted not to oppose the Settlement Agreement and "[does] not request any specific modifications thereto."[140] PSEG's statement that PJM's RPM proposal provides a superior alternative suggests that it is using this proceeding to indicate its support for PJM's RPM proposal. This is not the appropriate forum.

169. With regard to Berkshire Power's comments, the Commission agrees with CMEEC and MMWEC: there is nothing in the Settlement Agreement that explicitly states that fixed transition payments will not be adequate to compensate ICAP resources operating under RMR agreements. Again, if this change in circumstances warrants termination of an RMR agreement, parties retain their rights to challenge the continued need for the contract.

### k. <u>Implementation of Scarcity Pricing</u>

170. PPL believes that the FCM (and the transition period) alone will not be effective in solving New England's long-term reliability problems. PPL recommends that ISO-NE be required to install enhanced scarcity pricing in the energy market in addition to the FCM proposal. PPL argues that scarcity pricing would permit prices to reflect the value of energy based on supply and demand conditions, increase the amount of price responsive demand, and provide incentives for long-term contracts and generation construction (in both peaking and baseload facilities). PPL believes that the FCM model is compatible with enhanced scarcity pricing in the energy market. Maine Parties

---

[138] *New England Power Pool and ISO New England, Inc.*, 115 FERC ¶ 61,175 (2006).

[139] *Id.* at P 78.

[140] Comments of PSEG at 1.

contend that PPL's request is beyond the scope of the proceeding and that the proper approach for seeking market changes is through the stakeholder process and/or a filing pursuant to section 206 of the FPA.

**Commission Conclusion**

171. The Commission agrees with Maine Parties that these arguments are beyond the scope of this proceeding. We encourage PPL to pursue its interests within the stakeholder process.

### 3. Other Issues

#### a. "Public Interest" Standard of Review for Prices and Modifications

172. Section 4.C of the Settlement Agreement states:

> From the Effective Date, absent the agreement of all Settling Parties to the proposed change, the standard of review for: (i) challenges to the Capacity Clearing Prices derived through the FCA and prices resulting from reconfiguration auctions provided for in the Settlement Agreement and in the Market Rules addressing the terms of the Settlement Agreement that are approved or accepted by the FERC pursuant to section 3, and (ii) proposed changes to section 11, Part VIII below (Agreements Regarding Transition Period) and the Market Rules implementing that part, shall be the "public interest" standard of review set forth in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332 (1956) and Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348 (1956) (the "Mobile-Sierra" doctrine), whether the change is proposed by a Settling Party, a non-Settling Party, or the FERC acting *sua sponte*. This Settlement Agreement does not impose the Mobile-Sierra standard on any provision of this Settlement Agreement or the Market Rules that address the terms of the Settlement Agreement except as expressly provided in this section 4.C.

173. IECG opposes this provision, arguing that it represents an attempt by the settling parties "to write a broad exception to the statutory provisions of the FPA, not only for themselves . . . but also as a broad disenfranchisement of non-Parties from the protections against unjust and unreasonable rates provided in the FPA."[141] Additionally, it argues that this provision improperly amends the NEPOOL Participants Agreement by

[141] Comments of IECG at 16.

restricting the authority of ISO-NE to protect customers except in the case of exigent circumstances (pursuant to section 11.2 of the Participants Agreement). Accordingly, IECG argues, acceptance of this provision by the Commission would lead to imprudent and unlawful results.

174. More specifically, IECG asserts that as a policy matter, the Commission is not bound to follow any particular methodology when setting rates as long as the resulting rate is just and reasonable. Section 4.C of the Settlement Agreement would alter this regulatory paradigm, IECG contends, by adopting a particular rate methodology in advance of the actual results of the as-yet untested market mechanism. It further argues that the New England RTO Governance Process and the Commission's continued authority to assure the justness and reasonableness of rates address any fears of uncertainty that this settlement provision may be intended to resolve. Furthermore, IECG suggests that tying the hands of ISO-NE, NEPOOL and the Commission to respond to unexpected developments of a matter of such importance may encourage market participants to search for and seek to benefit from design flaws.

175. Additionally, IECG states that section 4.C of the Settlement Agreement would unlawfully amend the Participants Agreement and Regional Transmission Organization (RTO) governance procedures that specifically allow participants to make proposals for changes to the market rules (and have those proposals considered in the NEPOOL Committee process and, with support, by the Commission), and entitle participants to the faithful and independent execution by ISO-NE of its duties.[142] According to IECG, these procedures explicitly do not permit market rules or procedures to be adopted outside of the NEPOOL advisory framework. IECG argues that ISO-NE and NEPOOL may not abrogate the procedural rights of market participants under the governing framework to make proposals for changes to the market rules through the insulation of particular market rules under a settlement. Further, IECG notes that section 17 of the Participants Agreement sets forth a process for amending the rights of parties under that agreement that was not observed. IECG maintains that accepting a waiver of this process through the joining of a settlement by ISO-NE or NEPOOL would invite a dismantling of the carefully balanced governance structure in New England.

