**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>CONSTELLATION ENERGY COMMODITIES GROUP, INC.<br><br>Defendant. | ) | C.A. NO. 06-404S |

**PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

Plaintiff, The Narragansett Electric Company ("NEC") hereby objects to the Motion to Dismiss or, in the Alternative, to Compel Arbitration and Stay Proceedings of Defendant, Constellation Energy Commodities Group, Inc. In support of its objection, NEC submits the accompanying memorandum of law.

THE NARRAGANSETT ELECTRIC COMPANY

By its attorneys,

/s/ Gerald J. Petros
Gerald J. Petros (#2931)
Robin Main (#4222)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (Facsimile)
gpetros@haslaw.com
rmain@haslaw.com

Dated: December 13, 2006.

**CERTIFICATION**

I hereby certify that on December 13, 2006, a copy of the foregoing Objection was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Robin Main (#4222)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (Facsimile)
gpetros@haslaw.com
rmain@haslaw.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>CONSTELLATION ENERGY COMMODITIES GROUP, INC.<br><br>Defendant. | ) | C.A. NO. 06-404S |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

## I. Introduction

In August 2006, Constellation Energy Commodities Group, Inc ("Constellation") demanded that The Narragansett Electric Company ("NEC") pay all or a portion of the Transition Period Capacity Costs that Constellation will incur in supplying electricity to meet the needs of NEC's Rhode Island customers. NEC rejected that demand. Constellation is not entitled to any payments or reimbursement from NEC for Capacity Costs because (1) the four Power Purchase Agreements ("PPAs") are fixed price contracts and they specifically provide that Constellation is responsible for all of the present and future supplier related costs, including Capacity Costs; (2) the FERC-approved Settlement Agreement confirms that Capacity Costs remain an obligation of Constellation, and that Constellation cannot pass those costs onto NEC and the Rhode Island ratepayers; and (3) Constellation waived any right to recover Transition Period Capacity Costs from NEC and the ratepayers. NEC filed this action to remedy

Constellation's breach and to declare the respective rights of the parties under the PPAs and under the Settlement Agreement.

Constellation's motion to dismiss describes a complaint that NEC did not file. NEC does not ask this Court to "abrogate" the PPAs or the Settlement Agreement; rather, NEC asks the Court to enforce those agreements. Those agreements, as they exist today, do not permit Constellation to recover Capacity Costs, or to shift those costs to NEC and the Rhode Island ratepayers. They are fixed price contracts, and Constellation expressly accepted responsibility for Capacity Costs under the PPAs. Further, Section VIII of the Settlement Agreement confirms that the Forward Capacity Market ("FCM") adopted by the Settlement Agreement did not alter that responsibility.[1] Indeed, the inclusion of Section VIII gained Rhode Island's support for the Settlement Agreement by ensuring that Constellation would not do what it now seeks to do – pass along Capacity Costs to Rhode Island ratepayers.[2]

Constellation seeks to evade the jurisdiction of this Court by setting up a series of straw men: (1) NEC seeks to abrogate the PPAs, and only FERC can permit this; (2) the execution of the Settlement Agreement triggered the parties' obligation to negotiate in good faith the "equitable adjustment"; and (3) NEC must arbitrate this dispute. First, NEC seeks *to enforce* both the PPAs and the Settlement Agreement, not *to abrogate* them. FERC's jurisdiction to "abrogate" rights under power purchase agreements is therefore beside the point. Second, the

---

[1] The capacity market has changed several times since New England opened up the sale of electricity to market forces in 1998. It began with two markets/payments: Installed Capacity ("ICAP") and Operable Capacity. In 2003, the parties eliminated the Operable Capacity market and modified ICAP to become Unforced Capacity ("UCAP"). In 2004, NEPOOL/ISO initiated a process that led to a FERC proceeding that adopted Locational Installed Capacity ("LICAP") as the next iteration of the capacity market. Nevertheless, fearful of costs under LICAP, the stakeholders convinced FERC to allow them to structure a more efficient market. This market would encourage and pay for electrical capacity to ensure that the region always has sufficient electricity. The Stakeholders proposed the FCM, and FERC accepted that proposal when it approved the Settlement Agreement. The FCM requires payment of Transition Period Capacity Costs beginning on December 1, 2006 and ending on May 31, 2010. The four PPAs expire on December 31, 2009.

[2] In fact, for years Constellation has accepted responsibility under the PPAs for Capacity Costs and never attempted to shift those costs to NEC or the Rhode Island ratepayers.

Settlement Agreement did not trigger an obligation to negotiate an "equitable adjustment" because both the PPAs and the Settlement Agreement prevent Constellation from recovering Capacity Costs – those agreements do not permit an adjustment. The Complaint contends, and the evidence will prove, that the Settlement Agreement does not trigger the "Change in Market Rules" provision, and thus, there is nothing to negotiate. Third, and for the same reason, there is nothing to arbitrate because the "Change in Market Rules" provision in the PPAs does not apply to Capacity Costs since the parties have already allocated those costs to Constellation. The change in methods in measuring Capacity Costs from ICAP to UCAP to the FCM does not alter the parties' agreement to enter into a fixed price supply contract that allocates responsibility for Capacity Costs to Constellation. Further, Constellation concedes that only one of the four PPAs contains a mandatory arbitration provision, albeit inapplicable here, and therefore referring this dispute to arbitration is not appropriate.

