**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| The Narragansett Electric Company, Plaintiff, | ) | |
| v. | ) | Dkt. No. 06-404S |
| Constellation Energy Commodities Group, Inc., Defendant. | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ARBITRATION**

Constellation Energy Commodities Group, Inc. ("Constellation") submits this reply in support of its motion pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss all counts in the complaint filed by The Narragansett Electric Company ("NEC"), or, alternatively, to compel arbitration.[1]

**REPLY**

NEC's opposition fails to establish any legally cognizable claim. Recognizing, as it must, that this Court lacks jurisdiction to abrogate or modify the "change in market rules" clauses of the PPAs and that FERC has not done so, NEC jettisons any reformation claim. NEC seeks to avoid dismissal by arguing the PPAs do not allow Constellation an equitable adjustment and that the Settlement Agreement confirms this "interpretation." Alternatively, NEC argues that Constellation's conduct before FERC effected a consensual modification of the PPAs, not subject to filed rate protection. Neither claim pleads a cognizable case before this Court.

---

[1] Capitalized terms not defined herein have the meaning assigned in Constellation's opening memorandum in support of the motion.

Count I fails because NEC's requested relief depends on the Court assuming what FERC would make of the Settlement Agreement applied here and the filed rate doctrine strips the Court of jurisdiction to do so. Constellation did not sign or join the Settlement Agreement, so its effect on Constellation can only be as FERC orders. Moreover, the Settlement Agreement on its face contradicts NEC's argument that it precludes Constellation from recovering an equitable adjustment. The Settlement Agreement specifies that the failure to comment on it does not constitute an admission that a settling party acted consistent with, or contrary to, any contract provision, and the complaint alleges no grounds for treating non-signatories, like Constellation, differently.

Count II fails because NEC's waiver claim depends on this Court usurping FERC's exclusive authority over the formation and affect of the Settlement Agreement. Subject matter jurisdiction aside, the complaint does not establish a *prima facie* case for waiver because it does not allege necessary facts, which if true, would show: (1) NEC asked Constellation to waive its rights under the PPAs; (2) Constellation knowingly and intentionally for due consideration agreed to waive its right to an equitable adjustment; (3) the parties agreed to waive compliance with the provisions of the 2002 and 2001 Contracts permitting amendments only when made in writing, signed by the parties; and (4) that grounds exist for depriving Constellation of the right in every PPA specifying that the failure of a party to insist on strict performance does not waive rights.

Counts III, IV and V fail because the PPAs unambiguously allow for an equitable adjustment when market rule changes occur that materially impact the cost of performance (and direct disputes over that adjustment to good faith negotiation and arbitration, if needed). NEC's failure to squarely address the plain terms of the PPAs belies its contention that the complaint

pleads a cognizable case for contract interpretation.[2] NEC's complaint admits the existing market rules for capacity were terminated and replaced with rules imposing new obligations and mandating fixed prices in lieu of the negotiated prices previously allowed. On the face of it, the complaint alleges that changes mandated by the Settlement Agreement have a material impact on the cost of performance and, consequently, trigger the equitable adjustment clause in each PPA.

The 2002 Contract directs this dispute to arbitration, as does the plain intent of the 2001 Contract (albeit the 2001 Contract errs in referring to Schedule B instead of Section 15.2). NEC's claim that its complaint seeks a determination that Constellation has no right to an equitable adjustment argues the merits of that dispute, not the arbitrability of it. NEC's opposition identifies no allegations in the complaint, which if true, would excuse NEC from its promise to arbitrate. Moreover, the PPAs all require good faith negotiations, which NEC failed to complete prior to filing this action.[3]

## I. THE COURT SHOULD DISMISS COUNTS I AND II FOR LACK OF SUBJECT MATTER JURISDICTION

Acknowledging this Court lacks the power to abrogate the change in market rules provisions, Pl.'s Opp'n at 9, NEC disavows any claim to reforming the PPAs without

---

[2] NEC misapprehends Federal Rule of Civil Procedure 12 when it contends that Constellation's motion is a disguised motion for summary judgment because Constellation attached to the motion to dismiss the PPAs, the Settlement Agreement and FERC Order approving it, and Constellation's August 1, 2006 letter to NEC. Pl.'s Opp'n at 4, n.3. NEC's complaint incorporated those documents by reference, so the Court may properly review them without converting this motion into one for summary judgment. *Greene v. Rhode Island*, 398 F.3d 45, 48 (1st Cir. 2005); *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003). As for Constellation's Rule 12(b)(1) motion, courts can rely on anything to determine whether or not they have jurisdiction to hear the case. *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363-64 (1st Cir. 2001).

[3] The parties have scheduled a meeting of senior representatives, but the ten-day period prescribed by the 2001 and 2002 Contracts for negotiations has not yet begun to run. The 1998 Contracts specify a 30-day period for good faith negotiations. The complaint omits any allegation that these requirements have been met or excused.

