EXHIBIT D

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Devon Power LLC, *et al.* Docket Nos. ER03-563-000, -030, -055

# REPORT ON CONTESTED SETTLEMENT BY SETTLEMENT JUDGE

(Issued April 11, 2006)

TO THE COMMISSION:

1. This case was designated for settlement judge procedures by the Commission's order issued October 21, 2005. 113 FERC ¶ 61,075. As scheduled by my January 31, 2006 report to the Chief Judge and the Commission, the Settling Parties[1] filed the proposed Settlement on March 6, 2006, accompanied by an Explanatory Statement that includes a request for expedited consideration of the Settlement by the Commission by June 30, 2006. The filing includes four supporting affidavits by experts who participated extensively in the development of the Settlement provisions.[2] The Settlement filing was supplemented on March 7, 2006, under cover of a letter to the Commission from an attorney for the ISO. The Supplement adds affidavit and Settling Parties' executed signature pages, a corrected table of contents of the Settlement and corrected lists of Settling Parties.

---

[1] The Settling Parties are those who joined in the settlement agreement by signing it. There are 61 one of them. The list of these parties appearing on pages 15-16 of the Explanatory Statement and pages 1-2 of the Settlement as filed on March 6, 2006, was corrected by the Supplement (at Attachments 5 and 6) filed March 7, 2006, under cover of a letter to the Commission from an attorney for ISO New England, Inc. (the ISO). This list was later updated with the addition of Berkshire Power Co., LLC, as requested in Berkshire's March 27, 2006 initial comments which attached its signature page. *See* the updated list in Attachment A to the April 5, 2006 reply comments of the New England Power Pool Participants Committee (NEPOOL).

[2] Attachment 2 is the affidavit of Robert Stoddard on behalf of a number of capacity suppliers. Attachment 3 is the affidavit of Miles Bidwell on behalf of the Connecticut Department of Public Utility Control (CT DPUC). Attachments 4 and 5, respectively, are the affidavits of Peter Cramton and David LaPlante on behalf of the ISO.

2. As predicted in my January 31, 2006 report, based on the then-polling of the parties on the Term Sheet, the Settlement is contested as expressed in initial and reply comments. However, three of the parties listed in my prior report as having indicated at that time that they would oppose the Settlement did not in the end oppose it. They are Central Maine Power Co., Constellation Energy Commodities Group and the Massachusetts Department of Telecommunications and Energy (DTE). The eight parties opposing the Settlement by their filed comments are:

- Attorney General of the Commonwealth of Massachusetts
- Richard Blumenthal, Attorney General for the State of Connecticut
- The Energy Consortium
- Industrial Energy Consumer Group (of Maine) (IECG)
- Maine Public Advocate
- Maine Public Utilities Commission
- NEPOOL Industrial Customer Coalition (ICC)
- NSTAR Electric & Gas Corporation

3. Initial comments on the Settlement were filed on March 27, 2006. The following parties filed initial comments supporting the Settlement:

- Berkshire Power Company, LLC (Berkshire)
- Consolidated Edison Energy, Inc. (CEE)
- EnerNOC, Inc.
- Exelon Generation Company, LLC and Exelon New England Holdings (Exelon)
- "Load Supporters"[3]
- PSEG Energy Resources & Trade LLC (PSEG)
- Reading Municipal Light Department (Reading)
- Select Energy, Inc. (Select)

Initial comments opposing the Settlement were filed by the following parties:

---

[3] The Load Supporters are: The Connecticut Department of Public Utility Control (CT DPUC), the Connecticut Office of Consumer Counsel (CT OCC), the New Hampshire Public Utilities Commission, the Rhode Island Public Utilities Commission, the Rhode Island Division of Public Utilities and Carriers, the Vermont Public Service Board, the Vermont Department of Public Service, and The Connecticut Light and Power Company (CL&P), by its agent Northeast Utilities Service Company.

