# EXHIBIT 1

McDermott
Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington, D.C.
Strategic alliance with MWE China Law Offices (Shanghai)

FILED
OFFICE OF THE SECRETARY
2007 MAR -1 P 4:57
FEDERAL ENERGY REGULATORY COMMISSION

Michael A. Yuffee
Attorney at Law
myuffee@mwe.com
202.756.8066

March 1, 2007

BY HAND DELIVERY

Hon. Magalie R. Salas
Secretary
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20001

Re: Petition for Declaratory Order of Constellation Energy Commodities Group, Inc., Docket No. EL07- -000

Dear Ms. Salas:

Attached, please find the original and fourteen copies of the Petition for Declaratory Order submitted by Constellation Energy Commodities Group, Inc. ("Constellation") in the above-captioned docket. As required under 18 C.F.R. § 381.302(a), along with the Petition, Constellation is enclosing a check in the amount of $19,890.00, made payable to the Treasurer of the United States.

Please contact the undersigned with any questions. Thank you for your assistance with this matter.

Respectfully submitted,

Michael A. Yuffee

Counsel for Constellation Energy Commodities Group, Inc.

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

Constellation Energy Commodities Group, Inc. ) Docket No. EL07-___-000

**PETITION FOR DECLARATORY ORDER**
**OF**
**CONSTELLATION ENERGY COMMODITIES GROUP, INC.**

Pursuant to Section 207 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission ("FERC" or "Commission"), 18 C.F.R. § 385.207, Constellation Energy Commodities Group, Inc. ("Constellation") hereby files this Petition for Declaratory Order against The Narragansett Electric Company ("Narragansett"). Specifically, Constellation requests that the Commission confirm that the ISO New England capacity market settlement in *Devon Power LLC*, 115 FERC ¶ 61,340 (2006) does not abrogate or modify Constellation's bilateral contractual rights and obligations under its wholesale power sales agreements with Narragansett.

## I. SUMMARY OF PETITION

This Petition concerns Narragansett's contention that a Commission-approved settlement, to which Constellation is not a party, has abrogated Constellation's contractual right under four power purchase agreements ("PPAs") with Narragansett to an equitable adjustment to the PPAs following regulatory changes that upend the economic balance that was struck at the execution of the contracts.[1]

Constellation sells wholesale energy and capacity to Narragansett pursuant to four

---

[1] Pl.'s Complaint, Narragansett Electric Co. v. Constellation Energy Commodities Group, Inc., C.A. No. 06-404S, P 33 (D.R.I. filed Sept. 11, 2006)("Complaint") (Attachment 2).

separate power purchase agreements ("PPAs") executed between 1998 and 2002.[2] Constellation has the obligation to provide capacity to Narragansett under each of the PPAs.[3] Furthermore, each PPA contains a provision that requires Narragansett and Constellation to negotiate an equitable adjustment to the price in the PPAs in the event of any regulatory change that materially alters the economic benefits and burdens contemplated by the parties at the time that they executed the PPAs.[4]

On June 16, 2006, the Commission issued an order approving a settlement agreement concerning ISO New England's locational installed capacity market ("LICAP") proposal ("Settlement Agreement" or "LICAP Settlement").[5] The Settlement Agreement effectively replaced the LICAP proposal with what is now called the Forward Capacity Market ("FCM").[6] The FCM includes an auction process for the supply of capacity, with an initial commitment period beginning on June 1, 2010.[7] In addition, the Settlement Agreement includes a transition period, from December 1, 2006 through May 31, 2010, during which capacity suppliers will

---

2 See Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company, Eastern Edison Company, Newport Electric Corporation and Constellation Power Source, Inc. (the "20% contract") dated December 21, 1998, and amended on January 27, 2003 and June 3, 2003; Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company, Eastern Edison Company, Newport Electric Corporation and Constellation Power Source, Inc. (the "36% contract") dated December 21, 1998, and amended on January 27, 2003 and June 3, 2003; Power Supply Agreement between the Narragansett Electric Company and Constellation Power Source, Inc. (the "2001 contract") dated October 5, 2001; Power Supply Agreement between the Narragansett Electric Company and Constellation Power Source, Inc. (the "2002 contract") dated August 23, 2002.

3 *See* 20% Contract at 5; 36% Contract at 5; 2001 Contract at 20; 2002 Contract at 23.

4 *See* 20% Contract at 17; 36% Contract at 17; 2001 Contract at 20-21; 2002 Contract at 24.

5 *Devon Power LLC*, 115 FERC ¶ 61,340 (2006)("June 16 Order").

6 *Id.* at P 2 – 29.

7 *Id.* at P 30.

receive fixed prices for capacity pursuant to a schedule of prices ("Transition Period").[8] The prices to be paid during the Transition Period are dramatically higher when compared with the time that each of the four PPAs was executed, and set at fixed, rather than negotiated rates.[9]

Narragansett (acting through its parent, National Grid) was one of the settling parties that supported the Settlement Agreement.[10] Constellation voted against the Settlement at the NEPOOL Participants Committee and did not sign the Settlement Agreement. Constellation did not file a formal protest at the Commission regarding the Settlement Agreement.[11] Rather, Constellation took no position when the Settlement Agreement was filed with the Commission.

On August 1, 2006, Constellation sent notice to Narragansett formally invoking the right under the PPAs to commence negotiations over the equitable adjustment provision of the PPAs in light of the June 16 Order and the change in the procurement and cost of capacity during the Transition Period.[12] In response to Constellation's request to negotiate an equitable adjustment to the PPAs, Narragansett filed suit in the United States District Court for the District of Rhode Island alleging that the LICAP Settlement precludes Constellation from seeking such equitable adjustment during the Transition Period.[13] Narragansett's contention relies on Section VIII(A) of the Settlement Agreement, which states:

> The current UCAP products shall be retained for the period commencing on December 1, 2006 and ending on May 30, 2010 (the "Transition Period") as provided for in Part VIII. Payments will be made to UCAP entitlement holders, and made by UCAP obligation holders including wholesale standard offer suppliers in Rhode Island as under the current

---

8 *Id.*

9 June 16 Order at P 75 – 81.

10 Settlement Agreement at Appendix A.

11 *See Id.*

12 *See* Complaint at P 30.

13 *Id.*

> Market Rules and tariffs; it being understood that the agreement of wholesale standard offer suppliers in Rhode Island to make UCAP payments is contingent upon the agreement of the state of Rhode Island utility regulatory authorities to support the settlement.[14]

Constellation seeks an order from the Commission that the Settlement Agreement does not abrogate Constellation's contractual rights under the PPAs to negotiate an equitable adjustment to compensate for the changes mandated by the Commission's approval of the LICAP Settlement. The Commission has exclusive jurisdiction over the issues raised herein because the PPAs are Commission-jurisdictional wholesale contracts, and Narragansett's attempt to have a federal court declare that Constellation is precluded from invoking its equitable adjustment rights due to the Settlement Agreement improperly usurps the Commission's authority. Alternatively, the Commission can and should assert its primary jurisdiction over this important issue.

Constellation asserts that the LICAP Settlement has not abrogated its contract rights under the PPAs because:

- The plain language of Section VIII(A) does not purport to amend bilateral contract rights;
- No party to the LICAP Settlement requested any decision from FERC amending or altering Constellation's bilateral contract rights; and
- Constellation did not acquiesce in any way to the notion that Section VIII(A) modifies or abrogates its equitable adjustment rights under the PPAs.

