UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| Narragansett Electric Company,<br>Plaintiff,<br><br>v.<br><br>Constellation Energy Commodities Group, Inc.,<br>Defendant. | C.A. No. 06-404S |

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

Plaintiff Narragansett Electric Company ("Plaintiff" or "NEC"), a Rhode Island corporation, brings this case against Constellation Energy Commodities Group, Inc. ("Defendant" or "Constellation"), a Delaware corporation with its principal place of business in Maryland, seeking to enforce the provisions of four power purchase agreements, as well as a settlement agreement approved by the Federal Energy Regulatory Commission ("FERC"). In its Complaint, NEC advances claims for declaratory relief, breach of contract, and waiver. Constellation moved to dismiss all the claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. In the alternative, Constellation requests that the proceedings be stayed pending arbitration. Additionally, the State of Rhode Island and the Rhode Island Division of Public Utilities and Carriers

(collectively, "State") have moved to intervene as a party plaintiff and join Counts I and II of the Complaint, and to join a new count of estoppel against Constellation.

For the reasons set forth below, Constellation's Motion to Dismiss NEC's Complaint or, in the Alternative, to Stay proceedings in this case is denied, and the State's Motion to Intervene and to Join Claim is granted.

I. Constellation's Motion to Dismiss NEC's Complaint

A. Factual Background[1]

Accepting the facts as pleaded and inferences to be drawn therefrom in the light most favorable to Plaintiff, as this Court is obliged to do, the Court finds as follows.

Plaintiff NEC is an electric distribution company that delivers electricity to retail customers in Rhode Island. Defendant Constellation is a wholesale supplier of electricity. As a wholesale supplier, Constellation purchases electricity from the entities that produce it – known in industry parlance as "generators" – and sells that electricity to retail distributors like NEC.

NEC and Constellation have for years maintained a relationship for the sale and purchase of wholesale electricity. Relevant to

---

[1] The background information is limited to that necessary for disposition of Constellation's motion. For purposes of deciding the motion, this Court takes the facts as set forth in NEC's Complaint, and from related materials that this Court may properly consider at the motion to dismiss stage.

this proceeding are four "Power Purchase Agreements" ("PPAs"),[2] pursuant to which Constellation supplies wholesale power to NEC for distribution to NEC's retail customers who contract for so-called

---

[2] Although NEC did not attach the PPAs to its Complaint, this Court may, as explained elsewhere in this opinion, consider undisputed documents alleged or referenced in the Complaint. See, e.g., Young v. Lepone, 305 F.3d 1, 11 (1st Cir. 2002) (district court entitled to consider letters not attached to complaint when complaint contained extensive excerpts from letters and references to them; when factual allegations of complaint revolved around document whose authenticity is unchallenged, the document effectively merges into pleadings).

The four PPAs, executed between 1998 and 2002, are:

(1) Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company, Eastern Edison Company, Newport Electric Corporation and Constellation Power Source, Inc. (Dated December 21, 1998, and amended on January 27, 2003 and July 3, 2003) (the "20% Contract");

(2) Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company, Eastern Edison Company, Newport Electric Corporation and Constellation Power Source, Inc. (Dated December 21, 1998, and amended on January 27, 2003 and July 3, 2003) (the "36% Contract");

(3) Power Supply Agreement between the Narragansett Electric Company and Constellation Power Source, Inc. (Dated October 5, 2001) (the "2001 Contract"); and

(4) Power Supply Agreement between the Narragansett Electric Company and Constellation Power Source, Inc. (Dated August 23, 2002, and amended August 23, 2002) (the "2002 Contract").

Blackstone Valley Electric Company, Eastern Edison Company, and Newport Electric Corporation were predecessor companies of NEC. Constellation Power Source, Inc. was the predecessor company of Constellation.

"Standard Offer Service."[3] As part of its Standard Offer Service, NEC is obligated by ISO New England, an entity known as an "independent system operator" that establishes requirements and markets for electricity in New England,[4] to obtain a sufficient supply of electricity to ensure that it can meet fluctuating demand from its retail customers. This required supply is called "capacity," and sometimes "installed capacity" or "unforced capacity" ("UCAP").[5] In a sense, UCAP serves as the functional equivalent of a call option held by NEC that allows it to quickly

---

[3] Generally speaking, "Standard Offer Service" is a standard form of electric service provided to customers who have not elected to obtain their electricity from a non-regulated power producer. A more technical definition provided in the 20% Contract and 36% Contract provides that Standard Offer Service is:

> firm all-requirements electric service (minute by minute, hour by hour, day by day) including, but not limited to, the following products: energy, installed capability, operable capability, reserves, and associated losses necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to [NEC's] retail customers taking Standard Offer Service in accordance with the Settlement Agreements. Such Standard Offer Service shall include changes in customer demand for any reason, including, but not limited to, seasonal factors, daily load fluctuations, increased or decreased usage, demand side management activities, extremes in weather, and other similar events.

20% Contract, Art. 1; 36% Contract, Art. 1.

[4] The requirements and markets established by ISO New England operate subject to rules and regulations promulgated by FERC.

