**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| THE NARRAGANSETT ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS and the RHODE ISLAND DIVISION OF PUBLIC UTILITIES AND CARRIERS,<br><br>Intervenor-Plaintiff,<br><br>v.<br><br>CONSTELLATION ENERGY COMMODITIES GROUP, INC.,<br><br>Defendant. | ) | C.A. NO. 06-404S |

**ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS OF**
**CONSTELLATION ENERGY COMMODITIES GROUP, INC.**

Constellation Energy Commodities Group, Inc. ("Constellation") as its Answer to the Complaint of The Narragansett Electric Company ("NEC") alleges and pleads as follows:

## PARTIES

1. Constellation denies knowledge or information sufficient to form any belief about the accuracy of this allegation and, therefore, denies it.

2. Admitted.

## JURISDICTION AND VENUE

3. To the extent the relief Plaintiff seeks entails abrogating or modifying any right Constellation enjoys under its wholesale power supply agreements with Plaintiff, Constellation denies this Court has subject matter jurisdiction; as to the allegations otherwise regarding

diversity jurisdiction and federal question jurisdiction, Constellation admits that there is diversity of citizenship, more than $75,000 (exclusive of interests and costs) in dispute, and issues of federal regulatory orders in dispute.

4. Constellation states that paragraph 4 of the Complaint consists of legal arguments to which no response is required; to the extent that any answer is required, Constellation admits that venue is proper under 28 U.S.C. §1391(b), but contends that this Court should transfer venue under 28 U.S.C. §1404(a).

**FACTS**

5. Admitted.

6. Admitted.

7. Admitted.

8. Admitted.

9. Denied.

10. Constellation denies knowledge or information sufficient to form any belief about the accuracy of this allegation and, therefore, denies it.

11. Denied.

12. Constellation denies knowledge or information sufficient to form any belief about the accuracy of this allegation and, therefore, denies it.

13. Constellation denies knowledge or information sufficient to form any belief about the accuracy of this allegation and, therefore, denies it.

14. Constellation denies knowledge or information sufficient to form any belief about the accuracy of this allegation and, therefore, denies it.

15. Constellation denies knowledge or information sufficient to form any belief about the accuracy of this allegation and, therefore, denies it.

16. Constellation denies knowledge or information sufficient to form any belief about the accuracy of this allegation and, therefore, denies it, except that Constellation admits that the PPAs terminate before June 1, 2010.

17. Constellation denies the allegations of Paragraph 17 of the Complaint to the extent they are directed at it; as to all other allegations, Constellation's knowledge or information sufficient to form any belief about the accuracy of those allegations and, therefore, denies them.

18. Constellation denies knowledge or information sufficient to form any belief about the accuracy of those allegations and, therefore, denies them.

19. Denied.

20. Denied.

21. Constellation denies the allegations in Paragraph 21 of the Complaint to the extent that they are directed at it; as to all other allegations, Constellation denies knowledge or information sufficient to form any belief about the accuracy of those allegations and, therefore, denies them.

22. Denied, except that as for the allegations in Paragraph 22 quoting from Section VIII(A) of the Settlement Agreement, that document speaks for itself.

23. Constellation denies the allegations in Paragraph 23 of the Complaint to the extent that they are directed at it; as to all other allegations, Constellation denies knowledge or information sufficient to form any belief about the accuracy of those allegations and, therefore, denies them.

24. Admitted.

25. Constellation denies the allegations in Paragraph 25 of the Complaint to the extent that they are directed at it. As for the allegations in Paragraph 25 quoting from documents filed with FERC, these documents speak for themselves. As to all other allegations, Constellation denies knowledge or information sufficient to form any belief about the accuracy of those allegations and, therefore, denies them.

26. Admitted.

27. Admitted.

28. Admitted.

29. Constellation states that Paragraph 29 of the Complaint consist of a legal arguments to which no response is required; to the extent any answer is required, Constellation denies that the Settlement Agreement bars or precludes Constellation from exercising any right it enjoys under the PPAs.

**NEC'S DEMAND**

30. Constellation states that Paragraph 30 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation denies the allegations therein, except that Constellation admits it sent a letter dated August 1, 2006 to NEC, the terms of which speak for themselves.

31. Constellation states that Paragraph 31 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation denies the allegations therein.

32. Admitted.

33. Constellation states that Paragraph 33 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation denies the allegations therein.

**COUNT I**
**Declaratory Judgment**

34. Constellation repeats and incorporates its responses to the allegations of Paragraphs 1 through 33 as if repeated herein.

35. Constellation states that Paragraph 35 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation denies that the Settlement Agreement bars or precludes Constellation from exercising any right it enjoys under the PPAs.

