# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**(Central Division)**

| | |
|---|---|
| CONSTELLATION ENERGY COMMODITIES GROUP, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE NARRAGANSETT ELECTRIC COMPANY<br><br>Defendant. | C.A. No. 08-40068 FDS |

**COMPLAINT**
**FOR DECLARATORY RELIEF AND DAMAGES**

Plaintiff Constellation Energy Commodities Group, Inc. ("Constellation") as and for its complaint against The Narragansett Electric Company ("NEC") alleges as follows:

## INTRODUCTION

1. This is an action for declaratory relief and breach of contract with regard to two wholesale power purchase agreements entitled Wholesale Standard Offer Service Agreements (collectively, the "WSOSAs") between NEC and Constellation, which were originally executed in 1998. Under the WSOSAs, Constellation agreed to supply wholesale electric power to NEC for NEC's retail customers in exchange for which NEC agreed to pay Constellation a fixed price where "Price = Standard Offer Wholesale Price + Fuel Adjustment Factor." The Fuel Adjustment Factor is an adjustment made to account for increases in the price of the fuel used to generate electricity. NEC breached these two contracts by purposely not seeking the Fuel Adjustment Factor in its rate filings with the Rhode Island Public Utilities Commission

FILING FEE PAID:
RECEIPT # ...
AMOUNT: ...
BY ...
DATE: 4/14/08

("RIPUC"). Through this manipulation, NEC tried to lower the price it would have to pay Constellation.

2. The issue before the Court is NEC's breach of its obligation under the WSOSAs with respect to the Fuel Adjustment Factor. The WSOSAs between NEC and Constellation are identical with respect to the Fuel Adjustment Factor in all material respects to the wholesale standard offer service agreement between NEC and TransCanada, in C.A. No. 05-40076-FDS, pending before this Court.

**PARTIES**

3. Plaintiff Constellation is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business at 111 Market Place, Suite 500, Baltimore, Maryland, and the successor by name change to Constellation Power Source, Inc.

4. NEC is a corporation organized and existing under the laws of the State of Rhode Island with its principal place of business at 280 Melrose Street, Providence, Rhode Island. NEC is a retail electric distribution company engaged in the transmission and distribution of electricity to retail end-use customers in Rhode Island. NEC's predecessors include the retail electric distribution companies in Rhode Island formerly known as Blackstone Valley Electric Company ("Blackstone") and Newport Electric Company ("Newport"), which merged into NEC in 2000. NEC and its predecessors Blackstone and Newport have, at all relevant times and for all relevant purposes, acted through, and been managed and operated by, representatives at affiliated service companies (National Grid USA Service Company ("National Grid") and EUA Service Corporation) based in Northborough and Bridgewater, Massachusetts, respectively.

## JURISDICTION AND VENUE

5. This Court has jurisdiction under 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in Massachusetts in that the WSOSAs were negotiated, signed, and subsequently administered in Massachusetts.

## FACTS

### Industry Background: The URA

6. In 1996, Rhode Island enacted legislation titled Utility Restructuring Act (the "URA") that restructured the regulatory structure governing public utilities serving customers in Rhode Island. The general objectives of the URA were to deregulate electric power supply and to develop a competitive retail market for electricity in Rhode Island. During the same period, Massachusetts was undergoing a similar electricity deregulation process.

7. The URA required that electric distribution companies in Rhode Island divest ownership of their electricity generation facilities, and offer "Retail Access" to Rhode Island retail customers. R.I.G.L. § 39-1-27.3 (1997) (which legislation has since been amended and revised). Retail Access required that each retail electric distribution company allow its customers to purchase electricity from non-affiliated retail suppliers. Retail Access also required each retail distribution company transport that purchased electricity over the retail distribution company's own lines from the alternative supplier to the customer.

8. The URA also required that, during the transition to Retail Access, the retail distribution companies provide a standard power supply ("Standard Offer Service") at regulated prices to Rhode Island retail customers through 2009. R.I.G.L. § 39-1-27.3(d) (1997). The purpose of Standard Offer Service was to provide a stable, competitively priced source of

electricity for those Rhode Island retail customers who had not yet obtained an alternative electricity supplier during the transition to a competitive Retail Access market.

