IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * CIVIL ACTION
NARRAGANSETT ELECTRIC * 06-404S
COMPANY *
*
VS. * MAY 6, 2008
*
CONSTELLATION ENERGY *
GROUP, INC. * PROVIDENCE, R.I.
* * * * * * * * * * * *

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH
DISTRICT JUDGE
(MOTION TO STAY)

APPEARANCES:

FOR THE PLAINTIFF: GERALD J. PETROS, ESQ.
Hinckley, Allen & Snyder
50 Kennedy Plaza
Suite 1500
Providence, RI
(401) 274-2000

FOR THE INTERVENOR: LEO J. WOLD, ESQ.
Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400

FOR THE DEFENDANT: KENNETH W. IRVIN, ESQ.
McDermott Will & Emory, LLP
600 13th Street, N.W.
Washington, DC 20005-3096

STACEY P. NAKASIAN, ATTY.
Duffy Sweeney & Scott, Ltd.
One Turks Head Place
Suite 1200
Providence, RI 02903
(401) 455-0700

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

THE COURT: Good afternoon, everyone. This is Narragansett Electric and the State of Rhode Island versus Constellation Energy Commodities Group. And we are here on a motion to stay pending the outcome of the appeal of the denial of the motion to dismiss.

Let's have you identify yourselves for the record first.

MR. PETROS: Good afternoon, your Honor. Jerry Petros for Narragansett Electric Company.

MR. WOLD: Good afternoon, your Honor. Leo Wold for the State of Rhode Island.

MS. NAKASIAN: Good afternoon, your Honor. Stacey Nakasian on behalf of Constellation Energy Commodities Group.

MR. IRVIN: Good afternoon, your Honor. Kenneth Irvin of the law firm McDermott, Will & Emery on behalf of Constellation.

THE COURT: All right. This is your motion, so I'll hear from Constellation.

MR. IRVIN: Kenneth Irvin for Constellation, your Honor.

Your Honor, we're here today on the filing that we made back in January, which suggested that this Court lacked jurisdiction to proceed with any of the claims, and in the alternative sought a stay. The

basis for that suggestion of lack of jurisdiction stems from our appeal to the First Circuit of this Court's denial of our motion to compel arbitration.

The issue before the Court today is whether the so-called divestiture rule associated with our appeal of the denial of the motion to compel arbitration and to stay all proceedings deprives this Court of jurisdiction while that appeal remains pending before the First Circuit.

We think the divestiture rule does apply, and we think that there is no issue before this Court over which jurisdiction remains here until the First Circuit acts.

THE COURT: Can you tell me what the status of the appeal in the First Circuit is?

MR. IRVIN: Our initial brief was filed, the State filed its responsive brief. Narragansett sought and obtained an extension and will file its responsive brief I believe tomorrow, and our reply brief is due 14 days hence, so approximately May 21.

If it would assist the Court, I have a courtesy copy of our brief and of the State's brief. We would have no objection if Narragansett wanted to provide a courtesy copy of its brief.

THE COURT: I'm happy to take them.

MR. IRVIN: I don't want to pollute your office with unnecessary paperwork, your Honor.

THE COURT: I can't guarantee that I'll read them.

It seems to me the issues on appeal are what they are, and the Court of Appeals will deal with that. I think the question here is really a different one. And the thing that I am struggling with, while I find the reasoning in Judge Woodcock's order in Combined Energies to be strongly reasoned and compelling, and the authority that he relies on, I'm not sure that it applies here or applies as neatly and with such scope as you suggest. Here's why.

It seems to me that if I give these cases and this authority the reading that you suggest I should, it is enhancing the arbitration provision above everything else. It places it above everything else that's going on in this case.

And in the best of all worlds, you have two contracts that have arbitration provisions in them. There are two contracts that clearly don't have any arbitration provision, and then you have the State's claim here, which has nothing to do with the contracts between Constellation and Narragansett. And so the question that I have is why should those aspects of

this suit, that is, those that relate to the FERC settlement agreement, those that relate to the two arbitration agreements that do not have -- the two PPAs that do not have arbitration agreements and all of the State's claims, why should those be held up and basically held hostage to the arbitration agreements that may apply in those other two PPAs.

MR. IRVIN: Your Honor, I believe I can answer all of your concerns, and I believe that when we look at the authorities that address those issues, there is only one answer that obtains, and that is the stay of these issues, as you identify them, is properly granted under Section 3 of the Federal Arbitration Act.

More importantly, whether to stay those issues under Section 3 is an integral element of our appeal. Our appeal addresses two questions, whether this Court's determination of the scope of arbitrability accords with the parties' contracts; and second of all, whether, if arbitration is to be had, provisions or claims not within the contracts with mandatory arbitration clauses should be stayed.

On the question of the scope of the 2001 and 2002 PPAs, the Power Purchase Agreements, that have the mandatory arbitration clause, the Court's opinion in December seemed to read those contracts as providing

for the Court to determine the need for an amendment and adjustment, if you will, in respect of regulatory actions and then to leave for the arbitration the form that that amendment takes.

We believe that that's in error. We believe that that misreads the contracts. We believe that those two Power Purchase Agreements from 2001 and 2002 clearly and unambiguously on their language say that the existence of a dispute about the need for as well as the form of any amendment suffices to trigger arbitration and that's the argument we've advanced on the first issue to the Court of Appeals.

Relatedly, we have asked that the Court of Appeals review the determination not to issue a stay. Certainly, this Court's decision that arbitration shouldn't be ordered, it seems to follow that, of course, then a stay wouldn't be granted. So perhaps the First Circuit's disposition will be to decide the question of arbitrability and then send the State question back, but we believe that under Section 3 of the FAA because the issues referable to arbitration under the 2001 and 2002 PPAs are the same issues that are going to be adjudicated under the 1998 contracts, the two 1998 PPAs that don't have mandatory arbitration, as well as under the State's claims,

because they're going to be addressed in the arbitration, Section 3 of the FAA mandates that this court issue a stay until the arbitration resolves itself.

