# Exhibit A

LEXSEE 2008 US DIST LEXIS 27609

**TRANSCANADA POWER MARKETING LTD., Plaintiff, v. NARRAGANSETT ELECTRIC COMPANY, Defendant.**

**Civil Action No. 05-40076-FDS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

***2008 U.S. Dist. LEXIS 27609***

**March 26, 2008, Decided**

**PRIOR HISTORY:** *Transcanada Power Mktg., Ltd. v. Narragansett Elec. Co., 402 F. Supp. 2d 343, 2005 U.S. Dist. LEXIS 34769 (D. Mass., 2005)*

**COUNSEL:** [*1] For Narragansett Electric Company, (Defendant): Michael P. Angelini, LEAD ATTORNEY, Kimberly A. Stone, Bowditch & Dewey, LLP, Worcester, MA.

For Narragansett Electric Company, (Counter Claimant), (Defendant): Daniel P. Flynn, Vincent F. O'Rourke, Jr., Bowditch & Dewey, LLP, Worcester, MA.

For TransCanada Power Marketing Ltd., (Plaintiff), (Counter Defendant): Dara Z. Kesselheim, Wendy S. Plotkin, LEAD ATTORNEY, Choate, Hall & Stewart, Boston, MA.

For TransCanada Power Marketing Ltd., (Plaintiff): Daniel C. Winston, LEAD ATTORNEY, Choate, Hall & Stewart, Boston, MA.

**JUDGES:** F. Dennis Saylor IV, United States District Judge.

**OPINION BY:** F. Dennis Saylor IV

**OPINION**

**MEMORANDUM AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is an action by plaintiff TransCanada Power Marketing Ltd., a wholesale electricity supplier, against Narragansett Electric Company, a retail electric distribution company. Narragansett is a regulated utility that is required to obtain approval from the Rhode Island Public Utilities Commission ("RIPUC") for the retail rates that it charges to consumers. The dispute essentially involves whether a wholesale contract for electric power between the parties required Narranganett (1) to include [*2] a fuel adjustment mechanism in its retail rate filings with the RIPUC for the period 2005 to 2009, permitting it to collect higher revenues if fuel costs went up, and thus (2) to pay a higher fuel-adjusted price to TransCanada. Jurisdiction is based on diversity of citizenship.

In substance, this is a declaratory judgment action, as Narragansett has been paying all disputed amounts to TransCanada pending resolution of this matter. The complaint asserts claims for breach of contract (Count 1), contractual indemnification (Count 2), breach of the implied covenant of good faith and fair dealing (Count 3), rescission or reformation of contract (Count 4), declaratory relief (Count 5), and unfair and deceptive acts and practices in violation of *Mass. Gen. Laws ch. 93A § 11* (Count 6). Narragansett has filed a counterclaim, asserting claims for breach of contract (Count 1), declaratory relief (Count 2), and breach of the implied covenant of good faith and fair dealing (Count 3).

TransCanada has moved for summary judgment as to Counts 1, 3, and 5 (or, in the alternative, as to Count 4) of the complaint, and as to all three counts of the counterclaim. Narranganett has cross-moved for summary [*3] judgment as to Count 2 of the complaint. For the following reasons, summary judgment will be granted in part in favor of TransCanada as to the claims for declaratory relief, granted in favor of Narragansett as to the claim for contractual indemnification, and otherwise denied.

**I. Statement of Facts**

The following facts are undisputed unless otherwise noted.

**A. The URA and Restructuring of the Electric Industry in Rhode Island and Massachusetts**

Prior to 1996, electric utility companies in New England were generally vertically integrated monopolies--that is, one utility company controlled (through its affiliate subsidiaries) the generation, transmission, and distribution functions for a given area. Before 1996, essentially only two electric utilities operated in Rhode Island: Eastern Utilities Association ("EUA") and the New England Electric System ("NEES"). EUA's power generation affiliate was Montaup Electric Company, and its retail distribution affiliates were Blackstone Valley Electric Company and Newport Electric Company in Rhode Island and Eastern Edison Company in Massachusetts. NEES's power generation affiliate was New England Power Company ("NEP"), and its retail distribution affiliates [*4] were Narragansett Electric Company in Rhode Island and Massachusetts Electric Company in Massachusetts. [1]

1 NEES supplied power to approximately three-quarters of Rhode Island, and EUA supplied it to most of the remaining quarter.

The power generation companies (Montaup and NEP) were regulated by the Federal Energy Regulatory Commission ("FERC"). The distribution companies (in Rhode Island, Blackstone, Newport, and Narragansett) were regulated by state public utility commissions (in Rhode Island, the RIPUC).