176. Last, IECG asserts that section 4.C attempts to revoke the section 206 protections given to non-parties, and notes that the Commission has rejected such attempts in the

[142] *See Id.* at 18-19, *citing* section 11 of the NEPOOL Participants Agreement.

past.[143] Even if the Settlement Agreement could be characterized as a contract, IECG argues, the parties have no legal ability to revoke the statutory protections of section 206. According to IECG, in analogous circumstances the Commission has rejected an attempt by the signatories to an agreement to limit the ability of non-parties to file challenges under section 206.[144]

177. In reply, several parties note that this provision only applies the *Mobile-Sierra* public interest standard to limited provisions of the Settlement Agreement, namely (i) challenges to the clearing prices in the FCA and any reconfiguration auctions provided for in the market rules adopted pursuant to the Settlement Agreement, and (ii) proposed changes to the provisions of the settlement regarding the transition period and the market rules implementing those provisions. Capacity Suppliers argue that it is not unusual for parties to a settlement to use *Mobile-Sierra* to provide greater price certainty, which will in turn provide lower prices for consumers. ISO-NE agrees, arguing that use of the *Mobile-Sierra* provision in this instance will reduce regulatory uncertainty and the risk premium that may be required by new entrants. According to Capacity Suppliers, the market would suffer if the final auction clearing process were in jeopardy each time a consumer thought prices were too high or a seller thought prices were too low. Similarly, NEPOOL states that this provision was intentionally limited and crafted with the narrow purpose of providing certainty during the transition period and price certainty and finality to the auction prices.[145]

---

[143] Comments of IECG at 21-22, *citing Carolina Power & Light Company and North Carolina Electric Membership Corporation*, 67 FERC ¶ 61,074 (1994) and *Northeast Utilities Service Corporation*, 66 FERC ¶ 61,332 (1994).

[144] Comments of IECG at 22, *citing PJM Interconnection LLC*, 96 FERC ¶ 61,206 (2001).

[145] NEPOOL states that this provision is far more limited than that standard that would be applied under the Commission's Notice of Proposed Rulemaking in Docket No. RM05-35-000. *See Standard of Review for Modifications to Jurisdictional Agreements*, 71 Fed. Reg. 303, FERC Stats. & Regs. ¶ 32,596 (2006). According to NEPOOL, if adopted, under those regulations *Mobile-Sierra* protections would serve as a default for review by the Commission of jurisdictional agreements (including settlement agreements) that are not signed by all signatories and are otherwise silent regarding the standard of review.

178. Further, Capacity Suppliers note that the *Mobile-Sierra* provision will not remove the risk of legal challenges, and the Commission cannot cede its authority under the FPA to ensure just and reasonable rates. Nevertheless, Capacity Suppliers contend, the Supreme Court allows parties to agree (via a *Mobile-Sierra* clause) that a stronger showing must be made before contract rates can be changed. Additionally, it argues that "[t]here is . . . 'no Commission or court precedent that supports a finding that a non-signatory [such as IECG] may unilaterally seek changes to a *Mobile-Sierra* 'public-interest' contract under the 'just and reasonable' standard of review.'"[146] Similarly, NEPOOL states that contrary to IECG's arguments, the Commission has consistently approved the use of the *Mobile-Sierra* standard for rates and terms established under a settlement agreement, and has consistently held that *Mobile-Sierra* protection does not "unjustly deprive a non-settling party from statutory rights to seek revisions to the terms or conditions of a filed settlement agreement."[147] American National Power also argues that section 4.C is fully consistent with recent Commission policy, noting that the Commission has on several occasions approved similar *Mobile-Sierra* provisions applying the public interest standard of review for both signatories and non-parties.[148] As a result, American National Power states that there is no justification for deleting the provision from the settlement, particularly where doing so would threaten to undo the efforts of the parties to achieve a broadly-supported settlement.

179. Capacity Suppliers and ISO-NE also explain that the Settlement Agreement contains several provisions permitting challenges to the auction prices before they become final. First, they note that section 3.B of the settlement permits parties to challenge the market rules that are filed with the Commission to the extent that they are inconsistent with the settlement. Second, under Part IX of the Settlement Agreement, ISO-NE must make an informational filing with the Commission 90 days before an FCA runs, specifying any separate zones that will be employed, the bids that qualify for participation in the market, and the Market Monitor's conclusions regarding the acceptability of bids in the auction. Interested parties have 15 days to file comments on this filing, and the Commission may order changes to the planned auction within 75 days. Finally, Capacity Suppliers and ISO-NE state that section 11 of Part II.G.3.b requires ISO-NE to file the results from the primary auctions under section 205 of the FPA, and parties will have 45 days to file objections to those auction results. Thus, they contend, the Settlement Agreement provides parties with "extraordinary protection" to voice their

---

[146] Reply Comments of Capacity Suppliers at 32, *citing Midwest Independent Transmission System Operator, Inc.*, 110 FERC ¶ 61,380 at P 24 (2005).

[147] Reply Comments of NEPOOL at 17-18 (citations omitted).

[148] Reply Comments of American National Power at 15-16 (citations omitted).

concerns regarding the justness and reasonableness of the auction prices while appropriately balancing a need for price certainty by giving the auction prices *Mobile-Sierra* protection once final.[149]

180. Capacity Suppliers also assert that IECG does not raise any specific argument as to why the transition provisions should not be afforded *Mobile-Sierra* protection. It argues that IECG and others are already challenging these provisions under the just and reasonable standard through their settlement comments, and thus should not be afforded another opportunity to challenge those provisions at a later date.

181. NEPOOL asserts that IECG has misconstrued the impact on the stakeholder process of the limited *Mobile-Sierra* protections in the Settlement Agreement. Rather than "paralyzing" the stakeholder process as IECG contends, NEPOOL argues that the settlement specifically calls for the development of market rules within the stakeholder process in the NEPOOL Participants Agreement and through consultation with state agencies. Under this framework, ISO-NE retains its independent judgment and participants may support alternative market rules if support exists among the stakeholders. IECG and all other market participants, NEPOOL contends, are not limited by the *Mobile-Sierra* provision in their ability to vote in support of or in opposition to the market rules that are developed under the Settlement Agreement. Finally, NEPOOL argues that nothing in the NEPOOL Participants Agreement prohibits ISO-NE or NEPOOL from agreeing to a *Mobile-Sierra* provision in a settlement agreement, and that such a limitation on NEPOOL's ability to settle contested matters would be ill advised.