In short, the Complaint plainly states substantial claims that properly implicate the jurisdiction of this Court – both diversity and federal question jurisdiction as well as exclusive jurisdiction pursuant to 16 U.S.C. § 825p. Constellation mischaracterizes the Complaint to evade that jurisdiction. Constellation's motion is without merit and falls far short of meeting the heavy burden required to prevail on a Rule 12(b) motion. The Court should deny that motion for the reasons set forth more fully below.

## II. <u>Argument</u>

In considering a motion to dismiss pursuant to Rule 12(b)(6) or Rule 12(b)(1), the Court must accept all well-pled facts and allegations as true and construe all reasonable inferences in the plaintiff's favor. <u>Toledo v. Sanchez</u>, 454 F.3d 24, 30 (1st Cir. 2006); <u>Aversa v. United States</u>, 99 F.3d 1200, 1209-10 (1st Cir. 1996). The defendant's burden on a Rule 12(b)(6)

motion to dismiss is heavy – it must demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of … [its] claim that would entitle … [it] to relief." Stanton v. Metro Corp., 438 F.3d 119, 123-24 (1st Cir. 2006) (all internals omitted). The defendant, therefore, must show that the plaintiff's claim is insufficient as a matter of law. National Credit Union Admin. Bd. v. Regine, 795 F. Supp. 59, 62 (D.R.I. 1992). Courts disfavor dismissals for failure to state a claim and hesitate to dismiss under Rule 12(b)(6) at the outset of a case. Resolution Trust Corp. v. Driscoll, 985 F.2d 44, 48 (1st Cir. 1993).[3]

In ruling on a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the Court must decide "whether or not the challenged pleading sets forth allegations sufficient to demonstrate that the Court has subject matter jurisdiction in the case." Casey v. Lifespan Corp., 62 F.Supp.2d 471, 474 (D.R.I. 1999). When the pleader alleges facts from which jurisdiction may be inferred, the Court must deny the motion. Id.

**A. The Court should deny Constellation's motion because NEC properly seeks to enforce the terms and provisions of both the PPAs and the Settlement Agreement.**

NEC's Complaint plainly states that under the PPAs Constellation accepted responsibility for Capacity Costs and cannot recover those costs from NEC or the Rhode Island ratepayers. Compl. ¶ 9. Under the PPAs, Constellation accepts responsibility for Capacity Costs whether or not those costs are calculated under ICAP, UCAP, LICAP, the Settlement Agreement [FCM], or

[3] Constellation has actually filed a stealth motion for summary judgment, without complying with any of the requirements under Local Rule Cv 56, including filing a statement of undisputed facts. Constellation inappropriately relies upon and introduces numerous documents outside the pleadings. A court "may not ordinarily consider any documents that are outside of the complaint, or not expressly incorporated therein, without converting the motion into one for summary judgment." Defazio v. Expetec Corp., No. 05-180S, 2006 WL 162327, at *3 (D.R.I. Jan. 20, 2006). "[T]he Court has complete discretion not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion." Marchak v. Observer Publications, Inc., 493 F.Supp. 278, 282 (D.R.I. 1980) (declining to consider affidavit submitted in support of Rule 12(b)(6) motion and refusing to convert motion into one for summary judgment). In this case, the Court should decline to consider the documents that Constellation submitted beyond the pleadings. Further, the Court cannot resolve disputed facts on a motion to dismiss. The Court should deny the motion.

some other method implemented in the future – and Constellation cannot pass those costs onto NEC. For example, Section 6.1(a) of the 40% Contract[4] provides that:

> Seller's obligations hereunder shall include generation and/or market purchase and delivery, to the Delivery Point, of such electric capacity, energy and ancillary services as are required to provide Wholesale Standard Offer 1 Service during the Delivery Term. **Seller**, as the supplier of Wholesale Standard Offer 1 Service, **will be responsible for all present and future requirements and associated costs for Installed Capacity**, Energy, Operating Reserves, Automatic Generation Control, losses, uplift costs and any congestion charges resulting from the provision of Wholesale Standard Offer 1 Service **and any other requirements, market products, expenses or charges imposed on Seller by NEPOOL or the ISO as they may be in effect from time to time**…. (Emphasis added.)

The 40% Contract assigns responsibility for Capacity Costs – and all other generation and/or market purchase costs – to Constellation. It also assigns to Constellation any other requirements or charges "imposed on seller [Constellation] by NEPOOL or the ISO, as they may be in effect from time to time." 40% Contract § 6.1(a). Thus, the PPAs assigned responsibility for Capacity Costs, however defined or set by NEPOOL/ISO, to Constellation. NEPOOL/ISO initiated and managed the process that resulted in the FCM and Transition Period Capacity Costs that replaced UCAP as the new measure of Capacity Costs and that are at issue here.

This assignment of Capacity Costs to Constellation is consistent with the central purpose of the PPAs: to provide NEC with a long-term supply of electricity at a fixed price. All four PPAs are fixed price contracts.[5] They set a fixed price for each year, subject only to an adjustment for fuel costs.

Not only do the PPAs assign responsibility for Capacity Costs payments to Constellation, but the Settlement Agreement confirms that the establishment of the FCM does not alter that assignment in any way. Section VIII of the Settlement Agreement provides that:

---

[4] Constellation refers to the "40% Contract" as the "2002 Contract."