Constellation's consent. *Id.* at 8-9, 20. NEC's retreat, nevertheless, does not save its complaint from violating the filed rate doctrine because the relief it seeks still depends on the Court assuming improperly what FERC would make of the Settlement Agreement applied here, where the arcane language on which NEC relies does not on its face "confirm" any interpretation of the PPAs or any "waiver" of a right thereunder.

The gravamen of Counts I and II remains a plea sounding in equity for relief barring Constellation from enforcing its contractual rights, which this Court cannot grant without usurping FERC's exclusive authority over the formation and affect of the Settlement Agreement. NEC's claims under Counts I and II depend on this Court exercising discretion over what a reasonable rate under the PPAs would be considering the circumstances giving rise to the Settlement Agreement and FERC's approval thereof. The Federal Power Act ("FPA") plainly delegates to FERC exclusive authority over such matters and, per the filed rate doctrine, the Court lacks subject matter jurisdiction to affect the rates in any way. *See, e.g., Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986) (filed rate doctrine is "not limited to 'rates' per se"); *Arkansas Louisiana Gas Co. v. Hall (Arkla)*, 453 U.S. 571, 577-79 (1981); *Montana–Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251-52 (1951); *Transmission Agency of N. Cal. v. Sierra Pac. Power Co. (TANC)*, 295 F.3d 918, 922 (9th Cir. 2002) (filed rate doctrine bars claims requiring court to assume how FERC would act).[4]

None of the cases cited by NEC about the authority of courts to interpret FERC orders apply here, where the Settlement Agreement and FERC Order[5] provide no clear, executable

---

[4] The grant of district court jurisdiction in section 317 of the FPA, 16 U.S.C. § 825p, does not overcome the bar erected by the filed rate doctrine to a court assuming what FERC would do. *Montana–Dakota Utils. Co.*, 341 U.S. at 251-52.

[5] *Devon Power LLC*, 115 FERC ¶ 61,340 (2006) (Def.'s Mot., Ex. F, "FERC Order").

guidance for the Court to effectuate.[6] Constellation was not a signatory to the Settlement Agreement, and the relief NEC seeks requires the Court to draw assumptions about how FERC would apply the Settlement Agreement to non-settling parties, which the filed rate doctrine squarely prohibits the Court from doing. *TANC*, 295 F.3d at 931-932 (holding filed rate doctrine barred breach of contract and related claims that depended on assuming how FERC would have treated contract following agency order). Accordingly, the Court should dismiss Count I for lack of subject matter jurisdiction.

The Court, likewise, lacks jurisdiction over Count II because it depends on assuming FERC meant the Settlement Agreement to waive Constellation's contractual rights despite the absence of any clear expression of that effect. Furthermore, NEC's conclusory allegations provide no basis upon which this Court could properly ignore the express provision of the Settlement Agreement not prejudicing contractual rights based on commenting or not on the Settlement Agreement.[7] *See* Settlement Agreement at ¶ 7.

---

[6] In *City of Cleveland v. Cleveland Elec. Illuminating Co.*, the court enforced numerous Federal Power Commission orders directing a named party (the City) to pay charges enumerated in the orders and underlying contracts. 570 F.2d 123 (6th Cir. 1978) (cited by Pl.'s Opp'n at 8). Nothing like that exists in the Settlement Agreement or FERC Order; nor is Constellation a signatory the Settlement Agreement. NEC's reliance on *State of California v. Oroville-Wyandotte Irrigation District* is similarly misplaced. 411 F. Supp. 361 (E.D. Cal. 1975), *aff'd*, 536 F.2d 304 (9th Cir. 1976) (cited by Pl.'s Opp'n at 8). There, the state of California brought suit through a state agency against another California state agency. The issue was whether there was a conflict between a Federal Power Commission order requiring a state agency to construct a tunnel for a canal and a California Public Utility Commission order requiring a different state agency to be financially responsible for the tunnel. Because the state action did not interfere with, substantially alter, or prevent the operation of the federal power projects, the court held that no conflict existed. *Id.*

[7] NEC's claim about what the State of Rhode Island supposedly said or did in conjunction with formation of the Settlement Agreement requires the Court to violate the Settlement Agreement provision rendering communications leading to formation of the Settlement Agreement privileged and confidential under FERC's rules of practice:

> The discussions among the parties related to this Settlement Agreement and the Term Sheet took place within the context of settlement discussions concerning matters covered herein. Discussions leading up

(continued...)

Because the filed rate doctrine protects the PPAs, modification of Constellation's rights could occur only upon FERC finding that ***the PPAs*** so adversely impacted the public interest as to require abrogation. *See, e.g., Boston Edison Co. v. FERC* (*BECo*), 233 F.3d 60, 68 (1st Cir. 2000) (holding that FERC may only override contract rates protected by the *Mobile-Sierra* doctrine "by determining that they are contrary to the public interest"); *Texaco Inc. v. FERC*, 148 F.3d 1091, 1096-97 (D.C. Cir. 1998) (stating that "the public interest necessary to override a private contract . . . requires analysis of the manner in which ***the contract*** harms the public interest and of the extent to which abrogation or reformation mitigates ***the contract's*** deleterious effect") (emphasis added).