- The "Objecting Parties"[4]
- The Industrial Energy Consumer Group (of Maine) (IECG)
- The Maine Public Utilities Commission (MPUC) and the Maine Public Advocate (MOPA) (jointly)
- NSTAR Electric & Gas Corporation (NSTAR) (supplemental comments in addition to the Objecting Parties comments in which NSTAR joined)

Initial comments neither supporting nor opposing the Settlement were filed by the PPL Parties. The Long Island Power Authority and its operating subsidiary LIPA (collectively LIPA) filed initial comments requesting that approval of the Settlement be conditioned.

4. Reply comments were filed on April 5, 2006. Comments in reply to comments opposing the Settlement were filed by the following parties:

- American National Power, Inc. (ANP), Granite Ridge Energy, LLC and Transcanada Power Marketing LTD. (jointly)
- Calpine Energy Services, L.P. and Calpine Eastern Corporation (Calpine)
- The "Capacity Suppliers"[5]
- Connecticut Municipal Electric Energy Cooperative (CMEEC)
- ISO New England Inc.

---

[4] The Objecting Parties are: The Attorney General of the Commonwealth of Massachusetts; Richard Blumenthal, Attorney General for the State of Connecticut; NSTAR Electric & Gas Corporation (NSTAR); the NEPOOL Industrial Customer Coalition; and The Energy Consortium (which includes: President and Fellows of Harvard College, Brandies University, Polaroid Corporation, USG Corporation (U.S. Gypsum), Massachusetts Institute of Technology, Procter & Gamble (Gillette), Tufts University, Acushnet Co. (Titleist), Massachusetts Water Resource Authority, and University of Massachusetts Medical School.)

[5] The Capacity Suppliers are Boston Generating, LLC, Mystic Development, LLC, Mystic I, LLC, Fore River Development, LLC (collectively, "Boston Gen"), FPL Energy, LLC, Mirant Americas Energy Marketing, LP, Mirant Kendall, LLC, Mirant Canal, LLC, Entergy Nuclear Generation Company, LLC, Entergy Nuclear Vermont Yankee, LLC, and for purposes of the joint reply comments Dominion Resources, Inc., Dominion Nuclear Connecticut, Inc. and Dominion Energy Marketing, Inc. (collectively, the "Capacity Suppliers"). The Capacity Suppliers' reply comments also are joined by CEE, Granite Ridge Energy and Select.

- Lake Road Generating Company, L.P. and Granite Ridge Energy, LLC (jointly)
- The Load Supporters[6]
- Massachusetts Municipal Wholesale Electric Company and Reading Municipal Light Department (MMWEC/Reading) (jointly)
- Milford Power Company, LLC
- National Grid USA
- New England Power Pool Participants Committee (NEPOOL)
- NRG Companies[7]
- The PPL Parties

Comments in reply to comments supporting the Settlement were filed by:

- The MPUC and MOPA (jointly)
- The "Objecting Parties"

Reply comments were filed by the New York Independent System Operation, Inc. (NYISO) to express agreement with some of the initial comments made by LIPA.

5. Since the Settlement is contested, as the Settlement Judge who was active in the extensive negotiations leading to the Settlement, I may not determine whether to certify the Settlement to the Commission or offer my opinion on whether the Commission should approve the Settlement. Rather, my role is to issue this report informing the Commission that the Settlement has been filed, that it is contested, that supporting and opposing initial and reply comments have been filed, and that the matter now is before the Commission for its consideration. I may, however, highlight some of the matters raised by the Settlement filing and the comments for the Commission's consideration.

6. The Commission held a September 20, 2005 oral argument before it as part of the appeals process of the so-called LICAP Initial Decision in this proceeding.[8]

---

[6] The Load Supporters on the reply are the parties that filed initial comments under that joint name, with the addition of Public Service Company of New Hampshire by its agent Northeast Utilities Service Company.

[7] The NRG Companies are Devon Power LLC, Montville Power, Connecticut Jet Power, and Middletown Power.

[8] 111 FERC ¶ 63,063 (June 15, 2005). LICAP stands for locational installed capacity.