Nothing in this Petition should be construed as raising issues with the Commission's June 16 Order approving the Settlement. Rather, Constellation's position with respect to Section VIII(A) simply is that the parties contractually obligated to procure capacity prior to the Settlement remain responsible for that obligation during the Transition Period and retain their rights as they existed under any extant agreements. Based on the plain terms of the LICAP Settlement and the

---

14 June 16 Order at P 46.

Commission's June 16 Order, nothing therein abrogates or waives the contractual rights and obligations (*i.e.*, the equitable adjustment rights) set forth in the PPAs.

Accordingly, for the reasons detailed below, Constellation respectfully requests that that Commission issue an order clarifying that the LICAP Settlement does not modify or abrogate Constellation's bilaterally-negotiated PPAs, and thus, the equitable adjustment provision of the PPA's continues to be in full force and effect. Commission action on this Petition is necessary to ensure that rights under existing contracts are not inadvertently prejudiced and to ensure a uniform resolution of this issue consistent with the Commission's objectives.

Finally, Constellation respectfully urges expedited Commission action on this Petition. As noted, the matter currently remains pending before the federal court in Rhode Island. Prompt Commission action to assert jurisdiction and dispose of this matter will assist in resolving the extant federal court dispute and allow the parties to move forward toward resolution.

## II. COMMUNICATION

Communications regarding this Petition should be directed to the following individuals, whom we request be included on the official service list established by the Commission in this proceeding:[15]

Kenneth W. Irvin
Michael A. Yuffee
McDermott, Will & Emery LLP
600 13th Street, NW
Washington, DC 20005
202.756.8000
kirvin@mwe.com
myuffee@mwe.com

Lisa M. Decker
Constellation Energy Group, Inc.
111 Market Place, Ste. 500
Baltimore, MD 21202
410.468.3792
Lisa.decker@constellation.com

---

15 Constellation requests waiver of 18 C.F.R. § 385.203(b)(3) to include three names on the service list.

## III. PROCEDURAL BACKGROUND

### A. The PPAs

Constellation is a wholesale power supplier.[16] Narragansett is a retail electric distribution company that delivers electricity to retail end-use customers in Rhode Island.[17] This Petition specifically involves four wholesale power purchase agreements ("PPAs") between the Parties. These four agreements include:

- Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company, Eastern Edison Company, Newport Electric Corporation and Constellation Power Source, Inc. (the "20% contract"). This PPA is dated December 21, 1998, and was amended on January 27, 2003 and June 3, 2003. It is in effect until midnight on December 31, 2009.
- Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company, Eastern Edison Company, Newport Electric Corporation and Constellation Power Source, Inc. (the "36% contract"). This PPA is dated December 21, 1998, and was amended on January 27, 2003 and June 3, 2003. It is in effect until midnight on December 31, 2009.
- Power Supply Agreement between the Narragansett Electric Company and Constellation Power Source, Inc. (the "2001 contract"). This PPA is dated October 5, 2001 and is in effect until December 31, 2009.
- Power Supply Agreement between the Narragansett Electric Company and Constellation Power Source, Inc. (the "2002 contract"). This PPA is dated August 23, 2002 is in effect until midnight on December 31, 2009.[18]

Pursuant to the PPAs, Constellation supplies, at wholesale, portions of Narragansett's total Standard Offer Services requirements.[19] As such, Constellation is required to supply

16 Complaint at P 6.

17 *Id.* at P 5.

18 Narragansett is the successor by merger to Blackstone Valley Electric Company and Newport Electric Corp. – the original Rhode Island parties to the two PPAs executed in 1998. Constellation is the successor by name change to Constellation Power Source, Inc. Eastern Edison Company merged into an affiliate of Narragansett and the portion of 1998 Contracts concerning Eastern Edison ended in 2005.

19 *See* 20% Contract at 1; 36% Contract at 1; 2001 Contract at 1; 2002 Contract at 1.

Narragansett with energy and capacity sufficient to serve those requirements. As Constellation owns no generation in New England, Constellation must procure capacity in the market from upstream sources of generation.[20] The PPAs specify a stipulated base price plus a fuel adjustment factor covering the entire quantity that Constellation delivers under the PPAs.[21]

Each PPA also contains an "equitable adjustment" clause. The parties expressly conditioned their duties on the regulatory landscape remaining unchanged from the date of contract execution. Rather than allocate all risks of regulatory change to one party, each PPA has a provision that binds Narragansett and Constellation to negotiate an equitable adjustment in the aftermath of any regulatory change that materially alters the economic benefits and burdens contemplated by the parties at the time of contracting.[22] This clause is invoked when intervening changes in law or market rules materially affect the costs and obligations to provide Standard Offer Service. Thus, under the PPAs neither of the contracting parties is forced to bear solely the risk of material regulatory changes. Instead, both parties benefit from the inclusion of equitable adjustments in the event of material regulatory changes that alter the economics of the parties' bargain.

Specifically, the 20% and 36% Contracts provide that:

> 18(2) This Agreement is intended to comply with all NEPOOL Criteria, Rules and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or altered by NEPOOL or the ISO, in a manner which materially affects the costs and obligations to provide Standard Offer Service, the Companies and Supplier shall meet to determine appropriate compensation to the affected Party.

---

20 *See* Complaint at P 7.

21 *See* 20% Contract at 3-5; 36% Contract at 5-6; 2001 Contract at 1,4; 2002 Contract at 1.

22 *See* 20% Contract at 17; 36% Contract at 17; 2001 Contract at 20-21; 2002 Contract at 24.

> 18(3) In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases Suppliers' costs or obligations to provide Standard Offer Service or the Companies are prevented from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier, the Companies and Supplier shall meet to determine appropriate compensation to the negatively impacted Party.[23]

The 2001 Contract likewise incorporates the parties' covenant to negotiate (and if necessary, arbitrate) any equitable adjustments needed to address changes that amend or terminate a Rule and which materially affect the costs and obligations to provide Standard Offer Service. Specifically, Article 14.2 reads:

> This Agreement must comply with all NEPOOL market rules and/or operating procedures ("Rules"). If, during the term of this Agreement, the NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate a replacement Rule ("Replacement Rule"). The intent of the Parties is that any such Replacement Rule reflect, as closely as possible, the intent and substance of the Rule being

---

23 20% Contract at 17; 36% Contract at 17.

Article 18 further provides that "[i]n the event that the Parties are not able to agree on the materiality of the increased cost or obligation or the amount to be reimbursed, Parties shall attempt to resolve the matter in accordance with Article 13." Article 13 requires that:

> Subject to Article 8(3), all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith.... In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. 20% Contract at 14; 36% Contract at 14.