[5] For the purposes of this opinion, the Court shall use interchangeably the terms "capacity" or "UCAP."

procure more energy supplies when faced with increasing demand from its customers. In the context of this case, NEC meets its obligation to maintain sufficient UCAP by contracting with Constellation to supply Standard Offer Service, of which UCAP is a component.

Thus, Constellation obtains UCAP from generators and pays for it at rates approved by FERC. NEC then pays Constellation for the energy required to provide its retail customers with Standard Offer Service, i.e., NEC buys Standard Offer Service from Constellation. Subject to the approval of the Rhode Island Public Utilities Commission ("RIPUC"), NEC's cost for power purchased from Constellation is passed through to Rhode Island ratepayers in the rate for Standard Offer Service under retail electric service rates.[6]

The Complaint also alleges that under the PPAs, Constellation, in providing Standard Offer Service, "has the obligation to provide and pay for reserves or ASM." ASM is the abbreviated form of "ancillary services market" and, while it is not entirely clear

---

[6] The Court notes here an apparently tensed thread running between NEC's Complaint and its memorandum of law supporting the State's intervention. In its Complaint, NEC alleges, or at least suggests, that the Rhode Island Public Utilities Commission has the discretion whether to allow NEC to pass on increased costs to ratepayers. However, in supporting the State's intervention, NEC claims that any capacity costs passed through to NEC will ultimately be absorbed by ratepayers without the benefit of any review by the Public Utilities Commission. The Court takes no position on this question as it is not necessary to the disposition of these motions.

from the Complaint how ASM differs from UCAP, according to the Complaint, the ASM obligation requires Constellation to provide electricity reserves that are ready to meet power demands in a relatively short period of time.

In early 2003, FERC expressed concern that New England's deregulated electricity market was not providing enough revenue to generators, and therefore not providing sufficient incentive for investment in new capacity. Although there was at the time, and still is, a sufficient amount of capacity in New England, FERC believed that ever increasing demand for electricity eventually would overwhelm the available supply. To head off the expected shortfall, FERC requested that ISO New England develop a market mechanism that would encourage investment in new capacity. In 2004, ISO New England proposed what it called a "Locational Installed Capacity" market ("LICAP"). While the details are beyond the scope of the present motion, the idea behind LICAP was that ISO New England would allocate capacity payments to power generators based on a complex formula that valued capacity more highly when supply was scarce. LICAP was opposed by every New England state, their congressional delegations, and many others involved in the electricity market because, in part, it was believed that LICAP would result in excessive payments to generators. In the face of this widespread opposition, FERC delayed implementation of LICAP pending the negotiation of an alternative framework to address the

New England region's future electricity requirements. Therefore, in 2005-06, with the active participation of a FERC Administrative Law Judge, representatives of all six New England states, transmission owners, power generators, power traders and marketers, and suppliers, among others,[7] negotiated a settlement (the "Settlement Agreement") that proposed a "Forward Capacity Market" ("FCM") as an alternative to LICAP.

In contrast to LICAP, the FCM establishes a process whereby capacity resources will be auctioned off three years before it is anticipated they will be needed, thus providing generators with reliable price signals with which to evaluate investments in new capacity. The initial auction is expected to be held in early 2008 for a one to five-year commitment period beginning in 2010. At each annual auction, generators of electricity will bid the amount of capacity that they will be willing to supply in the future.

Because the FCM will not result in the actual purchase of capacity until at least 2010, the Settlement Agreement includes provisions for a transitional capacity market. From December 2006 to May 2010 (the "Transition Period"), suppliers of electricity must purchase capacity, or UCAP, from generators under a schedule

---

[7] Among the parties that participated in the Settlement Agreement negotiations were: Constellation, the State of Rhode Island, NEC's parent company National Grid USA, and FPL Energy, LLC, whose affiliate Florida Power & Light Company was, claims NEC, pursuing a merger with Constellation. The State of Rhode Island, National Grid USA, and FPL Energy, LLC are signatories to the Settlement Agreement.

of fixed prices, in lieu of the negotiated terms allowed previously, for each year of the Transition Period.[8] Under the fixed schedule the cost charged for capacity is higher than it likely otherwise would be under market conditions.

Although the transitional price schedule increases the cost of energy sold to wholesalers such as Constellation, NEC claims that Constellation is contractually bound by the PPAs to cover any increased cost for capacity, i.e., in effect, to supply UCAP to NEC, as part of Standard Offer Service, at prices below those set for the Transition Period. Constellation, on the other hand, contends that each of the PPAs, by its express terms, provides Constellation with a right to an "equitable adjustment" that should allow it to recover at least some of the increased costs through negotiations with NEC.

Since FERC established the settlement process largely in response to the concerns about LICAP expressed by the New England states, support for the Settlement Agreement from those states was recognized to be critical to FERC's acceptance of the Settlement Agreement. Consequently, Rhode Island conditioned its support of the Settlement Agreement on confirmation that Constellation would continue to meet its UCAP obligations during the Transition Period in the manner provided under the PPAs, and further that

[8] The PPAs terminate just prior to the end of the Transition Period.