36. Constellation states that Paragraph 36 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation denies the allegations therein.

37. Constellation states that Paragraph 37 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation admits the allegations therein.

38. Constellation states that Paragraph 38 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation denies the allegations therein.

**COUNT II**
**Waiver**

39. Constellation repeats and incorporates its response to the allegations of Paragraphs 1 through 38 as if repeated herein.

40. Constellation states that Paragraph 40 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation denies the allegations therein.

41. Constellation states that Paragraph 41 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation denies the allegations therein.

42. Constellation states that Paragraph 42 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation denies the allegations therein.

**COUNT III**
**Declaratory Judgment**
**(Transition Period UCAP Costs/PPAs)**

43. Constellation repeats and incorporates its response to the allegations of Paragraphs 1 through 42 as if repeated herein.

44. Constellation states that Paragraph 44 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation denies the allegations therein.

45. Constellation states that Paragraph 45 of the Complaint consists of legal arguments to which no response is required; to the extent that any response is required, Constellation admits the allegations therein.

46. Constellation states that Paragraph 46 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation denies the allegations therein.

**COUNT IV**
**Declaratory Judgment**
**(ASM/PPAs)**

47. Constellation repeats and incorporates its response to the allegations of Paragraphs 1 through 46 as if repeated herein.

48. Constellation states that Paragraph 48 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation denies the allegations therein.

49. Constellation states that Paragraph 49 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation admits the allegations therein.

50. Constellation states that Paragraph 50 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation denies the allegations therein.

**COUNT V**
**Breach of Contract**
**(The PPAs)**

51. Constellation repeats and incorporates its response to the allegations of Paragraphs 1 through 50 as if repeated herein.

52. Constellation states that Paragraph 52 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation denies the allegations therein.

53. Constellation states that Paragraph 53 of the Complaint consists of legal arguments to which no response is required; to the extent any response is required, Constellation denies the allegations therein.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

54. This Court lacks subject matter jurisdiction over this dispute.

### Second Affirmative Defense

55. NEC fails to plead a claim on which relief can be granted. NEC has no cognizable claim for relief, or for the recovery from Constellation of any costs, attorneys' fees or other expenses it may incur or have already incurred in conjunction with this proceeding.

### Third Affirmative Defense

56. NEC is barred by the doctrine of estoppel from interposing or seeking to interpose any claim, allegation or other issue that would interfere with Constellation's lawful rights (including economic interests) under four Power Purchase Agreements (the "PPAs").

### Fifth Affirmative Defense

57. NEC is barred by the doctrine of laches from interposing or seeking to interpose any claim, allegation or other issue that would interfere with Constellation's lawful rights (including economic interests) under the PPAs.

### Sixth Affirmative Defense

58. NEC is barred by the doctrine of unclean hands from interposing or seeking to interpose any claim, allegation or other issue that would interfere with Constellation's lawful rights (including economic interests) under the PPAs.

**Seventh Affirmative Defense**

59. NEC is barred by the doctrine of release from interposing or seeking to interpose any claim, allegation or other issue that would interfere with Constellation's lawful rights (including economic interests) under the PPAs.

**Eighth Affirmative Defense**

60. NEC is barred by the doctrine of waiver from interposing or seeking to interpose any claim, allegation or other issue that would interfere with Constellation's lawful rights (including economic interests) under the PPAs.

**Ninth Affirmative Defense**

61. NEC's complaint is barred by the doctrine of accord and satisfaction.

**Tenth Affirmative Defense**

62. NEC's complaint is barred by the doctrine of failure of consideration.

**Eleventh Affirmative Defense**

63. NEC's complaint is barred by illegality in that no valid and lawful order of a duly empowered authority (namely, the Federal Energy Regulatory Commission) has abrogated or modified Constellation's rights under the PPAs, and this Court has no authority to grant any relief altering or hypothesizing alteration of any right enjoyed by Constellation under those four PPAs.

**Twelfth Affirmative Defense**

64. NEC's complaint is barred by the doctrine of frustration of purpose.

**Thirteenth Affirmative Defense**

65. NEC's complaint is barred by the doctrine of impossibility of performance.

**Fourteenth Affirmative Defense**

66. NEC has no cognizable claim to a jury trial as its claims sound in equity and not in law.

**Fifteenth Affirmative Defense**

67. The Court should transfer this matter to a different venue under 28 U.S.C. §1404. Venue is not in the interests of justice in this Court because Constellation cannot receive a fair and impartial trial before any jury comprised of NEC ratepayers in light of the State's professed abdication of any prudence review of costs under the PPAs that NEC seeks to pass on to ratepayers.

**Sixteenth Affirmative Defense**

68. The claims raised by NEC's complaint are properly the subject of binding arbitration and/or a stay under the Federal Arbitration Act.