9. Under the URA, the Standard Offer Service was to be priced to account for several factors reasonably beyond the control of power suppliers, including "extraordinary fuel costs." R.I.G.L. § 39-1-27.3(d) (1997). The URA required that retail distribution companies file tariffs with the RIPUC to implement Standard Offer Service through 2009, for the benefit of wholesale and retail customers and their suppliers. R.I.G.L. § 39-1-27(a) (1997). Thus, the protection offered by the Fuel Adjustment Factor was an important consideration for Constellation's agreement to enter into long term (12-year) electric supply contracts as the parties understood that fuel prices could significantly and unpredictably increase over the life of the WSOSAs.

**Implementation of the URA**

10. At the time of enactment of the URA, Blackstone and Newport were retail electric distribution companies in Rhode Island and wholly-owned subsidiaries of Eastern Utilities Associates ("EUA"), a Massachusetts-based public utility holding company. EUA also owned a retail electric company in Massachusetts, Eastern Edison Company ("Eastern" and, collectively with Blackstone and Newport, the "EUA Companies").

11. At the time of enactment of the URA and its Massachusetts counterpart, the EUA Companies, purchased their electricity, which they then supplied to their retail customers, from an affiliated wholesale electricity supplier in Massachusetts, Montaup Electric Company ("Montaup"). To comply with the URA (and the Massachusetts state law counterpart), the Companies were required to terminate their wholesale supply contracts with Montaup, and allow

their retail customers to have Retail Access to alternative suppliers. Montaup also was required to divest its generation facilities.

12. On October 17, 1997, in order to implement the URA, Blackstone, Newport, and Montaup entered into a Stipulation and Agreement with the RIPUC, as well as the Rhode Island Division of Public Utilities and Carriers ("Division") (hereinafter, the "RI Settlement Agreement"). The Federal Energy Regulatory Commission ("FERC") approved the RI Settlement Agreement. The same entities entered into a similar Stipulation and Agreement, executed in Massachusetts and approved by FERC (the "MA Settlement Agreement" and, collectively with the RI Settlement Agreement, the "Settlement Agreements").

13. In order to ensure a steady supply of Standard Offer Service, the RI Settlement Agreement required that Montaup provide Blackstone and Newport with a guaranteed "Backstop" supply of Standard Offer Service through 2009. Blackstone and Newport were in turn required to seek alternative wholesale suppliers for Standard Offer Service during that term, and were to release Montaup from its Backstop obligation to the extent Blackstone and Newport were able to obtain replacement contracts. In order to ensure a Standard Offer Service to Rhode Island retail customers through 2009, Montaup's Backstop obligation required that it provide Standard Offer Service to Blackstone and Newport through 2009, to the extent that those companies did not obtain alternative wholesale Standard Offer Service supply contracts.

14. The RI Settlement Agreement required Montaup and its successors to provide Standard Offer Service to Blackstone and Newport in exchange for a stipulated set of base prices rising over time, subject to a "fuel index" to account for future extraordinary fuel costs, through 2009. That fuel index is the crux of this litigation. The purpose of the fuel index, as envisioned by the URA and Settlement Agreements, was to protect wholesale Standard Offer Service

suppliers against the risk of future extraordinary increases in fuel costs, so that suppliers would agree to the desired long-term Standard Offer Service supply contracts for the benefit of Rhode Island retail customers.

**<u>Constellation's WSOS Agreements</u>**

15. On or about December 21, 1998, Constellation and Montaup entered into an agreement whereby Constellation purchased certain wholesale power purchase agreements from Montaup. The Settlement Agreements required that Constellation assume a percentage share of Montaup's Backstop obligation to provide Standard Offer Service to Blackstone, Newport, and Eastern.

16. Constellation and the EUA Companies entered into the two WSOSAs on or about December 21, 1998. Each of the WSOSAs state at Article 14 that "[t]he interpretation and performance of this Agreement shall be in accordance with and shall be controlled by the laws of the Commonwealth of Massachusetts, without regard to Massachusetts conflict of law principles." In those WSOSAs, Constellation agreed to provide wholesale Standard Offer Service to Blackstone and Newport through December 31, 2009 (the term of the Standard Offer Service in Rhode Island) and to Eastern through February 28, 2005. (*See* WSOSAs, § 3 & App. A.) Upon information and belief, the EUA Companies negotiated, signed, and subsequently administered the WSOSAs in and from their offices in Massachusetts.