THE COURT: Let me focus in on a couple of things that you just said.

First, aren't you over-reading what I held in my order in December? I think I said that, explicitly, that I would not categorically foreclose the possibility of arbitration in the future, at least with respect to those PPAs that may eventually be determined to require arbitration of the present dispute.

I think what I held here is that on the record that was before me, and on the briefing that I had received as of that time, that I couldn't ascertain whether PPAs, at least the ones that had the arbitration provisions, required arbitration of this type of dispute.

MR. IRVIN: Your Honor, we start from the premise that the scope of arbitrability under those two contracts, the 2001-2002 is a question of law for the Court to decide. Next, we look at the plain language of those contracts to see if they can be interpreted. We believe they are unambiguous, that the mere dispute of a need-for amendment, in this case there's obviously

a dispute about the need-for amendment. Constellation says there is a need. Narragansett and the State say, no, there is not.

We believe the language of those two agreements makes that sufficient to trigger the need for arbitration and the referral for arbitration.

But we go two steps further, your Honor, two alternative steps further, which is, even if the contractual language was somehow vague or ambiguous, the instructions from the Supreme Court's decision in AT&T versus Communications Worker and the First Circuit's decision in Christian versus Comcast, as well as from other circuits, all teach that ambiguity or doubts as to the scope of arbitrability are to be construed in favor of arbitrability.

So if there was any doubt as to whether the contractual language made the mere existence of a dispute about the need for an amendment sufficient to trigger arbitration, the absence of positive assurance that it does not means we get to arbitration.

The AT&T case uses that language, positive assurance. In order for you to conclude that there is not arbitration under the 2001 and 2002 PPAs, this Court has to make a determination with positive assurance that the dispute about a need-for amendment

is not within that scope. Otherwise, you have to send those cases, those contracts to arbitration.

THE COURT: What if you waived or gave that up in the FERC settlement agreement?

MR. IRVIN: Well, there's no allegation here, your Honor, that we waived our right to arbitration. What the contention is, is that we somehow conducted ourselves in a way that bars or precludes us from getting an adjustment, but there's no allegation before the Court that we waived arbitration, and, indeed, there was never a discussion about arbitration and the right to arbitration.

The second way that we end up in arbitration is, your Honor, and I don't think I'm misreading or over extending your decision, because you did say at page 274 of the Federal Supp 2d version, quote, "If no right or obligation of either party has been affected, then the obligation to arbitrate is not triggered."

That's where I come up with my need-for versus form of dichotomy. I read that along with the other language that appears on 275 with the determine resolutely phraseology where your interpretation is that this Court determines whether, in fact, there is a need or not for an amendment.

I don't think that's a fair read of the PPAs.

But even if it is the proper construction of the PPAs, you yourself found in this same opinion that there was a change in the rights and obligations of parties.

You yourself acknowledged in this opinion and in our oral argument on the motion to dismiss that what FERC's forward capacity market settlement agreement has done is it has changed the capacity market from one in which the price for capacity was set by market forces to one in which FERC is itself substituting a price. That's an alteration in the rights of an obligation.

So even if this Court's view of what the arbitration clause reads is correct, your findings are that there has been a triggering event because you found a change, a material change in moving from market force pricing to fixed fees.

So we believe that properly the 2001 and 2002 contracts call for arbitration. You know, it's not a comfortable position for me to be in front of you having this discussion, undoubtedly, and I take responsibility if I wasn't clear before, but I think when you step back and you look at those contracts, you look at the language in those two agreements, I think it's very clear. And moreover, I don't think it's workable in terms of giving effect to the intent to arbitrate to have the Court decide need-for and then

leave to the arbitration the decision of the form of the amendment because, in this area in particular, the two are opposite sides of the same coin.

The need is going to determine the form. It's not like liability and damages in your basic civil trial where they can be bifurcated and tried sequentially. To determine the need for an amendment is to preordain the scope or the form of that amendment. And these two contracts call upon industry experts to look at need and to look at form and to hear the parties' positions about what is appropriate in light of the intervening regulatory change and how to address that to restore the economic balance originally struck, and to do that on an expedited basis without the ordinary trappings of civil procedure, discovery and the like.

THE COURT: You may be right and that may be fine, but it can only go so far as the two agreements that contain arbitration clauses.

And my problem with your argument here is that it elevates the so-called industry expert into a position of dictating to this Court, and to other courts, whoever might have this dispute before them, what the outcome of this litigation will be. And I don't think that's the role of an arbitrator. An

arbitrator can only interpret the contract that is before him.

He has no right to tell this Court or anyone else what the meaning of the FERC settlement agreement is or how the two -- the other two PPAs should be interpreted. And I get the sense that you think that you're going to arbitrate the two PPAs with arbitration agreements first, hold up the rest of this litigation, get a ruling from the arbitrator, and then attempt to enforce that ruling using the deferential standard accorded to arbitration decisions as sort of the rule of the case on the other issues that are before me.

MR. IRVIN: Your Honor --

THE COURT: And I have a real hard time seeing how you can move from -- how you can suggest that an arbitrator, so-called industry expert interpreting two PPAs is going to decide what the rights of the State are in this litigation.

MR. IRVIN: Your Honor, with regard to the State, the State said when it moved to intervene that it's injecting no new facts here, no new issues. And your December order finds as much. The State explicitly adopted Count I and Count II of Narragansett's complaint, and its Count III is no different in articulation than the counts that

Narragansett has pled.

The State is not injecting anything new here. It doesn't have a different position or different type of claim. Its issues are the same as Narragansett's issues.