As regulated entities, the distribution companies are not free to charge their retail customers whatever the market might bear. Instead, they are required make filings with the utility commissions to obtain approval of the rates they intend to charge. In simple terms, the utilities file tariffs, or schedules listing the rates they intend to charge, with the commissions, which may approve, modify, or reject the rates after a hearing. *See R.I. Gen. Laws § 39-3-10.*

The cost of fuel--such as oil and natural gas--is a significant component of the cost of generating power. Before 1996, the retail distribution companies paid their power generation affiliates pursuant to contracts for their [*5] fuel costs. In turn, the Rhode Island distribution companies filed retail tariffs with the RIPUC that included fuel-adjustment mechanisms that permitted the companies to charge consumers a higher rate if fuel costs rose beyond certain points.

In 1996, Rhode Island enacted the Utility Restructuring Act (the "URA"), and Massachusetts enacted a similar counterpart. The URA was intended to restructure the utility market in an effort to create a competitive market for power supply and ultimately to provide lower prices to consumers. The URA (and its Massachusetts counterpart) also mandated a transition supply of electricity to consumers called Standard Offer Service ("SOS"). Standard Offer Service was intended to be a guaranteed power supply to consumers who did not elect, or had not yet elected, to obtain their supply from a competitive marketer.

The URA required the retail distribution companies to provide SOS power to retail customers through 2009 and to arrange with wholesale power suppliers to provide the necessary power. *R.I. Gen. Laws § 39-1-27.3(d)*. The URA established a pricing scheme for SOS that allowed the retail distribution companies to charge customers up to a price cap to [*6] be determined by a formula. The price cap was determined by (1) a rising stipulated annual price, adjusted upwards for (2) ". . . factors reasonably beyond the control of the electric distribution company and its former wholesale power supplier including but not limited to changes in federal, state or local taxes or extraordinary fuel costs . . . ." *Id.*

In 1997, in order to comply with the URA, the utility holding companies (NEES and EUA) negotiated "Settlement Agreements" with state and federal authorities. Among other things, the Settlement Agreements described public bid processes that the retail distribution companies would use initially to solicit wholesale suppliers for their SOS needs. [2]

2 In order to ensure a steady supply of power for SOS customers, the Settlement Agreements required the generation companies to provide a guaranteed "backstop" supply of power to the retail distribution companies through 2009 in the event that the latter were unable to obtain such a supply in the wholesale market. Thus, the EUA Settlement Agreement required Montaup to provide a guaranteed supply to Blackstone and Newport. In addition, the EUA Settlement Agreement required Montaup to assign to any [*7] purchaser of its generation assets a proportional share of its "backstop" obligation.

**B. The WSOSA**

In November 1997, EUA and TransCanada began to negotiate an agreement under which TransCanada would purchase certain Montaup power generation assets. As a part of that process, TransCanada and EUA also negotiated a wholesale power supply contract. Eventually, on April 7, 1998, TransCanada and EUA's retail distribution affiliates (Blackstone and Newport) entered into a Wholesale Standard Offer Service Agreement ("WSOSA"). [3] Under the WSOSA,

TransCanada agreed to supply power to Blackstone and Newport for distribution to their customers for a certain number of years.

3 EUA's Massachusetts retail distribution affiliate, Eastern Edison, was also a party to the agreement.

The price to be paid to TransCanada for the power supplied under the WSOSA had two components: a "Standard Offer Wholesale Price" and a "Fuel Adjustment Factor." Thus, Article 5 of the WSOSA states as follows:

> For each kilowatt-hour of Delivered Energy that Supplier Provides in each month, . . . the Companies shall pay Supplier the applicable Price for the month in cents per kilowatt-hour calculated as follows:
>
> Price= Standard Offer [*8] Wholesale Price
>
> + Fuel Adjustment Factor
>
> Where: . . . Fuel Adjustment Factor is a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the retail Rate Fuel mechanism in the Companies' Standard Offer Service tariffs. The incremental revenues attributed to the retail Fuel Adjustment will be fully allocated to Suppliers in proportion to the Standard Offer Service energy provided by each Supplier for the applicable billing month through the Fuel Adjustment Factor. The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service.