**<u>Commission Conclusion</u>**

182. IECG appears to interpret section 4.C more broadly than it is intended to apply. Our reading of the provision indicates that, as several reply commenters note, the "public interest" standard will only apply to (1) the final clearing prices in the FCA and any reconfiguration auctions permitted under the market rules, and (2) the transition mechanism. The *Mobile-Sierra* provision does not apply to the market rules that will be developed and filed with the Commission under the Settlement Agreement or to any other aspect of the settlement not specifically mentioned in section 4.C. Therefore, IECG's concerns that the *Mobile-Sierra* clause will broadly eliminate the ability of parties to exercise their rights under the FPA are misplaced.

183. The Commission will not require the Settling Parties to revise the limited *Mobile-Sierra* provision included in the Settlement Agreement. As NEPOOL, Capacity

---

[149] Reply Comments of Capacity Suppliers at 33; Reply Comments of ISO-NE at 53.

Suppliers and American National Power correctly state, the Commission has routinely permitted the use of similar provisions in settlement agreements, including contested settlements.[150] Moreover, as the Commission has stated on several recent occasions, "there is no Commission or court precedent that supports a finding that a non-signatory may unilaterally seek changes to a *Mobile-Sierra* 'public interest' contract under the 'just and reasonable' standard of review."[151] Therefore, as an initial matter, we conclude that the *Mobile-Sierra* provision is fully consistent with current Commission policy.

184. Furthermore, we find this *Mobile-Sierra* provision reasonable because it does not operate to the detriment of the parties who have not signed on to the Settlement Agreement. Those parties are still protected in several ways. First, as the court explained in *Northeast Utilities I*, "the most attractive case for affording additional protection . . . is where the protection is intended to safeguard the interests of third parties."[152] The court noted there that "[t]he Mobile-Sierra doctrine itself allows for intervention by FERC where it is shown that the interests of third parties are threatened," noting that the standard articulated by the Supreme Court in such cases "is the protection of outside parties from 'undue discrimination' or imposition of an 'excessive burden.'"[153]

---

[150] *See, e.g., Midwest Independent System Operator, Inc.*, 115 FERC ¶ 61,174 (2006); *Midwest Independent System Operator, Inc.*, 110 FERC ¶ 61,177 (2005); *Midwest Independent System Operator, Inc.*, 110 FERC ¶ 61,380 (2005); *Pennsylvania-New Jersey-Maryland Interconnection*, 105 FERC 61,294 (2003), *reh'g denied,* 108 FERC ¶ 61,032 (2004); *Vermont Electric Cooperative, Inc.*, 114 F.E.R.C. ¶ 61,220 (2006); *Calpine Construction Finance Company, L.P.*, 114 F.E.R.C. ¶ 61,217 (2006); *Hermiston Power Partnership*, 114 F.E.R.C. ¶ 61,204 (2006); *Central Maine Power Company*, 114 F.E.R.C. ¶ 61,184 (2006); *San Diego Gas & Electric Company*, 114 F.E.R.C. ¶ 61,158 (2006); *Wisconsin Power & Light Co.,* 106 FERC ¶ 61,112 (2004).

[151] *Pennsylvania-New Jersey-Maryland Interconnection*, 108 FERC ¶ 61,032 at P 7, *citing Public Utilities Commission of the State of California,* 105 FERC ¶ 61,182 at P 50 (2003).

[152] *Id.*

[153] *Id., citing United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 344-45 (1956) (*Mobile*) and *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 355 (1956) (*Sierra*). *See also Papago Tribal Utility Authority v. FERC*, 723 F.2d 950, 953 n.4 (D.C. Cir. 1983) (*Papago*) (recognizing that the Commission's ability under the *Mobile-Sierra* doctrine to address undue discrimination under section 206 of the FPA includes the ability to address rates, terms and conditions of utility service that are "unduly discriminatory or preferential to the detriment of purchasers who are not parties to the contract.").

Additionally, in *Northeast Utilities II*, the court rejected the notion, expressed in *Papago*, that the public interest standard is "practically insurmountable."[154] Therefore, even under the "public interest" standard of review, the Commission retains significant authority to protect non-parties to the settlement from harm.

185. As several entities point out in the reply comments summarized above, the Settlement Agreement itself provides for thorough review of the final auction clearing prices. In particular, the Settlement Agreement provides that ISO-NE will make both an informational filing prior to the auction that includes information regarding the zones to be used and qualifying bids, and a section 205 filing following the auction containing the results. The limited *Mobile-Sierra* provision in section 4.C does not apply to these filings, and thus the Commission will review them under the just and reasonable standard. All parties will have the ability to comment on such filings, as set forth in the Settlement Agreement.

186. In conclusion, we believe that this limited *Mobile-Sierra* provision appropriately balances the need for rate stability and the interests of the diverse entities who will be subject to the FCM. Stability is particularly important in this case, which was initiated in part because of the unstable nature of ICAP revenues and the effect that has on generating units, particularly those who are critical to maintaining reliability. "The court has repeatedly emphasized the importance of contractual stability in a number of cases involving the *Mobile-Sierra* doctrine."[155] The Court's statement in *Mobile* that "all agree . . . [that] the stability of supply arrangements . . . is essential to the health of the natural gas industry" is no less true with regard to the health of New England's electricity infrastructure.[156] At the same time, we must ensure that rates for capacity meet our legal requirements. This limited *Mobile-Sierra* provision achieves that balance.

**b. <u>Due Process</u>**

187. Objecting Parties argue that opponents of LICAP have not been afforded due process. First, they note that ISO-NE, when it originally filed LICAP, committed to conduct a "regional dialogue," which began only with the recent settlement discussions.