[5] See 40% Contract § 15.1(b) (stating that "[t]his is a fixed price agreement"); 2001 PPA § 14.1(b) (same); 36% Contract Art. 1, 5 (setting price by specific formula); 20% Contract Art. 1, 5 (same).

> The current UCAP products shall be retained for the period commencing on December 1, 2006 and ending on May 30, 2010 (the "Transition Period") as provided for in Part VIII.I. Payments will be made to UCAP entitlement holders, and made by UCAP obligation holders including wholesale standard offer suppliers in Rhode Island as under the current Market Rules and tariffs; it being understood that the agreement of wholesale standard offer suppliers in Rhode Island to make UCAP payments is contingent upon the agreement of the State of Rhode Island utility regulatory authorities to support the settlement.

Constellation is a "UCAP obligation holder" and a "wholesale standard offer supplier in Rhode Island." Constellation retained responsibility for Capacity Costs (and indeed paid Capacity Costs) under the PPAs from their inception. Section VIII confirms that Constellation remains responsible for payments for Capacity Costs [UCAP] during the Transition Period from December 1, 2006 through May 31, 2010 "as under the current Market Rules and tariffs." The Settlement Agreement did not change the Market Rules and tariffs that require Constellation to continue to pay Capacity Costs during the transition period.[6] NEC's claims are properly stated in the Complaint, and NEC is entitled to a hearing on the merits on those claims. Compl. ¶ 5-29.

Further, NEC is not required to prove the merits of its claims on this motion to dismiss. Constellation is required to demonstrate beyond doubt that NEC can prove no set of facts that could support its claims. Constellation fails to meet this burden. Instead, Constellation mischaracterizes NEC's claims and contends that NEC seeks to abrogate and amend both the PPAs and the Settlement Agreement. That contention is without merit. The PPAs provide NEC with a "fixed price" for electricity and make Constellation responsible for the payment of Capacity Costs, regardless of how those costs are calculated. The Settlement Agreement, already

[6] Constellation contends that the parties included Section VIII in the Settlement Agreement, not to confirm that Constellation remained responsible for payment of these Capacity Costs, but only to indicate that Constellation would make the "initial payment" and would then demand reimbursement from NEC and the Rhode Island ratepayers. This tortured and self-serving construction of Section VIII does violence to its plain language, to the rules of construction for contracts, and to the parties' past dealings. NEC looks forward to briefing this issue on the merits in a Motion for Summary Judgment.

approved by FERC, confirms this obligation on the part of Constellation. NEC asks the Court to enforce those agreements, not to change them.[7]

**B. The Court should deny Constellation's Rule 12(b)(1) motion because the Federal Power Act vests subject matter jurisdiction in this Court and the Filed Rate Doctrine does not apply to this dispute.**

Constellation argues that this Court lacks subject matter jurisdiction under the "filed rate doctrine," which holds that only FERC can modify or abrogate a rate on file. Constellation's argument fails because the "filed rate doctrine" is irrelevant to this case. The Court has subject matter jurisdiction over this dispute because (1) the Court can interpret and enforce the PPAs and the Settlement Agreement pursuant to the jurisdictional grant of 16 U.S.C. § 825p; and (2) the filed rate doctrine is not applicable in this matter of interpretation and enforcement of the FERC-approved Settlement Agreement.

**1. The Federal Power Act grants subject matter jurisdiction to the Court.**

The Federal Power Act grants federal district courts subject matter jurisdiction over actions to enforce FERC orders. The Act states, in pertinent part:

> The District Courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of [the Federal Power Act] or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of [the Federal Power Act] or any rule, regulation, or order thereunder.

[7] In footnote 18 of its brief, Constellation makes a weak challenge to Count IV of the Complaint, which seeks a declaratory judgment that Constellation is not entitled to receive additional compensation from NEC under the PPAs for any alleged additional costs arising from the implementation of the auxiliary services market phases I and II ("ASM"). Under the PPAs, Constellation, in providing Standard Offer Service, has the obligation to provide and pay for ASM, which provides electricity reserves that are ready to meet power demands in a short period of time. Compl. ¶ 32, 33. While costs associated with ASM fall outside the scope of the Settlement Agreement, they are covered by the PPAs which, as argued herein, do not allow for price adjustments based on changes in the costs of meeting contractually bargained for obligations. Compl.¶ 33. Accordingly, Constellation's motion as to the ASM fails based on NEC's well-pleaded Complaint, the reasonable inferences that can be drawn therefrom, and the terms of the PPAs themselves.

16 U.S.C. § 825p. This Court has subject matter jurisdiction over this dispute because NEC seeks to enforce the terms of the PPAs and the FERC-approved Settlement Agreement.

Although the First Circuit has not directly addressed the jurisdictional grant of 16 U.S.C. § 825p, sister circuits and other district courts agree that district courts have jurisdiction to entertain actions based on FERC orders. See, e.g., City of Cleveland v. Cleveland Elec. Illuminating Co., 570 F.2d 123, 124-25 (6th Cir. 1978) (affirming a district court holding that it had jurisdiction to "entertain an action based on an order of the Federal Power Commission" requiring the City of Cleveland to pay charges "pursuant to certain Federal Power Commission orders and a contract entered into between the parties."[8]); State of California v. Oroville-Wyandotte Irrigation Dist., 411 F.Supp. 361, 367 (E.D. Cal. 1975), judgment aff'd, 536 F.2d 304 (9th Cir. 1976) (holding that the district courts are empowered under § 825p to enforce violations of Federal Power Commission orders and that this jurisdictional base can be read in conjunction with the Declaratory Relief Act); Occidental Chemical Corporation v. Power Authority of New York, 758 F.Supp. 854, 859, 861 (W.D.N.Y. 1991) (holding that the federal court had exclusive jurisdiction pursuant to 16 U.S.C. § 825p over a declaratory judgment action concerning an alleged violation of a Federal Power Commission license). Because NEC asks this Court to interpret and enforce the FERC-approved Settlement Agreement, as well as the PPAs, the Court has subject matter jurisdiction.