Neither the Settlement Agreement nor the FERC Order include any finding that the PPAs "harm[] the public interest" or "the extent to which abrogation or reformation [of the PPAs] mitigates [any] deleterious effect" of the PPAs. To the contrary, the Settlement Agreement explicitly is not a "finding" by FERC, and the FERC Order—despite discussing at length the views of "Load Supporters," which included Rhode Island—says nothing supporting NEC's contention that Section VIII.A of the Settlement Agreement abrogated or waived Constellation's contractual right to an equitable adjustment. *See, e.g.*, FERC Order at PP 83-86. Because there exists no directive from FERC aimed with sufficient particularity and intention at effectuating a

---

> to this Settlement Agreement and the Term Sheet, the finalization of this Settlement Agreement and the Term Sheet, and any drafts of those documents, and any other documentation that reflects the negotiation of this Settlement Agreement and the Term Sheet are privileged and confidential in accordance with the applicable sections of the FERC's Rules of Practice and Procedure, the Federal Rules of Evidence and any other applicable rules of evidence.

Settlement Agreement ¶ 8. It also depends on the Court assuming how FERC would apply its rules of practice.

waiver by Constellation, the Court cannot grant relief under Count II without usurping FERC's exclusive authority over the affect of the Settlement Agreement. Accordingly, the Court should dismiss Count II for lack of subject matter jurisdiction.

## II. THE COURT SHOULD DISMISS ALL COUNTS FOR FAILURE TO PLEAD A LEGALLY SUFFICIENT CASE FOR RELIEF

### A. NEC's opposition does not establish that Counts I, III, IV and V plead claims upon which relief can be granted

NEC's opposition tries to escape the consequences of its legally deficient complaint by contending that Constellation's claim to an equitable adjustment depends on "assumptions" not properly addressed in a Rule 12(b) motion, Pl.'s Opp'n at 14, n.14, but NEC's contention is unavailing since its "interpretation" claims are properly tested on a motion to dismiss. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Kiely v. Raytheon Co.*, 914 F. Supp. 708, 714 (D. Mass. 1996) (proof that reasonably specific damages were caused by the defendant's breach is essential to a contract claim, and dismissal lies if plaintiff fails to allege that); *Blacksmith Invs., LLC. v. Cives Steel Co.*, 228 F.R.D. 66, 71-72 (D. Mass. 2005) (dismissal granted because complaint failed to set forth sufficient allegations establishing breach of contract claim).

NEC's claims are legally deficient because they improperly conflate the allocation of regulatory risk with the assignment of market risk prescribed by the PPAs. NEC's contention that the Settlement Agreement "confirms" the meaning of the PPAs does not withstand scrutiny, and its opposition fails to identify any factual allegation in the complaint, which if true, would excuse compliance with the right in the PPAs to an equitable adjustment after the regulatory changes at hand.[8]

---

[8] NEC's opposition cites to paragraph 9 of the complaint, Pl.'s Opp'n at 4, but that paragraph merely alleges a bald legal conclusion, and says nothing about the equitable adjustment rights under the PPAs or (continued...)

### 1. NEC conflates market risk with regulatory risk

NEC misleads the Court by conflating the allocation of regulatory risk with the allocation in the PPAs of market risk. NEC's contention that its complaint pleads a case that Constellation is "responsible for the payment of Capacity Costs, regardless of how those costs are calculated," Pl.'s Opp'n at 6, fails in the face of the unambiguous right in the PPAs to an equitable adjustment. NEC claims that because the PPAs are fixed-price contracts (with a fuel adjustment) the change in market rules provisions are not implicated. Compl. at ¶¶ 9, 11, 19. However, that bald legal conclusion does not save NEC's complaint since it ignores the plain language of the PPAs reserving the issue of how to deal with intervening regulatory changes for the parties to address when they occur. 2002 Contract, Art. 15, §15.2; 2001 Contract, Art. 14, §14.2; 36% Contract, Art. 18(2); 20% Contract, Art. 18(2).

NEC's focus on Constellation's obligation to procure capacity and supply it to NEC (duties which Constellation has neither breached nor repudiated) misses the separate right prescribed by the PPAs to an adjustment when changes in market rules materially alter "***including economically*** . . . the rights and obligations" of the parties. 2002 Contract, Art. 15, §15.2 (emphasis added); *see* 2001 Contract, Art. 14, §14.2; 36% Contract, Art. 18(2); 20% Contract, Art. 18(2). Although the PPAs allocate to Constellation the risk of future changes caused by market forces, they do not assign to Constellation or NEC the risk of future material economic impact caused by intervening regulatory changes. Instead, the PPAs provide that the parties shall negotiate or arbitrate adjustments needed to address such regulatory action if and