At the request of many of the parties struggling and contesting in litigation how to achieve a fair and equitable solution to the problem of a lack of electrical capacity in New England, the Commission provided a further opportunity for the parties to try to reach a settlement. As stated in its October 21, 2005 order convening settlement procedures, the Commission is concerned about the resource adequacy in New England, especially in the congested areas of Southwestern Connecticut and Northeastern Massachusetts, and the resulting impact on wholesale power prices. 113 FERC ¶ 61,075 (2005) at P 5. The Commission had before it whether the LICAP mechanism adopted in the Initial Decision would provide for just and reasonable prices, and whether there are workable alternative approaches. *Id.* at P 3. The Commission stated it is ". . . committed to ensuring that a workable mechanism that solves the capacity market problems faced by New England is implemented." *Id.* at P 5.

7. It was, and remains, the "Load" interests, which include public utility and municipal load serving entities and state regulatory bodies, that objected categorically to the LICAP mechanism proposed by the ISO and approved by the Initial Decision. Two of the proposed alternatives to LICAP were supported by different coalitions of Load interests, and were labeled the New England Resource Adequacy Market (NERAM) and the New England Locational Resource Adequacy Market (NELRAM). *Id.* at P 7.

8. The Settling Parties believe they have achieved the Commission's goal of a "workable mechanism" that would solve New England's capacity market problems in a way that would result in just and reasonable wholesale power prices. No party claims, nor could they, that the Settlement is the only way to achieve these collective goals of the parties and the Commission.[9] However, the Settlement is the only package that has garnered the overwhelming support of almost all of the parties to resolve the New England resource problem. As discussed in comments, it is in important parts the product of much work that preceded the recent period of negotiations.[10] In the recent period of intense negotiations, from the time of the

---

[9] Nor should the capacity market created by the Settlement for New England necessarily be a template for other regions, even adjacent and nearby ones such as New York and PJM. Some parties who also participate in other markets make this point in their comments.

[10] The Forward Capacity Market (FCM) in the Settlement has important elements of the Central Resource Adequacy Market (CRAM) report considered in the several northeast ISO/pools in 2003. The CRAM model also was relied upon for much of the Load-advocated NERAM, NELRAM and Reliability Options (RO) constructs, which in turn led to the formulation of critical elements of the FCM.

Commission's October 21, 2005 order through the March 7, 2006 filing of the Settlement, it is the result of over 30 formally noticed settlement conferences with my active involvement, and of numerous meetings among the parties in that period, often with my participation. Over time, there were more than 175 individuals representing over 100 parties in the proceeding. *See* the attachment to my January 31, 2006 report for a list of most of the representatives.

9. The Settlement is well-described in the Explanatory Statement and parts of it pertinent to particular comments by parties are highlighted in such comments. A useful concise, and therefore necessarily simplified but nevertheless accurate, overview is presented in the initial comments of PSEG (at pp. 2-3). The FCM established by the Settlement operates an annual descending clock Forward Capacity Auction (FCA) by which the ISO would obtain the Installed Capacity Requirement (ICR) of New England, normally three years in advance.[11] In addition to the FCA, there will be reconfiguration auctions held annually, monthly and seasonably at which capacity obligations can be sold, bought or exchanged. Intermittent and demand resources may participate in supplying capacity in the auctions.

10. The ISO will determine in advance of an FCA, based on whether there are binding transmission limits that would cause zonal price separation, whether there should be Capacity Zones with separate auctions for such zones. Any changes to the objective definitional criteria used to determine this are subject to the existing NEPOOL stakeholder process including consultation with state utility regulatory agencies. As might be expected with most complex endeavors, whether established by settlement, decisions or Commission rules, there are numerous Market Rules that must be developed through the normal NEPOOL process for the detailed implementation of the FCM. Among the many subjects, one would be Market Rules to specify the process for export from or through any import constrained zone determined to exist, over tie lines to external regions. Settlement at III. A.