> replaced as such Rule was in effect prior to such termination or amendment of the NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Appendix B [sic] . . . and to seek a resolution of the matter consistent with the above stated intent. [24]

Finally, the 2002 Contract also includes the parties' covenant to negotiate an equitable adjustment. Section 15.2 of the 2002 Contract reads:

> If, during the term of this Agreement, any NEPOOL Rule [defined at page 3 of the 2002 Contract as all rules, operating procedures, agreements, manuals, protocols and tariffs adopted by NEPOOL/ISO, and accepted by FERC], Rhode Island statute or other applicable law is terminated or amended in a manner that would eliminate or materially (including economically) alter any rights or obligations of a Party hereunder, the Parties agree to negotiate in good faith to amend this Agreement so as to maintain, as closely as possible, the intent and substance of the allocation of rights and obligations contemplated hereunder. If after a period of thirty (30) days from the date on which a Party provides written notice to the other Party of the need to amend this Agreement, the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Section 16.2 (*regardless of the amount, if any, in controversy*) and to seek a resolution of the matter consistent with the above stated intent.[25]

---

[24] 2001 Contract at 20-21.

The reference in the 2001 Contract to Appendix B appears to be an error. Presumably, the correct reference should be to Section 15.2. The direction of Section 14.2 to "submit the matter to arbitration under ***the terms*** . . ." evidences the parties' intent to submit equitable adjustment disputes to arbitration regardless of the amount in controversy. *See* 2001 Contract at 21 (emphasis added).

[25] 2002 Contract at 23-24 (*emphasis* added).

Section 16.2 provides, in relevant part, that:

> Any dispute between the Company and Seller arising under or in connection with or relating in any way to this Agreement shall be referred to a senior representative of the Seller designated by the Seller and a senior representative of the Company designated by the Company for resolution on an informal basis as promptly as practicable. In the event the designated senior representatives are unable to resolve the dispute within ten (10) days, or such other period as the Parties may jointly agree upon . . . such dispute shall be submitted to arbitration and resolved in accordance with the arbitration procedure set forth in this Section 16.2. . .

**B. ISO New England LICAP Proceeding and Settlement**

In 2004, at the behest of the Commission to address reliability issues, ISO New England proposed the LICAP market in order to increase investment incentives in New England's electricity market.[26] Due to concerns expressed by numerous parties, FERC delayed implementation of this framework.[27] Beginning in the Fall of 2005, interested parties negotiated a Settlement Agreement aimed at creating a regulatory regime that would spur development of new electric generation and ensure maintenance of existing units, and therefore, to ensure reliable service in the future.[28]

The Settlement Agreement proposed the FCM, that includes a capacity auction in which generators of electricity will bid the number of megawatts they will be willing to supply.[29] Under the Settlement Agreement, the commitment period for the first FCM Auction will commence on June 1, 2010.[30] However, during the Transition Period, companies needing to procure capacity, such as Constellation, would be required to purchase UCAP under a fixed price schedule negotiated among the settling parties.[31] The Settlement Agreement also included Section VIII(A), which provided that, during the Transition Period, the UCAP payment

---

> [T]he arbitrators shall be knowledgeable in electric utility matters, including wholesale power transactions and power market issues[.] 2002 Contract at 24.

While Section 16.2 also states that the matter shall be submitted to arbitration "to the extent a reasonable estimate of the amount in dispute does not exceed two hundred fifty thousand dollars ($250,000.00)," Section 15.2 nullifies this cap when there is a law or regulatory change equitable adjustment dispute.

26 June 16 Order at P 6.

27 *Id.* at P 14.

28 *Devon Power LLC*, 113 FERC ¶61,075 at P 10 – 14 (2005).

29 June 16 Order at P 18.

30 *Id.* at P 10.

31 *Id.* at P 30 – 33.

obligations "including wholesale standard offer suppliers in Rhode Island" would be made "as under the current Market Rules and tariffs."[32]

The proposed Settlement Agreement was filed with the Commission on March 6, 2006.[33] Constellation neither signed onto the Settlement Agreement, nor filed a formal objection to it. On June 16, 2006, the Commission approved the Settlement Agreement.[34] Section VIII(A) was never referenced or discussed in the FERC Order or the explanatory statement. Also, no party requested modification of the PPAs under FPA Section 206.

**1. Instant Dispute**

As noted above, the terms of the approved Settlement Agreement for the Transition Period mandates that capacity suppliers will receive fixed prices for capacity in lieu of the negotiated terms allowed under the regulatory regime when the PPAs were executed. In addition, the quantity of capacity and the fixed prices for capacity during the Transition Period are substantially higher than at the time that the PPAs were executed.[35] This change alters the balance of economic benefits and burdens struck in the PPAs. Consequently, Constellation notified Narragansett on August 1, 2006 of its request to negotiate in good faith an equitable adjustment under the terms of the PPAs.[36]

Narragansett failed to abide by the equitable adjustment contract terms in the PPAs and cut off negotiations with Constellation after one meeting.[37] Instead, Narragansett filed a

---

32 Def.'s Mot. Dismiss, Narragansett Electric Co. v. Constellation Energy Commodities Group, Inc., C.A. No. 06-404S, P 33 (D.R.I. filed October 23, 2006)("Constellation Motion").

33 June 16 Order at P 1.

34 *Id.*

35 *Id.* at P 30 – 33.

36 Complaint at P 30

37 Constellation Motion at P 13.

complaint in the United States District Court of Rhode Island on September 11, 2006 seeking a declaratory judgment that Constellation could not invoke contract provisions for an equitable adjustment in light of this regulatory change.[38] Constellation filed to dismiss the complaint on October 23, 2006.[39]

On January 9, 2007, the State of Rhode Island and Providence Plantations and the Rhode Island Division of Public Utilities and Carriers (collectively "State"), by and through the Rhode Island Attorney General, filed a Motion to Intervene and to Join Claim in the federal court proceeding.[40] In addition, the State has sought to add a new count through its own complaint.[41] Constellation filed to oppose the State's intervention and dismiss its complaint on January 29, 2007.[42] The district court heard argument on the State's intervention on February 5, 2007, and will hear argument on the motions to dismiss on March 5, 2007.

Narragansett asserts that the federal courts are the proper venue to interpret whether the LICAP Settlement alters the terms of the PPAs and precludes Constellation from seeking an equitable adjustment from Narragansett. Constellation disagrees and is filing this Petition with the Commission.

## IV. PETITION

By and through its federal court action, Narragansett seeks a finding that Section VIII(A) of the LICAP Settlement has abrogated Constellation's contract right in the PPAs to an equitable

---

38 Complaint at P 30.

39 *Id.*

40 St.'s Mot. Intervene, Narragansett Electric Co. v. Constellation Energy Commodities Group, Inc., C.A. No. 06-404S, P 33 (D.R.I. filed January 9, 2007).

41 *Id.* at 26 – 30.

42 Def's Opp. to St.'s Mot. and Mot. to Dismiss, Narragansett Electric Co. v. Constellation Energy Commodities Group, Inc., C.A. No. 06-404S, P 33 (D.R.I. filed January 29, 2007).

adjustment in the event that a regulatory change materially alters that economic balance struck at the execution of the PPAs.[43] Constellation seeks a Commission order finding that the Settlement Agreement did not abrogate Constellation's right under the PPAs including, more specifically, the equitable adjustment provision.

Constellation respectfully submits that the issue of whether the LICAP Settlement, in any way, has modified the Constellation-Narragansett PPAs is within the Commission's sole and exclusive jurisdiction to address. As such, Constellation has moved to dismiss Narragansett's federal court action. Alternatively, Constellation respectfully contends that, pursuant to *Arkla*, the Commission should exercise its primary jurisdiction and grant the relief sought herein.