Constellation and other Standard Offer Service wholesale suppliers would not shift the burden of such costs to Rhode Island ratepayers.

Therefore, the settlement participants, including Rhode Island standard offer wholesale suppliers, in order to induce the State to become a signatory, included the following language in Section VIII(A) of the Settlement Agreement:

> The current UCAP products shall be retained for the period commencing on December 1, 2006 and ending on May 30, 2010 (the "Transition Period") as provided for in Part VIII.I. Payments will be made to UCAP entitlement holders, and made by UCAP obligation holders including wholesale standard offer suppliers in Rhode Island as under the current Market Rules and tariffs; it being understood that the agreement of wholesale standard offer suppliers in Rhode Island to make UCAP payments is contingent upon the agreement of the state of Rhode Island utility regulatory authorities to support the settlement.

On March 6, 2006, the Settlement Agreement was filed with FERC for its approval. Subsequently, Constellation was listed as a party "waiving any and all objections" under the April 5, 2006 New England Power Pool ("NEPOOL")[9] Participants Committee Reply Comments to the Settlement Agreement, which were also filed with FERC. On April 11, 2006, the Report of the FERC Settlement Judge noted that Constellation "did not in the end oppose [the Settlement]." On June 16, 2006, FERC approved the Settlement

[9] NEPOOL is an association of utility companies throughout New England that participates in the production and management of energy resources in the New England Region.

Agreement.[10] Constellation did not oppose, appeal, or seek rehearing on any part of the Settlement Agreement.

According to NEC, under the terms of the PPAs and the Settlement Agreement, Constellation is solely responsible for paying the cost of procuring capacity during the Transition Period, regardless of how much the cost of capacity increases or decreases. Nevertheless, on August 1, 2006, Constellation wrote to NEC and demanded that the parties initiate negotiations to determine "appropriate compensation" for Constellation in light of the Transition Period UCAP costs, as well as to offset higher costs arising from changes in the ancillary services market (ASM). NEC then filed this action, premised on diversity and federal question jurisdiction, alleging that Constellation had breached the PPAs. NEC also seeks a judgment declaring the rights of NEC and Constellation under the PPAs and the Settlement Agreement.[11] In short, NEC asks the Court to declare, in accordance with the terms of the PPA and the Settlement Agreement, that Constellation must pay Transition Period UCAP costs and ASM costs and that

---

[10] FERC approved the Settlement Agreement in Devon Power LLC, 115 FERC P 61,340 (2006).

[11] The two counts -- breach of contract and declaratory judgment -- seem to plow the same ground. While on one level it is unclear just what NEC says Constellation has done to breach, at bottom NEC is really seeking a declaration of the parties' rights and obligations under the PPAs and to foreclose Constellation from seeking additional compensation.

Constellation may not pass those additional costs through to NEC and, ultimately, Rhode Island ratepayers.

B. Legal Standard

In ruling on a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"), a court must construe the complaint liberally, treat all well-pleaded facts as true, and indulge all reasonable inferences in favor of the plaintiff. Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996); Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995). It is the plaintiff's burden to prove the existence of subject matter jurisdiction. Murphy, 45 F.3d at 522.

In ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), a court must determine whether the complaint states any claim upon which relief can be granted. As with motions brought pursuant to Rule 12(b)(1), the court must construe the complaint in the light most favorable to the plaintiff, taking all well-pleaded factual allegations as true and giving the plaintiff the benefit of all reasonable inferences. Aybar v. Crispin-Reyes, 118 F.3d 10, 13 (1st Cir. 1997); Carreiro v. Rhodes Gill & Co., 68 F.3d 1443, 1446 (1st Cir. 1995).

In deciding a motion to dismiss, the Court is not limited to considering the plaintiff's complaint. The First Circuit Court of Appeals has adopted a "practical, commonsense approach" for

determining what materials may be properly considered on a motion to dismiss. Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16 (1st Cir. 1998). A court may consider not only the complaint, but also the "facts extractable from documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice." Jorge v. Rumsfeld, 404 F.3d 556, 559 (1st Cir. 2005). In addition, when a "complaint's factual allegations are expressly linked to — and admittedly dependent upon — a document (the authenticity of which is not challenged), that document effectively merges into the pleadings." Beddall, 137 F.3d at 17. "Moreover, the district court appropriately may consider the whole of a document integral to or explicitly relied upon in a complaint, even if that document is not annexed to the complaint." Jorge, 404 F.3d at 559.

Although NEC's Complaint referenced several documents, none were attached as exhibits. Constellation, however, appended several documents to its Motion to Dismiss and contemporaneously filed Motion for Leave to File Under Seal. Exhibits A-D to the Motion for Leave to File Under Seal include the four PPAs executed by NEC, Constellation, or their predecessors. Exhibit E to the Motion to Dismiss is the Settlement Agreement and related documents. Exhibit F to the Motion to Dismiss is the Order of FERC approving the then-proposed Settlement Agreement. Exhibit G to the Motion to Dismiss is the August 1, 2006 letter from Constellation

to NEC in which Constellation invoked its purported right under the PPAs to negotiate appropriate compensation to Constellation in light of FERC's approval of the Settlement Agreement and the implementation of new ancillary services markets. None of NEC's Objection or Sur-reply, or Constellation's Reply, contained any additional attachments.