**COUNTERCLAIM**

1. At issue in this Counterclaim are four Power Purchase Agreements ("PPAs") that the NEC and Constellation entered into between 1998 and 2002 , under which Constellation agreed to supply wholesale power to NEC for NEC's retail customers.

2. In each of the four PPAs, NEC and Constellation expressly conditioned their duties on the regulatory landscape remaining unchanged from the date of contract execution. Rather than allocate the risk of intervening regulatory change to one party or the other, each PPA has a provision that binds NEC and Constellation to negotiate an equitable adjustment of the contract in the aftermath of any market rule or regulatory change that alters the benefits and burdens (including economically) contemplated by the parties at the time of contracting.

3. In March 2006, just such a regulatory change took place. At the time, proceedings at the Federal Energy Regulatory Commission ("FERC") resulted in a "Settlement Agreement" that not only significantly altered the regulatory framework for buying and selling what is know in the energy business as "capacity," but also forever changed the rights and obligations of the NEC and Constellation under their four PPAs.

4. This significant regulatory change had a severe economic impact on Constellation, forcing it to buy "capacity" at a fixed price set by the Settlement Agreement, rather than on the open market, as was contemplated by the parties. From the time that the Settlement Agreement went into effect until the end of the four PPAs at issue in 2010, this change could adversely effect Constellation in amounts upwards of $150 million.

5. On August 1, 2006, in response to this regulatory change, Constellation wrote to NEC and invoked its right to negotiate an equitable adjustment under the four PPAs. Rather than fulfilling its promise to negotiate in good faith and arbitrate this matter, as required by the PPAs, NEC filed this lawsuit.

6. Constellation now responds with these Counterclaims. Although this dispute is subject to arbitration under the agreement of the parties, NEC has sought to litigate. Despite the fact that the four PPAs at issue show that Constellation is entitled to an equitable adjustment to account for a shift in the regulatory framework, NEC has claimed that no such adjustment is available or required. And, although the Settlement Agreement entered into before FERC had no effect on Constellation's right to an equitable adjustment under the four PPAs, NEC claims otherwise.

7. For these reasons, and the ones set forth below, Constellation seeks:

a. an order from this Court staying all proceedings in this case and compelling the parties to arbitrate this dispute under the Federal Arbitration Act, 9 U.S.C. §§ 3-4;

b. a declaration under 28 U.S.C. § 2201, that Constellation is entitled to an equitable adjustment under the four PPAs, and that NEC has breached these agreements by refusing to agree to such an adjustment;

c. a declaration under 28 U.S.C. § 2201 that Constellation is entitled to recover the costs it incurred as a result of the implementation of the ancillary services market ("ASM") phases I and II;

d. a finding that NEC's knowing and willful breach of the four PPAs has resulted in damages to Constellation of $150 million and award of damages in that amount; and

e. alternatively, in the event that the four PPAs do not cover the subject matter of this dispute, a finding that NEC has been unjustly enriched in the amount of $150 million and that it is, therefore, liable to Constellation under the doctrines of quasi-contract, unjust enrichment, and/or quantum meruit in that amount.

**PARTIES**

8. Constellation is a corporation duly organized an existing under the laws of the State of Delaware with its principal place of business located at 11 Market Place, Suite 500, Baltimore, Maryland, and the successor by name change to Constellation Power Source, Inc.

9. On information and belief, NEC is a corporation organized and existing under the laws of Rhode Island with its principal place of business at 280 Melrose Street, Providence, Rhode Island.

10. On information and belief, NEC is the successor by merger to Blackstone Valley Electric Company and Newport Electric Corporation—the original Rhode Island parties to the two PPAs executed in 1998.

## JURISDICTION AND VENUE

11. This Court has diversity jurisdiction under 28 U.S.C. § 1332 because NEC and Constellation are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12. This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because the action arises under the laws of the United States.

13. This Court also possesses supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

14. Venue for Constellation's Counterclaims is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

### A. NEC and Constellation

15. NEC is a retail electric distribution company that delivers electricity to retail end-user customers in Rhode Island. Constellation sells at wholesale in interstate commerce power ("energy" and "capacity") to NEC that partially meets NEC's overall requirements.