17. Under the WSOSAs, the Settlement Agreements and the URA, Constellation was to receive a price for delivering Standard Offer Service consisting of the stipulated set of base prices rising over time (the "Standard Offer Wholesale Price"), plus a fuel index (the "Fuel Adjustment Factor") to account for future extraordinary fuel costs. Under the WSOSAs, the Fuel

Adjustment Factor is calculated based upon the tariffs that the URA and Settlement Agreements require Blackstone and Newport to file. Specifically, Article Five of the WSOSAs provides that:

> For each kilowatt-hour of Delivered Energy that Supplier [Constellation] provides in each month . . ., the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt-hour calculated as follows:
>
> Price = Standard Offer Wholesale Price + Fuel Adjustment Factor
>
> Where: Standard Offer Wholesale Price in cents per kilowatt hour is as defined in Article 1 and shown in Appendix A, and
>
> Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the operation of the Retail Standard Offer Fuel Index ("Fuel Index") mechanism in the Companies' Standard Offer Service tariffs .... The Fuel Index, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.

18. The WSOSAs thus imposed upon Blackstone and Newport (and in turn upon NEC as their successor) the duty and good faith obligation to make the required Standard Offer Service Tariff filings with the RIPUC, and to use reasonable efforts to obtain regulatory approval for a Fuel Adjustment Factor by Blackstone and Newport to Constellation over the 2009 term of the WSOSAs.

19. The WSOSAs also provided Constellation with termination rights and damages rights, in the event that NEC failed to perform any of their obligations under the WSOSAs. Specifically, the WSOSAs provide that, upon an uncured default by any of the Companies (now, NEC), Constellation has the right to recover direct damages resulting from the default; to pursue all other remedies and damages provided for by law; and to terminate the WSOSAs upon sixty (60) days notice. (WSOSAs § 8.) Finally, the WSOSAs provide that Constellation is entitled to recover interest on any improperly withheld payments. (*Id.* § 6.)

20. NEC and Constellation are litigants before the United States District Court for the District of Rhode Island in a dispute concerning the change in law or market rules provisions of the WSOSAs (and two subsequent wholesale power purchase agreements between the parties), Civil Action C.A. No. 06-404S. The action in Rhode Island district court concerns a separate and distinct provision of the parties' contracts in the two 1998 WSOSAs, plus the parties' 2001 and 2002 agreements, and the factual and legal issues before that court do not relate to the issues asserted in this Complaint. The Rhode Island action concerns whether Constellation has the right under the change in law or market rules provisions of the party's contracts to an amendment in those contracts following regulatory changes mandated by FERC, and the issues in that dispute are subject to mandatory arbitration provisions in the parties' 2001 and 2002 agreements. In this case, there is no mandatory arbitration clause applicable to the dispute, and there is no Fuel Adjustment Factor dispute under the parties' 2001 and 2002 agreements.

**The NEC Merger**

21. From the signing of the WSOSAs in April 1998 through early 2000, Blackstone and Newport filed the required Standard Offer Service Tariffs with the RIPUC on a periodic basis. Blackstone, Newport and Eastern thereby obtained approval of the Standard Offer Wholesale Prices and a Fuel Adjustment Factor for 1999 and 2000, as required by the WSOSAs. Upon information and belief, Blackstone, Newport and Eastern's representatives planned and prepared the Tariff filings in EUA's offices in Massachusetts.

22. In 2000, Blackstone and Newport merged into NEC. At the same time, Eastern merged into Massachusetts Electric Company ("Mass. Electric").

23. NEC and Mass. Electric were at the time (and still are, upon information and belief), wholly-owned subsidiaries of National Grid, a Massachusetts-based public utility holding

company. Upon information and believe, at all relevant times National Grid exercised dominion and control over NEC with respect to the allegations herein from National Grid's offices in Massachusetts. Through the comprehensive merger, each of the EUA Companies' former retail distribution companies in Rhode Island and Massachusetts (Blackstone, Newport, and Eastern),[1] merged into the corresponding Rhode Island and Massachusetts retail distribution companies of National Grid, consisting of NEC and Mass. Electric.