And the issues as between the PPAs are the same across all four. Your Honor, the Court rails against the fact that the arbitration will govern the 2001 and 2002 contracts and may have some sort of effect on the 1998 contracts, but that's a consequence of the parties' agreement voluntarily to contract as they did.

The progression of arbitration clauses in these contracts proceeds along the track where arbitration becomes a more and more important role. Starting in 1998, it was voluntary. By 2001 and 2002, it becomes mandatory in these situations.

THE COURT: How can the 2001 and 2002 agreements bind the parties with respect to the '98 and '99 agreements? How can the arbitrator have the authority to say that?

MR. IRVIN: I don't expect that the arbitration will be addressing the language of the 1998 contracts. To the extent that there's a textual argument based on the contractual working of the 1998 contracts that differentiates or distinguishes them from the 2001 and

2002 --

THE COURT: Slow down. You've got to slow down.

MR. IRVIN: I'm sorry. I've had this problem before.

To the extent that there's a textual difference between the 1998 contracts on the one hand and the 2001 and 2002 PPAs, on the other hand, that's an area that I don't expect the arbitrators will be addressing. I don't see that coming before them.

But with respect to Constellation's conduct before FERC and the consequences of that, that is an issue that's going to come before the arbitrators because it's going to be addressed for the '01 and '02 contracts.

And the significance of the arbitration findings about that conduct is going to be of significance to this Court in proceeding on the 1998 contract.

THE COURT: Why should I let an arbitrator tell me how to interpret Constellation's conduct before FERC?

MR. IRVIN: Well, we start with Congress has decided in the Federal Arbitration Act that there's a strong preference in favor of arbitration. And where parties have agreed to it by contract, they have committed themselves to avoid litigation.

So these parties have agreed to it and that's the chosen venue for resolving their disputes for the '01 and '02 contracts.

The significance of our conduct before FERC, Narragansett and the State would have you believe that that's a condition precedent to arbitrability. We submit that it's a defense to our claim in arbitration that's to be decided by the arbitration panel. But that issue is an aspect of what we're appealing in our challenge to the arbitrability ruling in the December order. Narragansett has, and the State has adopted as well, these so-called threshold issues, which include the meaning of the FERC settlement, agreement, the meaning of FERC's order and our conduct before it.

Those are all, to our read of the contracts, covered within the scope of the need-for determination, which is for the arbitration panel to decide.

And your Honor, much has been said about our proceedings at FERC and our request for a ruling. We have filed with the Court the two orders that FERC has issued. I think if you read those orders carefully, you will see that FERC itself has said this is not an issue of FERC orders. This is an issue of the PPAs. FERC's order on rehearing was very clear that the Commission was not going to assert its jurisdiction

because our prosecution of a right to adjustment under our PPAs was not a violation of FERC's order approving FCM settlement. It's a question of interpreting the PPAs and the consequences of that settlement under the PPAs.

So our conduct before FERC is going to come before the arbitration panel with respect to the adjustment, if any, due under the 2001 and 2002 contracts. What that panel finds with regard to that conduct is going to be of significance in terms of how you proceed on the 1998 contracts when we come back to them. But the Federal Arbitration Act says we favor strongly arbitration over litigation and, thus, under Section 3, whenever an issue referable -- wherever there exists an issue referable to arbitration, trial of the action must be stayed. And the language is very clear that it refers to issue referable to arbitration and staying the action, which is a broader array of things than the issue referable to arbitration. And it is on that premise that we look to a stay of the 1998 contracts and as well as a stay of the State's claims.

THE COURT: So the State's interest in this case is not the same, while it didn't raise any new legal issues in its intervention, and we have talked about this before, its interests are not exactly the same as

Narragansett's.

Narragansett takes the view that if adjustments are allowed, they will pass that through to the ratepayers and the State says, no, we get to decide whether these costs get passed through to the ratepayers.

Aren't you effectively taking away the -- or attempting to take away from the Court and place into the hands of these arbitrators the State's arguments here?

MR. IRVIN: We submit we are not, your Honor. The Court's findings at page 275 of the published opinion are the State is not seeking to inject any new issues into this already labyrinth dispute. Rather it appears possible and perhaps even likely that that State's entry may actually hasten the resolution of the issues.

Your Honor, a note on what the Court said, the State has acknowledged that whatever liability Narragansett faces here will be passed through to the ratepayers. When we were here on the intervention motion, I made the argument to which the Court alluded, that the State had some right of review under formal utility law to make a prudence review and the State pointed out that, no, the statutory scheme in Rhode

Island has waived that prudence review.

So the State stands here before you saying that anything that Narragansett owes to Constellation ratepayers will pay. But that does not mean, your Honor, and Narragansett has not abdicated its responsibility, that does not mean that our arbitration with Narragansett is going to disserve the interest of ratepayers. And if that were the case, your Honor, then these contracts should not have been approved in the first place. And these are regulatorily-approved contracts that were executed under the supervision of the State at the time including with the arbitration clauses they contain.

The other aspects of this case that the State references are its status as sovereign and it's inability to be compelled to the arbitration. Those are irrelevant to the analysis here, your Honor. We believe that the State's claims are properly stayed. We have appealed the determination of whether to stay those pending arbitration. Consequently, proceeding on the State's claims while the question of whether they should be stayed or not is in violation of the divestiture rule because it has this Court acting on the same issue that appears before the First Circuit.

I know that Narragansett points to the Ninth

Circuit decision in the Britton case and tries to distinguish the First Circuit's pre-FAA case in Loomis, which was followed by Judge Easterbrook in the Seventh Circuit and has been followed by others, but, quite frankly, I think Loomis is all the more stronger that it's a pre-FAA case. The reason we have the Federal Arbitration Act is because time was the judiciary was hostile to arbitration. Time was the judiciary used all kinds of reasons to avoid directing disputes to arbitration, including at the time that Loomis was decided.