No further mention of the Fuel Adjustment Factor is made in the WSOSA. [4]

4 Article 8(3) of the WSOSA, also at issue in this case, states:

> In the event that the Standard Offer Service or the Terms and Conditions for Suppliers are terminated, amended or replaced by any governmental or regulatory agency having jurisdiction over the provision of Standard Offer Service in a manner which materially increases costs or obligations [*9] to provide Standard Offer Service, the Companies shall promptly reimburse Supplier for any such costs or increased obligations or otherwise provide relief reasonably acceptably to supplier to or indemnify the Supplier from such changes . . . .

*Id.*

As noted, Narragansett contends that any obligation it may have had to file Standard Offer Service rates with a fuel adjustment mechanism, and thus to pay a higher fuel-adjusted price to TransCanada, expired in 2004. The WSOSA states that the "term of this agreement shall begin on the Commencement Date of Service and end at 12:00 midnight on December 31, 2009, unless terminated sooner . . . ." The only specific mention of the year 2004 in the WSOSA is set forth in Appendix A, where (1) Standard Offer Wholesale Prices are listed for every year from 1999-2009, including 2004, and (2) a footnote states that "Standard Offer Service for Eastern Edison [i.e., in Massachusetts] terminates at 12:00 midnight on December 31, 2004."

The WSOSA contains an integration clause. *See* Art. 19(d) ("This Agreement shall constitute the entire understanding between the Parties and shall supersede all prior correspondence and understandings pertaining to the subject [*10] matter of this Agreement").

**C. The Narragansett Merger**

In March 2000, Blackstone and Newport were merged into Narragansett. As a result, Narragansett assumed the obligations of Blackstone and Newport under the WSOSA.

In April 2000, Narragansett's power supply manager informed TransCanada via letter of the merger. The letter stated that

> [Narragansett] will assume the obligations of the former EUA subsidiaries pursuant to Article 11 of the [WSOSA]. . . . The obligations of the parties or their successors and the terms of the [WSOSA] are not affected by the merger and assignments. The following

> actions will be taken in order to continue to facilitate the administration of the [WSOSA]. These actions are not intended and in no way constitute nor should be deemed to constitute a modification of the terms of the [WSOSA].

It went on to state:

> **2. Application of the Fuel Adjustment Factor.** Article 5 of the [WSOSA] entitles [TransCanada] to receive additional monies based on revenues collected from retail customers pursuant to Fuel Adjustment mechanisms [contained] in . . . Blackstone's and Newport's Standard Offer Service tariffs. . . . Narragansett will continue to make such Fuel Adjustment payments, [*11] if applicable, according to Attachment 2. Attachment 2 replaces the retail fuel adjustment mechanisms contained in the EUA Companies' respective Standard Offer Service tariffs. Said payments will be made by . . . Narragansett in the month immediately following service.

Attachment 2 was a "standard offer fuel adjustment provision" sheet that listed fuel trigger points and fuel adjustment values for the years 2000-2004. Attachment 2 did not set forth a fuel adjustment provision for the years 2005-2009.

**D. Activities of TransCanada and Narragansett between 2000 and 2004**

It is undisputed that Blackstone and Newport, and their successor Narragansett, filed tariffs with the RIPUC that included a fuel adjustment mechanism in their Standard Offer Service rates for the years 1999 to 2004. It is also undisputed that the companies received higher revenues from retail customers as a result, and that during those years they paid a higher fuel-adjusted price to TransCanada pursuant to the "Fuel Adjustment Factor" component of the contract pricing formula.

As noted, this dispute concerns whether Narragansett was required to do the same from 2005 to 2009. Narragansett contends that it has consistently [*12] taken the position, before the RIPUC and elsewhere, that the Fuel Adjustment Factor component of the price expired in 2004. [5] TransCanada contends that Narragansett initially took the position that the Fuel Adjustment Factor was in operation through 2009, and that it subsequently changed its position. TransCanada also contends that Narragansett witnesses, in public proceedings before the RIPUC, made false statements about what TransCanada had been told. As a result, TransCanada contends that from 2000 to 2005, Narragansett engaged in "improper and misleading conduct" as to its interpretation of the contract.

5 Narragansett contends that during the post-merger integration period, its employees reviewed past tariff filings and concluded that the Fuel Adjustment Factor obligation terminated in 2004. Narragansett also contends that EUA representatives advised it that the FAF was payable only until 2004 and was not applicable in subsequent years of the contract.

**E. Activities of TransCanada and Narragansett from 2005 to Present**

Narragansett did not request a fuel adjustment mechanism in the Standard Offer Service tariff that it filed with RIPUC for January 2005, and the retail rates as approved [*13] did not contain such a mechanism. The payment to TransCanada in February 2005 therefore included only the Standard Offer Wholesale Price, without additional payments based on the Fuel Adjustment Factor.