---

[154] *Northeast Utilities Service Co. v. FERC*, 55 F.3d 686, 691 (D.C. Cir. 1995) (*Northeast Utilities II*), *citing Papago*, 723 F.2d at 954. The court "noted that neither Mobile nor Sierra stated or intimated that the 'public interest' doctrine was 'practically insurmountable.'" *Northeast Utilities II*, 55 F.3d at 691.

[155] *Potomac Electric Power Co. v. FERC*, 210 F.3d 403, 409 (D.C. Cir. 2000) (citations omitted).

[156] *Mobile*, 350 U.S. at 344.

According to Objecting Parties, the settlement discussions only offered generators an attractive alternative (*i.e.*, the LICAP mechanism) to a negotiated settlement. Objecting Parties assert that the Presiding Judge during the hearing procedures should have been given the opportunity to consider alternatives to the LICAP mechanism. Following the oral argument, Objecting Parties continue, the Commission could have structured a fair and balanced settlement process. Instead, they contend that "the Commission offered a Hobson's Choice," structuring a settlement process that gave generators all the leverage when it stated in the October 21 Order that "if the parties cannot agree upon a workable alternative, the Commission will be prepared to move promptly to consider the existing record and the Initial Decision."[157] This process, they argue, "forced load to buy its way out of the LICAP mechanism."[158] To rectify this problem, Objecting Parties assert that the Commission should provide a fresh start, and give parties the opportunity to decide whether the FCM is appropriate, free of the threat that the Commission will implement LICAP.

188. In reply comments, Capacity Suppliers state that the Commission should reject these claims. First, Capacity Suppliers argue that the Commission did not issue a "settle or LICAP" ultimatum as Objecting Parties claim, but simply noted that it was prepared to act on the record and Initial Decision before it. Second, Capacity Suppliers assert that the level of support for the settlement among load parties,[159] and the fact that the settlement contains much of what load parties argued for at the oral argument, confirms load's equal or superior leverage.[160] Finally, Capacity Suppliers argue that Objecting Parties' claims that the Commission violated their due process rights by not considering alternatives are without merit. They note that the Commission rejected alternatives originally offered in

---

[157] Comments of Objecting Parties at 18, *citing* October 21 Order at P 10.

[158] Comments of Objecting Parties at 18.

[159] NEPOOL, in its reply comments, also states that the support of Load Supporters for the settlement contradict Objecting Parties' claim of a lack of bargaining power.

[160] Reply Comments of Capacity Suppliers at 6 (noting that the settlement includes a forward capacity market with no demand curve and an availability metric, which load parties argued for at the oral argument).

response to the initial LICAP proposal, and subsequently "bent over backwards" to give load parties the opportunity to present their arguments by permitting oral argument and establishing additional settlement procedures at the request of load representatives.[161]

189. Similarly, ISO-NE states that NSTAR (one of the Objecting Parties) and others, in an October 7, 2005 letter to Chairman Kelliher, supported the institution of the settlement procedures they now protest as unbalanced, and did not indicate at the oral argument that a settlement procedure would be biased or unworkable. Further, it notes that the Connecticut and Massachusetts Attorneys General (also members of the Objecting Parties) supported the procedural proposal filed by CMEEC and MMWEC prior to the oral argument, which included a settlement process mediated by a Commission Administrative Law Judge of the parties' choosing that would conclude on February 1, 2006. Moreover, ISO-NE notes that load representatives achieved almost unanimous political consensus that LICAP should not be adopted, and their efforts resulted in a provision in the Energy Policy Act of 2005 urging the Commission to carefully consider the states' objections. These actions do not evidence a lack of bargaining power or leverage, ISO-NE argues. Additionally, ISO-NE contends that the fact that almost all of the elements of the market design advocated by NSTAR and the Energy Consortium prior to and at the oral argument were adopted in the Settlement Agreement, and that the Objecting Parties do not quarrel with the overall design of the FCM, shows that their arguments are "a strategy of delay."[162] Finally, ISO-NE asserts that claims that LICAP opponents were not given an opportunity to present alternatives are now moot, since an alternative was adopted through the settlement procedures.

**Commission Conclusion**

190. "[C]onstitutional due process requires that a party affected by a governmental action be given 'the opportunity to be heard at a meaningful time and in a meaningful manner.'"[163] We agree with Capacity Suppliers and ISO-NE that this standard was more than satisfied in this proceeding. Through the course of this proceeding, parties have

---

[161] *Id.* at 6-7. Capacity Suppliers note that no load parties opposed the proposal to establish settlement procedures or sought rehearing of the procedures set forth in the October 21 Order.

[162] Reply Comments of ISO-NE at 24. *See also* Reply Comments of NEPOOL at 11.

[163] *See City of Anaheim, California, City of Riverside, California*, Opinion No. 483, 113 FERC ¶ 61,091 at P 153 (2005) (*citing Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)), *reh'g denied*, 114 FERC ¶ 61,311 (2006).

been given numerous opportunities to present evidence and lodge their objections to the various proposals for dealing with the deficiencies identified in the ICAP market. As recounted in the background and procedural history of this order, the Commission: (1) addressed requests for rehearing of the April 25 Order initially establishing these section 206 proceedings; (2) provided notice and opportunity for comment on ISO-NE's proposed LICAP mechanism, and addressed those comments in the June 2 Order setting portions of that proposal for hearing;[164] (3) established hearing procedures regarding specific critical aspects of the LICAP mechanism, giving all interested parties the opportunity to fully litigate those matters; (4) took the rare step of providing the parties with opportunity for oral argument before the Commission to present their arguments regarding the LICAP mechanism and to advance potential alternatives to the LICAP mechanism; (5) established settlement procedures to allow the parties an opportunity to develop an alternative to the LICAP mechanism; and (6) is now addressing comments regarding the Settlement Agreement. It is unclear to us what more process could have been provided consistent with constitutional principles, and Objecting Parties have not stated what additional procedures should have been provided, instead simply seeking to have the Commission abandon the Settlement Agreement and provide a "fresh start."