**2. The filed rate doctrine is irrelevant because NEC's Complaint does not seek to alter the Settlement Agreement.**

The filed rate doctrine applies when parties seek to alter, either directly or indirectly, or challenge the reasonableness of, a filed rate approved by a regulatory agency. Montana-Dakota Co. v. Pub. Serv. Co., 341 U.S. 246 (1951). In this dispute, the filed rate doctrine does not apply

[8] The Federal Power Commission's functions were transferred to the Secretary of Energy and FERC in 1977. See 42 U.S.C. §§ 7151(b), 7171(a), 7291, 7293.

because NEC seeks to have the Court interpret and enforce the FERC–approved Settlement Agreement. Constellation mischaracterizes NEC's claim as one for reformation of the PPAs under the Settlement Agreement in a maneuver to divest the Court of its jurisdiction. NEC does not seek to alter the PPAs; it seeks to enforce the PPAs and the FERC-approved Settlement Agreement. Thus, the filed rate doctrine is inapplicable.

The filed rate doctrine "is actually a set of rules that have evolved over time, but revolve around the notion that under statutes like the Federal Power Act, utility filings with the regulatory agency prevail over unfiled contracts or other claims seeking different rates or terms than those reflected in the filings with the agency." Town of Norwood, Mass. v. F.E.R.C., 217 F.3d 24, 28 (1st Cir. 2000) (collecting cases); see also Town of Norwood v. F.E.R.C., 202 F.3d 392, 400 (1st Cir. 2000). The filed rate doctrine bars suits challenging rates where such challenges, if successful, would have the effect of changing the filed rate. Nantahala Power and Light, Co. v. Thornburg, 476 U.S. 953, 966-67 (1986) (holding that, generally speaking, a FERC order allocating power and rates could not be interfered with by a state court reallocation). While "the filed-rate doctrine precludes courts from deciding whether a tariff is reasonable," the filed rate doctrine "does not preclude courts from *interpreting* the provisions of a tariff and *enforcing* that tariff." See Brown v. MCI Worldcom Network Servs., Inc., 277 F.3d 1166, 1170-71 (9th Cir. 2002) (emphasis added). Otherwise, the filed rate doctrine "would render meaningless provisions … allowing plaintiffs redress in federal court." Id.

Because NEC seeks to have the Court interpret and enforce the Settlement Agreement – as written and approved by FERC – and the PPAs, this case is properly before the Court, and Constellation's Rule 12(b)(1) motion should be denied.

### C. The Court should deny Constellation's Rule 12(b)(6) motion because the execution of the Settlement Agreement did not trigger the "Change in Market Rules" provision in the PPAs.

Constellation seeks to avoid payment of potentially higher Capacity Costs under the FCM by contending that the stakeholders' proposal and FERC's adoption of the Settlement Agreement triggers a negotiation under the "Change in Market Rules" provision of the PPAs.[9] Constellation is wrong. Constellation remains responsible for Capacity Costs. The implementation of the FCM adopted under the Settlement Agreement does not trigger negotiations under the "Change in Market Rules" provision.

When FERC opened the sale of electricity in New England to market forces in 1998, it precipitated the widespread unbundling of generation, transmission, and distribution functions of most of New England's load-bearing entities, including NEC and its parent. NEC became a transmission and distribution company and decided to enter into long-term, fixed price power purchase agreements to meet the demands of its Rhode Island customers and to ensure steady, reliable rates for customers who remained on the standard offer service. Between 1998 and 2002, NEC and its predecessors negotiated and entered into the PPAs with Constellation. Those PPAs guaranteed that NEC, having sold its generation facilities, could meet the demands for electricity of the Rhode Island ratepayers, and could deliver that electricity at a predictable and steady rate. NEC accomplished these objectives in several ways.

First, NEC entered into fixed price contracts with Constellation. The parties set an annual price for electricity for each year of the contracts. The only price adjustment permitted under the contracts is a fuel adjustment.[10] Otherwise, the price is fixed. Constellation, in turn, was free to go into the market and sign long term contracts with generators to meet the

---

[9] This provision varies slightly depending on the PPA. See 20% Contract Art. 18(2); 36% Contract Art. 18(2); 40% Contract § 15.2; 2001 PPA § 14.2.
[10] See 40% Contract App. B; 2001 PPA App. B; 36% Contract Art. 5; 20% Contract Art. 5.

requirements under the four PPAs, or to buy electricity on the short term market to meet these requirements.[11]

Second, the PPAs specifically allocate Capacity Costs and other supplier related costs to Constellation. The PPAs do not say that if these costs get "too high," Constellation is entitled to an adjustment. The parties clearly intended to allocate, and did allocate, this risk of increasing Capacity Costs to Constellation. The PPAs left Constellation free to manage this risk by entering into long-term arrangements of its own if it chose to do so. Moreover, the PPAs expressly recognize that NEPOOL or ISO might from time to time impose different charges, requirements, expenses, or market products on suppliers in the future, and the PPAs place that risk on Constellation as well.