---

any grounds for excusing compliance with that provision. The uncontested duty of Constellation to procure and deliver capacity for the term of the PPAs does not bar Constellation from seeking reimbursement from NEC of the costs of that new regime because both provisions of the PPAs must be given effect. NEC's failure to allege grounds for not effectuating both provisions is fatal to its complaint.

when it occurs. The PPAs explicitly allow a bilateral opportunity for an equitable adjustment following market rule changes "to maintain, as closely as possible, the intent and substance of the allocation of risks and obligations." *Id.*

NEC's admission in its opposition that the parties could not have known at the time of contract formation about "the scope of Capacity Costs and how they would change or be measured over the term of the contracts," Pl.'s Opp'n at 12, demonstrates the rationale for the change in law or market rules provisions. The assignment to Constellation of the responsibility to satisfy all present and future requirements and associated costs for Installed Capacity, does not conflict with the right to an equitable adjustment following rule changes because the PPAs unambiguously provide Constellation the right to an equitable adjustment if regulatory action, as opposed to normal market forces, materially alter (including economically) the obligation of Constellation.

NEC's opposition glaringly omits any explanation of what the change in market rules clauses means under its interpretation. NEC, not Constellation, violates basic rules of contract interpretation by failing to read the PPAs in a manner that gives effect to all provisions of the PPAs. *See, e.g., Computer Sys. of Am., Inc. v. W. Reserve Life Assurance, Co.*, 475 N.E.2d 745, 751 (Mass. App. Ct. 1985) (explaining "the canon of construction that every word or phrase of a contract should, if possible, be given meaning, and that none should be treated as surplusage if any other construction is rationally possible"); *accord Andrukiewicz v. Andrukiewicz*, 860 A.2d 235, 239 (R.I. 2004).

**2. NEC's contention that the Settlement Agreement "confirms" the meaning of the PPAs does not withstand scrutiny**

NEC's contention that the Settlement Agreement "confirms" that Constellation must "continue to pay Capacity Costs during the transition period" does not save its complaint. Pl.'s

Opp'n at 5-6. The language on which NEC relies does ***not*** provide that Constellation cannot seek an equitable adjustment under its validly existing contractual rights. Nor does the retention of "current UCAP products" for the Transition Period and the obligation of suppliers (like Constellation) to make payment to capacity suppliers "as under the current Market Rules and tariffs" evince assent by Constellation to waive its right to an equitable adjustment.

NEC's assertion that it does not bear responsibility for the transition payment fails in light of the plain reading of the Settlement Agreement and FERC Order. FERC Order at P 31. Indeed, FERC recently confirmed that load-serving entities bear responsibility for transition payments:

> The Settlement Agreement also contains a transition period prior to the first commitment period of this FCM. During this transition period – which begins December 1, 2006 and ends June 1, 2010 – fixed payments will be made to all installed capacity resources. **Under the terms of the Settlement Agreement, the payments are made by load-serving entities holding unforced capacity obligations.** . . . The Settlement Agreement requires ISO-NE to file tariff changes to implement the transition period on or before October 1, 2006.

117 FERC ¶ 61,132 at P 4 (2006) (emphasis added).

Even if Section VIII.A of the Settlement Agreement "provides" or "confirms" that Constellation will pay capacity supplied at the fixed prices set for the Transition Period, the Settlement Agreement says nothing about abrogating Constellation's right to an adjustment in the price NEC pays Constellation. The ability of NEC to satisfy its reliability obligations by contracting with wholesale suppliers like Constellation was preserved, but the Settlement Agreement left unaltered whatever bilateral rights parties enjoyed under their individual contracts. Settlement Agreement at ¶ 7.

### 3. The Settlement Agreement effected market rule changes

NEC's opposition advances a new argument (not plead in the complaint) that the Settlement Agreement does not constitute a change in market rule triggering the equitable adjustment rights under the PPAs. Pl.'s Opp'n at 11. NEC cites collectively to paragraphs 5-29 of its complaint to contend that the Settlement Agreement "did not change the Market Rules," *id.* at 6, but that contention cannot be squared with NEC's admission that the Settlement Agreement changed the rules from a market in which capacity prices were set by negotiation, to the fixed price regime for the remaining term of the PPAs, *see, e.g.*, Compl. at ¶¶ 9, 19; Pl.'s Opp'n at 12, n.12 (Settlement Agreement "alters the measure or price of Capacity Costs"). Even in a charitable light, NEC's newly-minted allegation does not save the complaint because, on its face, the Settlement Agreement changes NEPOOL rules. Indeed, NEC's complaint admits those changes have a profound impact on the cost of performing the PPAs. *See* Compl. at ¶¶ 32, 52 (alleging Constellation estimates that costs increased by $150 million).