11. Under the FCM, capacity suppliers will be substantially penalized and also rewarded depending on whether they are available during defined "Shortage Events". Settlement at V. C. This is an evolution of the "shortage hours" approach previously urged on the Commission by the ISO, after the ISO was unsuccessful in its attempt in the litigation to have it adopted in the Initial Decision. It is an element very important to the ISO and Load interests for the

---

[11] The target date for the first auction is early 2008, for a Commitment Period beginning with the June 1, 2010 power year. In that event, the lead time for the first auction will be closer to two years.

long-term market design to help assure that the resources are there when most needed. The heavy penalties and the specific Shortage Events built into this aspect of the Settlement were agreed to by the Suppliers only as part of the overall package of the Settlement. This could be said about many, even most, parts of the Settlement from the standpoint of each side, depending on the specific Settlement provision. As could also be said about many specific Settlement provisions, there has been no showing whether the "Shortage Events" criteria or the level of the penalties would be adopted if a dispute on it had to be pursued before an administrative law judge, the Commission or on appeal in the courts. This is but one of a myriad of many intertwined possible examples of why the Settling Parties emphasize to the Commission that there is a high likelihood that any change or condition to the Settlement would unwind the agreement among the parties. There are many provisions that even the supporting parties might like to "improve" from their point of view to which they were unsuccessful in getting the parties to agree. To add my own metaphor to the sometimes colorful ones in the parties' comments,[12] any further attempts to herd these over 100 cats easily could lead them to scatter in all directions.

12. Before the first Commitment Period could begin, the Settlement provides for a transition period of a schedule of fixed capacity payments beginning December 1, 2006 and ending May 31, 2010, beginning at $3.05/kW-month through May 31, 2008, then rising to $3.75 June 1, 2008 and to $4.10 June 1, 2009. The power year begins June 1 of each year. If due to reasons such as auction failure (e.g. failure under the Insufficient Competition market test), the FCM Commitment Period cannot begin June 1, 2010, then beginning at that time, the results of the auctions conducted by that time will be used to set the capacity price. If that is not possible, due to reasons such as failure to be able to hold the 2010/2011 FCA, the default capacity price at that time will be $4.70 per kW-month. Settlement at VIII. B. and VIII. I. The transition payments will be adjusted for the availability of a unit, at first based on its Equivalent Forced Outage Rate (EFORd) (as adopted in the LICAP Initial Decision), and then phased into the stronger availability incentive of weighted EFORd. Settlement at VIII. D.

13. Unless otherwise agreed in a FERC-approved settlement, transition payments shall be netted against RMR payments. Transition payments shall be considered capacity payments for purposes of netting in the new LFRM market. Settlement at VIII. E. The Settlement keeps matters neutral on the subject of RMR agreements during the transition period by not providing for their automatic termination or right to continue. Section VIII. F. It expressly says that other than not being able to use this Settlement as an argument for automatic termination,

---

[12] I fear I am doomed to recall this proceeding whenever the subjects of drinking Kool-Aid, bugs on the windshield, playing Jenga, etc. come up.

nothing in this comprehensive Settlement prejudices the rights of any party to challenge, seek to terminate or support an RMR agreement. *Id.*

14. As correctly noted by many of the comments, including those in support of the Settlement, the Commission's decision on whether to approve a contested settlement is not based on counting the votes of the parties for and against. However, NEPOOL points out in its reply comments (at 5) that the "exceptionally broad support" for the Settlement, while not legally dispositive, is 'compelling evidence" that the agreement is balanced, just and reasonable. In NEPOOL's view, this support combined with the record before the Commission in this case, clearly demonstrates that the Settlement as a package falls within the zone of reasonableness and is just and reasonable.

15. The exceptionally broad support cited by NEPOOL, and others in their comments, is in my view quite extraordinary and therefore noteworthy considering the previous contentiously warring positions of many of those now agreeing to the Settlement. These strong, competing positions persisted, indeed became even more vigorous, after the LICAP Initial Decision. The Commission is well-aware of this from the September 20, 2005 oral argument before it, and the filings of the parties leading up to the oral argument, including the briefs on exceptions and the filings by Load interests advocating the alternatives to LICAP. The parties and I strived mightily for unanimity, not simply for the Settlement now before the Commission, but for many variations of the package. We came closest with this proposal. The fact that of the 115 parties in the proceeding, 107 parties now support the Settlement (61 who signed on directly, and an additional 46 parties who now are deemed under the regulations to have waived any objections[13]), is impressive support. NEPOOL was able to become a Settling Party signatory by virtue of the supermajority 78.46% sector vote of NEPOOL members under its Commission-approved (in prior proceedings) governance structure. However, given the history of this proceeding, that very high level of support is perhaps less significant a factor for the Commission to consider than the breadth of the support among previously warring factions.