### A. The Commission Has Exclusive and/or Primary Jurisdiction to Address The Issue Raised In This Petition

The FPA, 16 U.S.C. §§ 824-824m, grants the Commission "exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce."[44] Through the FPA, Congress granted the Commission plenary authority over all sales of electric energy at wholesale in interstate commerce.[45] The Commission's power includes the exclusive authority to determine the reasonableness of wholesale rates.[46]

Although the Commission and courts enjoy concurrent jurisdiction over matters of contract interpretation and enforcement, the Commission has exclusive jurisdiction to determine

---

43 Complaint at P 33.

44 *Pub. Util. Dist. No. 1 v. IDACORP Inc.* (*Grays Harbor*), 379 F.3d 641, 646 (9th Cir. 2004) (citations omitted) (emphasis omitted).

45 *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986).

46 *Miss. Power & Light Co., v. Miss.*, 487 U.S. 354, 371 (1988); 16 U.S.C. § 824e(e)(2).

rates for the sale of wholesale power.[47] The Commission's exclusive authority is not limited to rates *per se*, but extends to, among other things, matters that directly affect wholesale rates.[48]

The issue presented here is whether Section VIII(A) of the LICAP Settlement has modified the PPAs between Constellation and Narragansett to remove the equitable adjustment provisions. The LICAP Settlement provides the rules for the sale of capacity in interstate commerce – a matter that, on its face, is subject to the Commission's exclusive jurisdiction. To the extent that one were to consider the issue presented herein to include contract interpretation and enforcement, the Commission still retains exclusive jurisdiction because Constellation is asking the Commission to clarify a matter that directly affects wholesale capacity rates. And, as noted below, there are additional grounds for the Commission to assert its exclusive jurisdiction over the issue raised in this Petition.

### 1. The Commission Has Exclusive Jurisdiction Pursuant To The Filed Rate Doctrine

The filed rate doctrine prohibits a court from "entering [any] judgment that would serve to alter the rate paid by a plaintiff."[49] In addition to barring court-imposed ***changes*** to filed rates, the filed rate doctrine also bars suits challenging the services, billing or other practices that ***affect*** the filed rate.[50] Consequently, courts have no authority to grant relief that alters provisions of a contract that affect the rate filed with and accepted by the Commission. While courts have

---

47 *Arkansas Louisiana Gas Co. v. Hall (Arkla)*, 453 U.S. 571, 583 (1981); *Pub. Util. Dist. No. 1 v. Dynegy Power Mktg., Inc. (Snohomish PUD)*, 384 F. 3d 756, 761-62 (9th Cir. 2004); *Utilimax.com, Inc. v. PPL Energy Plus, LLC*, 378 F. 3d 303 (3d. Cir. 2004).

48 *Nantahala*, 476 U.S. at 966-67.

49 *Bryan v. Bellsouth Commc'ns, Inc.*, 377 F.3d 424, 429 (4th Cir. 2004) (citation omitted).

50 *Brown v. MCI Worldcom Network Servs., Inc.*, 277 F.3d 1166, 1170 (9th Cir. 2002); *see also Stand Energy Corp. v. Columbia Gas Transmission Corp.*, 373 F. Supp. 2d 631, 635 (S.D.W.Va. 2005) (citing 15 U.S.C. § 717c(c)) (ruling that the filed rate doctrine "extends to the services, classifications, charges and practices included in the rate filing").

authority to hear cases concerning breaches of filed rates, courts may not award damages using a rate other than the one on file with the Commission.[51] Regardless of whether the court believes a different rate would be more reasonable, the filed rate doctrine bars it from assuming any right to a rate different from the rate approved by the Commission.[52] No matter how reasonable an alteration of the rates at issue may seem, the filed rate doctrine bars a court from granting any such relief.[53]

In the case of Narragansett's declaratory judgment action, Narragansett seeks contract reformation — *i.e.*, a ruling that the Settlement Agreement and FERC Order abrogated Constellation's right to an equitable adjustment following the regulatory change at hand.[54] As such, Narragansett seeks a direct, material alteration of a provision that affects the rate on file with the Commission. As a result, Narragansett's federal court complaint seeks exactly the relief that the filed rate doctrine requires the Commission alone to grant because it concerns interpretation of the Settlement Agreement as applied to the PPAs.

The PPAs at issue were all executed pursuant to Constellation's market-based rate authority. The PPAs are wholesale sales subject to the Commission's exclusive jurisdiction under the filed rate doctrine. At its essence, "the filed rate doctrine provides that state law, and some federal law (e.g., antitrust law), may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question."[55] The federal district court in Rhode Island simply cannot provide Narragansett the equitable relief that

---

51 *Arkla*, 453 U.S. at 579 ("It would undermine the congressional scheme of uniform rate regulation to allow a state court to award as damages a rate never filed with [FERC]").

52 *Montana-Dakota*, 341 U.S. at 251-52.

53 *AT&T v. Cent. Office Tel., Inc.*, 524 U.S. 214, 223 (1998).

54 Complaint at P 31

55 *Id.* at 929.

it seeks as it would materially alter a contract provision that affects a rate filed with the Commission.[56]

### 2. Alternatively, The Commission Has Primary Jurisdiction

Alternatively, if the Commission does not assert exclusive jurisdiction over these issues, the Commission can and should assert primary jurisdiction and take action under the standard articulated in *Arkansas Louisiana Gas Co. v. Hall, et al.*[57] In *Arkla*, the Commission established a three-part test to determine whether to assert primary jurisdiction over contractual disputes related to jurisdictional activities over which it has concurrent jurisdiction with state and federal courts.[58] The test considers whether:

(1) the Commission possesses some special expertise that makes the case peculiarly appropriate for Commission decision;[59]

(2) there is a need for uniformity of interpretation of the type of question raised in the dispute;[60] and

---

56 *Arkla*, 453 U.S. at 579-580; *Montana-Dakota*, 341 U.S. at 251-521; *Snohomish PUD*, 384 F.3d at 761-62; *California v. Dynegy, Inc.*, 375 F.3d 831, 836-39 (9th Cir. 2004); *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 416 (1st Cir. 2000).

57 7 FERC ¶ 61,175 (1979).

58 FERC has concurrent jurisdiction over contract disputes. *See City of Camden v. Carolina Power and Light Co.*, 56 FERC ¶ 61,149 (1991) ("Such issues of contract construction and interpretation are within this Commission's concurrent jurisdiction with the courts, and whether the Commission decides to exercise its primary jurisdiction over the case is a matter within the Commission's discretion.").

59 Although FERC noted in *Arkla* that it is "no more expert than a court in deciding non-technical contract questions," FERC has acknowledged that the interpretation of some contractual clauses "may involve examination of technical issues" which are within FERC's special expertise. 7 FERC at 61,322. The Commission in *Arkla* cited *Pure Oil Co. v. FPC* as an example of a contract dispute that did involve the special expertise of FERC. In Pure Oil, the "interpretation of a favored nation clause involved the issue of whether certain purchased gas possessed exceptional qualities for peaking purposes which enhanced its value to the extent that a seemingly triggering price was not higher on a comparative basis than the prices paid under the contract." *Arkla* at 61,323 (citing *Pure Oil*, 229 F.2d 370 (7th Cir. 1962)).