This Court may consider each of the exhibits attached to Constellation's Motion to Dismiss and Motion for Leave to File Under Seal. NEC's Complaint is replete with references to them, see, e.g., Compl. ¶¶ 6-7, 9-11, 15-30, 32-33, their authenticity has not been questioned, and allegations in the Complaint are expressly linked to and dependent upon them. See Beddall, 137 F.3d at 17 (agreement properly before the court on a Rule 12(b)(6) motion where the agreement was not attached to the complaint, but the complaint discussed the agreement at length, the agreement's authenticity was not challenged, and the agreement was appended to the 12(b)(6) motion).

C. Discussion

1. Constellation's 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

As a threshold matter, the Court must consider Constellation's argument that this Court lacks subject matter jurisdiction over the instant case. If the Court lacks jurisdiction, it would be inappropriate to consider the other arguments advanced by the parties. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83,

94-95 (1998); see also Bell v. Hood, 327 U.S. 678, 682 (1946) ("Whether the complaint states a cause of action on which relief could be granted is a question of law . . . [which] must be decided after and not before the court has assumed jurisdiction over the controversy.").

Constellation argues that the Federal Power Act, 16 U.S.C. §§ 824 - 824(m), grants FERC exclusive jurisdiction to determine the rates for the sale of wholesale power, and that the so-called "filed rate doctrine" bars this Court from entering any judgment that would materially alter a contract provision affecting a rate filed with FERC.[12] According to Constellation, "the gravamen of NEC's claim seeks contract reformation – i.e., a ruling that the Settlement Agreement and FERC Order abrogated Constellation's right [under the PPAs] to an equitable adjustment following the regulatory change at hand." In other words, Constellation claims

---

[12] Briefly, the filed rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 577 (1981). A corollary of the filed rate doctrine is that a court may not enter a judgment that would effectively impose a different rate than the rate filed with the relevant federal regulatory authority. Id. at 578; see also Bryan v. Bellsouth Commc'ns, Inc., 377 F.3d 424, 429 (4th Cir. 2004) (filed rate doctrine prohibits "a court from entering a judgment that would serve to alter the rate paid by a plaintiff") (citing Hill v. BellSouth Telecomms., Inc., 364 F.3d 1308, 1316 (11th Cir. 2004)). The filed rate doctrine does not, however, preclude district courts from interpreting contracts or statutes to the extent that such interpretation does not amount to rate setting. See, e.g., United States v. Pac. Gas & Elec. Co., 714 F. Supp. 1039, 1054 (N.D. Cal. 1989).

that NEC's Complaint asks this Court to exceed its jurisdiction by materially altering a contract provision directly affecting a rate on file with FERC. Constellation's characterization of the Complaint misses the mark.

NEC's Complaint presents a dispute over the proper interpretation to be accorded to the PPAs and the Settlement Agreement. See, e.g., Compl. ¶¶ 11, 19, 23. On its face, the Complaint does not, as Constellation contends, request that the Court "abrogate [Constellation's] material rights" under the PPAs. The Complaint provides at its outset that it seeks to establish that "under" the PPAs and Settlement Agreement, "Constellation may not shift to NEC any increase in costs that it might incur to purchase certain wholesale electric market products."

It is well established that district courts and FERC share concurrent jurisdiction over cases interpreting contracts and settlement agreements.[13] See, e.g., Kentucky Utils. Co., 109 FERC P 61,033 (2004), reh'g denied, 110 FERC P 61,285 at ¶ 10-11 (2005); Portland Gen. Elec. Co., 72 FERC P 61,009 at 61,021 (1995). Further, the Federal Power Act authorizes district courts to

---

[13] Constellation admits as much in its Motion to Dismiss. See Mot. to Dismiss, at 15.

enforce FERC[14] orders. In relevant part, the Federal Power Act provides that:

> The District Courts of the United States ... shall have exclusive jurisdiction of violations of this chapter or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this chapter or any rule, regulation, or order thereunder.

16 U.S.C. § 825p (emphasis added). While it appears that the First Circuit has not had the occasion to consider the jurisdictional boundaries afforded by 16 U.S.C. § 825p, there is ample authority from other circuits holding that district courts may hear actions arising out of FERC orders. See, e.g., City of Cleveland v. Cleveland Elec. Illuminating Co., 570 F.2d 123, 124-25 (6th Cir. 1978) (district court had jurisdiction to "entertain an action based on an order of the Federal Power Commission" requiring city to pay charges "pursuant to certain Federal Power Commission [] orders and a contract entered into between the parties"); State of California v. Oroville-Wyandotte Irrigation Dist., 411 F. Supp. 361, 367 (E.D. Cal. 1975), aff'd, 536 F.2d 304 (9th Cir. 1976) (16 U.S.C. § 825p empowers district courts to enforce violations of Federal Power Commission orders); Occidental Chem. Corp. v. Power Auth. of New York, 758 F.Supp. 854, 859, 861 (W.D.N.Y. 1991) (federal court had jurisdiction over declaratory judgment action

---

[14] The former Federal Power Commission's functions were transferred in 1977 to the Secretary of Energy and FERC. 42 U.S.C. §§ 7151(b), 7171(a), 7291, 7293.

concerning an alleged violation of Federal Power Commission license).