16. For many years, NEC and Constellation have enjoyed a customer-supplier relationship. Between 1998 and 2002, the parties entered into four PPAs under which Constellation agreed to supply wholesale power to NEC for NEC's retail customers. These agreements are as follows:

a. Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company, Eastern Edison Company, Newport Electric Corporation and Constellation Power Source, Inc. (dated December 21, 1998, and amended on January 27, 2003 and June 3, 2003) (the "20% Contract").

b. Wholesale Standard Offer Service Agreement between Blackstone Valley Electric Company, Eastern Edison Company, Newport Electric Corporation and Constellation Power Source, Inc. (dated December 21, 1998, and amended on January 27, 2003 and June 3, 2003) (the "36% Contract").

c. Power Supply Agreement between The Narragansett Electric Company and Constellation Power Source, Inc. (dated October 5, 2001) (the "2001 Contract").

d. Power Supply Agreement between Narragansett Electric Company and Constellation Power Source, Inc. (dated August 23, 2002, and amended August 23, 2002) (the "2002 Contract").

17. The 20% Contract, the 36% Contract, and the 2001 Contract are governed by Massachusetts law, while the 2002 Contract is governed by Rhode Island law.

**B. Key Terms under the PPAs**

18. Under the PPAs, Constellation supplies (at wholesale) portions of NEC's total Standard Offer Service requirements. Delivering "Wholesale Standard Offer Service" entails Constellation supplying NEC with the necessary electric "energy" and "capacity" required to satisfy those requirements.

19. "Capacity" (also known as "installed capacity" or "unforced capacity" or "UCAP") as used in the PPAs serves as the functional equivalent of an option held by NEC to call forth more energy to meet increasing demand from its retail customers.

20. Requirements mandated by the New England Independent System Operator ("ISO New England") and the New England Power Pool ("NEPOOL") obligate NEC to procure "capacity" to supply "energy." NEC satisfies these requirements by procuring supplies from Constellation, among others.

21. NEPOOL is a voluntary association of more than 200 participants in the New England bulk power system, created in 1971 to establish a central dispatch system for New England interstate power and to enhance system reliability. NEPOOL created a regional power grid that now includes more than 350 generating plants and more than 8,000 miles of transmission lines. NEPOOL has contracted with ISO New England, Inc. to operate and administer the New England transmission system and wholesale markets in Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.

22. Standard Offer Service under the PPAs is firm all requirements electric power service, including installed capacity and reserves necessary to fulfill the requirements of those retail customers who contract with NEC for electric service.

23. The PPAs define Standard Offer Service as "firm all-requirements electric service . . . including . . . installed capability . . . necessary to fulfill all NEPOOL and ISO obligations as they may change from time to time associated with providing firm all requirements power to the Companies' retail customers taking Standard Offer Service." 20% Contract at 3; 36% Contract at 3. Constellation's duties under the PPAs include delivering "energy" and "capacity" to NEC, which Constellation procures from upstream sources of generation.

24. The PPAs specify a stipulated base price plus a fuel adjustment factor covering all that Constellation delivers under the contracts. Under Article 3 of the 20% Contract and 36%

Contract, for example, Constellation promised to deliver the allocated portion of NEC's total aggregated load of customers taking Standard Offer Service and to satisfy all requirements and costs of performance. 20% Contract at 3-5; 36% Contract at 5-6.

25. The 2001 Contract likewise provides that Constellation shall deliver 100% of NEC's Standard Offer 2 Service requirements, and satisfy all requirements and costs of performing. 2001 Contract at 1, 4.

26. The 2002 Contract also follows this pattern. This contract requires Constellation to deliver the allocated portion of NEC's Wholesale Standard Offer 1 Service, and to satisfy all present and future requirements and costs for "Installed Capacity" required for the provision of Wholesale Standard Offer 1 Service and any related requirements, expenses or charges. 2002 Contract at 1.

**C. Constellation's Right to an Equitable Adjustment**

27. In each of the four PPAs, the parties expressly conditioned their duties on the regulatory landscape remaining unchanged from the date of contract execution. Rather than allocate the risk of intervening regulatory change to one party or the other, each PPA has a provision that binds NEC and Constellation to negotiate an equitable adjustment in the aftermath of any market rule or regulatory change that alters the economic benefits and burdens contemplated by the parties at the time of contracting.

28. Although the PPAs obligated Constellation to secure and pay for the "capacity" needed to satisfy the allocated share of NEC's Standard Offer Service load, the PPAs each contain the parties' promise to negotiate any equitable adjustments needed to address intervening changes in law or market rules that materially affect the costs and obligations to provide Standard Offer Service.

29. Specifically, the 20% and 36% Contracts provide that:

> 18(2) This Agreement is intended to comply with all NEPOOL Criteria, Rules and Standards ("Rules"). If, during the term of this Agreement, the Restated NEPOOL Agreement is terminated or amended in a manner that would eliminate or alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or altered by NEPOOL or the ISO, in a manner which materially affects the costs and obligations to provide Standard Offer Service, the Companies and Supplier shall meet to determine appropriate compensation to the affected Party.
>
> 18(3) In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases Suppliers' costs or obligations to provide Standard Offer Service or the Companies are prevented from recovering from customers taking Standard Offer Service the cost of electricity provided by Supplier, the Companies and Supplier shall meet to determine appropriate compensation to the negatively impacted Party. In the event that the Parties are not able to agree on the materiality of the increased cost or obligation or the amount to be reimbursed, Parties shall attempt to resolve the matter in accordance with Article 13.