24. By way of the Rhode Island portion of the merger, NEC became the retail electric distribution company both for the previous retail customers of Blackstone and Newport in Rhode Island (hereinafter the former "EUA Zone"), as well as its own previous retail customers in its former area (hereinafter the old "Narragansett Zone"). That distinction was for the benefit of NEC and its affiliates and was not intended to, and did not have the effect of, modifying any rights with regard to the Fuel Adjustment Factor that Constellation enjoyed under the WSOSAs.

25. The RIPUC approved the NEC merger in March 2000. At the request of NEC, the RIPUC cancelled the Blackstone and Newport Standard Offer Service Tariffs and ruled that NEC could continue to obtain payment for Standard Offer Service in both its new EUA Zone and in its old Narragansett Zone through NEC's own and future Standard Offer Service Tariffs and related filings.[2]

---

[1] Eastern Edison Company merged into an affiliate of NEC and the portion of the WSOSAs concerning Eastern Edison ended in 2005.

[2] NEC, like Blackstone and Newport, had entered into its own Settlement Agreement with the RIPUC in 1997, which also required Retail Access and divestiture of generation assets. NEC's Settlement Agreement required NEC to provide Standard Offer Service at the same set of stipulated prices and fuel adjustment triggers as in Blackstone's and Newport's RI Settlement Agreement. Like Blackstone and Newport, NEC also subsequently entered into Standard Offer Service supply contracts with a number of wholesale Standard Offer Service suppliers. NEC was required, like Blackstone and Newport, to file tariffs under the URA to implement the Standard Offer Service for the benefit of its customers and suppliers.

**NEC's Breach and Wrongful Conduct**

26. In April 2000, NEC notified Constellation of the merger and asserted that NEC would succeed to and assume the obligations of Blackstone and Newport under the WSOSAs. That notice assured Constellation that the obligations of the parties "are not affected by the merger and assignments." NEC's notice further stated that NEC would continue to make Fuel Adjustment Factor payments to Constellation "after 1999," according to the mechanism previously established in the RI Settlement Agreement and in the Blackstone and Newport Standard Offer Service Tariffs.

27. It was to NEC's benefit not to pay a Fuel Adjustment Factor, particularly in times of rising fuel prices, in order to reduce its overall expenses and costs, among other reasons. Fuel prices began rising at the time of NEC's merger, which price increases triggered the Fuel Adjustment Factors in NEC's and Blackstone's and Newport's wholesale Standard Offer Service supply contracts.

28. From 2000 and through the end of 2004, NEC continued to pay Constellation for Standard Offer Service as required under the WSOSAs, including both the base Wholesale Standard Offer Price and a Fuel Adjustment Factor. Fuel prices continued to rise, however, and Fuel Adjustment Factor payments to Constellation and other wholesale Standard Offer Service suppliers became a regular, material component of the price NEC paid to its suppliers for Wholesale Standard Offer Services.

29. In May 2003, upon information and belief, NEC's Massachusetts representatives began to assert before the RIPUC (based on filings planned and prepared in Massachusetts) that its suppliers in the former EUA Zone should not be paid a Fuel Adjustment Factor after 2004.

30. In December 2004, NEC filed with the RIPUC its proposed Standard Offer Service Tariffs and rates for 2005. NEC specified that no Fuel Adjustment Factor should be

granted to Constellation (or any other EUA Zone suppliers) in 2005. As a result of that filing, and NEC's arguments, the RIPUC approved Standard Offer Service Tariffs and rates for 2005 that provide no allocation for a Fuel Adjustment Factor for Constellation. At the same time, NEC continued to request and to obtain approval for a Fuel Adjustment Factor in 2005 for its suppliers in the old Narragansett Zone. NEC also paid another supplier in the EUA Zone (TransCanada) a Fuel Adjustment Factor subject to NEC's contention that no liability was owed.

31. NEC's breaches of its obligations under the WSOSAs to file Standard Offer Service rates that include a fuel adjustment mechanism and, if allowed, to pay that higher fuel-adjusted price to Constellation, have deprived Constellation of its contractual rights to payment of a Fuel Adjustment Factor under the WSOSAs.

32. Constellation never waived any of its rights with regard to the Fuel Adjustment Factor, and NEC's breaches have caused and are continuing to cause Constellation substantial and ongoing damages.