And here we come along in the post-FAA world and the Seventh Circuit in Bradford Scott, the 10th Circuit in McCully and the other decisions we've cited look to Loomis, look to the rationale there about the divestiture rule, look to the permission to take interlocutory appeals allowed under Section 16 of the FAA and says of course the divestiture rule must apply or otherwise you have a situation in which the trial court and the appellate court are acting on the same matter.

But your Honor, even if you decide this Court's going to follow the Ninth Circuit rule in Britton, that court recognized that you have the discretionary right to grant a stay and so we come to the discretionary

stay issues and the balance of harms and the issues involved there.

And we did argue the success on the merits, your Honor. Our success on the merits are our point about the arbitration clauses in the 2001 and 2002 contracts, and we've also pointed out the balance of harms issue.

If we are forced to litigate now while our issue about arbitration and the scope of arbitrability is pending, our right contractually to avoid litigation is gutted. That is irreparable harm. It can never be restored while we suffer through whatever discovery or adjudication proceedings go on up until the point where the Court of Appeals reverses.

If the State is stayed or if Narragansett is stayed, they suffer no harm immediately. They make out this potential for rate shock but that is a product of their own elections, and it actually presupposes that we win on the ultimate merits.

THE COURT: I guess I don't understand this argument that you're irreparably harmed. All that is being asked of the Court is to declare the respective rights of the parties under these agreements. And assuming that at the end of the day there is a finding that you do have a right to seek an adjustment for this transition period, then you can assert that in

arbitration and you get a ruling from the arbitrator as to what the adjustment is.

So how are you irreparably harmed by that?

MR. IRVIN: The irreparable harm comes from the failure to recognize our right, contractually, a contractual promise between Constellation and Narragansett to avoid litigation of that question of whether to grant an adjustment or not.

We have that right in the 2002 and 2001 PPAs, and if we have to endure litigation of the question of whether to recognize an amendment or not, then our right under the contract to avoid litigation is eviscerated.

THE COURT: You only have the right to avoid litigation, if at all, as to those two contracts.

MR. IRVIN: Ultimately, you may be right, your Honor, in terms of having to litigate the 1998 contracts. But I am entitled under Section 3 because there's no differentiation made by the plaintiffs here between the four PPAs as to the impact of FERC's order.

The intervening regulatory change is the same across all four. So Section 3 of the FAA says is there an issue with respect to these PPAs that's referable to arbitration. If so, the action trying liability under these PPAs must be stayed.

And the issue referable to arbitration is whether an amendment under the 2001 and 2002 contracts must go to arbitration, thus, the action on whether an amendment on any other issue of the same ilk must be stayed. And your Honor, there's two cases out of the Fifth Circuit that I will refer the Court to. There's the Harvey case and the Sam Risen (sic) case. And in both of those situations the Court of Appeals there recognized that claims of parties not bound to arbitration could be stayed pending the outcome of the arbitration. Reisfeld, Sam Reisfeld is 530 F.2d 679 and Harvey is 199 F.3d 790. Admittedly, they're the Fifth Circuit, your Honor, but they address points of whether it is appropriate in the face of arbitration clauses within the scope of the FAA that are going for arbitration and the scope of Section 3 of the FAA and whether those can be stayed. And the court there said, yes, they should be stayed out of the strong federal presumption in favor of arbitration.

THE COURT: Okay. Thank you.

MR. PETROS: Your Honor, from the inception of this lawsuit, Constellation has done everything in its power to prevent this Court from addressing the merits of this dispute. They initially filed a motion to dismiss or stay this action. They filed a declaratory

judgment action with FERC two days before the Court heard argument on the motion to dismiss.

They then moved this Court to stay all proceedings pending the FERC hearing.

When FERC dismissed Constellation's declaratory judgment action, they petitioned for rehearing in front of FERC. When the Court denied the motion to dismiss, they filed an appeal with the First Circuit. This complaint was filed in December 16th, 2006, and we are no closer to determining the merits of this dispute than we were 20 months ago when it was first filed.

I don't contend for a minute, your Honor, that Constellation has acted in bad faith or filed inappropriate motions. My point is simply that it is past time now to get to the merits of this dispute.

Constellation is here today seeking another delay that will delay the merits by probably another four to six months.

We think there are three reasons why the Court should deny that motion and allow the parties to proceed to get to the merits of this dispute.

First, I think as the Court observed, there is absolutely no dispute that two of the contracts do not provide for arbitration. No question about that. Constellation admits it.

Second, there is no basis that I have seen, read or heard that compels the State to determine its claims through arbitration.

Further, with respect to the threshold issues, which I'll address in a moment, until today, until the papers filed on this motion, Constellation has affirmatively argued to this Court and to FERC that those issues do not belong in arbitration. This is a new story we're hearing today.

Second, your Honor, or finally, we would argue at the end it would be a miscarriage of justice to delay any further getting to the merits.

Let me start with this issue about the threshold issues and go to the broader issues. Constellation has argued today expressly before the Court that these threshold issues including, your Honor, the question of whether or not the settlement agreement bars its claim, the question of whether or not the Power Purchase Agreements assign responsibility to pay for capacity costs to Constellation regardless of changes in the markets, and the question of whether or not Constellation's conduct before FERC effectuates a waiver as we contend or an estoppel as the State contends.

Constellation has argued in papers and in

representations standing right here, arguing to your Honor, that those issues are not for arbitration. Let me be more specific.

In its motion to dismiss the first papers it filed with this Court, it argued to this Court that the Court must defer to FERC to determine the question of whether or not the settlement agreement bars Constellation's claim for an adjustment.

Second, they argue that this Court can determine and should dismiss both the claim that the PPAs bar Constellation's claim for an adjustment and the waiver claim. They sought arbitration only with respect to the determination of an appropriate equitable adjustment.

Now, your Honor, I could read quotes and I will avoid that for your Honor's sake and the court reporter's sake, but I will point to a few if I may.