TransCanada objected in writing on March 1, 2005, stating that it was providing "notice of default under Article 7(1)(b) of the [WSOSA], based upon [Narragansett's] failure to comply with Article V of the [WSOSA]." [6] The letter stated that Narragansett had thirty days to cure or rectify the default.

6 Article 7(1)(b) provides as follows:

> (1) Unless excused . . . each of the following events shall be deemed to be an Event of Default hereunder:
>
> . . .
>
> > (b) Failure of the Companies, in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, and such failure is not cured or rectified within thirty (30) days

after notice thereof
from the Supplier.

In order to forestall a disruption in power supply to its customers, Narragansett agreed on March 31, 2005, to pay under protest all amounts to which TransCanada claimed it was entitled, subject to refund if it prevails in this litigation. Narranganset's protest payments have since been included [*14] in the approved rates charged by Narragansett to consumers, again subject to refund. TransCanada commenced this action in May 2005. [7]

7 Article 12 of the WSOSA contains dispute resolution provisions applicable to "all disputes between the Companies and Supplier resulting from or arising out of performance under this Agreement," other than certain disputes arising out of an Event of Default. The dispute resolution section, in substance, requires mandatory settlement discussions and provides that any dispute that cannot be resolved "may" be submitted to arbitration. Neither party has argued that Article 12 has been violated, or that the present dispute is subject to mandatory arbitration.

**II. Analysis**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue [*15] in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)*.

In substance, TransCanada contends that the WSOSA unambiguously requires Narragansett to file Standard Offer Service rates that include a fuel adjustment mechanism, and, if approved, to pay a higher fuel-adjusted price to TransCanada, and to do so through 2009. In support (and opposition) to the motions for summary judgment, the parties have submitted thousands of pages of depositions, declarations, regulatory filings, and internal corporate documents. The text of the contract itself, however, disposes of most of the issues in this dispute.

**A. General Principles of Contract Interpretation**

Under Massachusetts law, interpretation of a contract is ordinarily a question of law for the court. *Edmonds v. United States, 642 F.2d 877, 881 (1st Cir. 1981)*; *accord Fairfield 274-278 Clarendon Trust v. Dwek, 970 F.2d 990, 993 (1st Cir. 1992)*. [8] Where the wording of the contract is unambiguous, it must be enforced according to its terms. *Id.* A triable issue of fact exists only if the contract is ambiguous. Evidence of prior or contemporaneous oral agreements cannot be considered to vary or modify the [*16] terms of an unambiguous, integrated contract. *Fairfield, 970 F.2d at 993, citing New England Financial Resources v. Coulouras, 30 Mass. App. Ct. 140, 145, 566 N.E.2d 1136 (1991)*.

8 The WSOSA states that "the interpretation and performance" of the agreement is governed by Massachusetts law. (WSOSA Art. 13).

**B. The Language of the Contract**

**1. Narragansett's Obligation to File Retail Rates Generally**

Article 5 of the WSOSA describes the price to be paid by Narragansett to TransCanada for wholesale power. That price has two components: a "Standard Offer Wholesale Price" and a "Fuel Adjustment Factor." The Fuel Adjustment Factor is defined as "a cents per kilowatt-hour adder based on the incremental revenues collected, if any, attributed to the retail Rate Fuel mechanism in the Companies' Standard Offer Service tariffs." The WSOSA further states that "The retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier, will be made subject to regulatory approval and only to the extent that the Companies are allowed to collect such revenues from their retail customers taking Standard Offer Service." It is thus clear that Narragansett has the obligation to pay some portion of any higher [*17] revenues received through a retail rate fuel adjustment mechanism. Before turning to the issue of the duration of Narragansett's obligation--that is, whether that obligation existed after 2004--it is useful to consider whether Narragansett is obliged to file *any* such retail rates with the RIPUC.

The WSOSA, somewhat surprisingly, contains no express term requiring Narragansett to file retail rates containing a fuel-adjustment component. Indeed, it contains no express term requiring Narragansett to file retail rates at all. Normally, such an omission might create an ambiguity, permitting the Court to consider parol evidence to ascertain the parties' intentions. Here, however, it is clear that there is only one possible reasonable interpretation, and there is thus no ambiguity that must be resolved.

First, Narragansett's obligation to file retail rates is necessarily implicit in the contract. As a regulated utility, Narragansett essentially has one principal source of revenue: the payments that it receives from its retail customers. If it did not make filings seeking approval of retail rates, it could not stay in business, much less pay TransCanada its contractual obligations for wholesale [*18] power. Put simply, the contract would make no sense if Narragansett simply had the option to file retail rates. It is thus implicit in the contract that Narragansett will make the necessary filings with the RIPUC to charge retail rates to its customers.