191. Moreover, Objecting Parties' misread the October 21 Order as establishing a "settle or LICAP" ultimatum. That order merely recognized that in light of the need for the Commission to address the status quo (which the parties to this case agree is failing), its only option outside of a settlement agreement providing an alternative to LICAP was to consider the extensive existing record in the case. The Commission did not suggest what action it would take regarding the Initial Decision. It simply acknowledged that review of the record and the Initial Decision was the next procedural step available if settlement talks failed. Finally, the Commission did not "structure" the settlement procedures at all, but simply provided the parties with additional time and the assistance of a Commission-appointed settlement judge (who was requested by the parties) to help the parties reach agreement on an alternative. This procedure did not give any party leverage in the settlement discussions.

---

[164] As we noted in the March 23 Order I (in response to rehearing requests that the Commission might otherwise have rejected as untimely), the Commission considered alternatives to LICAP in the June 2 Order to the extent they were presented. March 23 Order I at P 18.

### c. Commission Jurisdiction over the Proposed Settlement Agreement

192. Objecting Parties argue that the Commission lacks jurisdiction to approve the Settlement Agreement. First, they note that section 202(a) of the FPA[165] encourages voluntary formation of power pools and grants the Commission jurisdiction over such pools, including the reserve sharing mechanisms proposed by pool members. Nevertheless, Objecting Parties contend, section 202(a) does not trump the limits on the Commission's jurisdiction in section 201 of the FPA, which leaves to the states "plenary authority over generation, including the determination of how much generation individual utilities must own or control to reliably serve retail customers."[166]

193. According to Objecting Parties, installed capacity has nothing to do with wholesale transmission of electric energy and is only tangentially related to wholesale sales of electricity. Objecting Parties note that the Commission has previously acknowledged, in both Order No. 888[167] and its orders in this proceeding, that matters related to the assessment of reliability and "resource adequacy" (or the amount of capacity necessary to serve loads) are within the interest and authority of the states.[168] Objecting Parties state that the Commission has previously respected this jurisdictional divide, under which power pool members are responsible for proposing and determining the justness and reasonableness of methods to share reserves.

194. Here, however, Objecting Parties state that the Commission has overreached the boundaries of its jurisdiction by directing ISO-NE to develop a new reserve sharing mechanism and has violated the limits of its jurisdiction in three respects. First, they contend that the Commission did not find the existing capacity market unjust and

---

[165] 16 U.S.C. § 824a(a) (2000).

[166] Comments in Opposition to Settlement of Objecting Parties at 26, *citing* 16 U.S.C. § 824a (2000).

[167] *Promoting Wholesale Competition Through Open Access Non-discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, 61 FR 21540 (May 10, 1996), FERC Stats. & Regs. ¶ 31,036 at 31,682 (1996), *order on reh'g*, Order No. 888-A, 62 FR 12274 (March 14, 1997), FERC Stats & Regs. ¶ 31,048 (1997), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[168] Comments in Opposition to Settlement of Objecting Parties at 26-27.

unreasonable, finding only that RMR agreements were distorting the wholesale market. According to Objecting Parties, the underlying cause of the increase in RMR agreements was a lack of local operating reserves in critical areas, which has been addressed by the locational forward reserves market. Moreover, Objecting Parties contend that the record does not show that all generators in NEPOOL need additional revenue through a revised capacity market or that all generators are earning insufficient revenues. Rather, they contend that the record shows that certain types of generators (coal and nuclear) are earning sufficient returns, making additional payments a windfall. Furthermore, they contend that the record shows that New England has a surplus of capacity, making it irrational to build new capacity (except in locally critical areas, which it argues the locational forward reserve market will address).

195. Second, Objecting Parties state that while RMR agreements are within the Commission's wholesale market jurisdiction, the Commission may not mandate minimum requirements for capacity and then dictate the prices for that capacity as a remedy for the proliferation of RMR agreements. Objecting Parties argue that the Commission oversteps it jurisdiction with regard to voluntary power pools by "mandating a scheme that is directed to determining how much generation needs to be available to meet local load requirements, and sets forth the basis upon which owners of generation are to be compensated."[169] Moreover, Objecting Parties state that the Commission's lack of authority over the method by which a utility satisfies its reserve requirements requires that participation in any new capacity market construct must be voluntary.[170] Despite the provision in the Settlement Agreement permitting participants to self-supply capacity, they charge that the FCM "essentially requires [load serving entities] to meet their generation capacity reserve obligations through the FCM mechanism." Thus, Objecting Parties argue that if the Commission approved FCM, it would be imposing a resource adequacy requirement on New England utilities in contravention of the FPA.

196. Third, Objecting Parties argue that to the extent the current capacity market is flawed, ISO-NE may not make a proposal to correct those flaws because it is not a member of NEPOOL. They contend that directing ISO-NE to make a proposal amounts to a prohibited evisceration of the voluntary nature of power pools under section 202(a) of the FPA.

---

[169] *Id.* at 29.

[170] Objecting Parties also contend that states should be able to expressly opt out of the FCM and have their load serving entities be responsible for procuring capacity and reserves.

197. In reply comments, Capacity Suppliers respond that "the current ICAP market is without a doubt broken."[171] They note that the Commission has made several prior findings that the current capacity market is unjust and unreasonable.[172] Further, they contend that the record contains substantial evidence showing that existing resources are not recovering sufficient revenues, noting that even the evidence of those opposing LICAP showed that generators were recovering only 10 percent of what they would recover under the LICAP mechanism as approved by the Initial Decision.