In short, the parties plainly intended, as demonstrated by the documents, to assign responsibility for Capacity Costs to the Seller/Supplier – Constellation. For the first 8 years of the PPAs, Capacity Costs remained low, and Constellation paid those costs without complaint or protest, and kept the profit generated by those low payments. Constellation can not evade its contractual obligation to pay Capacity Costs now that those costs have increased effective December 2006. The specific assignment of these costs to Constellation under the PPAs prevents this evasion.

Constellation's "Change in Market Rules" contention is miscast. The Settlement Agreement does not alter Constellation's rights or obligations – Constellation was obligated to pay Capacity Costs before implementation of the Settlement Agreement, and it remains obligated

[11] Constellation chose to play the short-term market, which apparently worked well for Constellation until now. Nevertheless, Constellation's decision to "gamble" rather than lock in supply contracts may work against it in the next few years, and may explain why Constellation is suddenly trying to pass off Capacity Cost payments for the first time in 8 years.

to make those payments today.[12] It can not pervert this “Change in Market Rules” provision to escape from a specifically bargained for contractual obligation. The parties could not have known in 1998 the scope of Capacity Costs and how they would change or be measured over the term of the contracts because this was a new market. With that knowledge in hand, they agreed to assign that responsibility to Constellation, and took this risk into account in setting the fixed price in the contracts for the next decade. Once again, Constellation was free to enter into long-term arrangements to minimize that risk. The Settlement Agreement did not change Constellation’s obligation to pay Capacity Costs, anymore than the change from ICAP to UCAP in 2003. These changes just impacted the cost of fulfilling that obligation.

Section VIII of the Settlement Agreement confirms Constellation’s continuing obligation to pay Capacity Costs under the FCM. Rhode Island threatened to oppose the Settlement Agreement, concerned that wholesale suppliers like Constellation might try to evade their obligation to pay Capacity Costs and attempt to pass those costs onto the Rhode Island ratepayers.[13] So, the Attorney General demanded assurance that this would not happen, and the stakeholders agreed to insert Section VIII. That section provides that Constellation will continue to be responsible for Capacity Payments. And Constellation did not object to that provision. Further, Section VIII specifically notes that the Settlement Agreement is not changing the existing Market Rules that govern Constellation’s obligation to pay Capacity Costs:

> “Payments will be made to UCAP entitlement holders [generators], and made by UCAP obligation holders [such as Constellation] including wholesale standard offer suppliers in Rhode Island **as under current Market Rules and tariffs**; it being understood that the agreement of wholesale standard offer

[12] Constellation contends that the Settlement Agreement triggered an “equitable adjustment” because it reallocated the parties’ “rights and obligations.” Constellation’s Mem. at 3. Nonsense. The “obligation” to pay Capacity Costs remains with Constellation; the Settlement Agreement did not reallocate that obligation. The Settlement Agreement merely alters the measure or price of Capacity Costs – and that change does not trigger an adjustment. Given the plain intent expressed in the PPAs, reallocating Capacity Costs to NEC and the Rhode Island ratepayers would be anything but “equitable.”

[13] Rhode Island’s concern has proved prescient.

> suppliers in Rhode Island [Constellation] to make UCAP payments is contingent upon the agreement of the state of Rhode Island utility regulatory authorities to support the settlement." (Emphasis and brackets added.)

This express finding by FERC is fatal to Constellation's claim. The parties agreed that Constellation would continue to make payments for Capacity Costs as it had in the past under the current Market Rules and tariffs in place *in Rhode Island*. They further agreed that Constellation's promise to make these payments is contingent upon Rhode Island's support for the settlement, which was opposed by most states at that time. Rhode Island kept its bargain and supported the settlement. Constellation can not now walk away from its promise and rely on the "Change in Market Rules" provision to eviscerate the bargain struck with Rhode Island.

Constellation's attempt to couple Paragraph 31 of the FERC Order and Section VIII of the Settlement Agreement is misleading. <u>See</u> <u>Constellation's Mem.</u> at 12. The Settlement Agreement <u>does not</u> "expressly provide that load-serving entities (like NEC) will make transition payments for UCAP." Paragraph 31 of the FERC Order – not the Settlement Agreement – states that "Transition payments will be made by unforced capacity (UCAP) obligation holders (load-serving entities)." This burden reflects the fact that Capacity Costs for each load-serving entity (such as NEC) are determined by ISO-NE based on the electricity needs served by each entity.

Constellation by contract (the PPAs) accepted the responsibility to pay the Capacity Costs associated with NEC's distribution of the electricity supplied by Constellation to NEC. For wholesale settlement purposes as administered by ISO-NE, Constellation is the load-serving entity for the term of the Rhode Island PPAs for the customers served pursuant to these PPAs. Section VIII of the Settlement Agreement "expressly provides" that this responsibility to pay Capacity Costs will remain with Constellation ("wholesale standard offer suppliers in Rhode

Island") and continue throughout the transition period. There is no inconsistency between Paragraph 31 of the FERC Order and Section VIII of the Settlement Agreement.