Moreover, NEC's construction of what Section VIII.A retains for the Transition Period overlooks the amount of capacity now required and the change to fixed-prices from negotiated prices mandated by the Settlement Agreement and ordered by FERC. The Settlement Agreement expressly mandates market rule changes:

> On or before October 1, 2006, [ISONE] . . . shall file with the FERC necessary changes to the ISO New England Inc. Transmission, Markets and Services Tariff, FERC Electric Tariff No. 3 (the "Tariff") to implement the Transition Period as defined in Section 11, Part VIII of this Settlement Agreement. . . . **The Market Rules shall be consistent with, and in furtherance of, all the terms contained in this Settlement Agreement[.]**

Settlement Agreement at 3, ¶ 3.A-B (emphasis added). The FERC Order confirms that the Settlement Agreement mandates market rule changes:

> Market rules governing the FCM will be developed in detail and

> filed with the Commission in at least two packages. The first filing, tentatively planned for October 1, 2006, will include rules for implementing the transition provisions on December 1, 2006. The second filing, which must be made by February 15, 2007, will contain the rules for the FCM. The Settlement Agreement provides that market rules will be developed in accordance with NEPOOL's traditional rule review process[.]

FERC Order at P 33.[9]

NEC's construction of Section VIII.A tries to misdirect attention away from the critical rule change by noting that one rule did not change—the ability of load-serving entities to satisfy their capacity obligations by contracting with wholesale suppliers. The market rule changes that implicate the equitable adjustment clauses are the changes imposing new requirements and mandating fixed-prices for capacity. The retention of NEC's right to satisfy its capacity obligations by contracting with Constellation does not exclude the possibility that Constellation would pursue remedies under the equitable adjustment clauses. Accordingly, Counts I, III, IV and V fail to plead a claim upon which relief can be granted.

**B. Count II fails to plead a cognizable claim for waiver**

Even if the Court has subject matter jurisdiction over Count II, NEC's complaint fails to plead a cognizable claim that Constellation consensually waived its right to an equitable

---

[9] The "termination" of the prior market rules was reiterated in a recent FERC order implementing the Settlement Agreement:

> The proposed market rules changes **terminate the existing Installed Capacity (ICAP) market and replace it with the [fixed-price] transition mechanism set forth in the Settlement Agreement.** During the transition period all installed capacity resources will receive fixed monthly ICAP payments. . . . **[The] existing ICAP market provisions will be replaced in [their] entirety with the proposed market rules changes. The new section III.8 sets forth the rules and procedures associated with transition payments**, ICAP resources, commitment periods, operating procedures and requirements, cost allocation of ICAP payments, sanctions, and other provisions.

117 FERC ¶ 61,132 at P 7-8 (emphasis added).

adjustment and arbitration. By operation of the unambiguous terms of the PPAs and the Settlement Agreement, Constellation's determination not to object to the Settlement Agreement cannot form the basis for finding that Constellation waived an express right in the PPAs. The 2002 and 2001 Contracts permit amendments only when made in writing, signed by all parties (Constellation did not sign the Settlement Agreement), and all the PPAs specify that the failure of a party to insist on strict performance does not waive any rights. 2002 Contract, Art. 14; 2001 Contract, Art. 13; 36% Contract, Art. 20(5); 20% Contract, Art. 20(5).[10] As for the Settlement Agreement, it expressly states:

> Neither support for this Settlement Agreement, nor the Term Sheet relating hereto, nor the submission of this Settlement Agreement and the concurrence in, **or failure to comment on,** the described settlement, shall constitute an admission by any Settling Party that any allegations or contentions . . . were true or valid **or that any Settling Party had acted consistent with, or contrary to, contract provisions,** the FPA, or any other federal or state law or regulation.

Settlement Agreement at ¶ 7 (emphasis added).

By this express provision, Constellation would not have acted inconsistent with the PPAs by not commenting on or opposing the Settlement Agreement, so it could not waive any contractual rights by action or inaction even if it had been a party to the Settlement Agreement. Because NEC's complaint alleges no facts that, if true, would excuse compliance with this provision of the Settlement Agreement, NEC's bald legal conclusion does not satisfy the requirements of Rule 12(b)(6). *See In re Credit Suisse First Boston Corp.*, 431 F.3d 36, 45 (1st

---

[10] Case law expressly rules against NEC's legal conclusion. *See, e.g., Hinds v. Titan Wheel Int'l, Inc.*, 45 F. App'x 490, 494 (6th Cir. 2002). In *Hinds*, the court held that, in light of a contract term specifying that "the waiver of any of the rights granted in the contract does not constitute a permanent waiver of the right[,] . . . Hinds's acquiescence in the changed terms of payment was not a permanent waiver, but that he acceded to Titan's unilateral change because he had no choice and needed to be paid." *Id.*

Cir. 2005) (on motion to dismiss, "court is free . . . to disregard bald assertions, unsupportable conclusions, and opprobrious epithets").