16. The supporting parties include the public utility regulatory agencies of five of the six New England states that are parties in this proceeding: Connecticut, Massachusetts, New Hampshire, Rhode Island and Vermont. Nor were these states of one mind previously. While all of them, and Maine which opposes at least parts of the Settlement, were strong advocates before the Commission for Load interests in opposing the LICAP mechanism and keeping capacity costs down, they had competing interests on locational proposals. Thus, four of them

---

[13] "Any failure to file a comment constitutes a waiver of all objections to the offer of settlement." 18 C.F.R. § 385.602(f)(3).

were part of the NELRAM filing group, but Connecticut and Massachusetts were not. These diverse state regulatory bodies are joined in their support of the Settlement by all the municipal electric systems and all the investor-owned load serving entities except NSTAR. Thus almost all Load interests, which previously had disparate views, especially on how to treat the locational problem of load pockets in congested areas, have united behind the solution of the Settlement. More remarkably, all of these Load interests have been joined in support of this comprehensive Settlement by all the capacity suppliers (including all the generators and alternative resources), most of which previously supported the LICAP mechanism and opposed the alternatives proffered by Load.

17. The "Objecting Parties" segment of Load interests puts forth the view in their comments, colorfully in places, that the Load interests (other than them and a few others) caved in to the pressure of having to agree to anything to avoid the imposition by the Commission of the LICAP proposal. I of course cannot divulge confidential negotiations, but with this matter raised by these parties, I must say that it is at best so exaggerated that it does not comport with my view of this Settlement process. To be sure, as in any settlement, part of the calculus is what might occur in the absence of a settlement, such as in further appeals and litigation. However, in my view, consistent with what is portrayed in the Load Supporters comments, this was a process of ". . . hard-fought compromise among extraordinarily diverse interests . . ." Load Supporters initial comments, at 2. The uncertainty of what might result, and when, is always a driver in settlements, as it was here. Most significantly, the result is a marked departure from, actually complete abandonment of, the LICAP construct. Rather, the FCM as noted above was developed from the Load proposals before the Commission on appeal from the LICAP decision, including at oral argument. This result would not be consistent with a group of Load interests bargaining from an overall inferior position. Indeed, among the negotiators for all sides, there were no shrinking violets, potted plants, or any other variety of weak, passive flora.

18. It is apparent from the opposing comments that despite some views on changes they would like to see in the FCM (changes that would likely upset the Settlement, which is why they were not achievable in the negotiations), the strongest thrust is their unhappiness with the level of the transition payments.[14]

---

[14] Indeed through most of the negotiations, through the January 31, 2006 vote on the Term Sheet, a number of the parties that now oppose the Settlement were important participants, with their experts and negotiators, in the very constructive development among the experts of the main features of the FCM, including price formation, auction mechanics and market power mitigation. I hope that if a capacity market is approved by this Settlement or otherwise by the Commission's rulings, that these parties

The transition payments are an important part of the comprehensive Settlement package to the Settling Parties as a whole. Interestingly, this is the part of the Settlement that the Commission arguably has the most thorough basis on which to make a determination. As noted in the Settlement filing supported by the affidavit of David LaPlante for the ISO, and in other comments, even with adjustment for the PER reduction that would apply to LICAP payments, the transition payments would be much lower than LICAP costs. Thus, among the options before it, based on the record of this entire proceeding, beginning with the Commission's determinations even before the LICAP hearing and Initial Decision, the Commission can determine as part of the overall Settlement package, whether the transition payments are just and reasonable, including in the context of the LICAP record and findings.

Lawrence Brenner
Settlement Judge

---

and their superb representatives will be part of the further development of detailed Market Rules.