60 The contracts in the *Arkla* case were private contracts, thus FERC determined there was no need to impose uniformity. FERC stated, however, that there may exist appropriate cases

(3) the case is important in relation to the regulatory responsibilities of the Commission.[61]

Each of these factors weighs heavily in favor of issuing the declaratory order that Constellation seeks.

First, this Petition seeks clarification of a Commission order. The Commission certainly has special expertise concerning its own orders. More specifically, the Commission has expertise concerning matters related to capacity markets. Moreover, the Commission has special expertise related to the interpretation of settlement agreements arising from proceedings held before its settlement judges and filed with the Commission. The settlement process was managed and administered by the Commission, and the Commission is best suited to address the impact and meaning of settlements that it approves. The Commission should not leave such important matters to the courts to address.[62]

---

where FERC must impose uniformity in order to carry out its statutory responsibilities. *See Arkla* at 61,323.

[61] In *Arkla*, since Hall was a small producer that was not required to file rate increases with FERC, the outcome of the case did not have a great impact on FERC's regulatory responsibilities. *See Arkla* at 61,323.

[62] *See, e.g. United Illuminating Co. v. Dominion Energy Mktg. Inc.*, 111 FERC ¶ 61, 224 (2005). In that case, FERC discussed the need for its oversight in matters involving its regulatory responsibilities and policies with regard to provisions that it had previously accepted:

> [W]e find that it is appropriate for the Commission to exercise its primary jurisdiction over the dispute. First, the Commission has special expertise regarding the responsibility for congestion costs and losses under SOS agreements, such as the PSA at issue in this proceeding. Concepts such as "transmission congestion costs" and "reliability must-run," which may be unfamiliar to a court, are subjects frequently addressed by the Commission. Moreover, the Commission previously determined the need for, and accepted as just and reasonable, the Reliability Cost Tracker charges over which the parties now dispute. Second, while the contract at issue may be unique, there is nonetheless a need for consistent application and understanding of terminology used in the market design approved by the Commission. Third, the matters raised in the complaint are important in relation to the regulatory responsibilities of the Commission.

Second, there is a need for uniformity with the type of interpretation requested herein. Stated broadly, the policy issue raised in this Petition is whether a Commission-approved settlement can implicitly and indirectly modify a bilateral contract involving a non-signatory to the Settlement Agreement. If this issue was left to the courts to decide, there could be (and likely would be) various different interpretations among the various judicial jurisdictions. Thus, uniformity is crucial in this instance.

Third, this Petition presents a number of important policy issues that are important with respect to the Commission's regulatory responsibilities, namely: can settlements modify bilateral contracts without the Settlement identifying contracts to be explicitly modified and the Commission making particularized findings of the basis justifying the relief granted in the Commission order approving the settlement; and should the courts or the Commission assert jurisdiction over clarifying or interpreting Commission-approved settlements. Among other issues, if left to the courts to decide these issues, the Section 602 settlement privilege, 18 C.F.R. § 385.602, could be significantly compromised because courts may allow discovery regarding how the settlement was reached and what was intended by its provisions. Another concern is maintaining faith in the effectiveness and usefulness of the Commission's settlement process, which would be undermined if courts may apply their own individual interpretations. Thus, this Petition implicates the Commission's interest in fostering and supporting its settlement process.

---

*Id.* at 62,023. *See also PPL Elec. Utils. Corp.*, 101 FERC ¶ 62, 546 (ruling on agreement because the agreement, "which PPL asks us to interpret, was approved by the Commission, it was entered into by the parties as a result of the evidentiary hearing procedures established by the Commission in the Stranded Cost Order and was negotiated and agreed to by the parties following the development of an extensive record in that proceeding. The issues . . . are directly related to the . . . policies and guidelines set forth by the Commission"). *Compare Nevada Power Co.*, 111 FERC ¶ 61,111 at P 15 (2005) (order declining to exercise jurisdiction over dispute found to be merely a contract dispute).

### B. The LICAP Settlement Did Not Modify the PPAs

#### 1. Section VIII(A) of the LICAP Settlement Does Not Even Purport to Amend Bilateral Contracts

A reading of the plain language of Section VIII(A) of the LICAP Settlement makes clear that the provision does not purport to amend Constellation's bilateral contract rights. Section VIII(A) states that:

> The current UCAP products shall be retained for the period commencing on December 1, 2006 and ending on May 30, 2010 (the "Transition Period") as provided for in Part VIII.I. Payments will be made to UCAP entitlement holders, and made by UCAP obligation holders including wholesale standard offer suppliers in Rhode Island as under the current Market Rules and tariffs; it being understood that the agreement of wholesale standard offer suppliers in Rhode Island to make UCAP payments is contingent upon the agreement of the state of Rhode Island utility regulatory authorities to support the settlement.[63]

The June 16 Order explained that "obligation holders" means "load-serving entities," like Narragansett.[64] In that regard, the natural and reasonable construction of Section VIII(A) provides that, the obligation of load-serving entities to pay UCAP entitlement holders may be satisfied (where applicable) by allowing the LSE to contract with a wholesale standard offer service supplier to procure the requisite capacity, as the then-current rules allowed. Section VIII(A) further identifies the parties from whom generators providing capacity may look for payment. Section VIII(A) does not address, in any way, bilateral contractual provisions allowing Constellation or Narragansett to return to the economic balance struck between the parties at the time of contract formation. Indeed, any interpretation that finds a bar to a wholesale standard offer supplier exercising its rights with its customers would extend the scope of the Settlement

---

63 Constellation Motion at P 33.

64 June 16 Order at P 31. *See also Devon Power LLC*, 117 FERC ¶61,132 at P 4 (2006).

Agreement beyond the terms plainly expressed and nowhere justified in any submission to the Commission.

Section VIII(A)further provides that those wholesale standard offer suppliers in Rhode Island who agree to the Settlement do so contingent on the agreement of the Rhode Island utility regulators to support the Settlement. This clause does not specify that Constellation – which did not sign the Settlement Agreement – would be bound to relinquish an important contractual right.

Section VIII(A) says nothing about amending or waiving particular bilateral contract rights. Moreover, Constellation received no consideration for the alleged abrogation of its equitable adjustment rights. As a result, the contention that Section VIII(A) somehow amends the PPAs and abrogates Constellation's right to seek an equitable adjustment finds no support in the plain language of this provision, the initial and reply comments filed concerning the Settlement Agreement, or in the Commission's orders approving the LICAP Settlement and denying rehearing.

### 2. No Party To The LICAP Settlement Requested Any Decision Altering or Amending Bilateral Contract Rights

The LICAP Settlement did not purport to address bilateral contract rights. No party to the LICAP Settlement requested that the Commission approve of amending or altering bilateral contract rights. In fact, none of the submissions submitted to the Commission regarding the Settlement Agreement addressed altering or amending bilateral contract rights. At no time did any party request a ruling that the Settlement Agreement precluded parties from asserting any equitable adjustment rights that may exist under bilateral contracts. Accordingly, the

Commission made no findings that the LICAP Settlement altered a party's bilateral contract rights.