Indeed, Constellation has already been rebuffed by FERC on this very issue. On March 1, 2007, during the pendency of this action, Constellation filed with FERC a petition for a declaratory order requesting that the Commission declare that the Settlement Agreement has no effect on Constellation's purported right to renegotiate prices under the PPAs. Constellation Energy Commodities Group, Inc., 119 FERC P 61,292, 2007 WL 1791169, *1 (2007). FERC denied the petition and expressly rejected Constellation's argument that FERC has exclusive jurisdiction over the case. Id. at *7. The Court agrees with FERC's analysis; Constellation's Motion to Dismiss is therefore denied.

2. Constellation's 12(b)(6) Motion to Dismiss for Failure to State a Claim

Constellation further argues that NEC's Complaint must be dismissed because it "does not allege any explicit consent by Constellation to waive its right to an equitable adjustment [under the PPAs]." Again, however, as explained above, NEC's Complaint requests that this Court interpret and enforce the PPAs and Settlement Agreement (see, e.g., Compl. ¶¶ 11, 19, 23), not abrogate or alter any rights that Constellation may have under the agreements. For example, Constellation argues that NEC's Complaint is devoid of any allegation that Constellation "knowingly assented, for due consideration, to the modification of the PPAs involved

with abrogating the right to an equitable adjustment and any arbitration attendant to that right." To the extent that NEC's Complaint lacks such an allegation, however, the reason may be found in the Complaint's claim that the PPAs "provide for certainty in price and do not allow for price adjustments based on changes in the cost of meeting UCAP obligations." In other words, NEC's Complaint is not a request for a judgment modifying the PPAs, but rather a request for a judgment enforcing the PPAs.

At this stage of the proceedings, Constellation's argument is not properly before the Court. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court is charged only with determining whether the Complaint states any claim upon which relief can be granted. In order to succeed on its Motion to Dismiss, Constellation must show that NEC can prove no set of facts that could support its claims.

Constellation has instead argued that it possesses a contractual right, i.e., a right to an "equitable adjustment," that precludes the relief that NEC seeks.[15] This argument more resembles

---

[15] Constellation also implies, though does not argue directly, that its failure to sign the Settlement Agreement releases it from any obligation to comply with the terms thereof. However, as explained even in the materials appended as exhibits to Constellation's motion, see Mot. to Dismiss, Ex. E at 8-10, it is well settled that FERC "can approve contested settlements as long as it determines that the proposal will establish just and reasonable rates." See, e.g., New Orleans Pub. Serv., Inc. v. FERC, 659 F.2d 509, 511-12 (5th Cir. 1981) (citing Placid Oil Co. v. FPC, 483 F.2d 880, 893 (5th Cir. 1973), aff'd sub nom. Mobil Oil Corp. v. FPC, 417 U.S. 283, 312-13 (1974)). The approved

an affirmative counterclaim for breach of contract than a reason to dismiss the Complaint. Regardless, at this stage the court must construe the Complaint in the light most favorable to NEC, taking all well-pleaded factual allegations as true and giving NEC the benefit of all reasonable inferences. Aybar, 118 F.3d at 13; Carreiro, 68 F.3d at 1446. NEC has pleaded that the PPAs and Settlement Agreement, whether considered separately or together, obligate Constellation to pay the cost of obtaining capacity and preclude Constellation from passing that cost on to NEC. Constellation may well be able to show, at a later stage in this

---

settlement is thereafter treated as an agency decision on the merits. Mobil Oil, 417 U.S. at 312. As a decision on the merits, "the terms of the settlement form the substance of an order binding on all the parties, even though not all are in accord to the result." Pennsylvania Gas & Water Co. v. Fed. Power Comm'n, 463 F.2d 1242, 1246 (D.C. Cir. 1972). The rule is no different where a settlement participant, rather than actively contesting a proposed settlement, fails to join in the final settlement. Mobil Oil, 417 U.S. at 312; United Mun. Distribs. Group v. Fed. Energy Regulatory Comm'n, 732 F.2d 202, 209 (D.C. Cir. 1984); Fed. Energy Regulatory Comm'n v. Triton Oil & Gas Corp., 712 F.2d 1450, 1458-59 (D.C. Cir. 1983); Pennsylvania Gas, 463 F.2d at 1249. Any other result would "disrupt orderly procedures and permit parties . . . to avoid [FERC] decisions simply because they disagree." In re Nw. Cent. Pipeline Corp., 27 FERC P 61430, 1984 WL 56900, *5 (1984). In certain circumstances, FERC can sever parties or issues from a contested settlement and approve the settlement as uncontested among the settling parties. 18 C.F.R. § 385.602(h). Severance may enable a party to litigate contested issues while permitting FERC to approve uncontested matters to "bring needed stability to the industry, end protracted litigation and thereby benefit customers." In re Duke Energy Trading & Mktg. Co., 117 FERC P 61039, 2006 WL 2881647, *3 (2006). However, severance did not occur here and is not at issue before this Court. The upshot in this case, then, is that the Settlement Agreement may not have contractual force as between NEC and Constellation, but has legal authority because it has become in effect a binding order of FERC.

proceeding, that it is entitled to pass on the cost of obtaining capacity to NEC. At the motion to dismiss stage, however, an assertion that essentially claims the plaintiff is itself in breach of contract is insufficient grounds on which to grant Constellation's motion.