20% Contract at 17; 36% Contract at 17.

30. Article 13 in turn provides, in relevant part, that:

> Subject to Article 8(3), all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement shall be referred to a senior representative of the Companies with authority to settle, designated by the Companies, and a senior representative of Supplier with authority to settle, designated by Supplier, for resolution on an informal, face-to-face basis as promptly as practicable. The Parties agree that such informal discussion shall be conducted in good faith.... In the event the designated senior representatives are unable to resolve the dispute within thirty (30) days, or such other period as the Companies and Supplier may jointly agree upon, such dispute may be submitted to arbitration and resolved in accordance with the arbitration procedure set forth herein if the Companies and Supplier jointly agree to submit it to arbitration.

Ex. A at 14; Ex. B at 14.

31. The 2001 Contract likewise incorporates the parties' covenant to negotiate (and if necessary, arbitrate) any equitable adjustments needed to address changes that amend or terminate a Rule and that materially affect the costs and obligations to provide Standard Offer Service. Specifically, Article 14.2 reads:

> This Agreement must comply with all NEPOOL market rules and/or operating procedures ("Rules"). If, during the term of this Agreement, the NEPOOL Agreement is terminated or amended in a manner that would eliminate or materially alter a Rule affecting a right or obligation of a Party hereunder, or if such a Rule is eliminated or materially altered by NEPOOL, the Parties agree to negotiate in good faith in an attempt to amend this Agreement to incorporate a replacement Rule ("Replacement Rule"). The intent of the Parties is that any such Replacement Rule reflect, as closely as possible, the intent and substance of the Rule being replaced as such Rule was in effect prior to such termination or amendment of the NEPOOL Agreement or elimination or alteration of the Rule. If the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Appendix B [sic] . . . and to seek a resolution of the matter consistent with the above stated intent.

2001 Contract at 20-21.

32. The reference in the 2001 Contract to Appendix B is an obvious typographical error. The correct reference should be to Section 15.2. The direction of Section 14.2 to "submit the matter to arbitration under ***the terms*** . . ." evidences the parties' intent to submit equitable adjustment disputes to arbitration regardless of the amount in controversy. *See* 2001 Contract at 21 (emphasis added).

33. The 2002 Contract also includes the parties' covenant to negotiate an equitable adjustment. Section 15.2 of the 2002 Contract reads:

> If, during the term of this Agreement, any NEPOOL Rule [defined at page 3 of the 2002 Contract as all rules, operating procedures, agreements, manuals, protocols and tariffs adopted by NEPOOL/ISO, and accepted by FERC], Rhode Island statute or other applicable law is terminated or amended in a manner that would eliminate or materially (including economically) alter any rights or obligations of a Party hereunder, the Parties agree to negotiate in good faith to amend this Agreement so as to maintain, as closely as possible, the intent and substance of the allocation of rights and obligations contemplated hereunder. If after a period of thirty (30) days from the date on which a Party provides written notice to the other Party of the need to amend this Agreement, the Parties are unable to reach agreement on such an amendment, the Parties agree to submit the matter to arbitration under the terms of Section 16.2 (*regardless of the amount, if any, in controversy*) and to seek a resolution of the matter consistent with the above stated intent.

2002 Contract at 23-24 (emphasis added).

34. Section 16.2 provides, in relevant part, that:

> Any dispute between the Company and Seller arising under or in connection with or relating in any way to this Agreement shall be referred to a senior representative of the Seller designated by the Seller and a senior representative of the Company designated by the Company for resolution on an informal basis as promptly as practicable. In the event the designated senior representatives are unable to resolve the dispute within ten (10) days, or such other period as the Parties may jointly agree upon . . . such dispute shall be submitted to arbitration and resolved in accordance with the arbitration procedure set forth in this Section 16.2. . . [T]he arbitrators shall be knowledgeable in electric utility matters, including wholesale power transactions and power market issues[.]

*Id.* at 24.

35. While Section 16.2 also states that the matter shall be submitted to arbitration "to the extent a reasonable estimate of the amount in dispute does not exceed two hundred fifty thousand dollars ($250,000.00)," Section 15.2 makes this cap inapplicable when there is a law or regulatory change equitable adjustment dispute.

**E. The Settlement Agreement**

36. FERC regulates the wholesale market for electric energy and capacity, including NEC's contracts with Constellation and the markets administered by ISO New England. At the time the parties contracted, the cost for supplying capacity was negligible.