33. On March 26, 2008, Judge F. Dennis Saylor IV issued a Memorandum and Order on Cross Motions for Summary Judgment ("TransCanada Order") in 05-40076-FDS, a case TransCanada filed in this district, against NEC, and involving identical issues in all material respects with regard to the Fuel Adjustment Factor. The TransCanada Order addressed the same provision of the WSOSAs between Constellation and NEC:

> The [TransCanada v. Narragansett] dispute essentially involves whether a wholesale contract for electric power between the parties required Narragansett (1) to include a fuel adjustment mechanism in its retail rate filings with the PUC for the period 2005 to 2009, permitting it to collect higher revenues if fuel costs went up, and thus (2) to pay a higher fuel-adjusted price to TransCanada.

TransCanada Order at 1. The court held that it did, and explained that

> [T]here is no indication anywhere in the contract that [NEC's] obligations as to the Fuel Adjustment Factor expire in 2004. The

> contract is an unambiguous, integrated agreement, negotiated and executed by sophisticated corporate entities. If the parties intended that [NEC's] obligations were to change in 2004, it would have been simple enough to say so. The parties elected not to. Accordingly, [NEC's] obligations ... remain in place until December 31, 2009.

*Id.* at 15.

**Count I**
**(Declaratory Relief)**

34. Constellation repeats and incorporates by reference paragraphs 1 through 33 above.

35. An actual controversy exists as to whether NEC breached the WSOSAs with respect to NEC's duty owed to Constellation under the WSOSAs to (a) file for or make a reasonable effort to obtain regulatory approval of a Fuel Adjustment Factor, and (b) to pay a Fuel Adjustment Factor to Constellation as required under the WSOSAs. A further actual controversy exists regarding whether Constellation has the right to terminate the WSOSAs, including under Articles 5 and/or 8, for NEC's failure to abide by its duties with respect to the Fuel Adjustment Factor.

36. Constellation requests a declaratory judgment that NEC breached the terms of the WSOSAs; that NEC failed to cure the breach (to the extent cure was applicable); that Constellation had and has the unconditional right, in addition to the right to recover damages and interest, to terminate the WSOSAs because of such breaches; and that Constellation's is entitled to damages for NEC's breaches.

**Count II**
**(Breach of Contract)**

37. Constellation repeats and incorporates by reference paragraphs 1 through 36 above.

38. NEC has breached the WSOSAs through the acts described above, including (a) its failure to file for or make a reasonable effort to obtain regulatory approval of a Fuel Adjustment Factor after 2004; and (b) its failure to pay a Fuel Adjustment Factor to Constellation as required under the WSOSAs.

39. Because of these breaches, Constellation has suffered and will continue to suffer monetary damages. Constellation was and is entitled to terminate the WSOSAs, and to an award of its damages and interest in such amount as to be proven at trial.

**Count III**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

40. Constellation repeats and incorporates by reference paragraphs 1 through 39 above.

41. The WSOSAs contain an implied covenant of good faith and fair dealing.

42. NEC has breached the covenant of good faith and fair dealing implied in the WSOSAs through its conduct described above, including but not limited to its various contractual breaches of the WSOSAs, its behavior before the RIPUC regarding the WSOSAs Fuel Adjustment Factor, and its expropriation to its own benefit of Constellation's rights under the WSOSAs.

43. As a result of these breaches, Constellation has suffered and will continue to suffer substantial monetary damages. Constellation was and is entitled to terminate the WSOSAs, and to an award of damages and interest.

WHEREFORE, Constellation requests the following relief against NEC:

1. Judgment in its favor on all counts.

2. A declaratory judgment that NEC has breached the terms of the WSOSAs and the implied covenant of good faith and fair dealing; that NEC has failed to cure its breach; and that Constellation has the unconditional right, in addition to the right to recover damages and interest, to terminate the WSOSAs immediately.

3. An award of specific performance and/or damages, including interest, in an amount to be determined at trial.

4. An award of costs and such further relief as this Court deems just and proper.

Respectfully submitted,

CONSTELLATION ENERGY COMMODITIES GROUP, INC.

By its attorneys,

Michael Kendall
McDermott Will & Emery LLP
28 State Street
Boston, MA 02109-1775
Tel. 617.535.4085
Fax. 617.535.3800
Email: mkendall@mwe.com

-and-

Kenneth W. Irvin
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, D.C. 20005
Tel. (202) 756-8116
Fax (202) 756-8087
Email: kirvin@mwe.com

WDC99 1553591-3 070626 0036