The motion to dismiss is replete with these statements. The reply memo is replete with these representations. For example, on page four of their reply memo, Constellation argues that FERC, not an arbitrator, must decide Narragansett's claims under Count I. Those are the settlement agreement claims.

On page seven, it asks this Court to dismiss all of Narragansett's counts for failure to state a claim

upon which relief can be granted. They didn't say that an arbitrator must decide it. They didn't ask you to defer those questions to an arbitrator. They said, Judge, you can't decide that; FERC has to decide it. And then they actually petitioned FERC to decide it and argued to FERC that they should decide it.

They also, Judge, I will point out in their reply memo eventually also argued that FERC should decide the waiver claim. They initially asked this Court to decide it; then they asked FERC to decide it. Your Honor, those arguments are set forth on page seven of the reply memo, page four of the reply memo, page eight and nine of the reply memo. Again, I'll try to shorten this by not reading all those quotes.

But in summary, your Honor, if the Court takes the time to look through the motion to dismiss, and look at the reply, the papers filed by Constellation, the Court will be struck by the fact that the so-called threshold issues that Constellation today argues are subject to arbitration, they admitted and argued affirmatively at that time that both this Court and FERC should decide those issues.

THE COURT: So let me be clear about something. Mr. Irvin said, I think, that you were not arguing waiver as a result of the FERC settlement agreement.

Now, you're saying you are.

MR. PETROS: Absolutely, your Honor.

THE COURT: That's what I thought, too, but I --

MR. PETROS: We have in our complaint, your Honor. We argued it in opposition to the motion to dismiss. I have argued it as I've stood here and argued those motions to the Court. That has been clear. It is a count.

Now, this goes even further, your Honor. If the Court has an opportunity to look at the transcript of the argument that took place before your Honor on March 5th, 2007, the representations go even further as to who should decide the threshold issues.

For example, on page four, Constellation argued and I quote, hopefully slowly, "We think FERC is the appropriate decisional authority to ask whether the settlement agreement has that effect." And the effect, your Honor, is precludes or bars Constellation from exercising its right to an equitable adjustment.

On page five, "One is that the settlement agreement bars or precludes us from recovering those rights. Those are allegations in both complaints, and we think that is for FERC to decide."

Page five and six, quote, "To your questions about the contractual interpretation claim, your Honor,

that is an issue for which this Court enjoys concurrent jurisdiction with FERC, and it could proceed on deciding that issue but we don't think Narragansett's complaint passes muster under Rule 12(b)(6)."

Your Honor, page 19, another admission; 19 to 20, another admission. And this one on page 31, your Honor, and I'll try to stop in terms of the quotes, but I think the Court should hear this. This is an exchange between the Court and Constellation.

"The Court: If I were to conclude that this is a regulatory change under the contract, as opposed to something that's just a change in market conditions, I can just declare that and then you're off to arbitration, take no position on what that means, whether it deserves an equitability adjustment or not.

Constellation: I don't disagree with that, your Honor. You can look at the settlement agreement and say this is a regulatory change contemplated by Section 15-2 of the 2002 contract or it's not. But the issue of the impact of that regulatory change and whether and adjustment is due because of that change, those are merit decisions for the arbitration panel."

Your Honor, that's the same question you asked earlier today. You got a different answer, but that's exactly the question you asked and back then

Constellation said, yes, that's the piece that goes to arbitration, what the adjustment should be if there should be one. But all of these other issues, the impact of the settlement agreement, whether or not the early provisions of the Power Purchase Agreements, all four of them bar this claim and whether or not the conduct of Constellation during the FERC proceeding constitutes a waiver or estoppel, all of those arguments are issues for the Court to decide. I've argued it, the State's argued it, and Constellation has affirmatively argued it both in its papers and as it stood here before the Court responding to questions and presenting arguments.

So the suggestion today that these threshold issues, that these three issues somehow under the Arbitration Act along with the arbitrator is contradicted not only by the language of the arbitration provision itself but by the Court filings and the Court representations of every single party in this courtroom today.

Now, to go back to the broader point, your Honor, it is clear , I think now beyond doubt, that there are numerous issues in this case that need to be decided that could never be decided even if at some point arbitration is triggered and the Court left that

possibility open in its decisions.

The Court hasn't even determined finally the question of arbitration yet. But before we get there, we've got two non-arbitrable contracts to deal with. We have at least three significant dispositive threshold issues to deal with.

In fact, there's a quote in here, your Honor, on page 74 that I didn't read where Mr. Irvin admits, hey, Judge, if FERC finds that the settlement agreement bars the claim, then you'll save time because you won't have to deal with the contract issues under the PPAs. It's on page 74 of the argument.

So they have acknowledged in every way that these issues need to get decided and must be decided before we reach arbitration, if we ever reach arbitration.

And it seems pointless, your Honor, to wait another four to six months for the First Circuit to decide this appeal and take no further action to address these merits when I think, again, it is clear beyond all dispute that there are significant merit issues that this Court will need to resolve under almost any scenario.

THE COURT: I think you need to address the jurisdictional question, which is really the premise of

why we're here, although I appreciate all of this argument.

How does that weave into the question of, or the suggestion that I do not have jurisdiction, regardless of what I might think of this appeal, once the interlocutory appeal is taken, I don't have jurisdiction to move forward on these?

MR. PETROS: I think there are two or three points, your Honor. First of all, under any scenario, none of the cases I don't believe that have been cited to the Court would suggest that somehow the non-arbitrable contracts are tied up in that proceeding. In fact, we will argue to the First Circuit, and we have argued to this Court in some of the earlier papers that even if the Court found that there are arbitrable issues under the 2001 and 2002 contracts, it cannot deny Narragansett Electric Company's right to a trial and potentially a trial by jury on the other contracts, the 1998 and 1999. Those contracts stand out there. We're entitled to a determination on those.