Second, it is well-established that when a contractual payment depends on one party's application for government approval, that party has an obligation to make the necessary applications in a reasonable effort to obtain the required approval. *See, e.g., Sechrest v. Safiol, 383 Mass. 568, 569-72 n.4, 419 N.E.2d 1384 (1981)* (where a party's obligation to purchase real estate was conditioned upon "obtaining from the proper public authorities all permits and other approvals reasonably necessary," "[n]ecessarily implied in the provision is an obligation to use reasonable efforts to obtain town approval"); *Stabile v. McCarthy, 336 Mass. 399, 402-04, 145 N.E.2d 821 (1957)* (where a party had an option to cancel a contract for purchase of real estate "in the event that he shall have been unable to obtain the approval of the [town planning board]," he was required to use reasonable efforts to obtain board approval). [9]

9 It is unclear whether the obligation derives from the implied [*19] covenant of good faith and fair dealing or whether it exists as a separate doctrine of Massachusetts contract law. The difference, if any, is not material here.

Third, if Narragansett elected for some reason not to file retail rates with the RIPUC, that would almost certainly have violated the implied covenant of good faith and fair dealing. The covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Speakman v. Allmerica Financial Life Ins., 367 F. Supp. 2d 122 (D. Mass. 2005)*; *Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471, 583 N.E.2d 806 (1991)*. "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Restaurants, 441 Mass. 376, 385, 805 N.E.2d 957 (2004)*. If Narragansett for some reason deliberately failed to file tariffs with retail rates sufficient to fulfill its obligations to TransCanada, it would have obviously destroyed the right of TransCanada to receive the fruits of the contract. *See Seaward Constr. Co. v. City of Rochester, 118 N.H. 128, 383 A.2d 707 (1978)* (where [*20] payment by city to a contractor was dependent on receipt of HUD funds from the federal government, "the city was under an obligation under the implied covenant of good faith and fair dealing to make a good-faith effort to obtain funds from HUD to pay the [contractor].").

The next question is whether--again putting to one side the issue of the duration of its contractual obligations--Narragansett's implied obligation to file retail rates included an obligation to file retail rates containing a fuel-adjustment component. Put another way, if Narragansett had an implied obligation to file retail rates as to the "Standard Offer Wholesale Price" component of the contract price, did it also have an implied obligation to file retail rates as to the "Fuel Adjustment Factor" component?

There is nothing in the contract to suggest that Narragansett's implied obligation to file rates as to one price component should be any different than its implied obligation to file rates as to the other. Both are treated essentially the same under Article 5; accordingly, if Narragansett had an implied obligation to file as to one, it necessarily had the same obligation to file as to the other.

The fact that the [*21] WSOSA uses the phrase "if any" to modify the phrase "incremental revenues collected" does not require a different result. The phrase "if any" is directed to the various contingencies upon which any additional revenues would depend, including the fact that the fuel adjustment mechanism (and thus the "Fuel Adjustment Factor") is triggered only under certain circumstances. Significantly, the phrase "if any" is placed after "incremental revenues collected," not "retail Rate Fuel mechanism," suggesting that the parties expected such a mechanism to be present in all the Standard Offer Service retail rates. Similarly, the fact that the "retail Fuel Adjustment, and the resulting Fuel Adjustment Factor to be paid to Supplier," was made "subject to regulatory approval" and "only to the extent" that Narragansett is "allowed to collect such revenues from [its] retail customers," in no way suggests that the filing of retail rates with a fuel-adjustment mechanism was entirely optional.

Finally, although the parol evidence is not necessary to resolve the issue, clearly Narragansett and its predecessors acted at all times as if the contract created an obligation to seek retail rates with a fuel adjustment [*22] mechanism between 1999 and 2004. During that period, Narragansett filed tariffs containing such rates, and it paid a higher price to TransCanada, calculating that price according to the Fuel Adjustment Factor set forth in the contract. Indeed, Narragansett seems to concede that between 1999 and 2004 it was obligated to

file rates with a fuel-adjustment mechanism, and to make higher fuel-adjusted payments as a result.

Accordingly, Narragansett was obligated, at a minimum, to file tariffs with the RIPUC that included a fuel-adjustment mechanism, and to pay a price under the WSOSA that included the Fuel Adjustment Factor component, through December 31, 2004. The question then becomes whether Narragansett's obligation ended in 2004, or whether it extends through the end of 2009. Put another way, if the contract imposed that obligation for the first five years, is there any reason to conclude that it did not do so for the last five years?