198. Capacity Suppliers argue that the Commission has jurisdiction to approve the settlement, and that state regulators, having taken the steps to form a tight power pool and organized electricity markets, may not "pick and choose" which market design elements they will cede to Commission jurisdiction and which they will reserve to state jurisdiction. Capacity Suppliers assert that federal courts have confirmed the Commission's authority to allocate the costs of capacity among members of a power pool, even in the face of opposition from state regulators.[173] Capacity Suppliers contend that as the Commission has previously held in these proceedings, while the capacity market may impact state regulatory programs, the design of the capacity market itself is not within the jurisdiction of the states. Finally, they note that the Energy Policy Act of 2005 increases the Commission's jurisdiction over electric system reliability.

199. ISO-NE contends that Objecting Parties have ignored the Commission's prior determination on the issue of state jurisdiction over resource adequacy. In particular, ISO-NE argues that the Commission acknowledged its jurisdiction over issues

---

[171] *See* Reply Comments of Capacity Suppliers at 17, *citing* Oral Argument Tr. At 252:8-14 (Chairman Kelliher's closing remarks, noting that "[t]here does seem to be consensus around a threshold issue that there is a problem under the status quo that needs to be addressed.")

[172] Reply Comments of Capacity Suppliers at 17-18.

[173] *Id.* at 40-41, *citing Mississippi Industries v. FERC*, 808 F.2d 1525, 1543 (D.C. Cir. 1987) (holding that the Commission had the authority to reallocate the costs of a nuclear generating facility among affiliated operating companies "pursuant to its exclusive rate authority over wholesale transactions and its remedial authority as set forth in sections 205 and 206" of the FPA.)

concerning the capacity market when it set the initial LICAP proposal for hearing, and has approved ISO-NE's authority to set installed capacity requirements, finding that doing so did not infringe on the state's resource adequacy jurisdiction.[174]

200. American National Power argues in reply that Objecting Parties' claims are an attempt to relitigate issues already decided by the Commission in these proceedings.[175] Additionally, American National Power argues that the Supreme Court has ruled "that the States cannot circumvent FERC's authority over the interstate transmission of electricity and wholesale electric sales by using their retail ratemaking authority."[176] It asserts that the issue in this proceeding is the price for wholesale capacity, which is clearly within the Commission's jurisdiction.

**Commission Conclusion**

201. The Commission has ample jurisdiction to consider and approve the Settlement Agreement. The settlement does not in any way alter the method by which resource adequacy requirements (particularly the installed capacity requirement) are determined or direct that a particular amount of capacity be installed, areas that the Commission has historically left to the states.[177] Also, as noted above, the Settlement Agreement contains provisions permitting load serving entities to self-supply their capacity obligations.[178] The Settlement Agreement and the tariff provisions that will follow it establish a mechanism and market structure for the purchase and sale of installed capacity at wholesale in interstate commerce and to determine the prices for those sales, bringing it squarely within the Commission's jurisdiction under the FPA.[179] Courts have confirmed

---

[174] Reply Comments of ISO-NE, *citing* June 1 2004 Order at P 58; *ISO New England, Inc.*, 111 FERC ¶ 61,185 at P 32 (2005).

[175] Reply Comments of American National Power at 19-20.

[176] *Id.* at 21, *citing Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 373 (1988).

[177] Currently, ISO-NE calculates capacity requirements to achieve "Objective Capability," or the total amount of capacity required by the system to meet peak load plus a reserve margin. Objective Capability is determined each year in accordance with Northeast Power Coordinating Council (NPCC) standards. *See* March 23 Order I at P 30.

[178] *See* Settlement Agreement, Part III.O.

[179] 16 U.S.C. § 824(b)(1) (2000) ("The provisions of this Part shall apply to the transmission of electric energy in interstate commerce and the sale of electric energy at wholesale in interstate commerce.")

that the Commission has jurisdiction under the FPA to regulate the charges for capacity in wholesale markets.[180] Objecting Parties do not point to any provision in the Settlement Agreement that establishes a resource adequacy requirement, or explain why the Commission does not have jurisdiction over the wholesale prices charged for the capacity product in New England. Objecting Parties' argument that load-serving entities are required to participate in the FCM (thus mandating participation in a resource adequacy program contrary to the FPA's limitations) fails because the provisions in the Settlement Agreement permit parties to self-supply their capacity obligations, and Objecting Parties have not explained why these provisions are insufficient.

202. Furthermore, the Commission fully addressed the issue of its jurisdiction in prior orders in this proceeding regarding the LICAP mechanism, and made clear that it did not intend to usurp the authority of the states' "central role in determining resource adequacy."[181] In its March 23 *Order on Rehearing and Clarification*, in particular, the Commission explained that the issue in this proceeding is not how the capacity requirement is calculated or how the responsibility for meeting that requirement is divided among load serving entities.[182] Instead, the issue is how prices for capacity are determined, to remedy identified flaws in the market.[183] As the Commission explained there, "the effect of this proceeding is not to impose a regional resource adequacy requirement, but merely to change the pricing."[184]

203. Objecting Parties are also incorrect in their assertion that the Commission did not find the existing capacity market unjust and unreasonable, as required by section 206 of the FPA. As the Commission explained in the June 2 Order, the April 25 Order directed revisions to the ISO-NE tariff "pursuant to section 206 of the [FPA]" to "implement . . . location or deliverability requirements in the ICAP or resource adequacy market . . . so

---

[180] *See Municipalities of Groton v. FERC,* 587 F.2d 1296 (D.C. Cir. 1978) (holding that the Commission had jurisdiction over the installed capability charge in New England, a precursor to ICAP); *Mississippi Industries v. FERC*, 808 F.2d 1525 (D.C. Cir. 1987) (holding that the Commission could exercise jurisdiction over the allocation of the costs of capacity among four utility operating companies of a holding company under "its undisputed authority over the wholesale rates of electric generating facilities in interstate commerce.").