For all of these reasons, the Settlement Agreement has not triggered the "Change in Market Rules" provision under the PPAs.[14]

**D. The Court should deny Constellation's motion because Constellation has waived any right to receive Capacity Cost payments from NEC or the Rhode Island ratepayers.**

Constellation bases its motion to dismiss NEC's waiver count on the faulty premise that NEC seeks to alter unilaterally the PPAs, and that Constellation must explicitly consent to such modifications. Constellation's argument not only misconstrues NEC's arguments but is contrary to the law of waiver. "Waiver is the intentional, voluntary relinquishment of a known right." Violet v. Travelers Express Company, 502 A.2d 347, 349 (1985), quoting Haxton's of Riverside, Inc. v. Windmill Realty, Inc., 488 A.2d 723, 725 (1985); Merrimack Mutual Fire Ins. Co. v. Nonaka, 414 Mass. 187, 189 (1993); Whelan v. McNally, 277 Mass. 391, 394, 178 N.E. 741, 742 (Mass. 1931). What NEC alleges is that Constellation, by its actions and inactions during the Settlement Agreement process, waived any known right it may have had to recover Capacity Costs and, therefore, cannot now obtain additional compensation under the PPAs. Compl. ¶ 41, 42. "[A] party for whose benefit a right is provided by agreement may waive such right by conduct inconsistent with the express terms of the agreement." Haxton's, 488 A.2d at 726, quoting Hattie Carnegie Industries, Inc. v. Lopreato, 114 R.I. 319, 327-28, 333 A.2d 145, 150

[14] If the Court, after a hearing or trial on the merits, does not accept NEC's claims, *then and only then* might that provision be implicated. But we are here on a Rule 12 motion to dismiss. Constellation's claim that it is entitled to a "Change in Market Rules" adjustment, determined through an arbitration proceeding, is premised on the assumptions that (1) the PPAs do not assign Capacity Costs to Constellation; (2) the Settlement Agreement does not confirm that responsibility for paying Capacity Costs remains with suppliers such as Constellation; (3) Constellation, by its actions, has not waived any claim to pass Capacity Costs onto NEC and the Rhode Island ratepayers; and (4) the Settlement Agreement triggered the "Change in Market Rules" provision. Constellation's "assumptions" are, of course, the core issues in this case that must be determined by the Court. Constellation is not entitled to an "inference," particularly on a Rule 12 motion, that it will prevail on the merits of NEC's claims.

(1975); Kact, Inc. v. Rubin, 62 Mass. App. Ct. 689, 819 N.E. 2d 610 (2004); Farlow v. Ellis, 81 Mass. 229, 232 (1860).

The allegations in NEC's Complaint are more than sufficient to establish waiver. NEC alleges that as a party to the FERC settlement proceedings, Constellation knew that the State of Rhode Island agreed to support the proposed Settlement Agreement because of the addition of Section VIII(A). Compl. ¶ 22. Indeed, that provision was added to induce Rhode Island's consent to the Settlement Agreement. To the extent Constellation had any objections to the proposed Settlement Agreement and to Section VIII, it waived those objections by consenting to being listed as a party "waiving any and all objections" under the April 5, 2006, "New England Power Pool Participants Committee Reply Comments to this Settlement Agreement," which were filed with FERC. Compl. ¶ 25. Moreover, Constellation never exercised its right to object to the Settlement Agreement during the FERC proceedings. Compl. ¶ 27. It is indisputable that under FERC's regulations any failure by a party to file a comment constitutes a waiver of all objections to the offer of settlement and that under FERC Rule 602, codified at 18 C.F.R. § 385.602, the Settlement Agreement is binding upon NEC and Constellation, regardless of whether Constellation is a "signatory" to the Agreement or not.[15] Compl. ¶ 25, 29. Furthermore, Constellation did not appeal or seek rehearing on any part of the Settlement Agreement. Compl. ¶ 28. These allegations of Constellation's actions and inactions and of binding federal law solidly support a waiver claim under a narrow motion to dismiss review. To the extent that Constellation argues that its actions or inactions did not amount to a waiver of its rights to

---

[15] Constellation states at various times in its memorandum that it was not a signatory to the Settlement Agreement. This is true, but completely irrelevant. While Constellation never argues – as it cannot – that it is not bound by the Settlement Agreement, it throws around the fact that it is not a signatory in an attempt to create an issue where none lies. Quite simply, as a matter of federal law, the Settlement Agreement is binding on Constellation. Compl. ¶ 29. If it were not, we would not be before this Court on the controversy Constellation began by sending its August 1, 2006 letter to NEC.

recover payments for Capacity Costs, such a factual dispute cannot be resolved on a motion to dismiss. In re Credit Suisse First Boston Corp., 431 F.3d 36, 45 (1st Cir. 2005)("In considering a motion to dismiss, the district court is bound to assume the truth of all well-pleaded facts and indulge all reasonable inferences that fit the plaintiff's stated theory of liability.")(all internal quotes omitted).

**E. The Court should deny Constellation's motion because Constellation is not entitled to evade the jurisdiction of this Court by relying on a single arbitration provision in only one of four contracts that itself is not applicable to this dispute.**

This dispute is not subject to arbitration because, as explained above, the Settlement Agreement did not trigger the "Change in Market Rules" provision upon which Constellation relies to claim arbitration. Further, as Constellation concedes, the 40% Contract is the only one of the four PPAs that provides for mandatory arbitration. 40% Contract § 15.2. The 20% Contract and the 36% Contract clearly provide for voluntary arbitration, contingent upon the consent of both parties. They state:

> In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such period as the Companies and the Supplier may jointly agree upon, such dispute **may** be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein **if the Companies and Supplier jointly agree to submit it to arbitration**.