Moreover, NEC's claim that the issue of waiver is a factual matter that cannot be resolved on a motion to dismiss, Pl.'s Opp'n at 15-16, does not satisfy NEC's burden to identify allegations of facts, which if proven, would establish a knowing and intentional waiver for due consideration by Constellation.[11] To survive a motion to dismiss, the complaint must allege facts sufficient to establish each material element to recover under an actionable legal theory. *Platten v. HG Berm. Exempted Ltd.*, 437 F.3d 118, 127 (1st Cir. 2006).[12]

NEC's waiver claim fails to allege that there was offer and acceptance of the contract change; mutual assent to the change; or that the parties intended to be bound by the change. Def.'s Mot. at 20-21 (relying on *Bourg v. Bristol Boat Co., Inc.*, 705 A.2d 969, 971 (R.I. 1998), *Costonis v. Medford Housing Auth.*, 176 N.E.2d 25, 28 (Mass. 1961), *Tri-City Concrete Co. v. A.L.A. Constr. Co.*, 179 N.E.2d 319, 320 (Mass. 1962)). NEC's complaint alleges nothing more than the actions of the State of Rhode Island purported to deprive Constellation of its contractual rights. That claim, however, is not cognizable because one party to a contract cannot change the obligation of the other party to the contract by unilateral action, *New England Mut. Life Ins. Co.*

---

[11] Even if NEC's waiver argument could pass Rule 12(b)(6) muster, that issue is reserved for the arbitrator, not the Court. *See infra* Section III; *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) (stating that "allegations of waiver, delay, or a like defense to arbitrability" are to be decided by the arbitrator, not the court).

[12] Notably, NEC does not cite waiver cases involving arbitration provisions. "[W]aiver [of arbitration provisions] is not to be lightly inferred" because arbitration is strongly favored under federal law. *In re Compl. of Ballard Shipping Co.*, 752 F. Supp. 546, 548 (D.R.I. 1990) (quoting *Page v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*, 806 F.2d 291, 293 (1st Cir. 1986)). Moreover, the authority upon which NEC relies is plainly inapposite. For example, *Whelan v. McNally* dealt with whether the decedent had the requisite mental capabilities to assent to a waiver. 178 N.E. 741 (Mass. 1931) (cited by Pl.'s Opp'n at 14).

*v. Harvey*, 82 F. Supp. 702, 706 (D. Mass. 1949), and in any event the State of Rhode Island is ***not*** a party to the PPAs.

NEC's claim for waiver also fails because the complaint identifies no consideration for Constellation to waive its valuable rights. Claims for unilateral contract modification lie only where due consideration for the modification is exchanged. *Tri-City Concrete Co.,* 179 N.E.2d at 320; *see also Doujotos v. Leventhal*, 171 N.E. 445, 445-46 (Mass. 1930) (citation omitted); *Violet v. Travelers Express Co., Inc.*, 502 A.2d 347 (R.I. 1985).

Furthermore, to overcome an express contract provision (as both the 2001 and 2002 Contracts require) that all modifications be in a writing signed by the parties, NEC must show that the parties waived their contractual right to that condition. *Costonis*, 176 N.E.2d at 28; *see also A.T. Cross Co. v. Royal Selangor(s) PTE, Ltd.*, 217 F. Supp. 2d 229, 232-33 (D.R.I. 2002). NEC fails to allege any facts sufficient to establish that Constellation waived the requirement that all contract modifications be in writing.

Sensing these deficiencies, NEC resorts to contentions (not pled in the complaint) that Constellation never in the past demanded an equitable adjustment despite supposed prior market rule changes. Pl.'s Opp'n at 2 n.2, 11. Since allegations of past performance are not included in the complaint, they cannot form any basis for denying Constellation's motion to dismiss. However, even if Constellation did not enforce its rights on past occasions, NEC fails to allege facts sufficient to excuse compliance with the PPA provisions providing that the failure to insist on strict performance does not waive one's rights. 2002 Contract, Art. 14; 2001 Contract, Art. 13; 36% Contract, Art. 20(5); 20% Contract, Art. 20(5). On their face, the PPAs and Settlement Agreement eliminate NEC's waiver argument. Indeed, in light of Constellation's contractual

right to an adjustment, the decision not to oppose the Settlement Agreement is unremarkable. Accordingly, the Court should dismiss Count II.

## III. NEC'S OPPOSITION ESTABLISHES NO CAUSE FOR EXCUSING COMPLIANCE WITH NEC'S PROMISE TO ARBITRATE

NEC's opposition ignores its obligation in all PPAs to submit this dispute to good faith negotiations among senior company officials. The parties have scheduled a conference, but that duty has not been satisfied, and NEC's opposition identifies no allegation in the complaint, which if true, would excuse NEC from fulfilling that promise. To the extent that NEC has not fulfilled its obligation to engage in good faith negotiations, this Court should compel NEC to do so forthwith. *See, e.g.*, *HIM Portland, LLC v. DeVito Builders, Inc.*, 317 F.3d 41, 44 (1st Cir. 2003); *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 335 (7th Cir. 1987). Should the Court find the duty of good faith negotiation satisfied, the Court should compel arbitration and dismiss or, alternatively, stay the case.