Judicial and Commission precedent provides that one of the key protections afforded to fixed-rate contracts is that, when a party seeks to unilaterally modify such a contract, the Commission must make particularized findings ***concerning the contract at issue.***[65] Such contracts cannot be modified *sub silentio* or by implication as the determination is in, in fact, contract specific.[66] In this case, no party requested modification of any bilateral contract.[67] In approving the Settlement Agreement, the Commission made no particularized findings that any contract should or would be modified.[68]

65 *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.* (*Mobile*), 350 U.S. 332 (1956); *EPC v. Sierra Pac. Power* (*Sierra*), 350 U.S. 348, 355 (1956). The U.S. Supreme Court devised the *Mobile-Sierra* standard because the Federal Power Act depends on settled contractual expectations of contracting Parties being disrupted "only if the public interest so requires." *Texaco, Inc. v. FERC*, 148 F.3d 1091, 1095 (D.C. Cir. 1998). *See also BECo*, 233 F.3d at 64-65, *Town of Norwood*, 202 F.3d at 408 (1st Cir. 2000).

66 *Texaco*, 148 F.3d at 1096-97 (("the public interest necessary to override a private contract . . . requires analysis of the manner in which ***the contract*** harms the public interest and of the extent to which abrogation or reformation mitigates ***the contract's*** deleterious effect") (*emphasis added*)).

67 Constellation contends that the any modification of its contract rights would have to made pursuant to the *Mobile-Sierra* doctrine. To be clear, Constellation does not raise the *Mobile-Sierra* doctrine in order to ask the Commission to determine the standard of review applicable to its fixed-rate PPAs. That issue is not ripe for adjudication as there were simply no findings by the Commission in the LICAP Settlement with respect to abrogating any party's bilateral contract rights. Rather, Constellation is asking the Commission to clarify that its approval if the Settlement Agreement did not abrogate the right to an equitable adjustment specified in each of the PPAs.

68 In the case of broad regulatory changes to the markets, the Commission has made changes to fixed-rate contracts on a general basis. For example, in approving Order No. 888, the Commission addressed the question of whether to permit parties to renegotiate *Mobile-Sierra* contracts in light of wholesale regulatory changes. *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services*, 75 FERC ¶61,080 (1996)("Order 888"). In that case, the Commission held that it is "appropriate that our public interest finding be made on a generic basis given the fact that by this Rule, we are requiring full open access that

In approving the LICAP Settlement, the Commission made no findings of any type supporting contract modification. And, the Commission made no specific or particularized findings with respect to the PPAs at issue. In fact, the Commission made no finding of any kind with respect to any bilateral contract between Constellation and Narragansett. Thus, the LICAP Settlement did not modify or abrogate the PPAs.

### 3. Constellation Did Not Acquiesce To Any Modification Or Abrogation Of the PPAs

As noted, Constellation is not a signatory to the Settlement and did not support the Settlement. However, the Settlement Agreement does not indicate that one's failure to support the Settlement or silence vis-à-vis the Settlement indicates a waiver of rights under bilateral contracts between wholesale suppliers and their customers. In fact, the Settlement Agreement explicitly purports to ***not*** prejudice contractual rights of parties:

> Neither support for this Settlement Agreement, nor the Term Sheet relating hereto, nor the submission of this Settlement Agreement and the concurrence in, ***or failure to comment on***, the described settlement shall constitute an admission by any Settling Party that any allegation or contentions in Docket Nos. ER03-563-030 and ER03-563-055 were true or valid or that any Settling Party had acted consistent with, or contrary to, contract provisions, the FPA, or any other federal or state law or regulation.

---

could significantly affect historical relationships among traditional utilities and their customers and the ability of utilities to recover prudently incurred costs." *Id.* at n. 688.

However, the Commission went on to find that even where it makes a generic finding that its order should modify bilateral contracts, it still would require parties seeking such modification to raise the issue before the Commission on a contract-by-contract basis in order for the Commission to make particularized findings on each contract modification request. Therefore, in Order No. 888, the Commission ordered that "even if an existing requirements contract contains an explicit *Mobile-Sierra* provision, it is in the public interest to permit the public utility to seek a unilateral amendment to add stranded cost provisions *if the contract does not already contain existing fees or other explicit stranded cost provisions*." Order No. 888 at n.679 (emphasis added). That requirement for case-by-case findings was key to the D.C. Circuit sustaining the Commission's generic finding. *See Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 710-741 (D.C. Cir. 2000).

* * *

> FERC's approval of this Settlement Agreement shall not constitute approval of or precedent regarding any principle or issue in Docket Nos. ER03-563-030 and ER03-563-055 before the FERC.[69]

Thus, Constellation has not waived its rights to invoke the equitable adjustment provision or otherwise acquiesced to any abrogation of those rights by its decision not to actively oppose or protest the Settlement before the Commission. Rather, Constellation chose not to protest the Settlement because it does not purport to effect abrogation of Constellation's equitable adjustment rights under the PPAs, and no claim for such relief was made to the Commission under FPA Section 206.

## V. CONCLUSION

For the reasons discussed, Constellation respectfully requests that the Commission issue a timely order granting the relief requested herein.

Respectfully submitted,

Kenneth W. Irvin
Michael A. Yuffee
Emily N. Smith
McDermott, Will & Emery
600 Thirteenth Street, N.W.
Washington, DC 20005

Lisa M. Decker
Constellation Energy Group, Inc.
111 Market Place
Suite 500
Baltimore, MD 21202

*Attorneys for*
*Constellation Energy Commodities Group, Inc.*

March 1, 2007

69 Settlement Agreement at 5-6 (*emphasis added*).

# ATTACHMENT 1

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

Constellation Energy Commodities Group, Inc. ) Docket No. EL07-___-000

**NOTICE OF PETITION**
**(__________)**

Take notice that on March 1, 2007, Constellation Energy Commodities Group ("Constellation") filed a Petition for Declaratory Order in which it requests that the Commission issue an order finding that the Settlement in *Devon Power LLC*, 115 FERC ¶ 61,340 (2006) does not modify or abrogate Constellation's Commission-jurisdictional wholesale power purchase agreements with Narragansett Electric Company.

Copies of the Petition have been served by e-mail, messenger, or overnight delivery on Narragansett. Any person desiring to intervene or protest this filing should file with the Federal Energy Regulatory Commission, 888 First Street, N.E. Washington, D.C. 20426, in accordance with Rules 211 and 214 of the Commission's Rules of Practice and Procedure (18 C.F.R. § 385.211 and § 385.214). All such motions and protests should be filed on or before March __, 2005. Protests will be considered by the Commission to determine the appropriate action to be taken, but will not serve to make protestants parties to the proceedings. Any person wishing to become a party must file a motion to intervene.

All such motions or protests should be filed on or before the comment date, and, to the extent applicable, must be served on the applicant and on any other person designated on the official service list. This filing is available for review at the Commission or may be viewed on the Commission's web site at http:www.ferc.gov, using the eLibrary (FERRIS) link. Enter the docket number excluding the last three digits in the docket number field to access the document. For assistance, please contact FERC Online Support at FERCOnlineSupport@ferc.gov or toll-free at (866) 208-3676, or for TTY, contact (202) 502-8659. Protests and interventions may be filed electronically via the Internet in lieu of paper; see 18 C.F.R. § 385.2001(a)(1)(iii) and the instructions on the Commission's web site under the "e-Filing" link. The Commission strongly encourages electronic filings.