In an echo of its 12(b)(1) Motion to Dismiss, Constellation additionally argues that the Mobile-Sierra doctrine, as developed by United Gas Pipe Line Co. v. Mobile Gas Serv. Corp. (Mobile), 350 U.S. 332 (1956) and FPC v. Sierra Pac. Power Co. (Sierra), 350 U.S. 348 (1956) precludes any finding that the Settlement Agreement or the FERC Order approving it "can unilaterally modify or abrogate the PPAs" without an explicit finding by FERC that "the public interest so requires." As explained earlier, however, NEC has not made any claim to modify or abrogate the PPAs. The Mobile-Sierra doctrine is inapplicable on its face to the Complaint as filed. Constellation's motion therefore must be denied.

3. Arbitration

Constellation alternatively argues that the Court should stay the proceedings pending arbitration pursuant to the dispute resolution provisions in the PPAs.

Whether in the first instance a dispute is arbitrable is properly an inquiry for the Court and not an arbitrator. Municipality of San Juan v. Corporacion Para El Fomento Economico de la Ciudad Capital, 415 F.3d 145, 149 (1st Cir. 2005); DeFazio v.

Expetec Corp., 2006 WL 162327, *2 (D.R.I. Jan. 20, 2006). When deciding whether the parties agreed to arbitrate a certain matter, courts generally[16] apply ordinary state-law principles that govern the formation of contracts. See, e.g., Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62-63 (1995); Volt Info. Sci., Inc. v. Bd. of Tr. of Leland Stanford Junior Univ., 489 U.S. 468, 475-76 (1989); see also Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 19 (1st Cir. 1999). The relevant state law here,[17] for example, would require the Court to see whether the parties objectively revealed an intent to submit the instant dispute to arbitration. See, e.g., Ladd v. Scudder Kemper

---

[16] An exception to the rule provides that courts should not assume that the parties agreed to arbitrate arbitrability unless there is "clea[r] and unmistakabl[e]" evidence that they did so. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995) (quoting AT&T Techs., Inc. v. Communc'ns Workers of Am., 475 U.S. 643, 649 (1986)). However, the Court is not faced with that issue here.

[17] The parties selected Massachusetts law as the governing law for interpretation and performance of the 20% Contract, the 36% Contract, and the 2001 Contract, see 20% Contract, Art. 14; 36% Contract, Art. 14; 2001 Contract, Art. 15.1, and Rhode Island law as the governing law for interpretation and performance of the 2002 Contract, see 2002 Contract, Art. 16.1. Neither party has disputed the existence or effect of the choice of law provisions. "Where the parties have agreed to the choice of law, this court is free to forgo an independent analysis and accept the parties' agreement." In re NTA, LLC, 380 F.3d 523, 529 n.11 (1st Cir. 2004) (quoting Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp., 317 F.3d 16, 20 (1st Cir. 2003). Therefore, Massachusetts law governs this Court's interpretation of the 20% Contract, 36% Contract, and 2001 Contract, while Rhode Island law governs the Court's interpretation of the 2002 Contract. In any event, with respect to the issue of arbitrability, the result apparently would be the same under either Massachusetts law or Rhode Island law.

Investments, Inc., 741 N.E.2d 47, 51 (Mass. 2001); State of Rhode Island Dept. of Corrections v. Rhode Island Broth. of Correctional Officers, 866 A.2d 1241, 1247 (R.I. 2005). Furthermore, a party cannot be compelled to submit a dispute to arbitration if it has not contractually agreed to do so. AT&T Techs., Inc., 475 U.S. at 648; United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960).

In the instant case, the question of arbitration is complicated because the four PPAs have different arbitration clauses. The 20% Contract and the 36% Contract each identically provide:

> [A]ll disputes between the Companies [NEC] and Supplier [Constellation] resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith. ... In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies [NEC] and the Supplier [Constellation] may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration. For any dispute or claim arising out of or relating to any charges incurred under this Agreement having a value less than or equivalent to $100,000 each, such arbitration shall be mandatory.

20% Contract, Art. 13; 36% Contract, Art. 13. In short, the 20% Contract and 36% Contract, on their face, do not require that the

parties arbitrate any dispute unless they jointly agree to do so or the value of the dispute is less than or equal to $100,000.