37. In March 2006, however, all that changed. At the time, FERC issued an order accepting a Settlement Agreement that marked a significant shift in the regulatory landscape that was in place at the time that NEC and Constellation entered into the four PPAs at issue.

38. Under that Settlement Agreement, FERC approved a market rule change for "capacity" that replaced a market-based pricing regime with a new regime in which prices for capacity were set administratively during the Settlement Agreement "Transition Period" (December 1, 2006 to May 31, 2010), which coincides with the remaining term of the PPAs.

39. Constellation is not a "Settling Party" as that term is used in the Settlement Agreement and FERC Order approving it. NEC's parent, National Grid USA—acting on behalf of itself and its subsidiaries—was a Settling Party.

40. Constellation never assented to modifying, abrogating, waiving or otherwise not deserting its equitable adjustment rights under the PPAs. At no time did Constellation say, do, or omit to say or do anything that reasonably would have induced NEC (or any other Party) to believe Constellation would forego any equitable adjustment rights Constellation enjoys under the PPAs.

41. Leading up to the Settlement Agreement, FERC found that companies supplying capacity were not receiving enough revenue to justify continued operation in a market-based rate regime or to foster development of the new generation needed for future demand. To address that problem, the Settlement Agreement imposes a regulatory regime intended to spur development of new electric generation to ensure reliable service in the future, which regime provides benefits of improved reliability to NEC and its ratepayers.

42. The change caused by the Settlement Agreement for the Transition Period profoundly alters the balance of economic benefits and burdens – rights and obligations – struck in the PPAs. That change mandates fixed prices for capacity suppliers in lieu of the negotiated terms allowed under the regulatory regime when the PPAs were executed. Costs of capacity billed by ISO New England to Standard Offer Service providers increase dramatically because the Settlement Agreement ordains a New England-wide fixed price negotiated by the capacity suppliers and other parties to the Settlement Agreement; not a price set by supply and demand.

43. Constellation received no consideration under the Settlement Agreement for any alleged promise to waive or not assert its rights under the PPAs.

44. FERC's approval of the Settlement Agreement does not abrogate, modify or waive the rights for an equitable adjustment Constellation enjoys under the PPAs.

45. Neither the FERC Order nor the explanatory statement filed in conjunction with applying for approval provide any support for NEC's contention that Section VIII(A) of the Settlement Agreement abrogated Constellation's rights under the PPAs to an equitable adjustment. The FERC Order and the explanatory statement contain no discussion of that provision and no indication of the consequence of the Settlement Agreement that NEC alleges.

46. The omission of any discussion in effect of the Settlement Agreement of the effect that NEC intended it to have on Constellation's rights under the PPAs was wrongful and done deliberately and with unclean hands so as to interfere with or denigrate Constellation's contractual and economic interests.

47. The Settlement Agreement explicitly does ***not*** prejudice contractual rights of parties:

> Neither support for this Settlement Agreement, nor the Term Sheet relating hereto, nor the submission of this Settlement Agreement and the concurrence in, ***or failure to comment on***, the described settlement shall constitute an admission by any Settling Party that any allegation or contentions in Docket Nos. ER03-563-030 and ER03-563-055 were true or valid or that any Settling Party had acted consistent with, or contrary to, contract provisions, the FPA, or any other federal or state law or regulation.
>
> * * *
>
> FERC's approval of this Settlement Agreement shall not constitute approval of or precedent regarding any principle or issue in Docket Nos. ER03-563-030 and ER03-563-055 before the FERC.

Settlement Agreement at 5-6 (emphasis added).

48. The Settlement Agreement does not, under any reasonable reading, provide that Constellation waives its right to an equitable adjustment under the PPAs or agrees not to prosecute such rights.

49. In support of its claim to the contrary, NEC has cited the following provision:

> The current UCAP products shall be retained for the period commencing on December 1, 2006 and ending on May 30, 2010 (the "Transition Period") as provided for in Part VIII.I. Payments will be made to UCAP entitlement holders, and made by UCAP obligation holders including wholesale standard offer suppliers in Rhode Island as under the current Market Rules and tariffs; it being understood that the agreement of wholesale standard offer suppliers in Rhode Island to make UCAP payments is contingent upon the agreement of the state of Rhode Island utility regulatory authorities to support the settlement.

*Id.* at 46. The FERC Order explained that "obligation holders" means "load-serving entities," like NEC.

50. That clause, Section VIII.A., however, merely provides that, in Rhode Island, the obligation of load-serving entities to pay UCAP entitlement holders will be satisfied by having wholesale standard offer service suppliers make the payment. The clause addresses the party from whom UCAP entitlement holders may expect payment as it concerns Rhode Island utilities. It does not address in any way specific contractually negotiated equitable adjustment rights that exist between a Rhode Island load-serving entity and a particular wholesale supplier.