Second, the State is here. The State's claims clearly are not subject to any arbitration provision and nobody can assert to the contrary.

Third, in terms of the actual cases, your Honor,

those cases deal I think almost exclusively with situations where there's an arbitration provision. And that arbitration provision arguably applies to the dispute before the parties.

In this situation, we've got one or two arbitration provisions. The scope of those arbitration provisions in terms of what they apply to I think is relatively clear and deals with a small piece of the dispute, of the potential dispute between the parties. You've got another plaintiff who is not subject to any arbitration, and you've got two other contracts that aren't subject to arbitration.

So I think on the facts, your Honor, this case is dramatically different than the cases that Constellation relies upon.

And beyond all of that, I think what is also unique about this case is the Court said quite clearly in its opinion, and I hate to paraphrase an opinion, but I think this is undisputed. The Court did not make a final ruling on arbitration. It said it would not categorically foreclose that arbitration might be appropriate down the line under these two contracts depending on the findings on the other issues we talked about this afternoon.

So I think all of those facts, and particularly

the Court's decision in holding open, not yet deciding that issue really distinguishes this from almost all of cases, in fact, from all of the cases that Constellation relies upon.

I would also, your Honor, commend to the Court the Britton decision, which we talk about. And I would point the Court to the end of page 18, the top of 19 where I think the Britton court quite pressingly said, "The rule urged by Leibling would allow a defendant to stall a trial simply by bringing a frivolous motion to compel arbitration. The system created by the Federal Arbitration Act allows the district court to evaluate the merits of the movant's claim, and if, for instance, the court finds the motion presents a substantial question to stay the proceeding pending an appeal from its refusal to compel arbitration. This is a proper subject for the exercise of discretion by the trial court."

We submit, your Honor, that this is, indeed, a proper subject for the exercise of this Court's discretion given the unique facts of this case, given the nature of the claims, and I think the obvious conclusion that many of those claims under any scenario are not subject to arbitration.

It makes sense for the Court to move forward

with the claims that remain here and to get to the merits of this dispute and not delay any longer in getting to these other issues. So I think that's my response, your Honor, in terms of the jurisdictional question.

THE COURT: Okay.

MR. PETROS: Thank you, your Honor.

THE COURT: Thank you, Mr. Petros. Now, does the State wish to argue?

MR. WOLD: Yes, briefly, your Honor.

THE COURT: Okay.

MR. WOLD: Good afternoon, your Honor. Leo Wold for the State of Rhode Island and the Division of Public Utilities and Carriers.

Constellation has emphasized in this matter the allegedly strong federal policy favoring arbitration under the Arbitration Act.

I would like to point out to the Court that the First Circuit has dealt with this issue with respect to non-arbitrable claims, and the First Circuit has expressly stated the federal policy favored arbitration presumes proof of a preexisting agreement to arbitrate disputes arising between the protagonists. The federal policy, quote, "Does not extend to situations in which the identity of the parties who have agreed to

arbitrate is unclear." Accordingly, the very policy that Constellation is advocating applies to this matter is completely inapplicable with respect to the State's position in this case. That's at McCarthy versus Azure, 22 Federal Reporter 3d, 351 page 355.

The Fifth Circuit has taken exactly the same position. They have gone one step further as I will explain to the Court. The Fifth Circuit stated In Re: Talbott Big Foot versus Boudreau at 887 Federal Reporter 2d 611, page 614, "Appellants who are not party to the Gard's P & I policy have not agreed to arbitrate their claims or defer their action while the insurer and insured arbitrate coverage disputes. Thus the Federal Arbitration Act, the source of federal policy favoring arbitration, has no application to require appellants to arbitrate or to stay their lawsuits."

The Fifth Circuit, interestingly, then went on to observe in Footnote 4 that the issue in connection with whether a stay would be appropriate would be a closer issue if, indeed, the party who was not a contracting party in the case was somehow in privity with the party that was a party to the contracts that were in dispute.

And the Fifth Circuit very clearly stated since

there was no privity, there was no right to compel or to require the non-contracting party to arbitrate their case.

So the federal policy, which Constellation makes much of in this case, is simply inapplicable.

Constellation has also advocated to the Court that they have a particular right under their PPAs that they claim will be eviscerated and that somehow they will be irreparably harmed. The State's cause of action is similar to Narragansett's in the sense that we have launched in our complaint the count of declaratory judgment, the count of waiver and count of estoppel. That refers to Section VIII(A) of the FERC settlement agreement.

As I've already indicated to the Court, however, the State is not taking a position in connection with the contracts between Narragansett Electric and Constellation. The point of that argument is, is that Constellation by its action and conduct before FERC, they have affected their rights under their contracts. We are not in a similar situation to the classic case where Constellation simply has a contractual dispute between itself and Narragansett Electric and no subsequent activity has taken place.

So the very rate that Constellation claims would

create irreparable harm is due to their own activities, and that's an issue for the Court to decide.

Of course, the First Circuit has also taken a position with respect to irreparable harm, but the time, resources and costs that Constellation claims that it will incur due to proceeding with this matter before this Court while the matter is on appeal, the First Circuit has held that the burden of litigation does not constitute irreparable harm.

The last point that the State would like to make concerns the issue of the automatic divestiture cases. The Combined Energies case, to which the Court referred, and also the precedent to which Constellation referred, as Narragansett Electric's attorney indicated to the Court does not apply. The Bradford Scott case and Combined Energies case dealt with cases where the issue in dispute between the parties were arbitrable issues. It did not deal with a non-arbitrable claim such as the State has in this case.

In fact, the Bradford Scott case upon which Judge Woodcock based his decision specifically stated "The Court concedes that the plaintiff did not argue that any individual claim is clearly non-arbitrable." The State, of course, is taking precisely the opposite position in this case. The State's claims, along with

the vast component of Narragansett's lawsuit's claims are not arbitrable. So the Bradford Scott case, the Combined Energy case, which your Honor inquired about earlier, simply are not applicable to this case.