**2. The Duration of the FAF Obligation**

Article 2 of the WSOSA states that the contract expires on December 31, 2009, unless terminated sooner because of a party's default. As noted, Article 5 sets forth two components of the contract price: the Standard Offer [*23] Wholesale Price plus a Fuel Adjustment Factor. Nothing in Article 5 states or suggests that the duration of one price component is shorter or longer than the other. Nothing in any other article of the contract states or suggests anything to the contrary. The obvious conclusion is that the contract imposes the same obligations on Narragansett, at least as to its service in Rhode Island, in 2005-2009 as it did in 1999-2004.

That conclusion is strongly underscored by Appendix A, which states that "Standard Offer Service for Eastern Edison [i.e., in Massachusetts] terminates at 12:00 midnight on December 31, 2004." Again, no such temporal limitation appears in Article 5, or indeed anywhere else in the contract. The parties obviously know how to draft language terminating a contractual obligation in 2004 when they intended such a result. [10]

> 10 Narragansett notes that the EUA settlement agreement (to which TransCanada was not a party) contemplated standard offer pricing to retail customers through 2009, but a fuel adjustment mechanism only through 2004. The settlement agreement, however, neither expressly requires nor prohibits a fuel adjustment mechanism between 2005 and 2009. More importantly, [*24] even if the settlement agreement is taken as a contemporaneous expression of EUA's intentions when negotiating the WSOSA, it cannot be considered to vary or contradict the terms of an unambiguous and integrated contract.

Put simply, there is *no* indication *anywhere* in the contract that Narragansett's obligations as to the Fuel Adjustment Factor expire in 2004. The contract is an unambiguous, integrated agreement, negotiated and executed by sophisticated corporate entities. If the parties intended that Narragansett's obligations were to change in 2004, it would have been simple enough to say so. The parties elected not to. Accordingly, those obligations--like all of Narragansett's obligations under the contract, other than Standard Offer Service for Eastern Edison--remain in place until December 31, 2009. [11]

> 11 Narragansett further contends that Article 5 is ambiguous because it does not specify the mechanism or the "trigger points" to be used in calculating and applying the FAF. Even if true--and the Court expresses no opinion on the subject--any such ambiguity is not relevant to the issue whether the contractual obligation expires in 2004 or 2009.

This Court's determination that the WSOSA [*25] is unambiguous renders most of the evidentiary record irrelevant. Narragansett argues vigorously that (1) EUA's settlement agreement with Rhode Island, and the November 1997 tariff filing with RIPUC, described SOS through 2009 but a FAF only through 2004; (2) various EUA representatives intended that the FAF would continue only through 2004; and (3) EUA consistently understood that the FAF would expire in 2004. TransCanada argues vigorously to the contrary that EUA and Narragansett took inconsistent and misleading positions throughout the relevant period.

These disputes are irrelevant. Again, the contract is integrated and unambiguous. The intentions and understandings of the parties prior to or at the time of the execution of the contract may not be considered to vary its terms. *See Hallmark Institute of Photography, Inc. v. Collegebound Network, LLC, 518 F. Supp. 2d 328, 331 (D. Mass. 2007)*; *ITT Corp v. LTX Corp., 926 F.2d 1258, 1261-1262 (1st Cir. 1991)*.

**C. Whether the Contract Was Subsequently Modified**

Evidence of the actions of the parties after execution of the contract may, however, be relevant to show a modification, whether written or oral, of an integrated agreement. *John Beaudette, Inc. v. Sentry Ins., 94 F. Supp. 2d 77, 139 (D. Mass. 1999)* [*26] (citing *Cambridgeport Sav. Bk. v. Boersner, 413 Mass. 432, 439, 597 N.E.2d 1017 (1992)*). Mutual agreement on modification may "be inferred from the conduct of the parties and from the attendant circumstances." *Cambridgeport, 413 Mass. at 439* (*citing First Pa. Mortgage Trust v. Dorchester Sav. Bank, 395 Mass. 614, 625, 481 N.E.2d 1132 (1985)*).