[181] November 8 Order on Rehearing at 70.

[182] *Devon Power LLC,* 110 FERC ¶ 61,315 at P 29-32 (2005).

[183] *Id.*

[184] *Id.* at P 32.

that capacity within [designated congestion areas] may be appropriately compensated for reliability."[185] In the July 24 Order, the Commission further clarified that it was acting under section 206 of the FPA and formally stated that it "found that Market Rule 1 created an unjust and unreasonable result" because RMR agreements, and the need for such agreements, caused an extensive disruption to wholesale markets.[186] Additionally, Objecting Parties' argument that the locational forward reserves market has addressed the underlying deficiencies in the capacity market is misplaced here, and is nonetheless unsupported by evidence.[187] To avoid any ambiguity, we reiterate here our prior finding that the existing ICAP market is unjust and unreasonable.

204. Further, we find without merit Objecting Parties' claim that the record does not show that generators are earning insufficient revenues. We agree with Capacity Suppliers that the record contains substantial evidence regarding the inability of generators to earn sufficient revenues in the current market, both to continue operating or to support new investment.[188] Moreover, as we have stated previously, the increase in RMR agreements in New England provides further substantial evidence that generators are failing to recover their costs and require additional revenues.[189]

205. Finally, we reject Objecting Parties' contention that ISO-NE may not make a proposal to correct the flaws in the existing capacity market. The provisions pertaining to the existing capacity market are contained in ISO-NE's tariff, and ISO-NE is the entity that is responsible under the NEPOOL Agreement for administering the regional markets. As a result, it is the proper entity to propose remedies to address the identified deficiencies in the current capacity market. In any event, the Settlement Agreement achieved a 78.46 percent favorable vote from the NEPOOL Participants Committee, far above the percentage vote necessary to permit ISO-NE to file market rule changes.[190]

---

[185] June 2 Order at P 29, *citing* April 25 Order at P 33, 37.

[186] June 2 Order at P 29, *citing* July 24 Order at P 33.

[187] Additionally, the Commission recently reiterated that "the markets for capacity and operating reserves are separate, distinct, and non-duplicative." *See New England Power Pool and ISO New England Inc.*, 115 FERC ¶ 61,175 at P 78 (2006); *see also New England Power Pool and ISO New England Inc.*, 105 FERC ¶ 61,204 at P 27 (2003).

[188] *See* Reply Comments of Capacity Suppliers at 18, *citing* Exh. ISO-23 (Rebuttal Testimony of David LaPlante in hearing); *see also supra* P 63.

[189] *See Devon Power LLC*, 110 FERC ¶ 61,315 at P 16 (2005). *See also supra* note 139 (listing recent Commission cases approving RMR agreements).

[190] *See* NEPOOL Participants Agreement, section 11.

#### d. Level of Support for the Settlement Agreement

206. Objecting Parties assert that the level of support for the Settlement Agreement is actually less than it first appears, and that the 78.46 percent vote in favor of the agreement in the NEPOOL stakeholder process masks the level of opposition to the agreement. In particular, they note that both Massachusetts and Maine (representing 53.4 percent of NEPOOL's peak demand) oppose the agreement, as do representatives of load from other states (including the Connecticut Attorney General). They also note that the Alternate Resources, End User and Publicly Owned Entity sectors of NEPOOL represented 40.27 percent of the 78.46 percent vote in favor (or more than 50 percent of the total NEPOOL support). According to Objecting Parties, due to flaws in the membership of these sectors, and the disproportionate weight given to the Publicly Owned Entity sector, true customer satisfaction with the settlement is misrepresented.[191]

207. NEPOOL states in reply that Objecting Parties' assertions regarding the opposition of Massachusetts and Maine are factually misleading. In fact, NEPOOL argues, most of the Massachusetts parties either support or did not oppose the Settlement Agreement, including Associated Industries of Massachusetts (representing the largest energy consumers in Massachusetts), transmission-owning utilities National Grid USA and Western Massachusetts Electric Company, and 38 publicly-owned entities. Similarly, Capacity Suppliers note that the Massachusetts Department of Telecommunications and Energy did not file comments in opposition to the settlement, nor did many of the load-serving entities in Massachusetts. NEPOOL notes that two distribution companies in Maine (Central Maine Power and Bangor Hydro Electric Company) did not file any comments in opposition, thus waiving any opposition they may have. NEPOOL notes that no competitive supplier from Massachusetts or Maine has filed comments in opposition. Further, it contends that Objecting Parties' statement that parties representing load from other states also oppose the settlement completely ignores the support of state regulators in Connecticut, New Hampshire, Rhode Island and Vermont, as well as the fact that the Connecticut Office of Consumer Counsel (the statutory representative of retail customers in Connecticut) is a settling party. Last, NEPOOL argues that the voting structure that Objecting Parties now challenge was created at the insistence of the Commission to ensure that individual entities like NSTAR would not have

---

[191] *See* Comments in Opposition to Settlement of Objecting Parties at 14-16.

disproportionate voting weight, and that this structure represents a rejection of Objecting Parties' implicit argument that NEPOOL voting should be more reflective of economic interests.[192]

208. CMEEC and MMWEC characterize Objecting Parties' arguments as a collateral attack on the NEPOOL voting process, and argue that it should play no role in the Commission's decision on the Settlement Agreement.[193] If the Commission decides to consider these issues, CMEEC notes that it also shares concerns with regard to the NEPOOL stakeholder process, arguing (in contrast to Objecting Parties) that the process gives too little weight to consumer interests and too much weight to sectors populated by investor-owned companies whose interest is to maximize shareholder returns and not ensure just and reasonable rates.