20% Contract, Art. 13; 36% Contract, Art. 13. (Emphasis added.)[16] The 2001 PPA provides for neither voluntary nor mandatory arbitration. It states: "[i]f the parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Appendix B." 2001 PPA § 14.2. Appendix B, however, concerns the Standard Offer Service Fuel Adjustment Provision and makes no reference to arbitration.

[16] The 36% Contract provision stating that "[f]or any dispute or claim arising out of or relating to any charges incurred under this Agreement having a value of less than or equivalent to $100,000, such arbitration shall be mandatory" does not apply to the instant dispute because the amount in controversy exceeds $100,000.

When deciding whether the parties to a contract agreed to arbitration, courts apply standard principles of contract law. See Rosenberg v. Merrill Lynch, 170 F.3d 1, 19 (1st Cir. 1999).[17] A court may compel arbitration only if it finds "clear contractual language" evidencing the parties' intent to be bound to arbitration. Maine Central Railroad Co. v. Bangor & Aroostook Railroad Co., 395 A.2d 1107, 1116 (Me. 1978).

Since arbitration is a matter of contract, a party cannot be required to submit to arbitration any dispute which it has not agreed to so submit. United Steelworkers of America v. Warrior and Gulf Navigation Co., 363 U.S. 574, 582 (1960). Absent a contractual obligation to arbitrate, a party is free to pursue any available remedy to redress its grievances. Boeing Co. v. Intl. Union, 370 F.2d 969, 970 (3rd Cir. 1967). Moreover, "the federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." American Heritage Life Ins. Co. v. Lang, 321 F.3d 533, 537-38 (5th Cir. 2003).

The First Circuit has not squarely addressed whether parties must arbitrate a dispute when the dispute involves several contracts containing conflicting arbitration clauses. Case law from other jurisdictions, however, makes clear that when the provisions at issue do not unambiguously mandate arbitration, a court will not order arbitration of the dispute. See e.g., Independent Oil Workers v. Mobil, 441 F.2d 651, 653-54 (3rd Cir. 1971); Rockel v. Cherry Hill Dodge, 847 A.2d 621, 623-25 (N.J. Super. 2004). In Rockel, for instance, the court concluded that the arbitration agreement at issue was "highly ambiguous because the parties executed two documents which contain separate and somewhat disparate arbitration clauses." 847 A.2d at

[17] Constellation correctly notes that whether this dispute is subject to arbitration is an inquiry for this Court and not for an arbitrator. See Constellation's Mem. at 30 (stating that "the question of arbitration is properly made by the court"). See also Municipality of San Juan v. Corporacion Para El Fomento Economico de la Ciudad Capital, 415 F.3d 145, 149 (1st Cir. 2005) (stating that "the question of arbitrability is undeniably an issue for judicial determination"); DeFazio v. Expetec Corp., C.A. No. 05-180S, 2006 WL 162327, at *2 (D.R.I. Jan. 20, 2006) (noting that "questions of arbitrability are committed to the courts").

624-23. The court held that this ambiguity was "fatal to the compelling of the arbitration" because a waiver of one's right to a court proceeding in favor of arbitration must be clear and unambiguous. Id. at 624-25. Similarly, when one arbitration clause was susceptible to two interpretations – one making arbitration non-mandatory and subject to the parties' agreement, and the other requiring mandatory arbitration at the plaintiff's election - the court refused to compel arbitration because it could not "find an unambiguous agreement to arbitrate." McNeer v. Thomson McKinnon Securities, Inc., 729 F. Supp. 1306, 1307-1308 (D. Kan. 1990). Courts have also held that when one contract provision mandates arbitration and another reserves the right of the parties to apply to a court for relief, the second provision is an "escape clause" that "nullifies the mandatory terms of the earlier language and makes arbitration optional." Independent Oil Workers, 441 F.2d at 654.

Here, there is no basis to compel arbitration. First, Constellation concedes, as it must, that the 20% and 36% Contracts plainly do not compel arbitration. The Court can not compel arbitration under those contracts because NEC has not agreed to arbitration under those contracts. See United Steelworkers of America, 363 U.S. at 582. NEC cannot be deprived of its right to a determination in court, before a jury, on those two contracts.

Second, the Court can not compel arbitration pursuant to the 2001 PPA. The reference in the 2001 PPA to an irrelevant appendix is fatal to any contention that arbitration is appropriate under that contract. See American Rail & Steel Co. v. India Supply Mission, 308 N.Y. 577 (Ct. App. 1955) (staying an already pending arbitration because the contract form mandating arbitration was not attached to the purchase order at issue, and therefore, the parties had not clearly expressed an intent to arbitrate). See also Emerson Radio & Phonograph Corp. v. Illustrated Technical Products Corp., 178 N.Y.S.2d 277, 278 (1958) (stating that "[a] provision

for arbitration may not be implied nor may it be incorporated by a reference to an extrinsic document which is neither exhibited nor attached to the contract itself").