### A. The Arbitration Clauses in the PPAs

NEC's opposition acknowledges that the 2002 Contract prescribes mandatory arbitration, but vainly attempts to persuade the Court to disregard that promise and the Federal Arbitration Act ("FAA") in favor of NEC's desire to litigate. Pl.'s Opp'n at 19. No grounds exist on the face of the complaint for not enforcing that promise as the FAA requires.

NEC claims that the 2001 Contract does not prescribe arbitration because of an obvious clerical mistake in the contract directing the parties to submit this matter to arbitration under the terms of Appendix B, which refers to standard fuel adjustments rather than the arbitration provision set forth in Section 15.2 of that agreement. Pl.'s Opp'n at 16 (citing 2001 PPA at § 14.2). NEC's claim is disingenuous because the parties plainly manifested their intent to

arbitrate this claim. The "change in market rules" clause in the 2001 Contract could not have been more explicit as it provides that, in the event of any dispute relating to a change in market rules, "the Parties agree to submit the matter to arbitration." 2001 Contract, Art. 14.2.

Because a common sense reading of the PPA demonstrates the clear intent to submit the dispute to arbitration, the Court can overlook the clerical error.[13] 17A AM. JUR. 2D *Contracts* § 373 (2006). Contract construction canons provide that,

> A written contract should be construed according to the obvious intention of the parties, notwithstanding clerical errors or inadvertent omissions therein which can be corrected by perusing the whole instrument. Accordingly, words may be transposed, rejected, or supplied if necessary to carry out the intention of the parties to a contract. If an improper word has been used or a word omitted, the court will strike out the improper word or supply the omitted word if from the context it can ascertain what word should have been used. Obvious mistakes in the use of words may be corrected[.]

(footnotes and citations omitted). Under the FAA, the Court's task is to discern the intentions of the parties, mindful of the federal policy favoring arbitration. *HIM Portland*, 317 F.3d at 43. Courts should deny arbitration only if "it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute." *AT&T Tech. Inc. v. Comm. Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers of Am. v.*

[13] *See City of Haverhill v. George Brox, Inc.*, 716 N.E.2d 138, 141 (Mass. App. Ct. 1999) (explaining that "[j]ustice, common sense and the probable intention of the parties are guides to construction of a written instrument. . . . So far as reasonably practicable [a contract] should be given a construction which will make it a rational business instrument and will effectuate what appears to have been the intention of the parties") (second alteration in original) (citations omitted); *W.P. Assocs. v. Forcier, Inc.*, 637 A.2d 353, 356 (R.I. 1994) (stating that a contract is unambiguous when there is only one reasonable interpretation, and that the "intention of the parties must govern if that intention can be clearly inferred from the writing"); *Potthoff v. Safety Armorite Conduit Co.*, 143 A.D. 161 (N.Y. App. Div. 1911) (stating that "[t]o carry out the intention of a contract words may be transposed, rejected or supplied, if necessary, to make its meaning more clear").

*Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)). It cannot be said with positive assurance that the 2001 Contract does not require arbitration.[14]

NEC requests that the Court decide the claims under the 1998 Contracts before submitting the identical claims in the remaining contracts to arbitration. Pl.'s Opp'n at 19. But, NEC's claim rests on unsound principles that would improperly evade NEC's promise to arbitrate in the 2002 and 2001 Contracts, as well as duplicate efforts and lead to potentially conflicting results. Tellingly, NEC fails to address the cases cited by Constellation that support the Court referring the equitable adjustment dispute to arbitration and dismissing or staying the case, and also fails to cite any legal authority for its request that the Court decide the equitable adjustment issue under the 1998 Contracts prior to any arbitration. If the Court does not dismiss under Rule 12(b), Constellation asks the Court to submit the equitable adjustment issue to the fast-track arbitration prescribed by the 2002 and 2001 Contracts, and (as is routinely done) dismiss or stay this case pending arbitration. Def.'s Mot. at 31-32.

### B. NEC's arguments are for the arbitrator, not the Court

NEC has the burden to demonstrate that the dispute is not arbitrable, which it failed to meet.[15] *Am. Heritage Life Ins. Co. v. Lang*, 321 F.3d 533, 539 (5th Cir. 2003). At bottom,

---

[14] NEC's cited authority (Pl.'s Opp'n at 18) does not support its claim that the Court cannot compel arbitration under the 2001 Contract. First, *American Rail & Steel Co.* rests on several factual grounds not present here, including that the contract at issue there provided it was governed by a form (which included the arbitration provision) that was not attached to the contract, arbitration was not mentioned in the contract, and the parties did not intend the form be incorporated into the contract. *Am. Rail & Steel Co. v. India Supply Mission*, 127 N.E.2d 562 (N.Y. 1955). Second, *Emerson Radio & Phonograph Corp.* involved a contract that did not even reference arbitration—"[n]o requirement for arbitration nor reference to arbitration was in any wise contained in any of the written or printed matter." *Emerson Radio & Phonograph Corp. v. Illustrated Technical Prods. Corp.*, 178 N.Y.S.2d 277, 278 (1958).