Comment Date: 5:00 p.m. Eastern Time on **(insert date)**.

Magalie R. Salas
Secretary

# ATTACHMENT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>CONSTELLATION ENERGY COMMODITIES GROUP, INC.<br>Defendant. | CA 06 404 S<br>C.A. NO. 06- |

## COMPLAINT

The Narragansett Electric Company ("NEC") brings this action to establish that (1) under a settlement agreement approved by the Federal Energy Regulatory Commission ("FERC") and (2) under four power purchase agreements between NEC and Constellation Energy Commodities Group, Inc. ("Constellation"), Constellation may not shift to NEC any increase in costs that it might incur to purchase certain wholesale electric market products in the New England wholesale power markets as administered by the Independent System Operator of New England ("ISO New England").

## PARTIES

1. Plaintiff, NEC, is a corporation organized and existing under the laws of Rhode Island with its principal place of business at 280 Melrose Street, Providence, Rhode Island.

2. Defendant, Constellation, is a corporation organized and existing under the laws of Delaware with its principal place of business at 111 Market Place, Suite 500, Baltimore, Maryland.

**JURISDICTION AND VENUE**

3. This Court has diversity jurisdiction under 28 U.S.C. § 1332, because NEC and Constellation are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

**FACTS**

THE POWER PURCHASE AGREEMENTS

5. NEC is a retail electric distribution company that supplies and delivers electricity to retail end-use customers in Rhode Island.

6. Constellation is an electricity supplier. Under the four power purchase agreements ("PPAs") with NEC, and pursuant to authorization granted by FERC under the Federal Power Act, 16 U.S.C. § 824 et seq., Constellation sells wholesale power to NEC for distribution to Rhode Island residents, businesses, government entities, and other organizations taking Standard Offer Service.

7. Standard Offer Service under the PPAs is firm all-requirements electric power service, including installed capacity and reserves necessary to fulfill electricity obligations.

8. "Installed capacity," which is now known as unforced capacity or "UCAP," is the amount of electricity a generator has available through its power plant to satisfy electricity demands and to ensure reliability. Suppliers of electricity, including Constellation, must obtain a certain amount of UCAP from generators as a requirement of, and based on formulae established by, ISO New England. ISO New England is the independent entity that is charged, among other things, with establishing requirements for suppliers to ensure that the region's electricity demands are reliably served. ISO New England fulfills this responsibility by establishing requirements and markets for electric energy, capacity, and reserves that operate subject to rules regulated by FERC.

9. Constellation, as a supplier, has the obligation to obtain UCAP from generators and pay for it at the rates that may be approved by FERC from time to time. NEC, in turn, pays Constellation for Standard Offer Service under the PPAs. The PPAs leave the UCAP obligation, and the costs of meeting that obligation, with Constellation.

10. Subject to the approval of the Rhode Island Public Utilities Commission, the cost for power under the PPAs that is charged to NEC by Constellation is typically passed through to Rhode Island ratepayers in the rate for Standard Offer Service under retail electric service tariffs. Thus, to the extent authorized by the Rhode Island Public Utilities Commission under applicable ratemaking principles, any increase in wholesale power costs under the PPAs will affect the retail power rate for consumers in Rhode Island.

11. The PPAs provide for certainty in price and do not allow for price adjustments based on changes in the cost of meeting UCAP obligations.

## THE SETTLEMENT AGREEMENT

12. Responding to concerns that New England's deregulated electricity market has not provided sufficient incentives for investment in new electric capacity, FERC in early 2003 asked ISO New England to develop, for FERC's review and approval, a mechanism to meet the region's future power needs.

13. In 2004, ISO New England proposed a "locational installed capacity" market ("LICAP"). Under LICAP, ISO New England was to allocate capacity payments to generators of electricity by geographic zones based on a formula designed to reflect that capacity is worth more when it is scarce. All of the New England states, including their entire congressional delegations, and many others involved in the electricity market opposed LICAP because, in part, they believed payments to generators would be too high.

14. As a result of this strong opposition, FERC delayed implementation of LICAP pending the negotiation of another type of framework to address the concerns about New England's future electric capacity.

15. Starting in the Fall of 2005 and continuing through the late Winter of 2006, with the active participation of a FERC administrative judge, representatives of all six New England states, transmission owners, power generators, power traders and marketers, and suppliers, among others, negotiated a Settlement Agreement that proposed a Forward Capacity Market ("FCM"), as an alternative to the LICAP.

16. The FCM includes an auction process at which generators of electricity will bid the number of Kilowatts (one thousand watts) that they will be willing to supply. The first commitment period of the FCM auction is scheduled to commence on June 1,

2010. The Settlement Agreement provides that prior to this date, from December 1, 2006 through May 31, 2010 (the "Transition Period"), suppliers like Constellation must continue to purchase UCAP and do so under a schedule of fixed prices for each year of the Transition Period ("Transition Period UCAP Costs"). The PPAs terminate just prior to the end of the Transition Period.

17. Among the parties who participated in the Settlement Agreement negotiations were: Constellation; the State of Rhode Island; NEC's parent, National Grid USA; and FPL Energy, LLC, whose affiliate Florida Power & Light Company was, and still is, pursuing a merger with Constellation.

18. FERC established the settlement process to pursue an alternative to LICAP in response to concerns that the New England states expressed. For this reason, support for the Settlement Agreement from as many of the New England states as possible was recognized to be instrumental for FERC's acceptance of the Settlement Agreement.

19. Under the PPAs, Constellation is responsible for supplying the capacity necessary to serve NEC's customers and to bear all costs associated with doing so, whether or not costs are incurred under the current UCAP market or under the fixed prices for UCAP established under the Settlement Agreement.

20. The State of Rhode Island made it clear that, in order to support the Settlement Agreement, it required confirmation that Constellation would continue to meet the UCAP obligations and payments for UCAP during the Transition Period in the manner provided under the PPAs, and that Constellation and other standard offer wholesale suppliers would not shift the burden of such costs to Rhode Island ratepayers.

21. To gain Rhode Island's support, Section VIII(A) was added to the Settlement Agreement to confirm that Transition Period UCAP Costs would be borne by the entities with the obligation to supply UCAP, including Constellation and other suppliers of capacity for the needs of Rhode Island customers, and would not be "shifted" to NEC and the ratepayers.

22. As a party to the FERC settlement proceeding, Constellation knew that the State of Rhode Island agreed to support the proposed Settlement Agreement because of the addition of Section VIII(A). Section VIII(A) of the Settlement Agreement provides that, during the transition into the FCM, "[t]he current UCAP products shall be retained for the period commencing on December 1, 2006 and ending on May 30, 2010 . . . [p]ayments will be made to UCAP [unforced capacity] entitlement holders, and made by UCAP obligation holders including wholesale standard offer suppliers in Rhode Island as under the current Market Rules and tariffs; it being understood that the agreement of wholesale standard offer suppliers in Rhode Island to make UCAP payments is contingent upon the agreement of the state of Rhode Island utility regulatory authorities to support the settlement."