In contrast, the 2001 Contract provides:

> This Agreement must comply with all NEPOOL market rules and/or operating procedures ("Rules"). If, during the term of this Agreement, the NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate a replacement Rule ("Replacement Rule"). The intent of the Parties is that any such Replacement Rule reflect, as closely as possible, the intent and substance of the Rule being replaced as such Rule was in effect prior to such termination or amendment of the NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on [an amendment to the Agreement], the Parties agree to submit the matter to arbitration under the terms of Appendix B, attached and incorporated herein by reference, and to seek a resolution of the matter consistent with the above stated intent.

2001 Contract, Art. 14.2.[18] Similarly, the 2002 Contract provides:

---

[18] As it happens, the arbitration clause in the 2001 Contract contains a latent error. Appendix B to the contract, which the arbitration clause refers to as providing the terms under which any arbitration will be conducted, has nothing to do with arbitration. Rather, Appendix B provides for adjustments in contract price consequent to changes in fuel prices. NEC argues that this error renders the entire arbitration clause so vague as to be invalid. The cases cited by NEC, however, do not support its argument. In In re Am. Rail & Steel Co. (India Supply Mission), 308 N.Y. 577 (Ct. App. 1955) and In re Emerson Radio & Phonograph Corp. (Illustrated Tech. Prod. Corp.), 178 N.Y.S.2d 277, 278 (1958), the determinative issue was whether the parties evidenced an intent to arbitrate. In those cases, an intent was lacking. Here, with respect to the 2001 Contract, the missing Appendix B relates only to the procedure under which arbitration is to be conducted, not whether the parties intended arbitration to be conducted at all. The language excerpted from Article 14.2 evidences the intent to arbitrate: "the Parties agree to submit the matter to arbitration

> If, during the term of this Agreement, any NEPOOL Rule, Rhode Island statute or other applicable law is terminated or amended in a manner that would eliminate or materially (including economically) alter any rights or obligations of a Party hereunder, the Parties agree to negotiate in good faith to amend this Agreement so as to maintain, as closely as possible, the intent and substance of the allocation of rights and obligations contemplated hereunder. If after a period of thirty (30) days from the date on which a Party provides written notice to the other Party of the need to amend this Agreement, the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Section 16.2 (regardless of the amount, if any, in controversy) and to seek a resolution of the matter consistent with the above stated intent.

2002 Contract, Art. 15.2. The 2001 Contract and 2002 Contract, unlike the 20% Contract and 36% Contract, plainly evidence an intent to arbitrate disputes related to certain regulatory events insofar as they affect a "right or obligation" of either party.

The language employed by each contract differs slightly, however. The 2001 Contract refers to circumstances in which "the NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or

---

. . . and to seek a resolution of the matter consistent with the above stated intent." If there is "clear contractual language" evidencing an intent to arbitrate a dispute, then the Court may compel the parties to arbitration. See, e.g., Ladd, 741 N.E.2d at 51; Maine Cent. R.R. Co. v. Bangor & Aroostook R.R. Co., 395 A.2d 1107, 1116 (Me. 1978). The 2001 Contract evidences an intent to arbitrate. This Court will not at this stage nullify the parties' bargained for agreement to arbitrate on account of what amounts to a scrivener's error. However, the Court will defer to a later time the question of what procedure is to be followed when - and if - arbitration is commenced.

materially altered by NEPOOL." The 2002 Contract, in comparison, more broadly encompasses circumstances in which "any NEPOOL Rule, Rhode Island statute or other applicable law is terminated or amended in a manner that would eliminate or materially (including economically) alter any rights or obligations of a Party hereunder." Thus, the 2001 Contract's arbitration clause appears to limit its scope to changes related to the "NEPOOL Agreement" and material alterations in any "Rule affecting a right or obligation" of the parties. The 2002 Contract's clause, on the other hand, may be triggered not only by changes to a NEPOOL Rule, but also to a Rhode Island statute, or "other applicable law," where the change would "eliminate or materially (including economically) alter any rights or obligations" of either party. The key language, however, appears to be "a right or obligation," in the case of the 2001 Contract, and "any rights or obligations," in the case of the 2002 Contract. If no right or obligation of either party has been affected, then the obligation to arbitrate is not triggered.

NEC has seized on the "rights and obligations" language, arguing that "[t]he Settlement Agreement does not alter Constellation's rights or obligations - Constellation was obligated to pay Capacity Costs before implementation of the Settlement Agreement, and it remains obligated to make those payments today." Therefore, argues NEC, even though the cost for capacity may have increased to Constellation's detriment, Constellation's obligation

to cover the cost for capacity has not changed and there is no basis to compel arbitration. Constellation argues that NEC's interpretation is overly constrained and that at least the 2002 Contract's apparent reference to "economic[]" alterations of rights or obligations shows that the arbitration clauses are triggered by regulatory changes that increase the cost of complying with existing obligations.

The Court believes that the contractually bargained-for expectations of the parties should be respected. However, the Court is also hard-pressed at this stage to determine resolutely whether a change has been effected in the rights or obligations assigned to either NEC or Constellation. Therefore, while the Court is cognizant of NEC's argument that the arbitration clauses - and indeed the PPAs in their entirety - are not implicated by a regulatory increase in capacity costs, and Constellation's argument to the converse, the Court cannot ascertain at this stage and on the briefing submitted whether the parties agreed, under any of the PPAs, to arbitrate disputes like that presented here. The Court will decline Constellation's request that this proceeding be stayed pending arbitration; however, it will not categorically foreclose such relief in the future, at least with respect to those PPAs that may eventually be determined to require arbitration of the present dispute.