**F. Constellation Duly Invoked the Right to an Equitable Adjustment**

51. In light regulatory changes made by the Settlement Agreement, and the equitable adjustment provisions in the PPAs, Constellation invoked its right to an equitable adjustment by a letter to NEC, dated August 1, 2006.

52. Constellation's August 1, 2006 letter did not assert any demand to specific remuneration, but rather properly exercised Constellation's right under each of the PPAs to discuss with NEC the appropriate adjustments needed.

53. Rather than negotiate in good faith, agree to equitable adjustment as required by the clear language of the PPAs, or submit this dispute to arbitration as required by the PPAs, NEC instead sued Constellation in this Court.

## COUNTERCLAIMS

### Count I
### Demand for Arbitration

54. Constellation incorporates each and every allegation in Paragraphs 1 through 53 of the Counterclaim as if repeated here.

55. Some or all of the PPAs require mandatory arbitration of the instant dispute over the need and measure of an equitable adjustment due to the changes in regulatory rules and laws implemented by the Settlement Agreement.

56. Pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, the Court should compel NEC to arbitrate its claims against Constellation.

57. Because any remaining non-arbitrable issues are so related to and intertwined with those subject to arbitration, pursuant to the FAA, 9 U.S.C. § 3, the Court should stay the proceedings of any nonarbitrable claims pending the outcome of the arbitration proceedings.

### Count II
### Declaratory Judgment
### (Equitable Adjustment)

58. Constellation incorporates each and every allegation in Paragraphs 1 through 57 of the Counterclaim as if repeated here.

59. There is an actual controversy as to whether Constellation is entitled to an equitable adjustment under the four PPAs.

60. Under the language of the four PPAs, Constellation is entitled to an equitable adjustment due to the intervening regulatory changes effectuated by the Settlement Agreement which regulatory changes (among other things) have altered the market for capacity from a free market to one in which prices are fixed by regulatory order.

61. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court should declare that Constellation is entitled to an equitable adjustment under the four PPAs and that NEC breached those agreements by failing to negotiate or agree to such an equitable adjustment.

**Count III**
**Breach of Contract**

62. Constellation incorporates each and every allegation in Paragraphs 1 through 61 of the Counterclaim as if repeated here.

63. Under the language of the four PPAs, Constellation is entitled to an equitable adjustment due to the intervening regulatory changes in the Settlement Agreement that have altered the regulatory landscape, the economic costs to Constellation, and the rights and obligations of Constellation and NEC.

64. NEC has breached the PPAs by refusing to enter into good faith settlement discussions regarding the need for an equitable adjustment to the contracts.

65. NEC has breached the PPAs by refusing to arbitrate the dispute regarding the need for an equitable adjustment to the contracts.

66. NEC has breached the PPAs by refusing to agree to an equitable adjustment to the contracts after the regulatory and law changes implemented by the Settlement Agreement.

67. Constellation has and will suffer damages as a direct and proximate result of NEC's breach of the PPAs, for which NEC is liable.

68. This Court should find that NEC has materially breached the four PPAs, and that Constellation has suffered and will continue to suffer damages as a direct and proximate result of this material breach.

**Count IV**
**Declaratory Judgment**
**(ASM/ PPAs)**

69. Constellation incorporates each and every allegation in Paragraphs 1 through 68 of the Counterclaim as if repeated here.

70. An actual controversy exists as to whether the costs Constellation incurred and is incurring as a result of the implementation of ASM Phases I and II, including transition period costs, entitle Constellation to additional compensation under the PPAs.

71. Under the language of the four PPAs, Constellation is entitled to additional compensation as a result of the implementation of the ASM Phases I and II, including transition period costs.

72. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court should declare that each of the PPAs entitle Constellation to recover an equitable adjustment for costs attributable to the implementation of ASM Phases I and II.

**Count V**
**Breach of Contract**
**(ASM/ PPAs)**

73. Constellation incorporates each and every allegation in Paragraphs 1 through 72 of the Counterclaim as if repeated here.

74. Under the language of the four PPAs, Constellation is entitled to additional compensation as a result of the implementation of the ASM Phases I and II, including transition period costs.

75. To date, however, NEC has refused to negotiate in good faith regarding that dispute, to arbitrate that dispute, or to provide additional compensation to Constellation as required by the terms of the four PPAs.

76. NEC has breached the PPAs by refusing to enter into good faith settlement discussions regarding the need to provide Constellation with additional compensation as a result of the implementation of the ASM Phases I and II, including transition period costs.