For those reasons and the others set forth in the State's memorandum, the State objects to the motion to stay this matter based on the discretionary request for a stay as well as the automatic divestiture theory, and we'd ask that the motion be denied. Thank you.

THE COURT: Thank you, Mr. Wold.

Mr. Irvin, would you like a chance to respond?

MR. IRVIN: Yes, please, your Honor.

Your Honor, the arguments you just heard are great merits arguments to be presented to the First Circuit and maybe they'll control the day, but the point here, your Honor, is that we have appealed the merits of those disputes, the arguments of what is a threshold issue of arbitration and what is not is on appeal to the First Circuit. It cannot be in two courts at the same time. Whether there should be a stay of the State's cases or not is on appeal to the First Circuit. It cannot be in two courts at the same time.

Your Honor, the cases dealing with the divestiture rule recognize that if our appeal was

frivolous, you could certify that and proceed with litigation here. Neither of the plaintiffs has moved to summarily dismiss our case, and I think you yourself said there is an arbitration clause here, there is an intent to arbitrate and you could not determine resolutely whether it applied. So I don't think anybody, in fairness, can say our appeal is frivolous. Certainly, the First Circuit hasn't summarily disposed of it.

THE COURT: Well, the only thing on appeal, if I understand you correctly, is the question of whether the matter should have been stayed pending arbitration; is that right?

MR. IRVIN: The appeal addresses whether the dispute concerning the 2002 and 2001 PPAs should have been referred to arbitration; and second of all, whether all further proceedings should have been stayed.

You know, your Honor, Mr. Petros argued that somehow I made judicial admissions in the motion to dismiss stage. Our motion was and preceding it, our posture has always been that if there's going to be a dispute resolution here, other than summarily dismissing the case, it is to go to arbitration.

Our motion was filed to dismiss, or in the

alternative to compel arbitration and stay all proceedings.

THE COURT: Okay. So it's to --

MR. IRVIN: If I may, your Honor, I will read to you the issues on appeal. We presented two issues on appeal to the First Circuit. One, whether the District Court erred when it denied Constellation's motion to compel arbitration contrary to the language of the 2001 and 2002 Power Purchase Agreements and the intent of the parties. Two, whether the District Court erred when it denied Constellation's motion to stay all proceedings pending arbitration.

Consequently, your Honor, any further adjudication of those issues, of issues brought within the umbrella of those two points on appeal, violates the divestiture rule and has this Court acting on a matter over which jurisdiction has been transferred to the First Circuit.

The question of waiver, your Honor, that I understood you were asking my on my opening remarks was, was there an allegation that Constellation had waived its right to arbitration. There is no such allegation here, and we have not.

There is an allegation that we have waived our right to an adjustment, but those are different issues.

There is no allegation that we have waived our right to arbitration.

THE COURT: Well, if you've waived your right to an adjustment, doesn't that mean you waived your right to an arbitration? Isn't it a predicate? If you have no right to arbitrate, how do you have a right to arbitration?

MR. IRVIN: Whether we've waived our right to an adjustment is a substantive issue to be decided in the resolution of the dispute. To waive our right to arbitration --

THE COURT: But if I decide that, if I decide that you have waived it in this declaratory judgment action, then --

MR. IRVIN: But you're not asked to decide whether we've waived our right to arbitration, your Honor. There is a count pled to that.

THE COURT: If I decide that you have no right to an adjustment in the context of this litigation, then what do you have to arbitrate?

MR. IRVIN: Well, your Honor, I guess if you were to decide that with, for example, the 2002 contract, we would take exception that you had usurped the function of the arbitration. If you had said, I'm going to reach out, we're going to have adjudication of

whether or not Constellation waived its right to an equitable adjustment, we would take exception to that, your Honor. We contend the substance of that dispute is for the arbitration panel.

THE COURT: Doesn't it depend on, as the question that Mr. Petros read from the prior transcript, doesn't it -- and I don't have all that right in front of me --

MR. IRVIN: Neither do I. It wasn't in any of the papers.

THE COURT: -- but doesn't that depend whether this is a regulatory change or a market adjustment.

So if I make a determination that it was -- what's the term in the agreement, that contemplates a market change, gives you the right to seek an adjustment, right?

So if I decide it's a result of a regulatory change and, therefore, precluded by the agreement from seeking an adjustment, then there is nothing to arbitrate.

MR. IRVIN: Well, your Honor, but, see, that's the Court acting on the question of whether there is a need for an adjustment. And that's not what the 2001 and 2002 PPAs have the Court do. The arbitration clause, the scope of arbitrability is met whenever

there is a dispute about the need for an amendment. And this issue of whether we have waived our right to an adjustment or not is a debate about whether there's a need for an amendment. But that is, by the operation of the contractual language, for the arbitration panel, not for this Court to decide.

It's contrary to what the parties agreed to in their contracts, your Honor.

You know, we're being maligned like we're trying to avoid proceedings here. But your Honor, what we're trying to do is fulfill the parties' express intentions to arbitrate. You know, it's Narragansett that filed preemptively when we sought to invoke arbitration.

And with regard to the State's contention, if the State's role in this case could avoid a stay of their proceedings pending arbitration, then arbitration clauses would be utterly meaningless, because the party in Narragansett's position would always go get somebody to put in the party of the State's position.

And the State would come in and say, whoa, I'm not bound for arbitration, so no arbitration goes on.

THE COURT: That's kind of a silly argument, because that presumes that every contract dispute has the kind of complexity that this situation has.

Now, your average contract dispute between, you

know, a seller of widgets and a buyer of widgets that says that the dispute over this contract should go to arbitration is not going to implicate the State's role as a regulator of electricity rates. I mean, this is not your average case.