There is considerable disagreement between the parties as to whether Narragansett made known its interpretation of the contract, and whether TransCanada had "notice" of that interpretation of the contract, during

the period between 2000 and 2004. Narragansett does not, however, allege that TransCanada ever *assented* to that interpretation, either orally or through a written instrument, nor has it alleged that any subsequent modification was supported by valid consideration. *See John Beaudette, 94 F. Supp. 2d at 139.* Indeed, Narragansett does not even assert a theory of subsequent modification, contending instead that the original contract provided a 2004 expiration date for the FAF. *See Cambridgeport, 413 Mass. at 440* (finding it "significant" in rejecting the theory of subsequent modification that defendants did not assert a subsequent agreement had been negotiated). Accordingly, [*27] any evidence concerning any party's understandings, intentions, or positions after execution of the contract do not create a genuine issue of material fact as to its terms.

In short, the contract unambiguously requires Narragansett to file Rhode Island Standard Offer Service tariffs with a fuel-adjustment mechanism through the full term of the contract, and to make higher payments to TransCanada as a result. Accordingly, TransCanada's notice on March 1, 2005, that it expected Fuel Adjustment Factor payments through 2009, and its subsequent position that it would exercise its contractual right to terminate the contract if FAF payments were not received, were entirely consistent with the terms of the contract.

**D. Whether Narragansett Breached the Contract**

The conclusion that Narragansett's interpretation of the contract is erroneous does not compel the conclusion that Narragansett is in material breach. The essential elements of a contract claim are "(1) an agreement, express or implied, in writing or oral, (2) for a valid consideration, (3) performance or its equivalent by the plaintiff *and breach by the defendant,* and (4) damage to the plaintiff." *Mass. Cash Register, Inc. v. Comtrex Systems Corp., 901 F. Supp. 404, 415 (D. Mass. 1995)* [*28] (emphasis added).

As noted, Narragansett has made payment of the disputed amounts under protest. Article 7 of the WSOSA provides that an "Event of Default" occurs when there is a "[f]ailure of [Narragansett], in a material respect, to comply with, observe, or perform any covenant, warranty or obligation under this Agreement, *and* such failure is not cured or rectified within thirty days (30) days after notice thereof from Supplier." (emphasis added). [12]

12 The contract also provides that if Narragansett commits any "Event of Default," TransCanada may unconditionally terminate the contract upon sixty days written notice. TransCanada never obtained the contractual right to provide sixty-day notice of termination.

It is undisputed that TransCanada first gave notice to Narragansett of the alleged default on March 1, 2005. That notice specifically referred to the thirty-day cure or rectification requirement of the WSOSA. The first "protest payment" made to TransCanada was made on March 31, 2005. That payment was within the contract's thirty-day period for cure or rectification of alleged default. These payments have continued to the present day, and TransCanada has not alleged any deficiency [*29] as to their amount or timeliness.

In short, TransCanada has received every payment, and every other material benefit, that it contends that it is entitled to by contract. Accordingly, Narragansett has not breached the WSOSA.

**E. Whether Either Party Breached the Implied Covenant of Good Faith and Fair Dealing**

Both parties have asserted claims for breach of the implied covenant of good faith and fair dealing implicit in every contract. A party may breach the implied covenant without breaching any express term of the contract. *Speakman, 367 F. Supp. 2d at 132* (citing *Fortune v. National Cash Register Co., 373 Mass 96, 101, 105, 364 N.E.2d 1251 (1977)).* The essential inquiry is whether "the challenged conduct conformed to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain, not whether the defendant abided by the letter of the contract in the course of performance." *Speakman, 367 F. Supp. 2d at 132* (citing *Larson v. Larson, 37 Mass. App. Ct. 106, 110, 636 N.E.2d 1365 (1994)).*

**1. Whether TransCanada Breached the Implied Covenant**

Narragansett contends that TransCanada violated the implied covenant because it (1) "failed to object" to Narragansett's stated intention [*30] to not pay a FAF after 2004, (2) did not notify Narragansett that it expected to receive FAF payments from 2005-2009 until March 2005, and (3) [threatened] to terminate the WSOSA "as a pretext to avoid a contract that had become economically disadvantageous."

It is apparently undisputed that TransCanada did not object, formally or informally, to Narragansett's interpretation of the contract until March 2005. [13] Even if the Court credits Narragansett's contention that TransCanada had "notice" of its interpretation at some point between 2000 and 2004, none of TransCanada's subsequent acts or omissions rise to the level of a breach of the implied covenant of good faith and fair dealing.

13 TransCanada disputes, however, whether it was notified prior to March 2005 of Narragansett's interpretation.

The implied covenant does not apply when a party "has exercised an express contractual power in good faith." *Speakman, 367 F. Supp. 2d at 132*. Furthermore, the covenant may not be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship. *Uno Restaurants, 441 Mass. at 385*.