**Commission Conclusion**

209. We reject Objecting Parties' attacks on the NEPOOL stakeholder process and the NEPOOL stakeholder vote in favor of the settlement. Objecting Parties' arguments are misplaced. As NEPOOL, CMEEC and MMWEC correctly point out, those stakeholder processes were confirmed in other Commission proceedings, and issues regarding their effectiveness or fairness are outside the scope of this proceeding.

The Commission orders:

The proposed Settlement Agreement is hereby accepted, as discussed in the body of this order.

By the Commission. Commissioner Kelly concurring with a separate statement attached.

( S E A L )

Magalie R. Salas,
Secretary.

---

[192] Reply Comments of NEPOOL at 9, *citing New England Power Pool*, 86 FERC ¶ 61,262 (1999).

[193] MMWEC also states that this stakeholder process was approved by the Commission in *New England Power Pool*, 88 FERC ¶ 61,079 (1999), and reconfirmed when the Commission approved New England's RTO arrangements in *ISO New England, Inc.*, 106 FERC ¶ 61,280 (2004).

**Appendix A – List of Settling Parties**

American National Power, Inc.
Associated Industries of Massachusetts
Boston Generating, LLC
Calpine Eastern Corporation
Calpine Energy Services, L.P.
Cape Wind Associates, LLC
Central Vermont Public Service Corporation
Connecticut Department of Public Utility Control
The Connecticut Light and Power Company
Connecticut Municipal Electric Energy Cooperative
Connecticut Office of Consumer Counsel
Conservation Services Group
Consolidated Edison Energy, Inc.
Dominion Energy Marketing, Inc.
Dominion Nuclear Connecticut, Inc.
Dominion Resources, Inc.
Duke Energy North America, LLC
Energy Management, Inc.
EnerNOC, Inc.
Entergy Nuclear Generation Company
Entergy Nuclear Vermont Yankee, LLC
Exelon Generation Company, LLC
Exelon New England Holdings, LLC
Fitchburg Gas & Electric Light Company
FFL Energy, LLC
Granite Ridge Energy, LLC
HQ Energy Services (U.S.), Inc.
ISO New England, Inc.
Lake Road Generating Company, LP
Long Island Power Authority (LIPA)
MASSPOWER
Milford Power Company, LLC
Mirant Americas Energy Marketing, LP
Mirant Canal, LLC
Mirant Kendall, LLC
Mystic Development, LLC, Mystic I, LLC. and Fore River Development, LLC
National Grid USA (on behalf of itself and its subsidiaries that are intervenors in this proceeding)

NEPOOL Participants Committee
New Hampshire Electric Cooperative, Inc.
New Hampshire Office of Consumer Advocate
New Hampshire Public Utilities Commission
NRG (Devon Power, LLC. Middletown Power LLC, Montville Power LLC, Norwalk Harbor, LLC, and NRG Power Marketing)
Pinpoint Power
Public Service Company of New Hampshire
RI Division of Public Utilities and Carriers
RI Public Utilities Commission
Select Energy
Sempra Trading
TransCanada Power Marketing Limited
The United Illuminating Company
Vermont Department of Public Service
Vermont Public Power Supply Authority
Vermont Public Service Board

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Devon Power LLC | Docket Nos. | ER03-563-030<br>ER03-563-055 |

(Issued June 16, 2006)

KELLY, Commissioner, *concurring*:

Price mitigation in energy markets, coupled with capacity payments that did not recognize transmission limitations that prevent some generation from reaching some areas and lack of adequate transmission investment to address those limitations, ultimately led to increased proliferation of cost-based RMR agreements as generation that should have been permitted to retire had to be kept on for local reliability. The Commission issued orders finding the existing situation unjust and unreasonable and directing ISO-NE to propose a solution. In response, ISO-NE developed the LICAP proposal with its sloping demand curve and other features. The proposal stirred up great controversy and even Congress addressed it in the Energy Policy Act of 2005.

Following the ALJ's issuance of the LICAP initial decision, we granted requests to hold an oral argument on LICAP and on proposed alternatives and ultimately delayed issuance of an Opinion on the initial decision pending the outcome of settlement procedures among the parties.

To my surprise and delight the vast majority of the parties reached a settlement that they believe will meet their broad and varied interests in an acceptable manner. Moreover, my examination of their settlement proposal shows it to be a balanced and reasonable way to address the underlying problems the Commission identified in earlier orders.

For these reasons, I am pleased to be able to vote for this settlement despite the fact that it includes a limited application of the Mobile-Sierra public interest standard. For the reasons I have previously set forth in *Wisconsin Power & Light Co.*, 106 FERC ¶ 61,112 (2004), I do not generally believe that the Commission should depart from its precedent of not approving settlement provisions that preclude the Commission, acting *sua sponte* on behalf of a non-party, or pursuant to a complaint by a non-party, from investigating rates, terms and conditions under the "just and reasonable" standard of section 206 of the Federal Power Act at such times and under such circumstances as the Commission deems appropriate.

Therefore, I have generally dissented in part from orders that accept for filing settlements that provide that the Mobile-Sierra "public interest" standard of review will apply to Commission action pursuant to section 206. However, I believe that no such dissent is warranted here due to the settling parties' decision to apply the Mobile-Sierra public interest standard in a very constrained and time-limited manner; specifically, applying it only to the stated transition period prices and the annual prices generated each year by the FCM auctions. Customers are protected due to the time-limited nature of this application and the fact that everything else is covered by the just and reasonable standard.

Suedeen G. Kelly