Third, NEC has not clearly and unequivocally relinquished its right to an action in a court of law, as is required for this Court to mandate arbitration. Like the contract in Independent Oil Workers, the 20% and 36% Contracts reserve NEC's right to relief in court, providing for non-mandatory arbitration. The four arbitration clauses at issue do not clearly mandate arbitration, as is required for this Court to compel arbitration. They are not just "somewhat disparate" like the clauses in Rockel, but completely contradictory: two provide for voluntary arbitration while one mandates arbitration. In light of this disparity alone, the Court should deny Constellation's motion to compel arbitration and stay proceedings.

Finally, since NEC is plainly entitled to resolution of the same issue under three of the PPAs in this action and before this Court, it makes no sense to refer a fourth contract with the only mandatory provision to arbitration. Referring one of four contracts to arbitration will not serve the interests of efficiency and economy when this Court must determine the same dispute under three contracts.[18]

**F. The Court should deny Constellation's motion because the *Mobile-Sierra* doctrine is not applicable here.**

Constellation contends that neither the Settlement Agreement nor the FERC order approving it can unilaterally modify or abrogate the PPAs or otherwise divest Constellation of its right to an "equitable adjustment" without an explicit FERC finding under the public interest test specified in the *Mobile-Sierra* doctrine. Constellation is wrong. The *Mobile-Sierra* doctrine protects utility contracts from modification unless FERC finds that the existing contract is contrary to the public interest. "The doctrine protects a party's interest in its contract (unless

[18] Further, even if the Court referred one PPA to arbitration, the Court would first need to determine the issues before the arbitration proceeded, to avoid denying NEC its right to a determination in this Court and before a jury.

overridden by a public interest finding)." Town of Norwood v. FERC, 202 F.3d 392, 400 (1st Cir. 2000)(*Norwood I)*. In both Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348 (1956), and United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332 (1956), public utilities filed rate increases that were inconsistent with the fixed price nature of their utility contracts. In finding that the Federal Power Commission in United Mobile should have rejected the filed rate increase, the Supreme Court held that a public utility's statutory duty to file a rate increase before charging it to a customer does not create a power in the utility to alter contract rates unilaterally. United Mobile, 350 U.S. at 343. On the same day as its decision in United Mobile, the Supreme Court issued its decision in Sierra Pacific and held that the power to increase utility rates contrary to an outstanding contract between the utility company and its customers could be exercised only if and after a hearing had shown the contract rates violate the "public interest." Sierra Pacific, 350 U.S at 355.

NEC does not seek to modify the Settlement Agreement; rather, it seeks to have this Court determine that the terms of both the PPAs and Settlement Agreement preclude Constellation from recovering Capacity Costs from NEC. This dispute lies outside of the *Mobile-Sierra* doctrine for several reasons. First, NEC does not claim that the Settlement Agreement and FERC order approving it modified the PPAs. Constellation invented this fiction to try to avoid what it may regard now as the improvident bargain it struck by entering into the PPAs. The PPAs are fixed price contracts, and they provide that Constellation is responsible for payment of Capacity Costs, just like other suppliers in the market. Compl. ¶ 9, 11. The Settlement Agreement confirms this obligation and makes clear that the responsibility for Capacity Costs remains with Constellation.

Second, NEC does not seek a modification of the Settlement Agreement and, thus, *Mobile Sierra* is once again inapplicable. The Complaint asks the Court to enforce the Settlement Agreement and declare that it – like the PPAs - precludes Constellation from recovering Capacity Costs from NEC and the Rhode Island ratepayers. The Settlement Agreement provides that Capacity Costs remain an obligation of Constellation, and that Constellation cannot pass those costs onto NEC or the Rhode Island ratepayers. Compl. ¶ 23.

Third, Constellation waived any right to recover Capacity Costs payments because of its actions during the Settlement Agreement process, and a *Mobile Sierra* finding is not required. Compl. ¶ 22, 25, 28, 35, and 36; see also supra, at 14-16. As stated above, the *Mobile Sierra* doctrine "prohibits a regulated utility from unilaterally changing the fixed terms of a utility's contract absent a finding from FERC that the existing term adversely affects the public interest." Town of Norwood v. FERC, 217 F.3d 24, 30 (1st Cir. 2000)(*Norwood II).* In this case, the Settlement Agreement is not an unilateral action. To the contrary, by virtue of Constellation's actions in waiving all objections and failing to seek rehearing on the Settlement Agreement, it can not now argue that unilateral action was taken with the Settlement Agreement.[19]

For these reasons, this dispute does not implicate the *Mobile Sierra* doctrine.

## III. **Conclusion**

For the reasons stated, the Court should deny Constellation's Motion to Dismiss in its entirety and proceed to the merits of this claim. The Court should likewise deny Constellation's Motion to Compel Arbitration and Stay Proceedings.

[19]FERC in its Order Accepting Proposed Settlement Agreement issued on June 16, 2006, found that the Settlement Agreement "presents a just and reasonable outcome for this proceeding consistent with the public interest." Thus, issue preclusion prevents Constellation from "relitigating" whether the FERC-approved Settlement Agreement is consistent with the public interest. FERC Order at 1.

THE NARRAGANSETT ELECTRIC COMPANY

By its attorneys,

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Robin Main (#4222)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (Facsimile)
gpetros@haslaw.com
rmain@haslaw.com

Dated: December 13, 2006.

**CERTIFICATION**

I hereby certify that on December 13, 2006, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Gerald J. Petros

Gerald J. Petros (#2931)
Robin Main (#4222)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (Facsimile)
gpetros@haslaw.com
rmain@haslaw.com