[15] The legal authority NEC cites (Pl.'s Opp'n at 17) offers no support for meeting this burden. For instance, *Lang* held that the federal policy favoring arbitration does not require arbitration when dealing with fraud in the inducement. 321 F.3d 533, 539-40 (5th Cir. 2003). However, the complaint nowhere alleges that the arbitration provisions in the PPAs were the result of fraud in the inducement (*i.e.*, an

(continued...)

NEC's opposition argues the merits of the dispute that NEC and Constellation agreed to arbitrate. The equitable adjustment dispute is not properly before the Court and should be decided by the arbitration to which the parties agreed. Under the governing standard, the Court can only consider issues relating to the making and performance of the agreement to arbitrate. *Prima Paint Corp. v. Flood & Conklin Mfg.* Co., 388 U.S. 395, 403-04 (1967). The arbitrator is left to decide everything else. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 82-85 (2002).

The question of arbitrability is of limited scope, and gateway procedural questions are not included in the question of arbitrability for the Court. *Id.* "[P]rocedural questions which grow out of the dispute and bear on its final disposition' are presumptively *not* for the judge, but for the arbitrator to decide." *Id.* at 84 (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964)). Arbitrators decide whether conditions precedent to arbitration have been completed. *Id.* at 84-85 (relying on *John Wiley*, 376 U.S. at 557; Revised Uniform Arbitration Act of 2000 § 6(c) and comment 2, 7 U.L.A. 12-13 (Supp. 2002)). Likewise, issues of time limits, notice, laches, and estoppel are for the arbitrator to decide. *Id.* at 85 (citation omitted). Because the FAA creates a "presumption . . . that the arbitrator should decide 'allegations of waiver, delay, or a like defense to arbitrability,'" *id.* at 84 (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25), and NEC identifies no allegation in the complaint that, if true, would rebut that presumption, the equitable adjustment due Constellation under the circumstances is for arbitration, not the Court.

---

illiterate person being lied to about what they are signing) or any other cognizable basis for not referring this dispute to arbitration.

NEC's suggestion that the Court ignore the parties' binding arbitration agreement rests on cases that are factually inapposite.[16] As they concern changes in market rules, the 2002 and 2001 Contracts evidence a clear intention to arbitrate and no conflicting provision or escape hatch is alleged in the complaint, nor has NEC alleged cause for escaping from its promise to negotiate in good faith and then arbitrate (if needed). Accordingly, to the extent the Court determines not to dismiss under Rule 12(b), it should compel arbitration and dismiss or stay the case.

[16] For instance, *Rockel v. Cherry Hill Dodge* involved a consumer contract with conflicting arbitration clauses in small print, and disparate bargaining power. 847 A.2d 621, 623-25 (N.J. Super. 2004) (cited by Pl.'s Opp'n at 17). Likewise, *McNeer v. Thompson McKinnon Securities, Inc.,* dealt with a single arbitration clause that was ambiguous on its face, unlike the four contracts at issue in the instant case. 729 F. Supp. 1306, 1307-08 (D. Kan. 1990) (cited by Pl.'s Opp'n at 18). And, *Independent Oil Workers* involved a single contract that provided for arbitration, yet also included a general contract escape clause stating that nothing in the contract would prevent the parties from pursuing judicial remedies. *Independent Oil Workers v. Mobil*, 441 F.2d 651, 653-54 (3d Cir. 1971) (cited by Pl.'s Opp'n at 17-18).

## CONCLUSION

For these reasons, the Court should dismiss NEC's complaint for lack of subject matter jurisdiction and failure to plead a claim upon which relief can be granted. Alternatively, if the Court determines not to dismiss under Rule 12(b), the Court should compel arbitration and dismiss or stay the case pending arbitration.

Dated: January 8, 2007

Respectfully Submitted,

/s/ Stacey P. Nakasian
Stacey P. Nakasian, Esq. (Bar No. 5069)
Duffy Sweeney & Scott, LTD.
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700-Phone
(401) 455-0701-Fax

Kenneth W. Irvin (DC Bar ID #439395)
Teresa M. Goody
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC 20005-3096
Tel: 202.756.8116
Fax: 202.756.8087
E-mail: kirvin@mwe.com
E-mail: tgoody@mwe.com

*Attorneys for Defendant*
*Constellation Energy Commodities Group, Inc.*

WDC99 1333004-4.070626.0036

CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2007, I electronically filed the foregoing *Reply in Support of Defendant's Motion to Dismiss, or in the Alternative, to Compel Arbitration* with the Clerk of the Court for the District of Rhode Island using the ECF System which will send notification to the following registered participants of the ECF System as listed on the Court's Notice of Electronic Filing:

Gerald Petros
Robin Main
Hinkley Allen & Snyder, LLP
50 Kennedy Plaza
Providence, RI 02903

/s/ Stacey P. Nakasian