23. Section VIII(A) was intended to confirm, and does confirm, that suppliers like Constellation retained the obligation to obtain and pay for UCAP, and that those suppliers can not pass on the Transition Period UCAP Costs to distributors and ratepayers, like NEC and the Rhode Island ratepayers. The Settlement Agreement did not shift those costs to distributors and ratepayers.

24. On March 6, 2006, the proposed Settlement Agreement, including the Section VIII(A) language, was filed with FERC for its approval.

25. To the extent that Constellation had any objections to the proposed Settlement Agreement, it consented to being listed as a party "waiving any and all objections" under the April 5, 2006, New England Power Pool Participants Committee Reply Comments to the Settlement Agreement, which were filed with FERC. The Report of the FERC Settlement Judge dated April 11, 2006 also noted that Constellation "did not in the end oppose [the Settlement]." Under FERC's regulations at 18 C.F.R. § 385.602(f)(3), any failure by a party "to file a comment [on a settlement] constitutes a waiver of all objections to the offer of settlement."

26. The State of Rhode Island, National Grid USA, including its subsidiaries, and FPL Energy, LLC are signatories to the Settlement Agreement.

27. In a June 16, 2006 written order, FERC approved the Settlement Agreement. In its Order, FERC noted that the proceeding was opposed by eight parties – none of which was Constellation – and accepted the proposed Settlement Agreement as a "just and reasonable outcome for this proceeding consistent with the public interest."

28. Constellation did not appeal or seek rehearing on any part of the Settlement Agreement.

29. Pursuant to federal law, specifically FERC Rule 602, codified at 18 C.F.R. § 385.602, the Settlement Agreement is binding upon NEC and Constellation.

CONSTELLATION'S DEMAND

30. In breach of the terms of the PPAs and contrary to the terms of Section VIII(A) of the Settlement Agreement, on August 1, 2006, Constellation wrote to NEC demanding additional compensation under the PPAs to pay for the Transition Period UCAP Costs.

31. Constellation is not entitled to recover any additional compensation from NEC because (1) the Settlement Agreement confirms that the Transition Period UCAP Costs remain an obligation of Constellation, and that Constellation cannot pass those costs onto NEC and the Rhode Island ratepayers; (2) the PPAs provide that Constellation is responsible for the UCAP obligation and payments, and Constellation is not entitled to pass on those costs, whether determined under LICAP, the Settlement Agreement, or some other method, to NEC and the Rhode Island ratepayers; and (3) Constellation has waived any right to recover Transition Period UCAP Costs from NEC and the ratepayers.

32. In its August 1, 2006 letter, Constellation also demanded additional compensation from NEC on the basis of higher costs arising out of changes in the ancillary services market ("ASM") Phases I and II.

33. Under the PPAs, Constellation, in providing Standard Offer Service, has the obligation to provide and pay for reserves or ASM, which provide electricity reserves that are ready to meet power demands in a short period of time. Costs associated with ASM fall outside of the scope of the Settlement Agreement but are covered by the PPAs. The PPAs do not allow for price adjustments based on changes in the cost of meeting ASM obligations.

**COUNT I**
**DECLARATORY JUDGMENT**

34. Count I incorporates by reference Paragraphs 1 through 33.

35. Pursuant to federal law, specifically FERC Rule 602, codified at 18 C.F.R. § 385.602, the Settlement Agreement is binding upon NEC and Constellation.

36. The terms of the Settlement Agreement preclude Constellation from recovering Transition Period UCAP Costs from NEC.

37. An actual controversy exists concerning whether the terms of the Settlement Agreement preclude Constellation from recovering the Transition Period UCAP Costs from NEC.

38. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court should declare that the Settlement Agreement precludes Constellation from recovering Transition Period UCAP Costs from NEC.

**COUNT II**
**WAIVER**

39. Count II incorporates by reference Paragraphs 1 through 38.

40. Constellation waived its right to recover Transition Period UCAP Costs because Constellation, inter alia: participated in the negotiation of the Settlement Agreement; knew that Rhode Island's support of the Settlement Agreement was based on the understanding that the Settlement Agreement precluded Constellation from either seeking or recovering such costs; and failed to object to Section VIII(A) and, in fact, waived its objections to the Settlement Agreement as a whole.

41. Constellation's actions and/or inactions during the Settlement Agreement negotiations resulted in a waiver of any known right it had to recover Transition Period UCAP Costs.

42. Therefore, Constellation cannot now obtain additional compensation under the PPAs for these costs.

**COUNT III**
**DECLARATORY JUDGMENT**
**(TRANSITION PERIOD UCAP COSTS/PPAS)**

43. Count III incorporates by reference Paragraphs 1 through 42.

44. Constellation is not entitled under the PPAs to recover Transition Period UCAP Costs.

45. An actual controversy exists concerning whether Constellation is entitled to recover Transition Period UCAP Costs under the PPAs, and whether Constellation will in fact incur additional Transition Period UCAP Costs due to the Settlement Agreement.

46. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court should declare that the PPAs preclude Constellation from recovering Transition Period UCAP Costs.

**COUNT IV**
**DECLARATORY JUDGMENT**
**(ASM /PPAS)**

47. Count IV incorporates by reference Paragraphs 1 through 46.

48. Constellation is not entitled to receive additional compensation from NEC under the PPAs for any alleged additional costs arising from the implementation of ASM Phases I and II.

49. An actual controversy exists concerning whether Constellation is entitled to additional compensation under the PPAs based on any additional costs attributable to the implementation of ASM Phases I and II, and whether Constellation will in fact incur additional costs from the implementation of ASM Phases I and II.

50. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court should declare that the PPAs preclude Constellation from recovering any costs attributable to the implementation of ASM Phases I and II.

**COUNT V**
**BREACH OF CONTRACT**
**(THE PPAs)**

51. Count V incorporates by reference Paragraphs 1 through 50.

52. Constellation has breached the PPAs by demanding payment of $150,000,000 from NEC as Transition Period UCAP Costs and additional ASM Phases I and II costs.

53. NEC has and will suffer damage as a direct and proximate result of Constellation's breach of the PPAs for which Constellation is liable.

**REQUEST FOR RELIEF**

**Wherefore,** NEC respectfully requests that this Court:

A. Declare, pursuant to 28 U.S.C. § 2201, that Section VIII(A) and/or other provisions of the Settlement Agreement and the PPAs preclude Constellation from obtaining any additional compensation attributable to market changes, including compensation for the Transition Period UCAP Costs;

B. Declare, pursuant to 28 U.S.C. § 2201, that the PPAs preclude Constellation from obtaining any additional compensation attributable to implementation of ASM Phases I and II;

C. Enter judgment in favor of NEC on Count II, finding that Constellation cannot obtain any additional compensation under the PPAs on account of the Transition Period UCAP Costs;

D. Enter judgment in favor of NEC on Count V, and award NEC compensatory damages for all damages caused by Constellation's breaches;

E. Award NEC attorneys' fees, interest, and costs; and

F. Award NEC such other relief as this Court may deem just and proper.

**NEC HEREBY DEMANDS TRIAL BY JURY**

THE NARRAGANSETT ELECTRIC COMPANY

By its attorneys,

Robin L. Main
Gerald J. Petros (#2931)
Robin Main (#4222)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (Facsimile)
gpetros@haslaw.com
rmain@haslaw.com

Dated: September 11, 2006.

743772