II. <u>State's Motion to Intervene and Join a Claim</u>

The State seeks to intervene in Counts I and II for declaratory judgment and waiver, respectively, of NEC's Complaint either as a matter of right under Federal Rule of Civil Procedure 24(a)(2)[19] or by permission under Federal Rule of Civil Procedure 24(b)(2).

Rule 24(b)(2) provides that "[u]pon timely application anyone may be permitted to intervene in an action ... when an applicant's claim or defense and the main action have a question of law or fact in common . . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." <u>See also</u> <u>Daggett v. Comm'n on Gov'tal Ethics & Election Practices</u>, 172 F.3d 104, 113-14 (1st Cir. 1999); <u>United States v. Pitney Bowes, Inc.</u>, 25 F.3d 66, 73 (2d Cir. 1994). A district court's ruling on permissive intervention is reviewable for abuse of discretion. <u>Mangual v. Rotger-Sabat</u>, 317 F.3d 45, 61 (1st Cir. 2003).

The State argues that its claims are substantially intertwined with questions of law and fact common to the claims made by NEC, in

---

[19] Federal Rule of Civil Procedure 24(a)(2) provides that "[u]pon timely application anyone shall be permitted to intervene in an action ... when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

that the State, like NEC, is seeking a declaration that the Settlement Agreement bars Constellation from recovering Transition Period UCAP costs or any similar costs from NEC. This Court agrees with the State's assessment, and does not find, as Constellation asserts, that the State's intervention is disruptive or that it "portends of future delays." The State is not seeking to inject any new issues into this already labyrinthine dispute. Rather, it appears possible and perhaps even likely that the State's entry into this action may actually hasten the resolution of the issues before the Court. The State was a participant in the negotiations leading up to the inclusion of the provision of the Settlement Agreement at issue and is possessed of expertise pertaining to public utility regulation in Rhode Island. Accordingly, the State's motion to intervene permissively is granted.

Having permitted the State to intervene, the Court must decide whether the State should be permitted to join an additional count for estoppel against Constellation. Under Federal Rule of Civil Procedure 18(a), "[a] party asserting a claim to relief as an original claim . . . may join, either as independent or as alternate claims, as many claims, legal, equitable, or maritime, as the party has against an opposing party." Although joinder of claims under Rule 18(a) is permissive, it is "strongly encouraged" except where joinder would result in great unfairness or prejudice

to a party. United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 724 (1966).

In the instant case, the State alleges in Count III of its Proposed Complaint that Constellation is estopped from recovering the Transition Period UCAP costs as a result of the Settlement Agreement and related FERC Order, as well as Constellation's own conduct during the settlement process. This claim arises from the same transactions or occurrences as Counts I and II of NEC's Complaint (in which the State is intervening). While the addition of a party and a claim to this proceeding will result in some additional burden for all involved (including the Court), given that the State's proposed claim largely implicates the same facts as would otherwise be in issue between NEC and Constellation, it is apparent that the burden does not result in "great unfairness or prejudice" that would preclude joinder.

III. Constellation's Motion to Dismiss State's Proposed Complaint

As required by Federal Rule of Civil Procedure 24(c), the State attached a "Proposed Complaint" as an exhibit to its Motion to Intervene and to Join Claim. The Proposed Complaint restates in similar but not identical language the claims for declaratory relief and waiver (Counts I and II, respectively) found in NEC's Complaint, as well as the original claim for estoppel. Although the Proposed Complaint has not formally been filed with the Court, Constellation, presumably as a precaution, moved to dismiss it and

that motion has been fully briefed by Constellation and the State. In spite of this preliminary skirmishing, it is axiomatic that an intervenor does not become a party to an action until intervention is actually granted. See, e.g., White v. Texas Am. Bank/Galleria N.A., 958 F.2d 80, 82-84 (5th Cir. 1992) (applicant did not become a party until the court permitted intervention, and could not be served or respond to a motion for summary judgment until it was a party). Therefore, now that the Court has granted the State's Motion to Intervene and to Join Claim, the State should formally file its complaint against Constellation. Constellation may respond to the complaint in whatever manner it sees fit in accordance with the ordinary rules of procedure.[20]

IV. Conclusion

For the foregoing reasons, Constellation's Motion to Dismiss or, in the Alternative, to Stay is DENIED. The State's Motion to Intervene and to Join Claim is GRANTED.

IT IS SO ORDERED.

WESmith

William E. Smith
United States District Judge
Date: 12/10/07

[20] Although the Court leaves to Constellation's discretion the manner in which it will proceed against the complaint once filed by the State, the Court is disinclined, based on its analysis and rulings here, to grant any motion to dismiss based on a theory that the State lacks standing to pursue its claims derived from the Settlement Agreement.