77. NEC has breached the PPAs by refusing to arbitrate the dispute regarding the need to provide Constellation with additional compensation as a result of the implementation of the ASM Phases I and II, including transition period costs.

78. NEC has breached the PPAs by refusing to provide Constellation with additional compensation as a result of the implementation of the ASM Phases I and II, including transition period costs.

79. Constellation has and will suffer damages as a direct and proximate result of NEC's breach of the PPAs, for which NEC is liable.

80. This Court should find that NEC has materially breached the four PPAs, and that Constellation has suffered and will continue to suffer damages as a direct and proximate result of this material breach.

**Count VI**
**Declaratory Judgment**
**(Waiver)**

81. Constellation incorporates each and every allegation in Paragraphs 1 through 80 of the Counterclaim as if repeated here.

82. An actual controversy exists as to whether the Settlement Agreement affects Constellation's rights under its PPAs with NEC, including its rights to equitable adjustments triggered by particular regulatory changes.

83. Constellation did not waive its rights to an equitable adjustment or to recover Transition Period UCAP costs as a result of either the Settlement Agreement or any of its knowledge or conduct related to that agreement.

84. The Settlement Agreement does not bar, preclude, waive or otherwise denigrate Constellation's right under the four PPAs to an equitable adjustment as a result of the regulatory changes effectuated pursuant to FERC's approval of the Settlement Agreement.

85. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court should declare that the Settlement Agreement has no effect on Constellation's right to equitable adjustments under the PPAs, and that each of the PPAs entitles Constellation to an equitable adjustment to be compensated for regulatory increase in the costs of capacity.

**Count V**
**Quasi-Contract; Unjust Enrichment; *Quantum Meruit***

86. Constellation incorporates each and every allegation in Paragraphs 1 through 85 of the Counterclaim as if repeated here.

87. In the event that the four PPAs do not provide Constellation with the right to an equitable adjustment, then Constellation is nonetheless entitled to relief under quasi-contract, unjust enrichment, or *quantum meruit*.

88. Constellation has conferred a benefit on NEC by continuing to provide the level of UCAP required by ISO New England despite the increase in cost to Constellation and despite the impossibility of performing the PPAs in accordance with the original intent of those contracts.

89. NEC has appreciated the benefit by continuing to supply power to its Rhode Island customers without providing additional compensation to Constellation.

90. NEC is unjustly enriched to the extent of the value of the UCAP received in excess of its payments to Constellation.

91. NEC is liable to Constellation under the doctrines of quasi-contract, unjust enrichment and/or *quantum meruit* for the value of the benefit Constellation has thus conferred on NEC and will continue to confer until termination of the PPAs.

## PRAYER FOR RELIEF

WHEREFORE, Constellation requests that the Court enter an order and judgment in favor of Constellation:

(i) compelling NEC to arbitrate this dispute and staying all other proceedings pending that arbitration;

(ii) declaring that Constellation is entitled to an equitable adjustment under the four PPAs and finding that NEC has breached the four PPAs;

(iii) dismissing all claims in NEC's Complaint with prejudice;

(iii) awarding Constellation such damages as may be proven at trial;

(iv) awarding Constellation all its reasonable costs;

(v) awarding Constellation its reasonable attorneys' fees; and

(vi) awarding such further relief as the Court deems just and proper

Dated: January 15, 2008

Respectfully Submitted,

*/s/ Stacey P. Nakasian*
Stacey P. Nakasian, Esq. (Bar No. 5069)
DUFFY SWEENEY & SCOTT, LTD.
One Turks Head Place, Suite 1200
Providence, RI 02903
Tel: (401) 455-0700
Fax: (401) 455-0701

Kenneth W. Irvin (DC Bar ID #439395)
Paul Thompson
Teresa M. Goody
MCDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, DC 20005-3096
Tel: (202) 756.8116
Fax: (202) 756.8087
Email: kirvin@mwe.com

*Attorneys for Defendant*
*Constellation Energy Commodities Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2008 the foregoing *Answer of Constellation Energy Commodities Group, Inc.* was filed electronically with the Clerk of the Court for the District of Rhode Island using the ECF System which will send notification to the following registered participants of the ECF System as listed on the Court's Notice of Electronic Filing:

Gerald J. Petros
Robin Main
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903

*Counsel for The Narragansett Electric Company*

Leo J. Wold, Esq.
Richard Woolley, Esq.
Rhode Island Attorney General
150 South Main Street
Providence, RI 02903

*Counsel for State of Rhode Island and Providence Plantations and the Rhode Island Division of Public Utilities and Carriers*

*/s/ Stacey P. Nakasian*
Stacey P. Nakasian

*Attorney for Defendant*
*Constellation Energy Commodities Group, Inc.*