MR. IRVIN: Maybe I overstated it. I don't think so, your Honor. But in this area of the law, in this area of industry, every party in Narragansett's role, every party that is a local, load-serving utility has a State regulator. And it is very common to include arbitration clauses and change of law clauses like we have here.

If this Court is going to say the State's activity in this case means that arbitration clause cannot give effect, that's going to be contrary to a lot of contracts, and have a disruptive effect, and it's not an efficient resolution of the issue.

And your Honor, even in a commercial setting, you could have a shareholder derivative suit where a shareholder steps up and says, My company that I invest in, that I hold shares in, has done wrong by me as a shareholder so I'm bringing this suit against this seller of widgets. And I'm not bound by the arbitration and so I want to disrupt that.

Now, your Honor, you cannot have an interloper.

You cannot have an intervenor come in and plead facts that are inextricably intertwined with Narragansett's case and then that is the cause for kicking us out of arbitration. That's contrary to the explicit federal policy in favor of arbitration. The policy elevates arbitration over litigation on purpose by design. And it's particularly apt here where the Court has acknowledged that this is a complex regulated area.

THE COURT: Well, it elevates it with respect to the contracts that are subject to the arbitration agreement. And there is a tendency, and I wrote a decision on this issue in the context of bankruptcy law, there is a tendency to elevate through the Federal Arbitration Act arbitration over all other fora for litigation. And that is not the intent. I set out my reasoning. Read the decision. It's Mortgage Electronic Services and that was in the context of bankruptcy. But that's not the intent of the law that gives deference to arbitration. It's not meant to supplant every other avenue of litigation.

MR. IRVIN: And we're not asking for that here, your Honor. I certainly understand the complexity of how the FAA intersects with the bankruptcy code. There are a lot of issues that go on simultaneously in a bankruptcy proceeding that should not be part of an

arbitration that are certainly for the bankruptcy judge to proceed with.

But here, when you look at the four different contracts at issue, neither Narragansett nor the State make any differentiation amongst those four contracts. They don't say this clause, this equitable adjustment clause may apply in the 2002 contract because the impact of the FERC settlement was in this particular flavor here, but it's different over here. No. They treat all four contracts as a monolith. They treat all four contracts as the same in terms of our performance and their responsibilities. And it's certainly the same in terms of our responsibility to supply capacity and the marketplace and the regulatory structures in which do that. So the impact across all four contracts is the same.

Our conduct before FERC, the consequence of FERC's rulings are the same across all four contracts. It's not like our conduct is a waiver under the 1998 contracts but not under the '02 contracts. No. They proceed monolithically. The State and Narragansett both make the same arguments as to all four contracts. And as a consequence of that, you cannot have adjudication going on on the 1998 contracts while the 2002 contracts are in litigation. That undermines and

usurps the function of the arbitration.

At the same time, even if you assess it in the context of a discretionary stay, what's the harm in awaiting the outcome of an arbitration which is a 90-day proceeding. Ninety days.

THE COURT: The harm is you wait another three or four months to get, at best, a decision out of the First Circuit. And then --

MR. IRVIN: We'd start the arbitration tomorrow if you want, your Honor.

THE COURT: You'd start the arbitration tomorrow? Well, what can I do about that?

MR. IRVIN: I'd be glad to sign a stipulated order that says we'll go to arbitration.

THE COURT: Well, maybe when we're done, you can try to work that out with your opposition. But right now, you're in the Court of Appeals. That's three to four months at best, and then three more months if they stay within that 90-day time frame. And where are we? Probably right back where we are now, and maybe even in worse shape because the arbitrators can, as I said repeatedly, they are only a creature of the contracts where there is an arbitration provision, which means they only have authority as to two contracts, and they can't bind the Court or FERC or anyone else with

respect to how they interpret those other contracts.

MR. IRVIN: I understand that, your Honor. I don't think we're arguing --

THE COURT: Then we're back to, you know, seven, eight months from now, we're starting the process of litigating the meaning of those other two contracts. That's in your best case scenario.

MR. IRVIN: Your Honor, let me ask rhetorically, if I may. If we went forward on the arbitration in the '02 contract and the arbitrator said, you know what, Constellation, your conduct before FERC is, in fact, a waiver or does, in fact, justify barring you from getting an adjustment, would not the State and Narragansett stand up and say, a-ha, this issue is now decided for the 1998 contract.

THE COURT: Except that's not the arbitrator's call. That's a question of arbitrability.

MR. IRVIN: No, your Honor, what I'm saying is if we're arbitrating the dispute under the 2002 contract, for example, we're going to say we're entitled to an adjustment because there's been a regulatory change that impacts the economics of our performance. Narragansett is going to stand up and say, no, among other reasons Constellation is not entitled to an adjustment because of its conduct before

FERC.

If the arbitration panel sides with Narragansett on that score, Narragansett is going to come back into this Court and say, a-ha, your Honor, the arbitration panel did confirm that Constellation's conduct before FERC is a bar, so give effect to that.

So it's actually going to short-circuit proceedings if we get into the arbitration and we get going.

THE COURT: Again, that's, as you said of their argument, that's a good argument for the First Circuit.

MR. IRVIN: Which leaves us back at the divestiture rule. And unless you believe that our appeal is frivolous, then this Court does not have jurisdiction over the two issues that we presented to the Court of Appeals, because that notice of appeal is the event of jurisdictional significance that transfers those issues to the Court of Appeals.

THE COURT: Thank you. I'm going to take this under advisement. I'm going to give you a written ruling on this, and I'll do it as quickly as I can, hopefully before the First Circuit rules on your appeal. Thank you.

MR. IRVIN: I appreciate your time, your Honor.

(Court concluded at 3:15 p.m.)

# C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/Anne M. Clayton

______________________________________

Anne M. Clayton, RPR

MAY 15, 2008

________________________________________

Date