Here, the contract contains no explicit or implicit requirement that [*31] TransCanada "object" every time Narragansett expresses an opinion about the contract with which it disagrees. Furthermore, the March 2005 notice to Narragansett was expressly permitted under the contract--the contract provides that TransCanada was to give notice after the occurrence of an event of default, so that Narragansett would have an opportunity to cure or rectify. TransCanada's statement that it would exercise its unconditional contract termination right if FAF payments were not resumed was similarly proper and did not violate the implied covenant.

**2. Whether Narragansett Breached the Implied Covenant**

TransCanada, for its part, contends that defendant has breached the implied covenant of good faith and fair dealing through a variety of misleading actions and representations. Its argument, however, is essentially an alternative argument: "[t]o the extent EUA (or Narragansett) maintained discretion under the Agreement as to whether to file a fuel adjustment in its Standard Offer Service tariffs through 2009, it was obligated to exercise that discretion consistent with the expectations of the contracting parties." (Pl. Mem. at 23). Because the Court has ruled that the contract in [*32] fact required Narragansett to make such a filing, TransCanada's claim for breach of the implied covenant is essentially moot.

**F. Indemnification**

Narranganset has moved for summary judgment in its favor as to Count 2 of the complaint. Count 2 alleges that Narranganset will be contractually obligated to indemnify TransCanada in the event of action by a "government or regulatory agency . . . which materially increases [TransCanada's] *costs or obligations* to provide Standard Offer Service" to Narranganset. TransCanada contends that Narranganset's failure to file rates with a fuel-adjustment mechanism after 2004 (and thus, the failure of Narranganset to remit FAF payments to TransCanada) materially increases its "costs and obligations" under the WSOSA. TransCanada further contends that its "obligations" to provide Standard Offer Service increase in the absence of a FAF, as it "is then obliged to cover on its own its higher supply costs due to extraordinary fuel costs."

The crux of TransCanada's argument is that because its *profits* may decrease, or because its *revenue* may decrease, it will suffer increased costs or obligations. An increase in "costs and obligations" is obviously not the [*33] same as a decrease in "profits" or "revenue." To conflate costs and obligations with reduced revenues or profit would run counter to elementary bookkeeping and accounting concepts. Furthermore, and in any event, TransCanada's fuel costs are determined by market forces, not by the action of any "government or regulatory agency." Accordingly, summary judgment will be granted in favor of Narragansett as to Count 2 of the complaint.

**G. Rescission or Reformation**

TransCanada alternatively seeks rescission or reformation of the contract on grounds of unilateral mistake. Because the WSOSA unambiguously requires Narragansett to make FAF payments through 2009, no rescission or reformation of the contract is necessary. Accordingly, the motion for summary judgment by TransCanada as to Count 4 will be denied.

**H. Declaratory Relief**

TransCanada requests declaratory judgment stating that (1) Narragansett breached the terms of the WSOSA, (2) Narragansett failed to cure that breach, (3) TransCanada had the unconditional right to terminate the WSOSA upon the breach, and (4) TransCanada is entitled to damages. Narragansett requests declaratory judgment stating that TransCanada had no right to terminate the [*34] WSOSA. The Court has determined that although the WSOSA unambiguously requires the filing of fuel-adjusted rates and payment of the FAF through 2009, Narragansett never actually breached the contract and TransCanada therefore never had the right to terminate.

The Court may declare the rights and other legal relations of parties seeking declaratory judgment "whether or not further relief is or could be sought." *28 U.S.C. § 2201*. The Court will grant summary judgment in part to TransCanada as to both declaratory judgment claims, but in a form to be determined consistent with this opinion, and not as to the specific declaratory relief sought.

**III. Conclusion**

For the foregoing reasons,

1. the motion of plaintiff TransCanada Power Marketing Ltd. for summary judgment is

a. DENIED as to Counts 1 (breach of contract), 3 (breach of the implied covenant of good faith and fair dealing), and 4 (rescission or reformation of contract) of the complaint;

b. GRANTED in part as to Count 5 (declaratory relief) of the complaint;

c. GRANTED as to Counts 1 (breach of contract) and 3 (breach of the implied covenant of good faith and fair dealing) of the counterclaim; and

d. GRANTED in part as to Count 2 (declaratory [*35] relief) of the counterclaim; and

2. the motion of defendant Narragansett Electric Company for summary judgment as to Count 2 (contractual indemnification) of the complaint is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor

F. Dennis Saylor IV

United States District Judge

Dated: March 26, 2008